**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEJUANA ARY, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TARGET CORPORATION, | |
| Defendant. | |

Plaintiff Shejuana Ary ("Plaintiff"), brings this action on behalf of herself and all others similarly situated against Defendant Target Corporation ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on her personal knowledge.

## **INTRODUCTION**

1. This is a putative class action lawsuit on behalf of purchasers of Defendant's "up & up lidocaine pain-relief patches" (the "Lidocaine Patches"). Defendant markets, sells, and distributes the Lidocaine Patches through numerous brick-and-mortar Target stores and online through www.target.com.

2. Lidocaine is a topical anesthetic that is used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain. Specifically, lidocaine functions by blocking sodium channels located on nerve endings which prevents action potential from propagating in the nerve cell and thereby interrupts the transmission of pain signals.

3. Although lidocaine patches and creams are often prescribed by doctors, Defendant offers its Lidocaine Patches over-the-counter to unsuspecting consumers under false pretenses. Defendant takes advantage of these consumers by prominently displaying on the packaging of the Lidocaine Patches that they provide "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours." Plaintiff and the proposed class members relied on those representations when making their purchases. To their dismay, however, Defendant's Lidocaine Patches regularly peel off their bodies within a few hours, and oftentimes minutes, after being properly applied. Furthermore, Defendant's Lidocaine Patches do not contain or deliver the maximum amount of lidocaine available with, or without, a prescription.

4.      As a result of its deceptive conduct, Defendant is, and continues to be, unjustly enriched at the expense of its customers.

**THE PARTIES**

5.      Plaintiff Shejuana Ary is a natural person and citizen of California who resides in Hayward, California. Plaintiff purchased Defendant's Lidocaine Patches for her personal use for approximately $7.99 on various occasions within the applicable statute of limitations, with her most recent purchase taking place on or about January of 2022. Plaintiff Ary made these purchases from one of Defendant's pharmacies located in Alameda County, California. Prior to her purchases, Plaintiff saw that the Lidocaine Patches were labeled and marketed as providing "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours." Plaintiff relied on Defendant's representations when she decided to purchase the Lidocaine Patches over comparable and less expensive pain-relieving patches or creams. Plaintiff saw those representations prior to and at the time of her purchases and understood them as a representation and warranty that the Lidocaine Patches would reliably adhere to her body and provide pain relief for up to 8 hours by delivering a maximum strength dose of lidocaine. Initially, Plaintiff became frustrated when her Lidocaine Patches peeled off her body while engaging in regular activities—such as walking, stretching, and sleeping—well before the represented 8 hours, through no fault of her own. Having given the Lidocaine Patches the benefit of the doubt, Plaintiff realized that the Lidocaine Patches consistently failed to provide pain relief anywhere close to the represented 8 hours. For example, on a couple of occasions, the Lidocaine Patches that Plaintiff bought peeled off her body within an hour or two after she properly applied them pursuant to the directions contained on the products—delivering little to no analgesic effect to her sore muscles. Plaintiff relied on Defendant's representations and warranties in deciding to purchase the Lidocaine Patches. Accordingly, those representations and warranties were part of the basis of her bargains, in that she would not have

purchased the Lidocaine Patches on the same terms had she known those representations and warranties were false. Additionally, in making her purchases, Plaintiff paid a substantial price premium due to the Defendant's false and misleading claims regarding the qualities of its Lidocaine Patches in comparison to less expensive lidocaine patches that did not contain those representations. However, Plaintiff did not receive the benefit of her bargains because her Lidocaine Patches did not, in fact, provide "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours."

6.      Plaintiff continues to desire to purchase the Lidocaine Patches from Defendant. However, concerned about the actual efficacy and health-related risks of the Lidocaine Patches, Plaintiff is unable to determine the true composition of the Lidocaine Patches. Plaintiff understands that the composition of the Lidocaine Patches may change over time. But as long as Defendant continues to represent that Lidocaine Patches afford "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours" without disclosing their actual pharmacological qualities, when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Lidocaine Patches and will be unable to evaluate the different prices between Defendant's Lidocaine Patches and those of competitor brands.

7.      Defendant Target Corporation ("Defendant") is a Minnesota corporation with its principal place of business in Minneapolis Minnesota. Defendant markets, sells, and distributes the Lidocaine Patches and is responsible for the advertising, marketing, trade dress, and packaging of the Lidocaine Patches. Defendant marketed, distributed, and sold the Lidocaine Patches during the class period.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Defendant.

