# EXHIBIT 1



**EFB2030**
(7U2) 7U2-000 EFB2030-1

Do not use if printed pouch is torn or punctured.

**HOW TO APPLY**

1.  2.  3.

Compare to active ingredient in
Salonpas® Lidocaine Patch*

NDC 11673-744-81

maximum strength
# lidocaine
# pain-relief
# patches

4% lidocaine/topical anesthetic

**desensitizes aggravated nerves in back, neck, shoulders, knees and elbows**

for temporary relief of pain
numbing
unscented

up to
**8**
hours

**up&up**™

6 PATCHES
3 15/16 IN x 5½ IN (10 cm x 14 cm) EACH

up&up®

**Drug Facts**

| Active ingredient | Purpose |
|---|---|
| Lidocaine 4% | Topical anesthetic |

**Uses**
For temporary relief of pain

**Warnings**
**For external use only**

**Do not use**
■ more than 1 patch at a time  ■ on wounds or damaged skin  ■ with a heating pad
■ if you have ever had an allergic reaction to this product or any of its ingredients

**When using this product**
■ use only as directed
■ avoid contact with the eyes, mucous membranes or rashes
■ do not bandage tightly

**Stop use and ask a doctor if**
■ localized skin reactions occur, such as rash, itching, redness, irritation, pain, swelling and blistering
■ conditions worsen
■ symptoms persist for more than 7 days
■ symptoms clear up and occur again within a few days

**If pregnant or breast-feeding,** ask a health professional before use.

**Keep out of reach of children.** If swallowed, get medical help or contact a Poison Control Center right away (1-800-222-1222).

**Directions**
**Adults and children 12 years of age and over:**
■ clean and dry affected area
■ remove film from patch and apply to the skin (see illustration)
■ apply 1 patch at a time to affected area, no more than 3 to 4 times daily
■ remove patch from the skin after at most 8 hours of application
**Children under 12 years of age:** consult a doctor

**Other information**
■ avoid storing product in direct sunlight
■ protect product from excessive moisture
■ store at 20-25°C (68-77°F)

**Inactive ingredients** carboxymethylcellulose sodium, dihydroxyaluminum aminoacetate, edetate disodium, glycerin, kaolin, methylparaben, polyacrylic acid, polyvinyl alcohol, propylene glycol, propylparaben, purified water, sodium polyacrylate, sodium polyacrylate starch, sorbitol solution, tartaric acid, urea

**Questions?** Call 1-888-547-7400

100% satisfaction guaranteed or your money back.

Distributed by Target Corporation
Minneapolis, MN 55403
Made in Taiwan
TM & ©2019 Target Brands, Inc.
*This product is not manufactured or distributed by Hisamitsu America, Inc., distributor of Salonpas® Lidocaine Patch.

7U291 UW C1

**CODE AREA**



**Prints at 90%**

**Perrigo**®
Graphics
502 Eastern Ave., Allegan, MI 49010
www.perrigo.com

Artist: **Stephanie**
Date: **03-26-19**
LS: **7U2.000**

Colors
UW Lt Teal
UW Lt Orange
Cyan
Magenta
Yellow
Black

Images
AG-UW-7U2Patch_CMY.psd

**PRINT VENDOR**
PANTONE® simulations used in this art may not match PANTONE identified solid color standards. Use current PANTONE Color Reference Manuals for accurate color.
The supplied production file and .pdf are for use in print production and quality checks. No further proof approvals are required from Perrigo. Perrigo is not responsible, and hereby disclaims any liability for future versions, including but not limited to, changes, errors, omissions or revisions made during pre-press or printing.

1-888-547-7400     * Perrigo number *

Rev 1.95

UW Target

CODE AREA PANEL:
Artists should flood color or background across entire panel (exception: no yellows).
If customer design dictates white panel, that is acceptable.
No text or graphic patterns in code area.
Part number should be 6 pt. Helvetica Neue LT Std 85 Heavy and
• black (on light background)
• knockout (on one color dark background)
• knockout and outlined (on dark multi-color background)

# EXHIBIT 2

# compare

---

 merriam-webster.com/dictionary/compare



verb

⚑ Save Word

com·pare | \ kəm-ˈper 🔊 \

compared; comparing

## Definition of *compare*

(Entry 1 of 2)

transitive verb

1 **:** to represent as similar **:** LIKEN Shall I compare thee to a summer's day?— William Shakespeare
2a **:** to examine the character or qualities of especially in order to discover resemblances or differences compare your responses with the answers

b **:** to view in relation to He is tall compared to me. The test was easy compared with the last one.

3 **:** to inflect or modify (an adjective or adverb) according to the degrees of comparison **:** state the positive, comparative, and superlative forms of
intransitive verb

1 **:** to bear being compared The two don't even begin to compare. We bought two different brands of peanut butter to see how they compare.
2 **:** to make comparisons If we now go to Italy at all, we go not to learn, but to compare.— Norman Douglas
3 **:** to be equal or alike Nothing compares to you.

compare

noun

**:** the possibility of comparing beauty beyond compare also **:** something with which to be compared a city without compare

 Synonyms & Antonyms ⬇ Choose the Right Synonym ⬇ More Example Sentences
⬇ Phrases Containing *compare* ⬇ Learn More About *compare*

## Synonyms & Antonyms for *compare*

Synonyms: Verb

- analogize,
- assimilate,
- bracket,
- equate,
- liken

Antonyms: Verb

  contrast

Visit the Thesaurus for More ⊛

## Choose the Right Synonym for *compare*

Verb

compare, contrast, collate mean to set side by side in order to show differences and likenesses. compare implies an aim of showing relative values or excellences by bringing out characteristic qualities whether similar or divergent. *compared* the convention facilities of the two cities contrast implies an emphasis on differences. *contrasted* the computerized system with the old filing cards collate implies minute and critical inspection in order to note points of agreement or divergence. data from districts around the country will be *collated*

## Examples of *compare* in a Sentence

Verb The singer's voice has been *compared to* that of Elvis. We each did the homework assignment, then *compared* answers. I *compared* several bicycles before buying one.

Recent Examples on the Web: Verb Diagnostic assays must be developed and shared promptly, with the ability and requirement for labs across the globe to quickly replicate those tests using standardized methods and reagents to accurately diagnose and *compare* results. — Sylvain Gariel, *Forbes*, 15 Aug. 2022 Studies that *compare* factors including number of gym memberships, obesity rates, percentage of people who bicycle to work, hours of sunshine and amount of public green spaces ranked Amsterdam top of the healthy cities. — The Editors, *Robb Report*, 14 Aug. 2022 There are images that *compare* leaves of types of walnuts, ahd the invasive tree of heaven, Ailanthus altissima. — *oregonlive*, 13 Aug. 2022 That incident was another reminder that people listen when Republican politicians *compare* a law enforcement search to a third-world coup. — Ben Kamisar, *NBC News*, 12 Aug. 2022 Heat Robert De Niro's master criminal Neil McCauley and Al Pacino's obsessive cop Vincent Hanna sit down in a diner to size up each other and *compare* notes, both professional and personal. — Clark Collis, *EW.com*, 9 Aug. 2022 The study will also *compare* the tolerability and reactogenicity of giving the vaccine via the two different routes. — Helen Branswell, *STAT*, 7 Aug. 2022 The fresh, flaky meat was more than enough to fill your belly, though the taste of the grouper didn't *compare* to other types of fish, such as cod or halibut. — Chuck Blount, *San Antonio Express-News*, 5 Aug. 2022 Here's how the actresses and comic book characters *compare*, plus any notable differences between their show appearance and their comic book portrayal. — Milan Polk, *Men's Health*, 30 July 2022 Recent Examples on the Web: Noun Bill Russell, a basketball player and man beyond *compare*, died Sunday, and then Scully two days later. — Chad Finn, *BostonGlobe.com*, 3 Aug. 2022 How does the slightly slower and less expensive EQB 300 *compare* to the EQB 350? — Michael Harley, *Forbes*, 1 Aug. 2022 How does the content of the podcast *compare* to the Hulu docuseries? — Shirley Ju, *Variety*, 28 July 2022 How does Great Wolf Lodge's deal *compare* to Groupon? — Michael Salerno, *The Arizona Republic*, 28 July 2022 How does mushroom coffee *compare* to traditional coffee? — *Good Housekeeping*, 21 July 2022 From a creative standpoint, how does designing a cake *compare* to writing and performing music? — Josh Chesler, *SPIN*, 23 June 2022 How does your fashion aesthetic *compare* to your on-stage style? — Caitlin Brody, *Glamour*, 10 June 2022 But in all of the moments and rivalries this town has had, few if any *compare* to the mid-90s-early 2000s with the Detroit Red Wings and Colorado Avalanche. — Tony Garcia, *Detroit Free Press*, 27 May 2022 See More These example sentences are selected automatically from various online news sources to reflect current usage of the word 'compare.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

## Phrases Containing *compare*

compare and contrast

compare apples and/to/with apples

compare apples and/to/with oranges

beyond compare

compare notes

 without compare

compare and contrast

compare apples and/to/with apples

compare apples and/to/with oranges

beyond compare

compare notes

 without compare

## First Known Use of *compare*

Verb

14th century, in the meaning defined at transitive sense 1

Noun

1589, in the meaning defined above

## History and Etymology for *compare*

Verb and Noun

Middle English, from Anglo-French *comparer*, from Latin *comparare* to couple, compare, from *compar* like, from *com-* + *par* equal

## Learn More About *compare*

From the Editors at Merriam-Webster



'Versus' vs. 'Verses'

## Dictionary Entries Near *compare*

comparator

compare

compare and contrast

See More Nearby Entries

## Statistics for *compare*

Last Updated

20 Aug 2022

Look-up Popularity

Cite this Entry

"Compare." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compare. Accessed 23 Aug. 2022.

**Style:** MLA

MLA ✓  Chicago ✓  APA ✓  Merriam-Webster ✓

More Definitions for *compare*

compare

verb

com·pare | \ kəm-ˈper 🔊 \

compared; comparing

## Kids Definition of *compare*

1 **:** to point out as similar **:** LIKEN She *compared* the activity of ants to the behavior of humans.
2 **:** to examine for similarity or differences Before buying *compare* the two bicycles.

3 **:** to appear in relation to others She *compares* well with the rest of the class.

4 **:** to state the positive, comparative, and superlative forms of an adjective or adverb

## Choose the Right Synonym for *compare*

compare and contrast mean to look closely at something in order to show likenesses and differences. compare is used for showing the likenesses between two or more things. *Compare* these sofas for size and comfort. contrast is used for showing the differences and especially the characteristics which are opposite. She finds it easy to *contrast* country and city life.

More from Merriam-Webster on *compare*

Nglish: Translation of *compare* for Spanish Speakers

Britannica English: Translation of *compare* for Arabic Speakers

# EXHIBIT 3

# up to

(MW) **merriam-webster.com**/dictionary/up to



preposition

🏳 Save Word

## Definition of *up to*

1 —used as a function word to indicate extension as far as a specified place sank *up to* his knees in the mud

2 —used as a function word to indicate a limit or boundary *up to* 50,000 copies a monthworked *up to* the last minute

## First Known Use of *up to*

13th century, in the meaning defined at sense 1

## Learn More About *up to*

## Dictionary Entries Near *up to*

uptime

up to

up to a point

See More Nearby Entries

## Statistics for *up to*

Look-up Popularity

Cite this Entry

"Up to." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/up%20to. Accessed 23 Aug. 2022.

**Style:** MLA

MLA ✓  Chicago ✓  APA ✓  Merriam-Webster ✓

More from Merriam-Webster on *up to*

Thesaurus: All synonyms and antonyms for *up to*

Nglish: Translation of *up to* for Spanish Speakers

## WORD OF THE DAY

### abrogate


See Definitions and Examples »

Get Word of the Day daily email!

### Test Your Vocabulary

Odd Habits and Quirks

- 

- Which of the following best describes an easily irritated person?

  - tetchy gregarious
  - flashy superficial



Can you spell these 10 commonly misspelled words?

TAKE THE QUIZ



A daily challenge for crossword fanatics.