9.     This Court has personal jurisdiction over Defendant transacts substantial business in this District, has substantial aggregate contacts with this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout this District, and purposefully availed itself of the laws of the State of California in this District, because the acts and transactions giving rise to this action occurred in this District.

10.     This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

**FACTUAL ALLEGATIONS**

***Defendant's False Advertising***

11.     Defendant markets, sells, and distributes the Lidocaine Patches through numerous brick-and-mortar Target retail locations and online through www.target.com. On the Lidocaine Patches packaging, Defendant represents that its Lidocaine Patches provide "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours."

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      12.     By representing that Lidocaine Patches are capable of providing "pain-relief" using

17 a "maximum strength" dose of lidocaine for "up to 8 hours"—a very specific number—Defendant

18 induced Plaintiff and the proposed class members into believing that the Lidocaine Patches would

19 continuously adhere to their bodies for 8 hours and would provide pain relief throughout the

20 specified amount of time represented therein.

21      13.     Furthermore, by representing that the Lidocaine Patches provide a "maximum

22 strength" dose of lidocaine, Defendant induced Plaintiff and the proposed class members into

23 believing that the Lidocaine Patches: (1) contain and deliver the maximum amount of lidocaine

24 available in the market; and (2) that they are superior, or at least equivalent, in efficacy and results

25 to other over-the-counter and/or prescription-strength lidocaine patches.

26

27

28

---

CLASS ACTION COMPLAINT                                                                                      5

14.     Despite those representations, however, Defendant's Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies well before 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not contain or deliver the maximum amount of lidocaine available in the market; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

**Defendant's Knowledge of the Defective Lidocaine Patches**

15.     Defendant knew that its Lidocaine Patches did not live up to their representations based on dozens of complaints posted on its own website, www.target.com, which Defendant actively monitors.  Below is an illustrative example of some of the most recent reviews that customers have posted on Defendant's website:[1]

///

///

///

///

///

///

///

///

---

[1] https://www.target.com/p/lidocaine-4-pain-relieving-gel-patch-6ct-up-38-up-8482/-/A-75664970#lnk=sametab (last accessed April 27, 2022).



**Worthless**

⭐☆☆☆☆ | ⊗ Would not recommend

MJ - 4 days ago

Doesn't stick at all so expect it to fall off right away and be utterly useless. I managed to medical tape one to my body and felt absolutely no effect. This patch is a zero.

Did you find this review helpful?

Helpful | Not helpful | Report review

**Eh**

⭐⭐☆☆☆ | ⊗ Would not recommend

Sarah Jo - 1 month ago, Verified purchaser

They don't stick well at all

3.0 Value out of 5 | 2.0 Quality out of 5

Did you find this review helpful?

Helpful | Not helpful | Report review

**Bad**

⭐☆☆☆☆ | ⊗ Would not recommend

In pain - 2 months ago, Verified purchaser

Didn't stick at all. Couldn't tell you if they help with the pain, they never stayed on long enough to tell.

1.0 Quality out of 5 | 1.0 Value out of 5

1 guest found this review helpful. Did you?

Helpful | Not helpful | Report review

**Do not buy**

⭐☆☆☆☆ | ⊗ Would not recommend

Customer - 2 months ago, Verified purchaser

They do not stick. Completely Worthless

1.0 Quality out of 5 | 1.0 Value out of 5

Did you find this review helpful?

Helpful | Not helpful | Report review

**Didn't Stick**

⭐⭐☆☆☆ | ⊗ Would not recommend

Tlaz - 3 months ago, Verified purchaser

Didn't Stick. I Used Them On My Neck. Not Sure If That Was The Issue..

Did you find this review helpful?

Helpful | Not helpful | Report review

**Don't waste your money**

⭐☆☆☆☆ | ⊗ Would not recommend

sadsleeper - 4 months ago

If I could give 0 stars, I would. I've never wanted to return a product more. The patches don't stick, fold onto themself, and are a mess to work with. It's laughable that they're advertised (on the packaging) as usable on a shoulder. The moment I took a breath once it was on my shoulder, the edges rolled and it bunched onto itself. This is all before even trying to put a shirt on over it. There's no way it would have happened. I've used different kinds of patches on my shoulder and neck before, and none where as difficult or useless as this.