TAKE THE QUIZ

Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

Merriam-Webster unabridged

# EXHIBIT 4

# AT LEAST English Definition and Meaning

L **lexico.com**/en/definition/at_least



Home US English at least

## phrase

- 1 Not less than; at the minimum.

  *'clean the windows at least once a week'*

  - *'They were blocking every exit, and Whitehall had at least ten vans full of officers.'*
  - *'It would appear that if you know at least one full line from a play, you can probably find it online.'*
  - *'Petunias are easy to grow so long as they are in full sun for at least part of the day.'*
  - *'He knows what he wants and hopefully he will be allowed at least a full season to put matters straight.'*
  - *'It seemed that our lives then had been happy indeed, or at least, full of hope and content.'*
  - *'Truth, or at least the whole truth and nothing but the truth, seems way down the list.'*
  - *'No one could cheat by swallowing anything whole because we had to chew it all at least five times.'*
  - *'This needs at least four minutes' brewing time to reveal its full array of flavours.'*
  - *'I see many blokes my age around, carrying at least as much weight and full of vim and vigour.'*
  - *'On the whole, though, they can at least be expected to grow along with the economy.'*

  **at the minimum**, no less than, not less than

  View synonyms

- 2 If nothing else (used to add a positive comment about a generally negative situation)

  *'the options aren't complete, but at least they're a start'*

  - *'What this means is that the relationship is not going anywhere, at least not in a positive way.'*
  - *'Not a plan for action, certainly, but at least a creative push in a positive direction.'*
  - *'You might be bored stupid and your boss may be a complete cretin, but at least your office is dry.'*
  - *'The consensus among the Elders is that no one would believe you anyway, or at least not many.'*
  - *'Basically, I was going to be in hell for a whole month or at least until I found a new job.'*
  - *'He is also keen to rescue James from his detractors, or at least to give us the whole picture.'*

- 3Anyway (used to modify something just stated)

    *'they seldom complained—officially at least'*

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

Monique Bell, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CVS Pharmacy, Inc.,

Defendant.

CASE NO.  21-cv-06850

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Monique Bell ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant CVS Pharmacy, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1. This is a putative class action lawsuit on behalf of purchasers of Defendant's lidocaine patches (the "Lidocaine Patches").[1] Defendant markets, sells and distributes the Lidocaine Patches through numerous brick-and-mortar CVS retail locations and online through www.cvs.com.

---

[1] The Lidocaine Patches include Defendant's "MAXIMUM STRENGTH Lidocaine Pain Relief Patch"; "MAXIMUM STRENGTH LIDOCAINE Cold & Hot Patch"; and "MAXIMUM STRENGTH Lidocaine Pain-Relieving Patch." Plaintiff has standing to sue Defendant for all of the Lidocaine Patches because "1) the products are substantially similar to the products that she did purchase; and 2) the alleged misrepresentation is the same." *See e.g., Rivera v. S.C. Johnson & Son, Inc.*, No. 20-CV-3588 (RA), 2021 U.S. Dist. LEXIS 183759, at *26 (S.D.N.Y. Sep. 24, 2021)

2.      Lidocaine is a topical anesthetic that is used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain. Specifically, lidocaine functions by blocking sodium channels located on nerve endings which prevents action potential from propagating in the nerve cell and thereby interrupting the transmission of the pain signal.

3.      Although lidocaine patches are often prescribed by doctors, Defendant offers its Lidocaine Patches over-the-counter to unsuspecting consumers under false pretenses. Defendant takes advantage of these consumers by prominently displaying on the packaging of the Lidocaine Patches that the patches deliver a "Maximum Strength" dose of lidocaine for up to 12 or 8 hours. Plaintiff and the proposed class members relied on those representations when making their purchases. To their dismay, however, Defendant's Lidocaine Patches regularly peel off their bodies within a few hours, and oftentimes minutes, after being properly applied, and do not deliver a maximum amount of lidocaine available in patch form.

4.      As a result of its deceptive conduct, Defendant is, and continues to be, unjustly enriched at the expense of its customers.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the class pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendant; and (4) the Defendant is not a governmental entity.

6.     This Court has personal jurisdiction over Defendant because it conducts substantial business within New York, including the sale, marketing, and advertising of the Lidocaine Patches. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State, including Plaintiff's purchases.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## THE PARTIES

8.     Plaintiff Monique Bell is a citizen of New York, residing in Brooklyn, New York. Plaintiff purchased Defendant's Lidocaine Pain Relief Patch for her personal use for approximately $9.79 on various occasions within the applicable statute of limitations, with her most recent purchase taking place in September of 2021. Plaintiff made these purchases at a CVS store located in Brooklyn, New York. Prior to her purchases, Plaintiff saw that the Lidocaine Patches were labeled and marketed as "Maximum Strength" patches capable of delivering a 4% lidocaine dose for "UP TO 12 HOURS" and read the directions on the back label, which indicated that she could use "1 patch for up to 12 hours." Plaintiff relied on Defendant's representations when she decided to purchase the Lidocaine Patches over comparable and less expensive pain-relieving patches or gels. Plaintiff saw those representations prior to and at the time of her purchases and understood them as a representation and warranty that the Lidocaine Patches would reliably adhere to her body and deliver a 4% lidocaine dose for 12 hours. Initially, Plaintiff became frustrated when her Lidocaine Patches peeled off her body while engaging in regular activities—such as walking, sitting, stretching, and sleeping—well before the represented 12 hours, through no fault of her own. Plaintiff, nonetheless, continued to purchase other

Lidocaine Patches, believing that such failures were the result of one-off manufacturing flukes. After giving the Lidocaine Patches the benefit of the doubt, however, Plaintiff stopped purchasing them altogether after realizing that the Lidocaine Patches consistently failed to provide pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS." For example, on a couple of occasions, the Lidocaine Patches that Plaintiff bought peeled off her body within an hour or two after she properly applied them pursuant to the directions contained on the products—delivering little to no analgesic effect to her sore muscles. Plaintiff relied on Defendant's representations and warranties in deciding to purchase her Lidocaine Patches. Accordingly, those representations and warranties were part of the basis of her bargains, in that she would not have purchased her Lidocaine Patches on the same terms had she known those representations and warranties were false. However, Plaintiff remains interested in purchasing Defendant's Lidocaine Patches and would consider the Lidocaine Patches in the future if Defendant ensured the products actually provide pain relief by delivering a 4% lidocaine dose to her body for "UP TO 12 HOURS." Additionally, in making her purchases, Plaintiff paid a substantial price premium due to Defendant's false and misleading claims regarding the qualities of its Lidocaine Patches. However, Plaintiff did not receive the benefit of her bargains because her Lidocaine Patches did not, in fact, provide pain relief by delivering a 4% "Maximum Strength" dose of lidocaine to her body for "UP TO 12 HOURS."

9.     Defendant CVS Pharmacy, Inc. ("Defendant") is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. Defendant markets, sells, and distributes the Lidocaine Patches and is responsible for the advertising, marketing, trade dress, and packaging of the Lidocaine Patches. Defendant marketed, distributed, and sold the Lidocaine Patches during the class period.

## FACTUAL ALLEGATIONS

*Defendant's False Advertising*

10.     Defendant markets, sells, and distributes the Lidocaine Patches through numerous brick-and-mortar CVS retail locations and online through www.cvs.com. On the Lidocaine Patches packaging, Defendant represents that its Lidocaine Patches last up to 12 or 8 hours, depending on the product. The Lidocaine Patches are all substantially similar in that they all share similar adhesiveness misrepresentations:



11.     By representing that Lidocaine Patches can be applied "UP TO 12 HOURS" or "UP TO 8 HOURS"—a very specific number[2]—Defendant induced Plaintiff and the proposed class members into believing that the Lidocaine Patches: (1) would continuously adhere to their bodies up to 12 or 8 hours; (2) were sufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping) for someone who is suffering from sore muscles; and (3) would continuously relieve pain by providing a 4% lidocaine dose throughout the specified

---

[2]Although under 2nd Circuit precedent in *Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018) reasonable consumers are not "expected to look beyond misleading representations on the front of the box" to cure a defendant's misrepresentation contained therein, the back labels of the Lidocaine Patches reinforce the misrepresentations made on their front labels—i.e., they all misleadingly instruct either to "use 1 patch for up to 12 hours" or to "remove the patch from the skin after, at most, 8-hour application." Exhibit A.

amount of time represented therein. Furthermore, by representing that the Lidocaine Patches provide "Maximum Strength," Defendant induced Plaintiff and the proposed class members into believing that the Lidocaine Patches: (1) contain and deliver the maximum amount of lidocaine available in patch form; and (2) that they are superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

12.     Despite these representations, however, Defendant's Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies up to 12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

### Defendant's Knowledge of the Defective Lidocaine Patches

13.     Defendant knew that its Lidocaine Patches did not live up to the adhesiveness representations contained therein based on dozens of complaints posted on its own website, www.cvs.com, which Defendant actively monitors.

14.     For example, in May of 2021, a buyer explained their issue trying to get a Lidocaine Patch to adhere to their body:

> "Absolutely awful. Active ingredient doesn't matter because the delivery method doesn't stick at all. Post-it notes have better adhesion. Spend a couple extra bucks and get something that will stay on."[3]

---

[3] https://www.cvs.com/shop/cvs-health-lidocaine-patch-max-strength-5-ct-prodid-1910091 (last accessed December 10, 2021).

15.     In June of 2020, yet another consumer expressed their frustration using Defendant's Lidocaine Patch:

> "If I could give negative stars I would. These simply do not stay on. Obviously this is a real problem with this product since so many reviews reflect the same opinion. If you're going to claim that your product is comparable to another, you should at least assure that it is able to be compared to said product. I am unable to compare it when it won't even stay put! Complete waste of money."[4]

16.     Furthermore, Defendant knew, or should have known, that its Lidocaine Patches were defectively designed based on FDA reports and scientific studies regarding the efficacy of the products.

17.     Specifically, Defendant's Lidocaine Patches work by delivering lidocaine through a transdermal mechanism—i.e., by delivering the analgesic chemical "through the dermis, or skin…in ointment or patch form."[5] According to FDA reports, transdermal drug delivery systems, such as the one used by Defendant, systematically fail to adhere to the body.[6] To that end, the FDA is in the process of finalizing an industry guidance on "Transdermal and Topical Delivery Systems" to address, *inter alia*, "considerations for areas where quality is closely tied to product performance and potential safety issues, such as adhesion failure…"[7]

---

[4] https://www.cvs.com/shop/cvs-health-maximum-strength-pain-relief-patch-3-5-16-x-5-1-2-10-cm-x-14-cm-5-ct-prodid-1730040 (last accessed December 10, 2021).

[5] https://medical-dictionary.thefreedictionary.com/transdermal (last accessed December10, 2021).

[6] *See* Yellela S.R. Krishnaiah, *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, PhD Division of Product Quality Research OTR/OPQ/CDER US Food and Drug Administration Silver Spring, MD, USA AAPSKrishnaiah, October 2015_Sunrise Session (2015). https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html (last accessed December 10, 2021). at pg. 8.

[7] *See* 84 FR 64319 - *Transdermal and Topical Delivery Systems-Product Development and Quality Considerations; Draft Guidance for Industry*; Availability (2019) https://www.regulations.gov/document/FDA-2019-D-4447-0001 (last accessed December 10, 2021).

18.     Even more alarming, the FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[8]

19.     Furthermore, a peer-reviewed study published in January of 2021 by the Journal of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion rate to the study's subjects after 12 hours (i.e., essentially no part of the product lifting off the skin).[9] The study also found that after 12 hours, "37.5% of subjects experienced substantial detachment (to <10% adhesion) while using the generic lidocaine patch 5%, including 7 (29.1%) complete detachments." The study also found that the mean adhesiveness score of the generic lidocaine patches after 12 hours was 37.67% (where 0% reflects complete detachment and 50% reflects half the product lifting off the skin but not detached). In contrast, the study found that a newly developed 1.8% lidocaine patch technology, which is bioequivalent to 5% lidocaine patches,[10] maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

_____

[8] *See* Gudin J, Nalamachu S. *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*. *Postgrad Med*. 2020;132(1):28–36. doi:10.1080/00325481.2019.1702296 https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296 (last accessed December 10, 2021).