1.0 Quality out of 5 | 1.0 Value out of 5

Did you find this review helpful?

Helpful | Not helpful | Report review

**Dont waste yoir money**

⭐☆☆☆☆ | ⊗ Would not recommend

D - 4 months ago, Verified purchaser

Disappointing. These don't adhere to the skin well or stay put. The edges continually lift & come loose

3.0 Value out of 5 | 1.0 Quality out of 5

1 guest found this review helpful. Did you?

Helpful | Not helpful | Report review

**What In the world...**

⭐☆☆☆☆ | ⊗ Would not recommend

John - 4 months ago

What's the point of this product if it doesn't stay in place? ESPECIALLY when you're actually in pain and need it.

1.0 Quality out of 5 | 1.0 Value out of 5

4 guests found this review helpful. Did you?

Helpful | Not helpful | Report review

16.     Furthermore, Defendant knew, or should have known, that its Lidocaine Patches were defectively designed based on FDA reports and scientific studies regarding the efficacy of the products.

17.     Specifically, Defendant's Lidocaine Patches work by delivering lidocaine through a topical delivery system—i.e., by delivering the analgesic chemical "through the dermis, or skin…in ointment or patch form."[2] According to FDA reports, topical delivery systems, such as the one used by Defendant, systematically fail to adhere to the body.[3] To that end, the FDA is in the process of finalizing an industry guidance on "Transdermal and Topical Delivery Systems" to address, *inter alia*, "considerations for areas where quality is closely tied to product performance and potential safety issues, such as adhesion failure…"[4]

18.     Even more alarming, the FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[5]

19.     Furthermore, a peer-reviewed study published in January of 2021 by the Journal of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion rate to the study's subjects after 12 hours (i.e., essentially no part of the product lifting off the skin).[6] The

---

[2] https://medical-dictionary.thefreedictionary.com/transdermal (last accessed April 27, 2022).

[3] *See* Yellela S.R. Krishnaiah *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, PhD Division of Product Quality Research OTR/OPQ/CDER US Food and Drug Administration Silver Spring, MD, USA AAPS 2015  Sunrise Session (2015). https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html (last accessed April 27, 2022).

[4] *See* 84 FR 64319 - *Transdermal and Topical Delivery Systems-Product Development and Quality Considerations; Draft Guidance for Industry*; Availability (2019) https://www.regulations.gov/document/FDA-2019-D-4447-0001 (last accessed April 27, 2022).

[5] *See* Gudin J, Nalamachu S. *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*. *Postgrad Med*. 2020;132(1):28–36. doi:10.1080/00325481.2019.1702296 https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296 (last accessed April 27, 2022).

[6] See Gudin J, Webster LR, Greuber E, Vought K, Patel K, Kuritzky L. *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects*. *J Pain Res*. 2021;14:513-526. Published 2021 Feb 23. doi:10.2147/JPR.S287153. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/

study also found that after 12 hours, "37.5% of subjects experienced substantial detachment (to <10% adhesion) while using the generic lidocaine patch 5%, including 7 (29.1%) complete detachments." The study also found that the mean adhesiveness score of the generic lidocaine patches after 12 hours was 37.67% (where 0% reflects complete detachment and 50% reflects half the product lifting off the skin but not detached). In contrast, the study found that a newly developed 1.8% lidocaine patch technology, which is bioequivalent to 5% lidocaine patches,[7] maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

20.     Although the study published by the Journal of Pain Research only tested generic prescription lidocaine patches, upon information and belief, Defendant's over-the-counter Lidocaine Patches—which have not undergone the rigorous approval process required by the FDA and use the same outdated and defective adhesion technology as the generic lidocaine patches[8] — fair no better.

---

(last accessed April 27, 2022). The study measured the adhesion of the patches "immediately after application (0 hours) and at 3, 6, 9, and 12 hours (±15 minutes; before product removal) after application. Assessments in Study 1 were performed by a trained scorer using the FDA-recommended 5-point adhesion scale. The FDA scale ranges from 0 to 4, where 0 represents ≥90% of the product adhered (essentially no part of the product lifting off the skin), 1 represents 75% to <90% adhered (only some edges of the product lifting off the skin), 2 represents 50% to <75% adhered (less than half the product lifting off the skin), 3 represents >0% to <50% adhered (more than half the product lifting off the skin but not detached), and 4 represents 0% adhered (complete product detachment). The mean cumulative adhesion score was calculated by summing the scores at 3, 6, 9, and 12 hours and dividing the total by the total number of observations per subject." *Id.*

[7] Gudin J, Argoff C, Fudin J, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects.* J Pain Res. 2020 Jun 22;13:1485-1496. doi: 10.2147/JPR.S237934. PMID: 32606914; PMCID: PMC7319520. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7319520/ (last accessed April 27, 2022).