[9] See Gudin J, Webster LR, Greuber E, Vought K, Patel K, Kuritzky L. *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects*. *J Pain Res*. 2021;14:513-526. Published 2021 Feb 23. doi:10.2147/JPR.S287153.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/ (last accessed December 10, 2021). The study measured adhesion of the patches "immediately after application (0 hours) and at 3, 6, 9, and 12 hours (±15 minutes; before product removal) after application. Assessments in Study 1 were performed by a trained scorer using the FDA-recommended 5-point adhesion scale. The FDA scale ranges from 0 to 4, where 0 represents ≥90% of the product adhered (essentially no part of the product lifting off the skin), 1 represents 75% to <90% adhered (only some edges of the product lifting off the skin), 2 represents 50% to <75% adhered (less than half the product lifting off the skin), 3 represents >0% to <50% adhered (more than half the product lifting off the skin but not detached), and 4 represents 0% adhered (complete product detachment). The mean cumulative adhesion score was calculated by summing the scores at 3, 6, 9, and 12 hours and dividing the total by the total number of observations per subject." *Id.*

[10] Gudin J, Argoff C, Fudin J, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects*. J Pain Res. 2020 Jun 22;13:1485-1496. doi: 10.2147/JPR.S237934. PMID:

20.     Although the study published by the Journal of Pain Research only tested generic prescription lidocaine patches, upon information and belief, Defendant's over-the-counter Lidocaine Patches—which have not undergone the rigorous approval process required by the FDA and use the same outdated and defective adhesion technology as the generic lidocaine patches[11] —fair no better.

21.     Furthermore, while certain companies have innovated their technology based on clinical studies to ensure that their lidocaine patches reliably adhere to a consumer's body,[12] even while exercising,[13] upon information and belief, Defendant has not.

22.     In complete disregard of the wealth of information to the contrary, however, Defendant continues to misrepresent that its Lidocaine Patches reliably adhere to its consumers' bodies up to 12 or 8 hours when, in fact, they do not. Defendant also failed to inform its consumers that the Lidocaine Patches are prone to even greater detachment when they engage in certain activities (such as walking, stretching, and sleeping). Nor is Defendant's representation that its Lidocaine Patches are capable of continuously relieving pain by providing a 4% lidocaine

---

32606914; PMCID: PMC7319520. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7319520/ (last accessed December 10, 2021).

[11] Defendant, whose Lidocaine Patches are manufactured in China, has not been approved by the FDA to market or sell its Lidocaine Patches despite being required to do so. The FDA is currently reviewing a Citizen Petition filed by Scilex Pharmaceuticals Inc. (a manufacturer of FDA-approved lidocaine patches) to remove from the market any over-the-counter lidocaine patches that lack FDA approval. *See* https://www.regulations.gov/docket/FDA-2019-P-0417/document (last accessed December 10, 2021).

[12] https://www.scilexpharma.com/scilex-presents-ztlido-data-on-superior-adhesion-over-lidocaine-patch-formulation/ (last accessed December 10, 2021).

[13] A separate study demonstrated that Scilex's lidocaine patches were able to reliably adhere when subjects engaged in moderate physical exercise (exercise bike) and heat (heating pad). *See* Fudin J, Wegrzyn EL, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System 1.8% During Physical Activity and Heat Treatment in Healthy Subjects*. *J Pain Res*. 2020;13:1359-1367. Published 2020 Jun 10. doi:10.2147/JPR.S238268. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7293912/#CIT0007 (last accessed December 10, 2021).

dose throughout the specified time periods true: given that they systematically fail to fully adhere to its consumers' bodies. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."[14]

23.     To make matters worse, Defendant misrepresents, without providing adequate disclaimers, that its Lidocaine Patches provide a "Maximum Strength" dose of lidocaine, when, in fact, there are superior lidocaine patches in the market that deliver a higher amount of lidocaine: including the previously mentioned 5% and 1.8% prescription-strength lidocaine patches.[15] Defendant compounds this problem by indicating that its "MAXIMUM STRENGTH LIDOCAINE Cold & Hot Patch" is "Medicated"—thereby reinforcing the misrepresentation that the Lidocaine Patches are comparable to prescription-strength lidocaine patches.

24.     Furthermore, nothing in Defendant's Lidocaine Patches indicates that they provide a greater dose of lidocaine in comparison to other over-the-counter lidocaine patches, including its own. Specifically, Defendant's representation that its Lidocaine Patches contain 4% lidocaine is misleading because the actual strength of a lidocaine patch is measured by the "mass of drug relative to the mass of the adhesive per patch."[16] In other words, Defendant's representation that its Lidocaine Patches contain 4% lidocaine does not indicate the *actual* amount of lidocaine milligrams that its Lidocaine Patches deliver to a consumer's body.[17]

---

[14] *See supra* footnote 10.

[15] *Id*.

[16] *See* Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit B at pg. 19.

[17] "It is emphasized that most of these patch products are labeled as a percentage strength, without providing the total drug content per patch. For other topical dosage forms like creams, ointments, and lotions, the amount of drug administered can easily be determined by weighing the mass of product and applying the strength factor as illustrated in the table below. In contrast, the amount of drug applied for patch products cannot easily be determined because the exact mass of adhesive applied cannot be estimated due to the contributing mass of the backing materials. inasmuch as patches are manufactured in a variety of sizes and thicknesses, the drug

25.     Shockingly, and by way of illustration, Defendant labels its "MAXIMUM STRENGTH LIDOCAINE Cold & Hot Patch" as possessing "MAXIMUM STRENGTH LIDOCAINE" although it has a lesser amount of lidocaine per patch (240 milligrams)[18] than its "MAXIMUM STRENGTH Lidocaine Pain Relief Patch" and "MAXIMUM STRENGTH Lidocaine Pain-Relieving Patch," both of which contain 567 milligrams of lidocaine per patch.[19][20] Further, all of Defendant's Lidocaine Patches contain less lidocaine than other over-the-counter lidocaine patches: which range from 600 to 4,500 milligrams.[21] Defendant's arbitrary and patently false claim regarding the strength of its Lidocaine Patches goes beyond the pale.

26.     Had Defendant not made the false, misleading, and deceptive misrepresentations and omissions alleged herein, Plaintiff and the proposed class members would not have purchased the Lidocaine Patches or would not have paid as much as they did for those purchases. Thus, Plaintiff and the proposed class members suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of herself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

28.     The class periods shall be defined from the date of the filing of this Complaint, back to any such time the Court deems appropriate.

---

exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk." Ex. B at pg. 20.

[18] https://ndclist.com/ndc/66902-220 (last acesed December 10, 2021).

[19] https://ndclist.com/ndc/66902-215 (last acesed December 10, 2021).

[20] https://ndclist.com/ndc/66902-276 (last acesed December 10, 2021).

[21] *See* Attachment 1 to Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit C.

29.     Plaintiff seeks to represent all persons in the United States who purchased Defendant's Lidocaine Patches (the "Class").

30.     Plaintiff also seeks to represent a subclass of all Class members who purchased Defendant's Lidocaine Patches in New York (the "New York Subclass") (collectively with the Class, the "Classes").

31.     The Classes do not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

32.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

33.     ***Community of Interest***: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

34.     ***Numerosity***: While the exact number of members of the Classes is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. The precise number of the members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

35.     ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Classes and predominate over any

questions affecting only individuals of the Classes. These common legal and factual questions include, but are not limited to:

(a) Whether the Lidocaine Patches are defective;

(b) Whether Defendant knew of the Lidocaine Patches' defective nature;

(c) Whether Defendant breached the express warranties on the Lidocaine Patches' packaging;

(d) Whether Defendant breached the Lidocaine Patches' implied warranty of merchantability;

(e) Whether Defendant breached the Lidocaine Patches' implied warranty of fitness for use;

(f) Whether Defendant's representations that the Lidocaine Patches adhere "UP TO 12 HOURS" or "UP TO 8 HOURS" or otherwise provides "Maximum Strength" lidocaine dosing is false and misleading in violation of New York's consumer-protection statutes;

(g) Whether Plaintiff and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof;

(h) Whether Plaintiff and the members of the Classes are entitled to statutory damages;

(i) Whether Plaintiff and the members of the Classes are entitled to restitution;

(j) Whether Plaintiff and the members of the Classes are entitled to injunctive relief to enjoin Defendant from further engaging in these wrongful practices; and

(k) Whether Plaintiff and the members of the Classes are entitled to attorney's fees and costs.

36.     *Typicality:* The claims of the named Plaintiff are typical of the claims of other members of the Classes in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's defective Lidocaine Patches, and suffered a loss as a result of those purchases.

37.     *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Classes because she has no interests which are adverse to the interests of the members of the Classes. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel, and by providing a cure-notice to Defendant regarding the Lidocaine Patches' defects on behalf of the members of the Classes to protect their interests.

38.     *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of New York's Warranty Act, N.Y. U.C.C. § 2-313
### (On Behalf of Plaintiff and the New York Subclass)

39.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

40.    Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

41.    Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

42.    Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

43.    15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

44.    N.Y. U.C.C. § 2-313 provides a cause of action to buyers when sellers breach express warranties.

45.    On the Lidocaine Patches' packaging, Defendant expressly warranted that its Lidocaine Patches were capable of providing pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS" or "UP TO 8 HOURS," depending on the product.

46.    Furthermore, on the Lidocaine Patches packaging, Defendant expressly warranted that its Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

47.    Those statements became the basis of the bargains for Plaintiff and the New York Subclass members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

48.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by delivering a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

49.     In so doing, Defendant breached N.Y. U.C.C. § 2-313.

50.     As a direct and proximate result of Defendant's breach of its express written warranties, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

### COUNT II
### Violation of New York's Warranty Act, N.Y. U.C.C. § 2-314
### (On Behalf of Plaintiff and the New York Subclass)

51.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

52.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

53.     Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

54.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

55.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

56.     N.Y. U.C.C. § 2-314(1) creates an implied warranty of merchantability when a seller "is a merchant with respect to goods of that kind."

57.     Defendant is a merchant as defined in 15 N.Y. U.C.C. § 2-104(1) because it deals in goods in the kind (i.e., selling Lidocaine Patches) and holds itself out as having knowledge or skill peculiar to the practices or goods involved (i.e., selling pharmaceutical goods).

58.     For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." N.Y. U.C.C. § 2-314(2)(c).

59.     Defendant breached its implied warranties of merchantability by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

60.     In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(c).

61.     For goods to be merchantable, they must also "conform to the promises or affirmations of fact made on the container or label if any." N.Y. U.C.C. §§ 2-314(2)(f).

62.     On the Lidocaine Patches' packaging, Defendant promised and otherwise made affirmations of fact that the Lidocaine Patches were capable of providing pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS" or "UP TO 8 HOURS," depending on the product.

63.     Furthermore, on the Lidocaine Patches packaging, Defendant promised and otherwise made affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other available over-the-counter and/or prescription-strength lidocaine patches.

64.     Defendant's Lidocaine Patches did not conform to those promises and affirmations of fact because they: (1) systemically fail to adhere to its consumers' bodies up to

12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by delivering a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

65. In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(f).

66. As a direct and proximate result of Defendant's breach of its implied warranties of merchantability, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

**COUNT III**
**Violation of New York's Warranty Act, N.Y. U.C.C. § 2-315**
**(On Behalf of Plaintiff and the New York Subclass)**

67. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

68. Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

69. Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

70. Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

71. 15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

72.     N.Y. U.C.C. § 2-315 provides a cause of action when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."

73.     Defendant knew that the Lidocaine Patches that it sold to Plaintiff and the New York Subclass members were designed for the specific purpose of providing analgesic effects to sore muscles.

74.     Lacking the requisite pharmacological knowledge to evaluate the efficacy of the Lidocaine Patches, Plaintiff and the New York Subclass members relied on Defendant's skill and judgment as a reputable pharmaceutical company when they chose to buy the Lidocaine Patches.