[8] Defendant, whose Lidocaine Patches are manufactured in China, has not been approved by the FDA to market or sell its Lidocaine Patches despite being required to do so. The FDA is currently reviewing a Citizen Petition filed by Scilex Pharmaceuticals Inc. (a manufacturer of FDA-approved lidocaine patches) to remove from the market all over-the-counter lidocaine patches that lack FDA approval. *See* https://www.regulations.gov/docket/FDA-2019-P-0417/document (last accessed April 27, 2022).

21.     Furthermore, while certain companies have innovated their technology based on clinical studies to ensure that their lidocaine patches reliably adhere to a consumer's body,[9] even while exercising,[10] upon information and belief, Defendant has not.

22.     In complete disregard of the wealth of information to the contrary, however, Defendant continues to misrepresent that its Lidocaine Patches can provide pain relief to its consumers' bodies for up to 8 hours when, in fact, they fail to do so by large margins given their poor adhesion technology. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."[11]

23.     Defendant also failed to inform its consumers that the Lidocaine Patches are prone to even greater detachment when they engage in regular daily activities (such as walking, stretching, and sleeping).

**Defendant's "Maximum Strength" Lidocaine Patches Misrepresentations**

24.     In 1983, the FDA published a Tentative Final Monography for External Analgesic Drug Products for Over-the-Counter Human Use, 48 Fed. Reg. 5852-01 (Feb. 8, 1983) (the "1983 TFM"), which provides permissible language for the labeling, ingredients, and doses for over-the-counter external analgesic products, including those containing 0.5% to 4% lidocaine. The 1983 TFM, however, was solely concerned with regulating the use of lidocaine creams and ointments as

---

[9] https://www.scilexpharma.com/scilex-presents-ztlido-data-on-superior-adhesion-over-lidocaine-patch-formulation/ (last accessed April 27, 2022).

[10] A separate study demonstrated that Scilex's lidocaine patches were able to reliably adhere when subjects engaged in moderate physical exercise (e.g., bike exercise) and heat (heating pad). *See* Fudin J, Wegrzyn EL, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System 1.8% During Physical Activity and Heat Treatment in Healthy Subjects. J Pain Res*. 2020;13:1359-1367. Published 2020 Jun 10. doi:10.2147/JPR.S238268. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7293912/#CIT0007 (last accessed April 27, 2022).

[11] *See supra* footnote 7.

---

a treatment for minor burns, cuts, and skin irritations; it did not consider, much less regulate, the safety or efficacy of lidocaine patches for muscle pain relief. After seeing dozens of new lidocaine patches were introduced into the market, the FDA issued a proposed rule in 2003 to amend the 1983 TFM seeking to exclude patches from the TFM; and it requested information—including the "Labeling of currently marketed products"—to determine if patches are "generally recognized as safe and effective." *See* External Analgesic Drug Products for Over-the-Counter Human Use; Reopening of the Administrative Record and Amendment of Tentative Final Monograph, 68 Fed. Reg. 42324-01, 42326 (July 17, 2003). The FDA, however, never finalized that process: an oversight that has permitted Defendant to mislabel its Lidocaine Patches as containing "maximum strength" with little regulatory oversight.

25.     Specifically, the 1983 TFM limited 4% as the permitted lidocaine dose for over-the-counter lidocaine creams and ointments. Under the 1983 TFM, the strength of lidocaine products could be easily calculated by multiplying the 4% lidocaine limit per 1 gram of a cream or ointment (i.e., 40 milligrams of lidocaine per gram). Lidocaine patches, however, use transdermal/topical delivery systems ("TDS"), a different drug delivery method whose actual strength cannot be discerned using the 1983 TFM 4% lidocaine limit. Unlike lidocaine creams and ointments, TDS patches are comprised of three main parts: (1) an outer protective backing membrane, (2) a drug-in-adhesive layer, and (3) a release liner that controls the rate and extent of drug administration:[12]

**Figure 1. Matrix Type Transdermal or Topical Delivery System**



---

[12] https://www.fda.gov/media/132674/download (last accessed April 27, 2022).