75.     Defendant breached its implied warranties of fitness for use by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

76.     In so doing, Defendant breached N.Y. U.C.C. § 2-315.

77.     As a direct and proximate result of Defendant's breach of its implied warranties of fitness for use, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

**COUNT IV**
**Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff and the Class)**

78.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

79.     15 U.S.C. § 2310(d) is satisfied because Plaintiff properly invokes jurisdiction under the Class Action Fairness Act ("CAFA").

80. 15 U.S.C. § 2310(e) is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

81. 15 U.S.C. § 2310(d)(1) provides a cause of action to "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation…under a written warranty, implied warranty, or service contract."

82. Defendant's Lidocaine Patches are consumer products as defined in 15 U.S.C. § 2301(1).

83. Plaintiff and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

84. Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

85. 15 U.S.C. § 2301(6)(A) defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship…will meet a specified level of performance over a specified period of time."

86. Defendant provided Plaintiff and the Class members "written warranties" within the meaning of 15 U.S.C. § 2301(6) by providing written promises and affirmations of fact on the Lidocaine Patches' packaging that they were capable of providing pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS" or "UP TO 8 HOURS," depending on the product.

87. Furthermore, on the Lidocaine Patches packaging, Defendant provided written promises and affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

88.     Those statements became the basis of the bargains for Plaintiff and the Class members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

89.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by delivering a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

90.     Further, Defendant breached its implied warranties of merchantability and fitness for use due to its breaches of N.Y. U.C.C. §§ 2-314, 15, as set forth above. 15 U.S.C. § 2301(7).

91.     As a direct and proximate result of Defendant's breach of its express and implied warranties, Plaintiff and the Class members have been damaged in an amount to be proven at trial.

**COUNT V**
**Violation of New York G.B.L. § 349**
**(On Behalf of Plaintiff and the New York Subclass)**

92.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

93.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

94.     In its sale of Lidocaine Patches throughout the State of New York, at all relevant times herein, Defendant conducted business and trade within the meaning and intendment of New York's General Business Law § 349.

95.     Plaintiff and the New York Subclass members are consumers who purchased the Lidocaine Patches from Defendant for their personal use.

96.     By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, (i) misrepresenting the efficacy of the Lidocaine Patches on their packaging (i.e., that they were capable of providing pain relief by delivering a 4% lidocaine dose to its consumers' bodies for "UP TO 12 HOURS" or "UP TO 8 HOURS," despite their systematic failure to do so); (ii) omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching, or sleeping; and (iii) misrepresenting that Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Lidocaine Patches do not provide the maximum amount of lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

97.     The foregoing deceptive acts and practices were directed at consumers.

98.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the intrinsic qualities of the Lidocaine Patches.

99.     As a result of Defendant's deceptive practices, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions,

and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

100. On behalf of herself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## COUNT VI
### Violation of New York G.B.L. §350
### (On Behalf of Plaintiff and the New York Subclass)

101. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

102. New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

103. Defendant violated New York General Business Law § 350 by falsely advertising on the Lidocaine Patches' packaging that the Lidocaine Patches would reliably provide pain relief by delivering a 4% lidocaine dose to its consumers' bodies for "UP TO 12 HOURS" or "UP TO 8 HOURS," when, in fact, they systematically fail to do so.

104. Furthermore, Defendant violated New York General Business Law § 350 by omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching or sleeping.

105. Finally, Defendant violated New York General Business Law § 350 by misrepresenting that the Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Maximum Strength Lidocaine Patches do not provide the maximum amount of

lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

106.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

107.    Defendant's misrepresentations and omissions have resulted in consumer injury or harm to the public interest.

108.    As a result of Defendant's false advertising, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions, and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

109.    On behalf of herself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Classes; and naming Plaintiff's attorney as Class Counsel to represent the Classes;

(b)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)    For compensatory and punitive damages in amounts to be determined by the

Court and/or jury;

      (d)     For prejudgment interest on all amounts awarded;

      (e)     For an order of restitution and all other forms of equitable monetary relief;

      (f)     For injunctive relief as pleaded or as the Court may deem proper; and

      (g)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees

and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable as of right.

Dated: December 11, 2021         Respectfully submitted,

          **GUCOVSCHI ROZENSHTEYN, PLLC**

          By:    */s/ Adrian Gucovschi*
                  Adrian Gucovschi

          Adrian Gucovschi
          630 Fifth Avenue, Suite 2000
          New York, NY 10111
          Telephone: (212) 884-4230
          E-Mail: adrian@gr-firm.com

          *Attorney for Plaintiff*

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————— x

Naomy Altagracia Gonzalez Rodriguez,                          :
individually and on behalf of all others similarly           :
situated,                                                     :
                                              :    Case No.
                                              :
                Plaintiff,                 :
v.                                                            :
                                              :
                                            :    **CLASS ACTION**
Walmart Inc.,                                                 :      **COMPLAINT**
                                              :
            Defendant.                 :    **JURY TRIAL DEMANDED**
                                              :
                                              :
——————————————————————— x

        Plaintiff Naomy Altagracia Gonzalez Rodriguez (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

       1.    This action seeks to remedy the deceptive and misleading business practices of Walmart Inc., (hereinafter "Defendant") with respect to the marketing and sale of Defendant's various pain relief lidocaine patch products throughout the state of New York and throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- Equate Maximum Strength Lidocaine Pain Relieving Patch; and

- Equate Lidocaine + Menthol Pain Relief Patch.

1

2. Lidocaine belongs to the family of medicines called local anesthetics. It prevents pain by blocking the signals at the nerve endings in the skin.[1] Lidocaine patches are often prescribed by doctors, but Defendant offers the Products over-the-counter to consumers.

3. Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign that represents that its lidocaine patches provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

4. As depicted below, Defendant claims that the topical patches provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

---

[1] https://www.mayoclinic.org/drugs-supplements/lidocaine-topical-application-route/description/drg-20072776.





5.      However, Defendant's claims, representations, and warranties are false and misleading.  As explained in further detail below, despite proper application, within a short time the Products commonly fall off of consumers' bodies, thus depriving consumers of the advertised

benefits (i.e.- they don't provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" as promised).

6.      Moreover, Defendant labels some of the Products as providing a "maximum strength" dose despite these Products only containing 4% lidocaine.

7.      Defendant's "maximum strength" claims are false and deceptive because there are other products available that offer lidocaine patches containing 5% lidocaine.[2]

8.      Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" when purchasing and administering the Products.  Plaintiff and Class Members paid a premium for the Products based upon these representations.  Given that Plaintiff and Class Members paid a premium for Products based on Defendant's misrepresentations that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

9.      Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350, and the Magnuson-Moss Warranty Act.  Defendant breached and continues to breach its warranties regarding the Products.  Defendant has been and continues to be unjustly enriched.  Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

---

[2] https://www.mountainside-medical.com/products/lidocaine-patch-5-by-watson; *see also* https://medic.hrt.org/drug/lidocaine-5-patch-adhesive-patch-medicated-3.

## FACTUAL BACKGROUND

10.     Lidocaine patches, akin to the Products, utilize lidocaine, an anesthetic, to cause loss of feeling in the skin and surrounding tissues to help alleviate pain in the applied bodily area.[3]

11.     Typically, lidocaine patches are prescribed by physicians.[4]    However, many companies have noticed the popularity of lidocaine patches amongst consumers and as a result now offer over-the-counter lidocaine patches, like the Products, to capitalize on consumers' desire for lidocaine pain relief patches.  Indeed, consumers are willing to pay, and have paid, a premium price for these products.  This is reflected in the global pain relief patches market size that is projected to reach 940.1 million USD by 2026.[5]

12.     Defendant falsely markets its Products as providing a "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."  Despite these representations, Defendant's Products are not easy to apply on consumers for up to 12 hours, and consequently do not provide the promised four percent maximum strength dose of lidocaine contained in the Products for up to 12 hours.

13.     Reasonable customers, including Plaintiff and Class Members, believe that Products that are marketed as being able to provide a "4%" and/or "maximum strength" dose through "easy to apply" patches that can be used for "up to 12 hours," will continuously adhere to their bodies for up to 12 hours, be sufficiently flexible to withstand regular daily activities, and will provide the pain relief for the 12 hours at maximum strength; however, the Products do not because they do not stay adhered to consumers' bodies for 12 hours.

---

[3] https://my.clevelandclinic.org/health/drugs/19854-lidocaine-skin-cream-or-ointment.
[4] https://www.webmd.com/drugs/2/drug-8532-1252/lidocaine-topical/lidocaine-patch-topical/details.
[5] https://www.thecowboychannel.com/story/45321517/pain-relief-patches-marketnbspsizenbspgrowthnbspratenbspanalysis-2021-2026-by-global-industry-trends-development-history-regional-overview-sharehttps://www.thecowboychannel.com/story/45321517/pain-relief-patches-marketnbspsizenbspgrowthnbspratenbspanalysis-2021-2026-by-global-industry-trends-development-history-regional-overview-share.

14. The Defendant was on notice of the Products' defect from complaints in its own website. Here are a few examples of the complaints concerning the Products available for public viewing on Defendant's website (www.walmart.com):



★☆☆☆☆                                    2/4/2022

**the adhesive is horrible quality**

do not buy these the patches are poorly made, the adhesive doesn't work they don't stay in your skin when you put them on. complete waste of money.

Josie



★☆☆☆☆ **Verified Purchaser**          8/8/2021

**How can this work if it doesn't stick?????**

I bought this item for my neck and the darn things would not stick to my skin. I could amagine what the back would be like. probably wouldn't stick there either?????? Please try to work on that sticky part so that people could get the releif that they expect. Thank you

Cookie

★☆☆☆☆  **Verified Purchaser**                    9/24/2021

### Not a fan of Equate Max Lidocaine Patches

I love Walmart and am generally thrilled with most of the Great Value products. Unfortunately these patches are terrible and need an update. I use other name brand patches regularly for years. These patches are way too sticky and stick to themselves when applying. Once the shape is compromised they fall off easily. I dont feel the medication is powerful either as with other brands. Walmart pls look into this and update this product thank you very much!

R

★☆☆☆☆                                         2/17/2022

### Don't buy it!

Not worth the money! Does not stay where you put it and doesn't help the pain!

Nrodd

15.     Moreover, the Federal Drug Administration (hereinafter "FDA") issued a report that transdermal drug patches (such as the Products) systemically fail to adhere to the body and thus do not provide the claimed pain relief.[6]

16.     Further, the FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[7]  This is in line with the above customer complaints regarding the Products' lack of adhesion abilities.

17.     A 2021, peer-reviewed published study in the Journal of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion rate after 12 hours.[8]  Moreover, the authors found that the mean adhesiveness score of the generic lidocaine patches after 12 hours was 37.67%.[9]  This figure is based on a scale where zero percent reflects complete detachment and 50% reflects half the product lifting off the skin but not detached.[10]

18.     When consumers purchase pain-relief products the strength of the dose is an important consideration.  Thus, consumers are willing to pay a price premium for pain-relief products that have higher doses.  For example, Defendant charges approximately $0.97 per patch for comparable patches on its website that aren't labeled "maximum strength" but charges approximately $1.16 for its "maximum strength" patches.[11]

---

[6] *See* Yellela S.R. Krishnaiah, PhD, *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, Oct. 28, 2015, AAPS 2015_Sunrise Session; link: https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html.
[7] *See* Jeff Gudin & Sri Nalamachu, *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*, Postgrad Med. 2020; 132(1):28-36; link: https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296.
[8] *Id.*
[9] *Id.*
[10] *See* Gudin J, et al., *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects,* J Pain Res. 2021; 14:513-526; link: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/.
[11] *See https://www.walmart.com/search?q=lidocaine+patches*

19.    Additionally, reasonable customers also believe that when a product is represented as "maximum strength" that there are no comparable products on the market that contain a greater dose; however, there are competitor prescription lidocaine patches that consist of 5% lidocaine as opposed to Defendant's 4% Products.[12] This 1% difference is significant with respect to claiming that the Products are "maximum strength," as compared to the 5% patches that are available. Thus, Defendant deceives reasonable consumers, like Plaintiff, into believing that they are purchasing the patch with the most lidocaine when there are other competitor prescription products available in the market that contain a higher dose of lidocaine.

20.    Despite all of this, Defendant continues to make the representations that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours," even though they do not.