26.     As currently marketed, manufacturers of lidocaine patches attempt to shoehorn the strength of their patches using the 1983 TFM 4% benchmark using a "mass of drug relative to the mass of the adhesive per patch."[13] Pursuant to FDA regulations, the "active ingredient" in a drug means "any component that is intended to furnish pharmacological activity or other direct effect in the...treatment, or prevention of disease, or to affect the structure or any function of the body of humans." 21 CFR  201.66(b)(2). Defendant's Lidocaine Patches use of 4% lidocaine as their "active ingredient" based on their drug-to-adhesive ratio flouts the FDA's regulations and does not communicate any useful information to consumers regarding their pharmacological efficacy.[14]

27.     To make matters worse, Defendant touts that its Lidocaine Patches contain a "maximum strength" dose of lidocaine. The FDA has expressly cautioned that such statements would mislead consumers when it amended the 1983 TFM to clarify the appropriate labeling of hydrocortisone—a topical over-the-counter drug that was approved to treat same conditions as lidocaine (i.e., "itching" associated with "skin irritations").  *See* External Analgesic Drug Products for Over-the-Counter Human Use; Amendment of Tentative Final Monograph, 55 Fed. Reg. 6932 (February 27, 1990).

28.     Specifically, the FDA declined to include the term "maximum strength" within the proposed amendment to the 1983 TFM because:

---

[13] *See* Citizen Petition from Scilex Pharmaceuticals Inc. at pg. 19. https://www.regulations.gov/document/FDA-2019-P-0417-0001  (last accessed April 27, 2022).

[14] "It is emphasized that most of these patch products are labeled as a percentage strength, without providing the total drug content per patch. For other topical dosage forms like creams, ointments, and lotions, the amount of drug administered can easily be determined by weighing the mass of product and applying the strength factor as illustrated in the table below. In contrast, the amount of drug applied for patch products cannot easily be determined because the exact mass of adhesive applied cannot be estimated due to the contributing mass of the backing materials. In as much as patches are manufactured in a variety of sizes and thicknesses, the drug exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk." *Id.* at pg. 20.

It is possible that the same entity (a 0.5-percent hydrocortisone product), marketed by either the same manufacturer or different manufacturers, could appear on the store shelf side-by-side with different labeling: one stating that the product is **"regular strength"** and the other stating that the same strength product is **"maximum strength." <u>Further, referring to 1 percent hydrocortisone as "maximum strength" could not only be confusing but also be considered misleading because there are higher concentrations of hydrocortisone available by prescription.</u>** *Id.*

29.     In complete disregard of the FDA's guidance and regulations, Defendant misrepresents, without providing adequate disclaimers, that its Lidocaine Patches provide a "maximum strength" dose of lidocaine, when, in fact, there are superior prescription lidocaine patches in the market that deliver a higher amount of lidocaine: including the previously mentioned 5% and 1.8% prescription-strength lidocaine patches.[15]

30.     Furthermore, Defendant's Lidocaine Patches do not contain, nor do they deliver, a greater dose of lidocaine in comparison to other over-the-counter lidocaine patches. Specifically, the FDA's National Drug Code Directory indicates that Defendant's Lidocaine Patches contain 560 milligrams of lidocaine per patch.[16] Yet dozens of other over-the-counter lidocaine patches contain a greater amount of lidocaine: ranging from 411.4 to 4,500 milligrams.[17]

31.     Defendant's arbitrary and patently false claim regarding the strength of its Lidocaine Patches goes beyond the pale. Had Defendant not made the false, misleading, and deceptive misrepresentations and omissions alleged herein, Plaintiff and the proposed class members (1) would not have purchased the Lidocaine Patches: (2) would not have paid as much as they did for those purchases; or (3) would have purchased less expensive lidocaine patches that do not charge a premium for the "maximum strength," or durational representations contained in

---

[15] *See supra* footnote 7.

[16] https://www.accessdata.fda.gov/spl/data/4a05261b-af63-46d1-a8b5-ec176ca1eba8/4a05261b-af63-46d1-a8b5-ec176ca1eba8.xml (last accessed April 27, 2022).

[17] *See* Attachment 1 re Citizen Petition from Scilex Pharmaceuticals Inc
https://www.regulations.gov/document/FDA-2019-P-0417-0003 (last accessed April 27, 2022).