### PLAINTIFF'S CLAIMS

21.    Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products do provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" when purchasing the Products. Plaintiff and other Class Members also believed that these claims were supported. Absent these misrepresentations, Plaintiff and Class Members would not have purchased the Products. Given that Plaintiff and Class Members paid for Products they would not otherwise have purchased and/or paid a premium for the Products based on Defendant's misrepresentations, Plaintiff and Class Members suffered an injury in the amount of the purchase price of the Products and/or premium paid.

---

[12] https://www.mountainside-medical.com/products/lidocaine-patch-5-by-watson; *see also* https://medic.hrt.org/drug/lidocaine-5-patch-adhesive-patch-medicated-3.

22.     Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350, and the consumer protection statutes of all 50 states. Defendant breached and continues to breach its express and implied warranties regarding the Products. Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

23.     Through its deceptive advertising and representations, Defendant has violated, *inter alia*, NY General Business Law § 392-b by: a) putting upon an article of merchandise, bottle, wrapper, package, label or other thing, containing or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b) selling or offering for sale an article, which to their knowledge is falsely described or indicated upon any such package, or vessel containing the same, or label thereupon, in any of the particulars specified.

24.     Consumers rely on marketing and information in making purchasing decisions.

25.     By marketing the Products as having the ability to provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours," Defendant knows that those claims are material to consumers.

26.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, since the Products are not easy to apply for 12 hours to provide the represented maximum strength pain relief. Further, Defendant's misrepresentations are deceiving as there are competitor lidocaine patch products that provide greater lidocaine than Defendant's "maximum strength" Products.

27. Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions because they purchased something of no value.

28. Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

29. In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for products marketed as having the ability to provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" over comparable products not so marketed.

30. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class Members in that they:

a.    Paid a sum of money for Products that were not what Defendant represented;

b.    Paid a premium price for Products that were not what Defendant represented;

c.    Were deprived of the benefit of the bargain because the Products they purchased was different from what Defendant warranted; and

d.    Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

31. Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

32.     Plaintiff and the Class Members paid for Products that provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" and that they believed actually did so.  The Products Plaintiff and the Class Members received were worth less than the Products for which they paid.

33.     Plaintiff and the Class Members all paid money for the Products; however, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions.  Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.  Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

34.     Plaintiff and Class Members read and relied on Defendant's representations about the benefits of using the Products, and purchased Defendant's Products based thereon.  Had Plaintiff and Class Members known the truth about the Products, i.e., that they do not have the benefits they say they do (i.e. easy to apply and provide pain relief for up to 12 hours and provide maximum amount possible of lidocaine) they would not have been willing to purchase it at any price, or, at minimum would have paid less for it.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) Plaintiff is a citizen of New York, and Defendant Walmart Inc. is a citizen of Arkansas; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

36.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the state of New York, contracts to supply goods within the state of New York, and supplies goods within the state of New York.

37.     Venue is proper because Plaintiff and many Class Members reside in the Southern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

**Plaintiff**

38.     Plaintiff, Naomy Altagracia Gonzalez Rodriguez, is an individual consumer who, at all times material hereto, was a citizen of New York State.  Plaintiff purchased the Products during the Class Period in 2021 and 2022 at Walmart Inc.'s brick-and-mortar locations in New York.  Prior to purchasing the Products, Plaintiff read the Products' marketing.  The claims of the Products Plaintiff purchased contained the representations that they provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours." Plaintiff purchased the Products in reliance on Defendant's representations that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."  Plaintiff also relied on the "maximum strength" representation by believing the proper dosages were present in the Products to be deemed as "maximum strength."  Plaintiff believes that products that claim to provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" will actually provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours." If the Products actually did provide "pain

relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours" as represented, Plaintiff would purchase the Products in the immediate future.

39.     Had Defendant not made the false, misleading, and deceptive representation that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."  Plaintiff would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and paid more for the Products than she would have had she known the truth about the Products.  The Products Plaintiff received were worth less than the Products for which she paid.  Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

40.     Defendant, Walmart Inc., is a corporation with its principal place of business in Bentonville, Arkansas.  Walmart Inc. is authorized to do business in New York.  Walmart Inc. distributes its products, including the Products, throughout the United States.  Walmart Inc.'s line of lidocaine patches, including the Products purchased by Plaintiff and Class Members, are available at retail stores throughout New York and the United States.

41.     Defendant manufactures, markets, advertises, and distributes the Products throughout the United States.  Defendant created and/or authorized the false, misleading, omitting, and deceptive advertisements, packaging, and labeling of their Products.

## CLASS ALLEGATIONS

42.     Plaintiff brings this matter on behalf of herself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and

representation practices. Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution, including injunctive relief.

43.    The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period (the "Class").

44.    Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

45.    The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

46.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

47.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendant's deceptive and misleading practices.

48.    <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

   a.    Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

   b.    Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

16

c.   Whether Defendant made false and/or misleading statements to the Class and the public concerning the contents of its Products;

d.   Whether Defendant's false and misleading statements concerning its Products were likely to deceive the public;

e.   Whether Plaintiff and the Class are entitled to injunctive relief; and

f.   Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members?

49.   <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

50.   <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seeks to represent, her consumer fraud claims are common to all members of the Class and she has a strong interest in vindicating her rights, she has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

51.   <u>Predominance</u>: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and representation practices.

52.   <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.    The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c.    When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.    It would be desirable to concentrate in this single venue the litigation of all class members who were induced by Defendant's uniform false advertising to purchase its Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

53.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## INJUNCTIVE CLASS RELIEF

54.     Rules 23(b)(1) and (2) contemplate a class action for purposes of seeking class-wide injunctive relief.  Here, Defendant has engaged in conduct resulting in misleading consumers about ingredients in its Products.  Since Defendant's conduct has been uniformly directed at all consumers in the United States, and the conduct continues presently, injunctive relief on a class-wide basis is a viable and suitable solution to remedy Defendant's continuing misconduct.  Plaintiff would purchase the Products again if it actually did provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

55.     The injunctive Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

a.      <u>Numerosity</u>: Individual joinder of the injunctive Class Members would be wholly impracticable.  Defendant's Products have been purchased by thousands of people throughout the United States;

b.      <u>Commonality</u>: Questions of law and fact are common to members of the Class. Defendant's misconduct was uniformly directed at all consumers.  Thus, all members of the Class have a common cause against Defendant to stop its misleading conduct through an injunction.  Since the issues presented by this injunctive Class deal exclusively with Defendant's misconduct, resolution of these questions would necessarily be common to the entire Class.  Moreover, there are common questions of law and fact inherent in the resolution of the proposed injunctive class, including, *inter alia*:

i.      Resolution of the issues presented in the 23(b)(3) class;

ii.     Whether members of the Class will continue to suffer harm by virtue of Defendant's deceptive Products marketing and representations; and

iii.    Whether, on equitable grounds, Defendant should be prevented from continuing to deceptively mislabel its Products as providing "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

c. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the injunctive Class because her claims arise from the same course of conduct (i.e. Defendant's deceptive and misleading marketing, labeling, and advertising practices). Plaintiff is a typical representative of the Class because, like all members of the injunctive Class, she purchased Defendant's Products which was sold unfairly and deceptively to consumers throughout the United States.

d. <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the injunctive Class. Her consumer protection claims are common to all members of the injunctive Class and she has a strong interest in vindicating her rights. In addition, Plaintiff and the Class are represented by counsel who is competent and experienced in both consumer protection and class action litigation.

56. The injunctive Class is properly brought and should be maintained as a class action under Rule 23(b)(2) because Plaintiff seeks injunctive relief on behalf of the Class Members on grounds generally applicable to the entire injunctive Class. Certification under Rule 23(b)(2) is appropriate because Defendant has acted or refused to act in a manner that applies generally to the injunctive Class (i.e. Defendant has marketed its Products using the same misleading and deceptive representations to all of the Class Members). Any final injunctive relief or declaratory relief would benefit the entire injunctive Class as Defendant would be prevented from continuing its misleading and deceptive marketing practices and would be required to honestly disclose to consumers the nature of its Products. Plaintiff would purchase the Products again if it actually did provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
#### (On Behalf of Plaintiff and New York Subclass Members)

57.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

58.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

59.     The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining them from inaccurately describing, representing, marketing, and promoting the Products and from charging consumers monies in the future.

60.     Defendant misleadingly, inaccurately, and deceptively advertise and market the Products to consumers.

61.     Defendant's improper consumer-oriented conduct (including advertising the Products as providing "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours")  is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have.  Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

62.     Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for a Products that (contrary to Defendant's representations) does not provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."  Plaintiff and the New York Subclass Members also relied to their detriment on the "maximum strength" representation by believing the proper dosages were present in the Products to be deemed as "maximum strength" even though they were not. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

63.     Defendant's advertising and Products' representations induced Plaintiff and the New York Subclass Members to buy Defendant's Products and to pay a premium price for it.

64.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

65.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory damages of $50 per unit sold, compensatory, treble and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK GBL § 350
### (On Behalf of Plaintiff and the New York Subclass Members)

66.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

67.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

68.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

69.     Defendant's representations and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

70.     Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the representations and advertising and paid a premium for the Products which (contrary to Defendant's representations) do not provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."  Plaintiff and the New York Subclass Members also relied to their detriment on the "maximum strength" representation by believing the proper dosages were present in the Products

to be deemed as "maximum strength" even though they were not. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

71.    Defendant's advertising and Products' representations induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

72.    Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

73.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

74.    Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and representations.

75.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

76.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory damages of $500 per unit sold, compensatory, treble and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
#### (On Behalf of Plaintiff and All Class Members)

77.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78. Defendant provided Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

79. The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

80. These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' transactions.

81. Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

82. Within a reasonable time after they knew or should have known, Defendant did not correct their Products' marketing and labeling to reflect the true nature of the Products' capabilities.

83. Defendant thereby breached the following state warranty laws:

   a.   Code of Ala. § 7-2-313;

   b.   Alaska Stat. § 45.02.313;

   c.   A.R.S. § 47-2313;

   d.   A.C.A. § 4-2-313;

   e.   Cal. Comm. Code § 2313;

   f.   Colo. Rev. Stat. § 4-2-313;

   g.   Conn. Gen. Stat. § 42a-2-313;

   h.   6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.   N.Y. U.C.C. Law § 2-313;

gg.   N.C. Gen. Stat. § 25-2-313;

hh.   N.D. Cent. Code § 41-02-30;

ii.   II. O.R.C. Ann. § 1302.26;

jj.   12A Okl. St. § 2-313;

kk.   Or. Rev. Stat. § 72-3130;

ll.   13 Pa. Rev. Stat. § 72-3130;

mm.   R.I. Gen. Laws § 6A-2-313;

nn.   S.C. Code Ann. § 36-2-313;

oo.   S.D. Codified Laws, § 57A-2-313;

pp.   Tenn. Code Ann. § 47-2-313;

qq.   Tex. Bus. & Com. Code § 2.313;

rr.   Utah Code Ann. § 70A-2-313;

ss.   9A V.S.A. § 2-313;

tt.   Va. Code Ann. § 59.1-504.2;

uu.   Wash. Rev. Code Ann. § 6A.2-313;

vv.   W. Va. Code § 46-2-313;

ww.   Wis. Stat. § 402.313;

xx.   Wyo. Stat. § 34.1-2-313.

84.   Defendant breached the express warranty because the Products do not provide "pain relieving/pain relief," that is "maximum strength," through an "easy to apply," and "stay-put, flexible patch" that will last "up to 12 hours."

85.     As a direct and proximate result of Defendant's breach of the express warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(On Behalf of Plaintiff and All Class Members in the Alternative)**

86.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     Plaintiff, on behalf of herself and consumers nationwide, brings a claim for unjust enrichment.

88.     Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling its Products while misrepresenting and omitting material facts.

89.     Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members, and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

90.     Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

91.     Under New York's common law principles of unjust enrichment, it is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class Members' overpayments.

92. Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b) Entering preliminary and permanent injunctive relief against Defendant, directing Defendant to correct its practices and to comply with consumer protection statutes nationwide, including New York consumer protection laws;

(c) Awarding monetary damages and treble damages;

(d) Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(e) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(f) Awarding punitive damages;

(g) Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

(h) Granting such other and further relief as the Court may deem just and proper.