Defendant's Lidocaine Patches. Thus, Plaintiff and the proposed class members suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

32.     Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the false and defective nature of the Lidocaine Patches as well as its failure to disclose the existence of those defects and misrepresentations to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

33.     **WHO:** Defendant, Target Corporation, made material misrepresentations and/or omissions of fact in its labeling and marketing of the Lidocaine Patches by representing that they are capable of providing "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours."

34.     **WHAT:** Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Lidocaine Patches are capable of providing "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours." Defendant omitted from Plaintiffs and the proposed class members that the Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies well before 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not contain or deliver the maximum amount of lidocaine available in the market; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

35.     **WHEN:** Defendant made material misrepresentations and/or omissions during the putative Class periods, including prior to and at the time Plaintiff and the proposed class members

purchased the Lidocaine Patches, despite its knowledge that the Lidocaine Patches do not conform to their purported qualities.

36.     **WHERE:** Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Lidocaine Patches' packaging, website, and through marketing materials.

37.     **HOW:** Defendant made material misrepresentations and/or failed to disclose material facts regarding the Lidocaine Patches, including their poor adhesion technology and the inferior amounts and pharmacological efficacy of the lidocaine contained therein.

38.     **WHY:** Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, the proposed class members, and all reasonable consumers to purchase and/or pay for the Lidocaine Patches, the effect of which was that Defendant profited by selling the Lidocaine Patches to tens of thousands of consumers.

39.     **INJURY:** Plaintiff and the proposed class members purchased, paid a premium, or otherwise paid more for the Lidocaine Patches when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action on behalf of herself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

41.     The class periods shall be defined from the date of the filing of this Complaint, back to any such time the Court deems appropriate.

42.     Plaintiff seeks to represent all persons in the United States who purchased Defendant's Lidocaine Patches (the "Class").

43.     Plaintiff also seeks to represent a subclass of all Class members who purchased Defendant's Lidocaine Patches in California (the "California Subclass") (collectively with the Class, the "Classes").

44.     The Classes do not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

45.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

46.     ***Community of Interest***: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

47.     ***Numerosity***: While the exact number of members of the Classes is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. The precise number of the members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

48.     ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes. These common legal and factual questions include, but are not limited to:

(a) Whether the Lidocaine Patches are defective;

(b) Whether Defendant knew of the Lidocaine Patches' defective nature;

(c) Whether Defendant breached the express warranties on the Lidocaine Patches'

packaging;

(d) Whether Defendant's representations that the Lidocaine Patches are capable of providing "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours" are false and misleading in violation of California's False Advertising Law, California's Unfair Competition Law, as well as the Consumers Legal Remedies Act;

(a) Whether Plaintiff and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof;

(b) Whether Plaintiff and the members of the Classes are entitled to statutory damages;

(c) Whether Plaintiff and the members of the Classes are entitled to restitution;

(d) Whether Plaintiff and the members of the Classes are entitled to injunctive relief to enjoin Defendant from further engaging in these wrongful practices; and

(e) Whether Plaintiff and the members of the Classes are entitled to attorney's fees and costs.

49.     *Typicality:* The claims of the named Plaintiff are typical of the claims of other members of the Classes in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's defective Lidocaine Patches, and suffered a loss as a result of those purchases.

50.     *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Classes because she has no interests which are adverse to the interests of the members of the Classes. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel.

51.    **Superiority:** A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of The Magnuson-Moss Warranty Act,
### 15 U.S.C. § 2301, *et seq.*
### (On Behalf of Plaintiff and the Class)

52.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

53.    15 U.S.C. § 2310(d) is satisfied because Plaintiff properly invokes jurisdiction under the Class Action Fairness Act ("CAFA").

54.    15 U.S.C. § 2310(d)(1) provides a cause of action to "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation… under a written warranty, implied warranty, or service contract."

55.    Defendant's Lidocaine Patches are consumer products as defined under 15 U.S.C. § 2301(1).

56.     Plaintiff and the Class members are consumers as defined under 15 U.S.C. § 2301(3).

57.     Defendant is a supplier and warrantor as defined under 15 U.S.C. §§ 2301(4) and (5).

58.     15 U.S.C. § 2301(6)(A) defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship…will meet a specified level of performance over a specified period of time."