Dated: April 11, 2022

**THE SULTZER LAW GROUP P.C.**

Jason P. Sultzer /s/

By: _____

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

*Counsel for Plaintiff and the Class*

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Delenator Stevens, individually and on behalf of all others similarly situated, | CASE NO. 21-cv-10603 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Walgreen Co., | |
| Defendant. | |

Plaintiff Delenator Stevens ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Walgreen Co. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1. This is a putative class action lawsuit on behalf of purchasers of Defendant's lidocaine patches (the "Lidocaine Patches").[1] Defendant markets, sells and distributes the Lidocaine Patches through numerous brick-and-mortar Walgreens retail locations and online through www.walgreens.com.

---

[1] The Lidocaine Patches include Defendant's "Pain Relieving Lidocaine Patch (5 patches)"; "Pain Relieving Lidocaine Patch (6 patches)"; "Pain Relieving Lidocaine Patches"; and "Cool n' Heat Lidocaine Patch."

1

2.      Lidocaine is a topical anesthetic that is used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain. Specifically, lidocaine functions by blocking sodium channels located on nerve endings which prevents action potential from propagating in the nerve cell and thereby interrupting the transmission of the pain signal.

3.      Although lidocaine patches are often prescribed by doctors, Defendant offers its Lidocaine Patches over-the-counter to unsuspecting consumers under false pretenses. Defendant takes advantage of these consumers by prominently displaying on the packaging of the Lidocaine Patches that the patches deliver a "Maximum Strength" dose of lidocaine while "Staying-put" for "up to 12 hours." Plaintiff and the proposed class members relied on those representations when making their purchases. To their dismay, however, Defendant's Lidocaine Patches regularly peel off their bodies within a few hours, and oftentimes minutes, after being properly applied, and do not deliver a maximum amount of lidocaine available in patch form.

4.      As a result of its deceptive conduct, Defendant is, and continues to be, unjustly enriched at the expense of its customers.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the class pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendant; and (4) the Defendant is not a governmental entity.

6. This Court has personal jurisdiction over Defendant because it conducts substantial business within New York, including the sale, marketing, and advertising of the Lidocaine Patches. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State, including Plaintiff's purchases.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## THE PARTIES

8. Plaintiff Delenator Stevens is a citizen of New York, residing in New York, New York. Plaintiff Stevens purchased Defendant's "Pain Relieving Lidocaine Patch (5 patches)" for approximately $8.99; "Pain Relieving Lidocaine Patch (6 patches)" for approximately $11.49; "Pain Relieving Lidocaine Patches" for approximately $12.49; and "Cool n' Heat Lidocaine Patch" for approximately $9.49. Plaintiff Stevens purchased these Lidocaine Patches on various occasions within the applicable statute of limitations, with his most recent purchase taking place in July of 2021. Plaintiff Stevens made these purchases at Walgreens stores located in the Bronx and New York, New York. Prior to his purchases, Plaintiff Stevens saw that the Lidocaine Patches were labeled and marketed as "Maximum Strength" and "Stay-put flexible" and read the directions on the back label, which indicated that he could use "[o]ne patch for up to 12 hours." Plaintiff Stevens relied on Defendant's representations when he decided to purchase the Lidocaine Patches over comparable and less expensive pain-relieving patches or gels. Plaintiff Stevens saw those representations prior to and at the time of his purchases and understood them as a representation and warranty that the Lidocaine Patches would reliably adhere to his body and deliver a 4% lidocaine dose for 12 hours. Initially, Plaintiff Stevens became frustrated when

3

his Lidocaine Patches peeled off his body while engaging in regular activities—such as walking, sitting, stretching, and sleeping—well before the represented 12 hours, through no fault of his own. Plaintiff Stevens, nonetheless, continued to purchase other Lidocaine Patches, believing that such failures were the result of one-off manufacturing flukes. After giving the Lidocaine Patches the benefit of the doubt, however, Plaintiff Stevens stopped purchasing them altogether after realizing that the Lidocaine Patches consistently failed to "Stay-put" or deliver a 4% "Maximum Strength" lidocaine dose for "up to 12 hours." For example, on a couple of occasions, the Lidocaine Patches that Plaintiff Stevens bought peeled off his body within an hour or two after he properly applied them pursuant to the directions contained on the products— delivering little to no analgesic effect to his sore muscles. Plaintiff Stevens relied on Defendant's representations and warranties in deciding to purchase his Lidocaine Patches. Accordingly, those representations and warranties were part of the basis of his bargains, in that he would not have purchased his Lidocaine Patches on the same terms had he known those representations and warranties were false. However, Plaintiff Stevens remains interested in purchasing Defendant's Lidocaine Patches and would consider the Lidocaine Patches in the future if Defendant ensured that the products actually "[s]tay- put" and can deliver a 4% "Maximum Strength" dose of lidocaine to his body for "up to 12 hours." Additionally, in making his purchases, Plaintiff Stevens paid a substantial price premium due to Defendant's false and misleading claims regarding the qualities of its Lidocaine Patches. However, Plaintiff Stevens did not receive the benefit of his bargains because his Lidocaine Patches did not, in fact, "[s]tay-put" or deliver a 4% "Maximum Strength" dose of lidocaine to his body for "up to 12 hours."

9.      Defendant Walgreen Co. ("Defendant") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Defendant markets, sells, and distributes the

Lidocaine Patches and is responsible for the advertising, marketing, trade dress, and packaging

of the Lidocaine Patches. Defendant marketed, distributed, and sold the Lidocaine Patches

during the class period.

## FACTUAL ALLEGATIONS

### *Defendant's False Advertising*

10.     Defendant markets, sells and distributes the Lidocaine Patches through numerous

brick-and-mortar Walgreens retail locations and online through www.walgreens.com. On the

Lidocaine Patches packaging, Defendant represents that its Lidocaine Patches are "Stay-put

flexible" patches that can be applied "up to 12 hours." The Lidocaine Patches are all

substantially similar, in that they all share the same adhesiveness misrepresentations:



11.     By representing that Lidocaine Patches are "Stay-put flexible" patches that can

be applied "up to 12 hours"[2]—a very specific number—Defendant induced Plaintiff and the

proposed class members into believing that the Lidocaine Patches: (1) would continuously

adhere to their bodies up to 12 hours; (2) were sufficiently flexible to withstand regular activities

---

[2] In the directions panel on the back label of each of the Lidocaine Patches, Defendant represents that consumer can "Use one patch for up to 12 hours." Exhibit A.

(such as walking, stretching, and sleeping) for someone who is suffering from sore muscles; and (3) would continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein. Furthermore, by representing that the "Pain Relieving Lidocaine Patch (6 patches)" and "Pain Relieving Lidocaine Patches" (the "Maximum Strength Lidocaine Patches") provide "Maximum Strength," Defendant induced Plaintiff and the proposed class members into believing that the Maximum Strength Lidocaine Patches: (1) contain and deliver the maximum amount of lidocaine available in patch form; and (2) that they are superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

12.      Despite these representations, however, Defendant's Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

### *Defendant's Knowledge of the Defective Lidocaine Patches*

13.      Defendant knew that its Lidocaine Patches did not live up to the adhesiveness representations contained therein based on dozens of complaints posted on its own website, www.walgreens.com, which Defendant actively monitors.

14.      For example, in October of 2021, a buyer explained their issue trying to get a Lidocaine Patch to adhere to their body:

"They don't stick to the skin well at all, the edges curl off with every movement, they're in a constant state of falling off. All the edges curl up from the moment you put them in and stick to any clothing or bedding rolling them up and pulling them off."[3]

15.    In January of 2021, yet another consumer expressed their frustration using Defendant's Lidocaine Patch:

"I bought these thinking they'd be better than they turned out to be. Scent free is about the only positive thing. They don't stick very well and if you have them under your cloths - normal moving around they fall off. Very disappointed but am unable to return them."[4]

16.    Furthermore, Defendant knew, or should have known, that its Lidocaine Patches were defectively designed based on FDA reports and scientific studies regarding the efficacy of the products.

17.    Specifically, Defendant's Lidocaine Patches work by delivering lidocaine through a transdermal mechanism—i.e., by delivering the analgesic chemical "through the dermis, or skin…in ointment or patch form."[5] According to FDA reports, transdermal drug delivery systems, such as the one used by Defendant, systematically fail to adhere to the body.[6] To that end, the FDA is in the process of finalizing an industry guidance on "Transdermal and Topical

---

[3] https://www.walgreens.com/store/c/walgreens-lidocaine-pain-relief-patches/ID=prod6386698-product (last accessed December 10, 2021).

[4] https://www.walgreens.com/store/c/walgreens-lidocaine-patches/ID=300394242-product (last accessed December 10, 2021).

[5] https://medical-dictionary.thefreedictionary.com/transdermal (last accessed December 10, 2021).

[6] *See* Yellela S.R. Krishnaiah *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, PhD Division of Product Quality Research OTR/OPQ/CDER US Food and Drug Administration Silver Spring, MD, USA AAPS 2015  Sunrise Session (2015). https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html (last accessed December 10, 2021).

Delivery Systems" to address, *inter alia*, "considerations for areas where quality is closely tied to product performance and potential safety issues, such as adhesion failure…"[7]

18.     Even more alarming, the FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[8]

19.     Furthermore, a peer-reviewed study published in January of 2021 by the Journal of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion rate to the study's subjects after 12 hours (i.e., essentially no part of the product lifting off the skin).[9] The study also found that after 12 hours, "37.5% of subjects experienced substantial detachment (to <10% adhesion) while using the generic lidocaine patch 5%, including 7 (29.1%) complete detachments." The study also found that the mean adhesiveness score of the generic lidocaine patches after 12 hours was 37.67% (where 0% reflects complete detachment and 50%

---

[7] *See* 84 FR 64319 - *Transdermal and Topical Delivery Systems-Product Development and Quality Considerations; Draft Guidance for Industry*; Availability (2019) https://www.regulations.gov/document/FDA-2019-D-4447-0001 (last accessed December 10, 2021).

[8] *See* Gudin J, Nalamachu S. *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*. *Postgrad Med*. 2020;132(1):28–36. doi:10.1080/00325481.2019.1702296 https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296 (last accessed December 10, 2021).

[9] See Gudin J, Webster LR, Greuber E, Vought K, Patel K, Kuritzky L. *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects*. *J Pain Res*. 2021;14:513-526. Published 2021 Feb 23. doi:10.2147/JPR.S287153. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/ (last accessed December 10, 2021). The study measured adhesion of the patches "immediately after application (0 hours) and at 3, 6, 9, and 12 hours (±15 minutes; before product removal) after application. Assessments in Study 1 were performed by a trained scorer using the FDA-recommended 5-point adhesion scale. The FDA scale ranges from 0 to 4, where 0 represents ≥90% of the product adhered (essentially no part of the product lifting off the skin), 1 represents 75% to <90% adhered (only some edges of the product lifting off the skin), 2 represents 50% to <75% adhered (less than half the product lifting off the skin), 3 represents >0% to <50% adhered (more than half the product lifting off the skin but not detached), and 4 represents 0% adhered (complete product detachment). The mean cumulative adhesion score was calculated by summing the scores at 3, 6, 9, and 12 hours and dividing the total by the total number of observations per subject." *Id.*

reflects half the product lifting off the skin but not detached). In contrast, the study found that a newly developed 1.8% lidocaine patch technology, which is bioequivalent to 5% lidocaine patches,[10] maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

20.     Although the study published by the Journal of Pain Research only tested generic prescription lidocaine patches, upon information and belief, Defendant's over-the-counter Lidocaine Patches—which have not undergone the rigorous approval process required by the FDA and use the same outdated and defective adhesion technology as the generic lidocaine patches[11] —fair no better.

21.     Furthermore, while certain companies have innovated their technology based on clinical studies to ensure that their lidocaine patches reliably adhere to a consumer's body,[12] even while exercising,[13] upon information and belief, Defendant has not.