59.     Defendant provided Plaintiff and the Class members "written warranties" within the meaning of 15 U.S.C. § 2301(6) by providing written promises and affirmations of fact on the Lidocaine Patches' packaging that the Lidocaine Patches: (1) contain and deliver a "maximum strength" dose of lidocaine available in the market; (2) are superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches; and (3) are capable of providing an adequate amount of "pain-relief" to be fit as an analgesic for sore muscles. Further, Defendant qualified that the above-referenced qualities of its Lidocaine Patches would remain effective "up to 8 hours."

60.     Those statements became the basis of the bargain for Plaintiff and the Class members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch for pain relief.

61.     Defendant breached the express warranties of its Lidocaine Patches because they: (1) systematically fail to adhere to its consumers' bodies well before 8 hours; (2) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment; (3) do not contain or deliver the maximum amount of lidocaine

available in the market; and (4) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

62.    As a direct and proximate result of Defendant's breach of its written warranties, Plaintiff and the Class members have been damaged in an amount to be proven at trial.

### COUNT II
### Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq.*
### (On Behalf of Plaintiff and the California Subclass)

63.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

64.    The FAL makes it "unlawful for any person…to make or disseminate or cause to be made or disseminated before the public in this state, … [in] any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or those services, professional or otherwise, or … performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

65.    Defendant committed acts of false and misleading advertising, as defined by the FAL, by using statements to promote the sale of its Lidocaine Patches representing in the Lidocaine Patches' packaging that they are capable of providing an a "pain-relief" using a "maximum strength" dose of lidocaine for "up to 8 hours." In so doing, Defendant omitted that the Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies well before 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not contain or deliver the maximum amount of lidocaine available in the market; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

66.    Defendant knew or should have known that its advertising claims have not been substantiated and are misleading and/or false.

67.    Defendants knew or should have known, through the exercise of reasonable care, that its representations were false and misleading and likely to deceive consumers and cause them to purchase Defendant's Lidocaine Patches.

68.    Defendants' wrongful conduct is ongoing and part of a general practice that is still being perpetuated and repeated throughout the State of California and nationwide.

69.    As a result of Defendant's wrongful conduct, Plaintiff and the California Subclass members lost money in an amount to be proven at trial. Plaintiff and the California Subclass members are therefore entitled to restitution as appropriate for this cause of action.

70.    Plaintiff and the California Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT III
### Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.* (On Behalf of Plaintiff and the California Subclass)

71.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

72.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

73.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

74.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

75.     Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

76.     Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

77.     On April 28, 2022, Plaintiff notified Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendants remedy those violations pursuant to Cal. Civ. Code § 1782.

78.     Plaintiff and the California Subclass members presently seek only injunctive relief under this Count. If Defendant fails to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

### COUNT IV
**Violation of Violation of California's Unfair Competition Law, ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

79.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

80.     The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

81.     Defendants' acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, *et seq.*

82.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, FAL, and the Magnuson-Moss Warranty Act, as described above.

83.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers. In addition, Defendant has committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully above.

84.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

85.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

86.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**. Defendant's claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

87.     Plaintiff and the other California Subclass members suffered a substantial injury by virtue of buying the Lidocaine Patches that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

88.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Lidocaine Patches.

89.     Plaintiff and the other California Subclass members had no way of reasonably knowing that the Lidocaine Patches that they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

90.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass members.

91.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff and the California Subclass members' attorneys' fees and costs.

**COUNT V**
**Quasi-Contract / Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

92.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

93.     Plaintiff brings this claim individually and on behalf of Class members under the laws of the State of California.

94.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

95.     Plaintiff and Class members conferred benefits on Defendant by purchasing the Lidocaine Patches.

96.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Lidocaine Patches.

97.     Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Lidocaine Patches were unfit for their intended purpose as an analgesic for sore muscles. These omissions caused injuries to Plaintiff and Class members because they would not have purchased the Lidocaine Patches if the true facts were known.

98.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as a representative of the Classes; and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)     For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(d)     For prejudgment interest on all amounts awarded;

(e)     For an order of restitution and all other forms of equitable monetary relief; and

(g)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: April 29, 2022                          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

Joseph I. Marchese (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Shejuana Ary in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the transaction alleged in the Complaint occurred in Alameda County.  Plaintiff Ary alleges that she purchased the defective Lidocaine Patches in this County.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California, this 29th day of April, 2022.


*/s/ L. Timothy Fisher*
L. Timothy Fisher