---

[10] Gudin J, Argoff C, Fudin J, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects*. J Pain Res. 2020 Jun 22;13:1485-1496. doi: 10.2147/JPR.S237934. PMID: 32606914; PMCID: PMC7319520. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7319520/ (last accessed December 10, 2021).

[11] Defendant, whose Lidocaine Patches are manufactured in China, has not been approved by the FDA to market or sell its Lidocaine Patches despite being required to do so. The FDA is currently reviewing a Citizen Petition filed by Scilex Pharmaceuticals Inc. (a manufacturer of FDA-approved lidocaine patches) to remove from the market all over-the-counter lidocaine patches that lack FDA approval. *See* https://www.regulations.gov/docket/FDA-2019-P-0417/document (last accessed December 10, 2021).

[12] https://www.scilexpharma.com/scilex-presents-ztlido-data-on-superior-adhesion-over-lidocaine-patch-formulation/ (last accessed December 10, 2021).

[13] A separate study demonstrated that Scilex's lidocaine patches were able to reliably adhere when subjects engaged in moderate physical exercise (exercise bike) and heat (heating pad). *See* Fudin J, Wegrzyn EL, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System 1.8% During Physical Activity and Heat Treatment in Healthy Subjects*. J Pain Res. 2020;13:1359-1367. Published 2020 Jun 10. doi:10.2147/JPR.S238268. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7293912/#CIT0007 (last accessed December 10, 2021).

22.     In complete disregard of the wealth of information to the contrary, however, Defendant continues to misrepresent that its Lidocaine Patches reliably adhere to its consumers' bodies up to 12 hours when, in fact, they do not. Defendant also failed to inform its consumers that the Lidocaine Patches are prone to even greater detachment when they engage in certain activities (such as walking, stretching, and sleeping). Nor is Defendant's representation that its Lidocaine Patches are capable of continuously relieving pain by providing a 4% lidocaine dose throughout the specified 12 hours true, given that they systematically fail to fully adhere to its consumers' bodies for that period. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."[14]

23.     To make matters worse, Defendant misrepresents, without providing adequate disclaimers, that its Maximum Strength Lidocaine Patches provide a "Maximum Strength" dose of lidocaine, when, in fact, there are superior lidocaine patches in the market that deliver a higher amount of lidocaine: including the previously mentioned 5% and 1.8% prescription-strength lidocaine patches.[15] Defendant compounds this problem by indicating that the Maximum Strength Lidocaine Patches are "Medicated"—thereby reinforcing the misrepresentation that its Maximum Strength Lidocaine Patches are comparable to prescription-strength lidocaine patches.

24.     Furthermore, nothing in Defendant's Maximum Strength Lidocaine Patches indicates that they provide a greater dose of lidocaine in comparison to other over-the-counter lidocaine patches, including its own. Specifically, Defendant's representation that its Lidocaine Patches contain 4% lidocaine is misleading because the actual strength of a lidocaine patch is

---

[14] *See supra* footnote 10.
[15] *Id.*

measured by the "mass of drug relative to the mass of the adhesive per patch."[16] In other words, Defendant's representation that its Lidocaine Patches contain 4% lidocaine does not indicate the *actual* amount of lidocaine milligrams that its Lidocaine Patches deliver to a consumer's body.[17]

25.     Shockingly, and by way of illustration, Defendant labels its "Pain Relieving Lidocaine Patch (6 patches)" as possessing "Maximum Strength" although it has the exact specifications and delivers the same amount of lidocaine as its non-maximum-strength "Pain Relieving Lidocaine Patch (5 patches)"—both Patches weigh 9 grams per patch and contain a lidocaine dose of 4 grams for every 100 grams.[18] Translated into milligrams, both Patches contain 360 milligrams of lidocaine per patch—although one of the Patches claims to possess "Maximum Strength," while the other one does not. Further, both of Defendant's Maximum Strength Lidocaine Patches contain less lidocaine than other over-the-counter lidocaine patches: which range from 411.4 to 4,500 milligrams.[19] Defendant's arbitrary and patently false claim regarding the strength of its Maximum Strength Lidocaine Patches goes beyond the pale.

26.     Had Defendant not made the false, misleading, and deceptive misrepresentations and omissions alleged herein, Plaintiff and the proposed class members would not have

---

[16] *See* Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit B at pg. 19.

[17] "It is emphasized that most of these patch products are labeled as a percentage strength, without providing the total drug content per patch. For other topical dosage forms like creams, ointments, and lotions, the amount of drug administered can easily be determined by weighing the mass of product and applying the strength factor as illustrated in the table below. In contrast, the amount of drug applied for patch products cannot easily be determined because the exact mass of adhesive applied cannot be estimated due to the contributing mass of the backing materials. inasmuch as patches are manufactured in a variety of sizes and thicknesses, the drug exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk." Ex. B at pg. 20.

[18] https://www.dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1a587e6e-88d1-4b01-abad-9a365dc64a4d (last accessed December 10, 2021).

[19] *See* Attachment 1 to Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit C.

purchased the Lidocaine Patches or would not have paid as much as they did for those purchases. Thus, Plaintiff and the proposed class members suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of himself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

28.     The class periods shall be defined from the date of the filing of this Complaint, back to any such time the Court deems appropriate.

29.     Plaintiff seeks to represent all persons in the United States who purchased Defendant's Lidocaine Patches (the "Class").

30.     Plaintiff also seeks to represent a subclass of all Class members who purchased Defendant's Lidocaine Patches in New York (the "New York Subclass") (collectively with the Class, the "Classes").

31.     The Classes do not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

32.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

33.     ***Community of Interest***: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

34. *Numerosity*: While the exact number of members of the Classes is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. The precise number of the members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

35. ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes. These common legal and factual questions include, but are not limited to:

(a) Whether the Lidocaine Patches are defective;

(b) Whether Defendant knew of the Lidocaine Patches' defective nature;

(c) Whether Defendant breached the express warranties on the Lidocaine Patches' packaging;

(d) Whether Defendant breached the Lidocaine Patches' implied warranty of merchantability;

(e) Whether Defendant breached the Lidocaine Patches' implied warranty of fitness for use;

(f) Whether Defendant's representations that the Lidocaine Patches are "Stay-put flexible" patches that can be applied "up to 12 hours" or otherwise provide "Maximum Strength" are false and misleading in violation of New York's consumer-protection statutes;

(g) Whether Plaintiff and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof;

(h) Whether Plaintiff and the members of the Classes are entitled to statutory damages;

(i) Whether Plaintiff and the members of the Classes are entitled to restitution;

(j) Whether Plaintiff and the members of the Classes are entitled to injunctive relief to enjoin Defendant from further engaging in these wrongful practices; and

(k) Whether Plaintiff and the members of the Classes are entitled to attorney's fees and costs.

36.     ***Typicality:*** The claims of the name Plaintiff are typical of the claims of other members of the Classes in that the name Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's defective Lidocaine Patches, and suffered a loss as a result of those purchases.

37.     ***Adequacy***: Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Classes because he has no interests which are adverse to the interests of the members of the Classes. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel, and by providing a cure-notice to Defendant regarding the Lidocaine Patches' defects on behalf of the members of the Classes to protect their interests.

38.     ***Superiority:*** A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for

members of the Classes to seek to redress their claims other than through the procedure

of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting

duplicity of lawsuits would cause members of the Classes to seek to redress their claims

other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and

there would be a failure of justice.

## **CAUSES OF ACTION**

### **COUNT I**
**Violation of New York's Warranty Act, N.Y. U.C.C. § 2-313**
**(On Behalf of Plaintiff and the New York Subclass)**

39.     Plaintiff incorporates by reference each of the allegations contained in the

foregoing paragraphs of this Complaint as though fully set forth herein.

40.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

41.     Plaintiff and the New York Subclass members are buyers as defined in N.Y.

U.C.C. § 2-103(1)(a).

42.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

43.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a

reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending

Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

44.     N.Y. U.C.C. § 2-313 provides a cause of action to buyers when sellers breach

express warranties.

45.     On the Lidocaine Patches' packaging, Defendant expressly warranted that Lidocaine Patches are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours."

46.     Furthermore, on the Maximum Strength Lidocaine Patches packaging, Defendant expressly warranted that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

47.     Those statements became the basis of the bargains for Plaintiff and the New York Subclass members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

48.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

49.     In so doing, Defendant breached N.Y. U.C.C. § 2-313.

50.     As a direct and proximate result of Defendant's breach of its express written warranties, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

## COUNT II
### Violation of New York's Warranty Act, N.Y. U.C.C. § 2-314
### (On Behalf of Plaintiff and the New York Subclass)

51.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

52.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

53.     Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

54.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

55.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

56.     N.Y. U.C.C. § 2-314(1) creates an implied warranty of merchantability when a seller "is a merchant with respect to goods of that kind."

57.     Defendant is a merchant as defined in 15 N.Y. U.C.C. § 2-104(1) because it deals in goods in the kind (i.e., selling Lidocaine Patches) and holds itself out as having knowledge or skill peculiar to the practices or goods involved (i.e., selling pharmaceutical goods).

58.      For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." N.Y. U.C.C. § 2-314(2)(c).

59.     Defendant breached its implied warranties of merchantability by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

60.     In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(c).

61.     For goods to be merchantable, they must also "conform to the promises or affirmations of fact made on the container or label if any." N.Y. U.C.C. §§ 2-314(2)(f).

62.     On the Lidocaine Patches' packaging, Defendant promised and otherwise made affirmations of fact that the Lidocaine Patches are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours."

63.     Furthermore, on the Maximum Strength Lidocaine Patches packaging, Defendant promised and otherwise made affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other available over-the-counter and/or prescription-strength lidocaine patches.

64.     Defendant's Lidocaine Patches did not conform to those promises and affirmations of fact because they: (1) systemically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

65.     In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(f).

66.     As a direct and proximate result of Defendant's breach of its implied warranties of merchantability, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

## COUNT III
### Violation of New York's Warranty Act, N.Y. U.C.C. § 2-315
### (On Behalf of Plaintiff and the New York Subclass)

67.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

68.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

69.     Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

70.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

71.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

72.     N.Y. U.C.C. § 2-315 provides a cause of action when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."

73.     Defendant knew that the Lidocaine Patches that it sold to Plaintiff and the New York Subclass members were designed for the specific purpose of providing analgesic effects to sore muscles.

74.     Lacking the requisite pharmacological knowledge to evaluate the efficacy of the Lidocaine Patches, Plaintiff and the New York Subclass members relied on Defendant's skill and judgment as a reputable pharmaceutical company when they chose to buy the Lidocaine Patches.

75.     Defendant breached its implied warranties of fitness for use by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

76.     In so doing, Defendant breached N.Y. U.C.C. § 2-315.

77.     As a direct and proximate result of Defendant's breach of its implied warranties of fitness for use, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

### COUNT IV
### Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*
### (On Behalf of Plaintiff and the Class)

78.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

79.     15 U.S.C. § 2310(d) is satisfied because Plaintiff properly invokes jurisdiction under the Class Action Fairness Act ("CAFA").

80.     15 U.S.C. § 2310(e) is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

81.     15 U.S.C. § 2310(d)(1) provides a cause of action to "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation… under a written warranty, implied warranty, or service contract."

82.     Defendant's Lidocaine Patches are consumer products as defined in 15 U.S.C. § 2301(1).

83.     Plaintiff and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

84.     Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

85.     15 U.S.C. § 2301(6)(A) defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that

such material or workmanship…will meet a specified level of performance over a specified period of time."

86.     Defendant provided Plaintiff and the Class members "written warranties" within the meaning of 15 U.S.C. § 2301(6) by providing written promises and affirmations of fact on the Lidocaine Patches' packaging that the Lidocaine Patches are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours."

87.     Furthermore, on the Maximum Strength Lidocaine Patches packaging, Defendant provided written promises and affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

88.     Those statements became the basis of the bargains for Plaintiff and the Class members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

89.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

90.     Further, Defendant breached its implied warranties of merchantability and fitness for use due to its breaches of N.Y. U.C.C. §§ 2-314, 15, as set forth above. 15 U.S.C. § 2301(7).

91.     As a direct and proximate result of Defendant's breach of its express and implied warranties, Plaintiff and the Class members have been damaged in an amount to be proven at trial.

## COUNT V
### Violation of New York G.B.L. § 349
### (On Behalf of Plaintiff and the New York Subclass)

92.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

93.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

94.     In its sale of Lidocaine Patches throughout the State of New York, at all relevant times herein, Defendant conducted business and trade within the meaning and intendment of New York's General Business Law § 349.

95.     Plaintiff and the New York Subclass members are consumers who purchased the Lidocaine Patches from Defendant for their personal use.

96.     By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, (i) misrepresenting the efficacy of the Lidocaine Patches on their packaging (i.e., that they are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine for "up to 12 hours," despite their systematic failure to do so); (ii) omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching, or sleeping; and (iii) misrepresenting that the Maximum Strength Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Maximum Strength Lidocaine Patches

do not provide the maximum amount of lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

97.     The foregoing deceptive acts and practices were directed at consumers.

98.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the intrinsic qualities of the Lidocaine Patches.

99.     As a result of Defendant's deceptive practices, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions, and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

100.     On behalf of himself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## <u>COUNT VI</u>
### Violation of New York G.B.L. §350
### (On Behalf of Plaintiff and the New York Subclass)

101.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

102.     New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

103.     Defendant violated New York General Business Law § 350 by falsely advertising on the Lidocaine Patches' packaging that they are "Stay-put flexible" patches capable of

providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours," when, in fact, they systematically fail to do so.

104.    Furthermore, Defendant violated New York General Business Law § 350 by omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching, or sleeping.

105.    Finally, Defendant violated New York General Business Law § 350 by misrepresenting that the Maximum Strength Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Maximum Strength Lidocaine Patches do not provide the maximum amount of lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

106.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

107.    Defendant's misrepresentations and omissions have resulted in consumer injury or harm to the public interest.

108.    As a result of Defendant's false advertising, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions, and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

109.    On behalf of himself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)  For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Classes; and naming Plaintiff's attorney as Class Counsel to represent the Classes;

(b)  For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)  For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(d)  For prejudgment interest on all amounts awarded;

(e)  For an order of restitution and all other forms of equitable monetary relief;

(f)  For injunctive relief as pleaded or as the Court may deem proper; and

(g)  For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: December 11, 2021                    Respectfully submitted,

                                            **GUCOVSCHI ROZENSHTEYN, PLLC**

                                            By:  ___/s/ Adrian Gucovschi_____
                                                      Adrian Gucovschi

                                            Adrian Gucovschi
                                            630 Fifth Avenue, Suite 2000
                                            New York, NY 10111

Telephone: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorney for Plaintiff*

# EXHIBIT 8

Plaintiff ~~Monique Bell~~<u>Shejuana Ary</u> is a <u>natural person and</u> citizen of ~~New York, residing in Brooklyn, New York~~<u>California who resides in Hayward, California</u>. Plaintiff purchased Defendant's Lidocaine ~~Pain Relief Patch~~<u>Patches</u> for her personal use for approximately $~~9.79~~<u>7.99</u> on various occasions within the applicable statute of limitations, with her most recent purchase taking place ~~in September~~<u>on or about January</u> of ~~2021~~<u>2022</u>. Plaintiff <u>Ary</u> made these purchases ~~at a CVS store~~<u>from one of Defendant's pharmacies</u> located in ~~Brooklyn, New York~~<u>Alameda County, California</u>. Prior to her purchases, Plaintiff saw that the Lidocaine Patches were labeled and marketed as ~~"Maximum Strength" patches capable of delivering a 4%~~<u>providing "pain-relief" using a "maximum strength" dose of</u> lidocaine ~~dose~~ for "~~UP TO 12 HOURS" and read the directions on the back label, which indicated that she could use "1 patch for~~ up to ~~12~~<u>8</u> hours." Plaintiff relied on Defendant's representations when she decided to purchase the Lidocaine Patches over comparable and less expensive pain-relieving patches or ~~gels~~<u>creams</u>. Plaintiff saw those representations prior to and at the time of her purchases and understood them as a representation and warranty that the Lidocaine Patches would reliably adhere to her body and ~~deliver a 4%~~<u>provide pain relief for up to 8 hours by delivering a maximum strength dose of</u> lidocaine ~~dose for 12 hours~~. Initially, Plaintiff became frustrated when her Lidocaine Patches peeled off her body while engaging in regular activities—such as walking, ~~sitting,~~ stretching, and sleeping—well before the represented ~~12~~<u>8</u> hours, through no fault of her own. ~~Plaintiff, nonetheless, continued to purchase other Lidocaine Patches, believing that such failures were the result of one-off manufacturing flukes. After giving~~<u>Having given</u> the Lidocaine Patches the benefit of the doubt, ~~however,~~ Plaintiff ~~stopped purchasing them altogether after realizing~~<u>realized</u> that the Lidocaine Patches consistently failed to provide pain relief ~~by delivering a 4% lidocaine dose for "UP TO 12 HOURS~~<u>anywhere close to the represented 8 hours</u>.~~"~~ For example, on a couple

of occasions, the Lidocaine Patches that Plaintiff bought peeled off her body within an hour or two after she properly applied them pursuant to the directions contained on the products—delivering little to no analgesic effect to her sore muscles. Plaintiff relied on Defendant's representations and warranties in deciding to purchase ~~her~~the Lidocaine Patches. Accordingly, those representations and warranties were part of the basis of her bargains, in that she would not have purchased ~~her~~the Lidocaine Patches on the same terms had she known those representations and warranties were false. ~~However, Plaintiff remains interested in purchasing Defendant's Lidocaine Patches and would consider the Lidocaine Patches in the future if Defendant ensured the products actually provide pain relief by delivering a 4% lidocaine dose to her body for "UP TO 12 HOURS."~~ Additionally, in making her purchases, Plaintiff paid a substantial price premium due to the Defendant's false and misleading claims regarding the qualities of its Lidocaine Patches in comparison to less expensive lidocaine patches that did not contain those representations. However, Plaintiff did not receive the benefit of her bargains because her Lidocaine Patches did not, in fact, provide "pain -relief ~~by delivering~~" using a ~~4%~~ "~~Maximum Strength~~maximum strength" dose of lidocaine ~~to her body~~ for "~~UP TO 12 HOURS~~up to 8 hours."

# EXHIBIT 9



My Store • Closes At 10pm
Pico Rivera ⌄

Target / Health / Medicines & Treatments / Pain & Fever

Shop all up & up

# Lidocaine 4% Pain Relieving Gel Patch - 6ct - up & up™

● Only 4 left at Pico Rivera · Aisle A26





**$7.99**

at Pico Rivera ⓘ

Lidocaine 4% Pain Relieving Gel Patch - 6ct - up & up™

★★★★☆ 137 ⌄ | 4 Questions

sort by **most recent** ⌄

filter by **5 stars** ⌄

☐ Verified purchases

5 star ✕

We found 19 matching reviews



**Works fast**

★★★★★ ✅ Would recommend

Cocomelon - 15 days ago, Verified purchaser

The product just works really well

5.0 **Value** out of 5    5.0 **Quality** out of 5

Did you find this review helpful?

Helpful    Not helpful

**Help on a budget**

★★★★★ ✅ Would recommend

Gal23 - 21 days ago, Verified purchaser

Good quality stay on

1 guest found this review helpful. Did you?

Helpful    Not helpful

**$7.99**

at Pico Rivera ⓘ

---

Lidocaine 4% Pain Relieving Gel Patch - 6ct - up & up™

★★★★☆ 137 ⌄ | 4 Questions

---

### BEST IN THE MARKET

★★★★★ | ✓ Would recommend

KJ - 2 months ago, Verified purchaser

I use these patches daily for chronic nerve pain. Best price compared to other drugstore brands. (I have tried them all) Relieve pain, stays on, highly recommend.

| 5.0 **Quality** out of 5 | 5.0 **Value** out of 5 |

2 guests found this review helpful. Did you?

Helpful | Not helpful

---

### Highly recommended

★★★★★ | ✓ Would recommend

Thomas - 3 months ago, Verified purchaser

Amazing pain relief. I had no trouble with them sticking.

2 guests found this review helpful. Did you?

Helpful | Not helpful

---

### Kathy

★★★★★ | ✓ Would recommend

Kathy - 3 months ago, Verified purchaser

Love These Patches Just As Good As Name Brands

2 guests found this review helpful. Did you?

Helpful | Not helpful

---

### Pain gel patch

★★★★★ | ✓ Would recommend

Just jess - 5 months ago, Verified purchaser

Love them! It really helped my lower back! I usually have problems with adhesive on my skin but had no problems. Definitely ordering more! No stinky smells either!

| 5.0 **Value** out of 5 | 5.0 **Quality** out of 5 |

3 guests found this review helpful. Did you?

Helpful | Not helpful

---

# EXHIBIT 10

# Salonpas Lidocaine 4% Pain Relieving Gel Patch - 6ct

🎯 **target.com**/p/salonpas-lidocaine-4-pain-relieving-gel-patch-6ct/-/A-51372049



## About this item

### At a glance



HSA/FSA Eligible

### Highlights

- SALONPAS LIDOCAINE PATCHES: Maximum strength Lidocaine, available without a prescription, provides relief for minor aches & pains. Easily apply patch under clothing for hours of relief from muscle soreness, sprains, back pain or backache, joint pain, & neck pain

- TACKLE LARGE OR SMALL PAIN AREAS: Convenient 4x5.5" Lidocaine patches can be used for up to 8 hours of powerful targeted relief. Plus, check out our whole assortment of pain relief products and find a pain relief solution tailored for you

- QUALITY ACTIVE INGREDIENTS WITH NO PRESCRIPTON: With 4% Lidocaine as the active ingredient, you get the maximum strength you can buy without a prescription. That's powerful medicine to provide targeted relief for hours with no doctor visits.

- HOURS OF PAIN RELIEF: Is back pain holding you back? Does neck pain make it hard to focus? Is joint pain or muscle soreness stopping your favorite activities? Salonpas patches provide hours of pain relief. Why let pain stop you, when you can stop pain

- SALONPAS TO HELP SOOTHE YOUR PAIN: With pain relief patches, spray, cream, gel and liquid, Salonpas is here to help you get through your day with discreet, easy to use, topical pain relief for temporary relief of aches and pains

## Specifications

**Suggested Age:** 12 Years and Up

**Product Form:** Patch

**Package Quantity:** 6

**Battery:** No Battery Used

**TCIN:** 51372049

**UPC:** 346581830064

**Item Number (DPCI):** 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

**Origin:** Imported

**Healthcare Disclaimer:**

Content on this site is for reference purposes only. Target does not represent or warrant that the nutrition, ingredient, allergen and other product information on our Web or Mobile sites are accurate or complete, since this information comes from the product manufacturers. On occasion, manufacturers may improve or change their product formulas and update their labels. We recommend that you do not rely solely on the information presented on our Web or Mobile sites and that you review the product's label or contact the manufacturer directly if you have specific product concerns or questions. If you have specific healthcare concerns or questions about the products displayed, please contact your licensed healthcare professional for advice or answers.

## Description

The Salonpas LIDOCAINE Pain Relieving Gel-Patch uses hydro-gel based technology and maximum strength Lidocaine available without a prescription to provide numbing relief. The Salonpas® LIDOCAINE Pain Relieving Gel-Patch provides temporary relief of pain associated with back, neck, shoulders, knees and elbows. These patches contain 4% Lidocaine, long lasting and the maximum strength you can buy without a prescription. That's powerful medicine that provides targeted relief for hours.

Topical pain relievers like Salonpas are recommended first-line pain treatment based on CDC & other guidelines. The targeted relief of Salonpas topical pain relievers works at the site of pain. Non-addictive Salonpas topical pain relievers are gentle on the body. In the century-and-a-half since our founding, Hisamitsu has pioneered the development of patches and other topical treatments to relieve everyday aches and pains. This is our mission, to make topical care available for all who seek it - anytime, anywhere.



HSA/FSA Eligible

Restrictions apply; contact your insurance provider about plan allowances and requirements If the item details above aren't accurate or complete, we want to know about it.

## From the manufacturer

Prices, promotions, styles and availability may vary by store & online. See our price match guarantee. a store is chosen for you.