# EXHIBIT 11

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems

## Yellela S.R. Krishnaiah, PhD

**Division of Product Quality Research**

**OTR/OPQ/CDER**

**US Food and Drug Administration**

**Silver Spring, MD, USA**

AAPS 2015_Sunrise Session (October 28, 2015)

*Disclaimer: Views expressed in this presentation are mine, and have not been adopted as regulatory policies by the Food and Drug Administration at this time.*

**FDA** U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Transdermal Drug Delivery Systems

Source: www.vivelledot.com







**Transdermal Systems**     **Oral products**





- Provide continuous systemic drug delivery over the proposed wear period

- Avoid first-pass metabolism

- No dose dumping

- Unwanted effects can be terminated

- High patient compliance

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Increased number of TDDS- DIA type gaining  popularity



Ref: Pastore e al. Br J Pharmacol (2015), 172: 2179-2209

2015AAPS_Sunrise Session

3

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Some of the FDA approved TDDS

- Scopolamine (Scop®)
- Nitroglycerin (Nitro-Dur®)
- Testosterone (Androderm®)
- Estradiol (Climara®, Alora®, Vivel-Dot®)
- Estradiol/Norethindrone acetate (CombiPatch®)
- Estradiol/Levonorgestrel (Climara Pro®)
- Nicotine (Nicoderm®)
- Oxybutynin (Oxytrol®)
- Methylphenidate (Daytrana System®)
- Fentanyl (Duragesic®)
- Norelgestromin/Ethynyl Estradiol (Ortho Evra®)
- Selegeline (Emsam®)

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Global sales for potent TDDS significantly high



Resource: http://pharmaceuticalintelligence.com/2013/02/04/transdermal-drug-delivery-tdd-system-and-nanotechnology-part-ii/

2015AAPS_Sunrise Session

5

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

## Product Quality Defects of TDDS: Recalls and Warning Letters

- **Leakage** from reservoir systems
- E.g., fentanyl patches - led to Class I recalls



## Adhesion failure modes

(Wokovich et al., EJPB, 64: 1-8, 2006)



Adhesive Failure
Case I

Adhesive Failure
Case II

Cohesive Failure
Case III

- ■ TDDS
- ▨ TDDS Adhesive
- ☐ Substrate



2015AAPS_Sunrise Session

7

www.fda.gov

## Adhesion lacking: Most widely reported Quality Defect of TDDS
### (Source: FDA/Medwatch Reports)



2015AAPS_Sunrise Session

8

**FDA** U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Drug release faster than specified



AMERICAN HEALTH CARE

DRUG PRODUCTS & SAFETY NEWS

Fentanyl Transdermal System Recall

*Potential for Active Ingredient to Release Faster Than Specified*

**October 22, 2010**

The Food and Drug Administration (FDA) notified healthcare professionals and patients that laboratory testing identified a patch in one lot of Fentanyl Transdermal System (Control/Lot # 30349) that released its active ingredient faster than the approved specification. An accelerated release of Fentanyl can lead to adverse events for at-risk patients, including excessive sedation, respiratory depression, hypoventilation (slow breathing), and apnea (temporary suspension of breathing). As a precautionary measure, in addition to the aforementioned lot, Actavis is recalling an additional 18 lots due to the possibility that additional patches may release Fentanyl more quickly than indicated.

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Drug crystallization in TDDS

www.aan.com/neurologytoday

Crystallization in TDDS may lead to reduced flux, associated adhesion difficulties or other general product quality stability issues.





2015AAPS_Sunrise Session

10

**FDA** U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Drug-in-adhesive type of transdermal drug delivery systems (TDDS) associated product quality issues

**Patients' voice about that "*sticky stuff*" and "*permanent circles*"**

"*Hated those patches, trying to remove **the sticky stuff** before adding new patches was the pits. There are still some of **the circles from the patches** on some of my clothes that I can't get out in the wash*."



"*Yea the stickiness is ridiculous! I have **permanent circles all over** :)*"

"*The patches ruined a pair of bed sheets for me! **That sticky stuff** was just impossible*."

"*And if you have kids don't let them get ahold of them. Mine got into mine and stuck them all over their wall. I now have **permanent circles all over**. There is no washing those off, with out taking off the paint*."

http://www.surromomsonline.com/support/showthread.php?188281-Climara-patch

2015AAPS_Sunrise Session

11

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# TDDS Product quality issues

- Adhesion failures

- Leakage of reservoir-type TDDS

- Drug crystals on TDDS

- Excessive cold flow

- Variability in permeation (skin flux)

- Complex product designs/ manufacturing process (product and process variables)

- Warrants for understanding the scientific basis for product quality defects

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Generic TDDS

- **Demonstration of Bioequivalence (BE) requires establishment of:**

(1) *Pharmaceutical Equivalence (PE)-*

- Same active ingredient

- Same dosage form

- Same route of administration and same strength (designated as rate for TDDS)

*(2) Comparable bioavailability (rate and extent of absorption)*

# Generic TDDS …..

- *To establish Therapeutic Equivalence (TE),* Generics

- (1) Must demonstrate **PE** and **BE** to the reference product

- (2) Must have adequate labeling and cGMP manufacturing

- (3) Generics rely on the safety and efficacy of the reference product

- Demonstrate for non-inferiority for adhesion, irritation and sensitization

- Minimal residual drug after labelled period of use (FDA guidance)

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# TDDS: Other Critical Quality considerations

- CQA of finished product- critical to quality and performance

- Maintain physical integrity during storage and application to skin

- Should be stable- no crystallization, no change in adhesion

- Potential for drug transfer where skin-to-skin contact with another person is possible

- Heat effects: Heat pad, electric blankets, sunbathing, heat or tanning lamps, sauna, hot tubs or hot baths

- Effect of sunscreen or moisturizing lotion on absorption

- Effect of showering and exercise

# Development of Generic TDDS

- First step is to focus on Quality Target Product Profile (QTPP)/ Target Product Profile (TPP)-

  -Delivery rate, bioequivalence, stability, Critical Quality Attributes (CQA), labeling etc.

- Demands a thorough product and process understanding

- Several CMA/CPP impact the CQA

- Requires a scientifically-sound product development approach (e.g., QbD and DoE) along with a comprehensive control strategy (from starting to ending)

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Guidance for Industry

- Residual drug in Transdermal and Related Drug Delivery System (August 2011, FDA)

- Estradiol TDDS (Draft, revised Sep 2015, FDA)

- Selegiline (final Oct 2011, FDA)

- Rivastigmine (Draft, revised Nov 2013, FDA)

- Scopolamine (Final, Oct 2011, FDA)

- Guideline on quality of transdermal patches (EMA, June 2015)

www.fda.gov

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# FDA Internal Research on cold flow of DIA-TDDS

18

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Cold flow in Drug-in-adhesive type of TDDS

- Drug-in-adhesive oozes out from under the backing membrane beyond the edge of TDDS





**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Implications of excessive cold flow

- **Can lead to TDDS adhering to inside of pouch**
- →makes removal and application difficult
- **Drug loss due to cold flow**
  → decreases drug's thermodynamic activity affecting delivery rate
- **Increase in dimension**
  → alters contact area between drug-loaded matrix & skin
  → affects therapeutic effectiveness
- **Risk/ safety to patient**
  → potential for continued drug absorption after TDDS removal
  → increase risk of drug transfer from patients to non-patients (e.g., highly potent Fentanyl TDDS)

2015AAPS_Sunrise Session

20

www.fda.gov

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Possible reasons for excessive cold flow

- Selection of PSA and other formulation ingredients is critical

- Dissolved drug/excipients in PSA influence PSA plasticization (cohesive/adhesive strength)

- Too high degree of PSA plasticization increases flow properties

- Too low degree of PSA plasticization may lead to loss of tack/peel properties

- DIA-TDDS formulations are to be designed with balanced adhesive and cohesive properties

- Balance in the degree of PSA plasticization (or low creep compliance) to prevent excessive cold flow

FDA

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

*There are no compendial or non-compendial methods for quantification of cold flow in TDDS*

# FDA internal research on cold flow of DIA-TDDS

- To develop a method for quantification of cold flow
- To quantify drug loss in cold flow region
- To determine the influence of cold flow on drug flux and potential of drug transfer via inter-personal contact
- Estradiol TDDS (used in HRT) selected as model drug product

2015AAPS_Sunrise Session

23

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Approach for cold flow quantification in DIA-TDDS

- May take long time to observe CF immediately after releasing the batch with well-designed TDDS products

- CF may occur faster when DIA-TDDS are improperly exposed to high temperatures.

- Adopted test methods described for assessing CF resistance of bulk dry PSA

- CF induced at accelerated conditions (by application of 1-kg force on punched out circular sample stuck to a glass slide stored at selected temperatures (e.g., 32 ˚C/60%RH) for 1-3 days.

_References:_ Beaulieu et al (1984). Recent Advances in Acrylic Hot-Melt, Pressure-Sensitive Adhesive Technology. Tappi J  67(9):102-105.

Benedek (2004). Test Methods. In Benedek I, editor Pressure-sensitive adhesives and applications, ed., New York: Marcel Dekker, Inc. p 544-610.

www.fda.gov

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health



RESEARCH ARTICLE – *Pharmaceutics, Drug Delivery and Pharmaceutical Technology*

# Stereomicroscopic Imaging Technique for the Quantification of Cold Flow in Drug-in-Adhesive Type of Transdermal Drug Delivery Systems

YELLELA S.R. KRISHNAIAH, USHA KATRAGADDA, MANSOOR A. KHAN

Division of Product Quality Research, Office of Testing and Research, Office of Pharmaceutical Science, Center for Drug Evaluation and Research, Food and Drug Administration, Silver Spring, Maryland 20993

*Received 6 January 2014; revised 27 January 2014; accepted 6 February 2014*

*Published online 1 March 2014 in Wiley Online Library (wileyonlinelibrary.com). DOI 10.1002/jps.23915*

**ABSTRACT:** Cold flow is a phenomenon occurring in drug-in-adhesive type of transdermal drug delivery systems (DIA-TDDS) because of the migration of DIA coat beyond the edge. Excessive cold flow can affect their therapeutic effectiveness, make removal of DIA-TDDS difficult from the pouch, and potentially decrease available dose if any drug remains adhered to pouch. There are no compendial or noncompendial methods available for quantification of this critical quality attribute. The objective was to develop a method for quantification of cold flow using stereomicroscopic imaging technique. Cold flow was induced by applying 1 kg force on punched-out samples of marketed estradiol DIA-TDDS (model product) stored at 25°C, 32°C, and 40°C/60% relative humidity (RH) for 1, 2, or 3 days. At the end of testing period, dimensional change in the area of DIA-TDDS samples was measured using image analysis software, and expressed as percent of cold flow. The percent of cold flow significantly decreased ($p < 0.001$) with increase in size of punched-out DIA-TDDS samples and increased ($p < 0.001$) with increase in cold flow induction temperature and time. This first ever report suggests that dimensional change in the area of punched-out samples stored at 32°C/60%RH for 2 days applied with 1 kg force could be used for quantification of cold flow in DIA-TDDS. © 2014 Wiley Periodicals, Inc. and the American Pharmacists Association J Pharm Sci 103:1433–1442, 2014

**Keywords:** transdermal; skin; drug delivery systems; microscopy; cold flow; stereomicroscopic; method development; imaging; drug-in-adhesive; physical characterization

- *Krishnaiah et al. J Pharm Sci, 2014, 103, 5, p1433-42.*

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Quantification of cold flow

- Marketed estradiol TDDS (used in HRT) chosen as a model drug product

- Cold flow induced at accelerated testing conditions (25, 32 and 40 ˚C) with punched-out TDDS samples (e.g., 1 cm$^2$) loaded with 1-kg force for 3 days.

- Measured as percent dimensional change in area

- Also measured as percent drug loss/migration to cold flow region of TDDS

# Induction and Evaluation of Cold Flow in TDDS



**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Effect of <u>sample diameter</u> and <u>induction temperature</u> on cold flow development in circular estradiol DIA-TDDS



*Percent of CF*   -   **Krishnaiah et al. (2014),** *J Pharm Sci*, **103, 5, p1433-42**.

- Decreases with increase of sample diameter
- Increases as induction temperature increases

**FDA** U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

## Effect of <u>sample diameter</u>, <u>induction time and temperature</u> on cold flow development in circular estradiol DIA-TDDS

| Sample Diameter (mm) | | Percent of Cold Flow in Samples Stored at | | |
|---|---|---|---|---|
| | | 25°C/60% RH | 32°C/60% RH | 40°C/60% RH |
| 11 | 1-day | $7.9 \pm 1.4^a$ | $12.8 \pm 2.0^b$ | $39.4 \pm 5.5$ |
| 14.3 | | $3.0 \pm 0.6^{c,d}$ | $5.6 \pm 0.8^{c,b}$ | $12.8 \pm 2.1^c$ |
| 17.8 | | $2.3 \pm 0.3^{c,g,f}$ | $3.7 \pm 0.5^{c,g,b}$ | $7.5 \pm 0.5^{c,e}$ |
| 11 | 2-day | $9.9 \pm 1.5^a$ | $27.3 \pm 6.8^b$ | $61.4 \pm 3.1$ |
| 14.3 | | $4.9 \pm 0.9^{c,a}$ | $10.0 \pm 1.2^{c,b}$ | $19.8 \pm 1.5^c$ |
| 17.8 | | $2.8 \pm 0.3^{c,d,e}$ | $6.3 \pm 1.3^{c,f,g}$ | $11.2 \pm 1.7^{c,h,i}$ |
| 11 | 3-day | $13.2 \pm 1.8^a$ | $35.9 \pm 5.8^b$ | $60.8 \pm 3.7$ |
| 14.3 | | $5.3 \pm 0.4^{c,a}$ | $11.5 \pm 2.6^{c,d,b}$ | $25.2 \pm 2.2^{c,d}$ |
| 17.8 | | $3.2 \pm 0.5^{c,e,a}$ | $7.4 \pm 1.1^{c,b}$ | $13.1 \pm 0.8^c$ |

***Conclusions:*** **Percent of CF**        - Krishnaiah et al. (2014) *J Pharm Sci*, 103, 5, p1433-42.

- Decreases with increase of sample diameter
- Increases as induction temperature increases
- Increases as induction time prolongs

2015AAPS_Sunrise Session                                   29

www.fda.gov

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Excessive CF alters contact area and drug concentration in TDDS



Product-*A*          Product-*B*

3-day CF induction at 25°C/60%RH

3-day CF induction at 32°C/60%RH

Punched-out circular samples loaded with 1-kg force and stored at 25˚C/60%RH or 32˚C/60%RH for 3 days

(*Image surface of product-B was redacted to hide product identification*)

| Cold flow measured as | Measurement method | Samples stored at | Product-*A* (86 µg/cm$^2$) | Product-*B* (156 µg/cm$^2$) |
|---|---|---|---|---|
| Percent dimensional change in area | Spectroscopic Imaging | **25˚C**/60%RH for 3 days | 14.4 ± 2.5 | 6.5 ± 0.8[**] |
| | | **32˚C**/60%RH for 3 days | 32.0 ± 2.9[##] | 39.1 ± 3.6[##] |
| Percent drug migration to CF region | HPLC | **25˚C**/60%RH for 3 days | 15.8 ± 3.2 | 8.8 ± 2.0[**] |
| | | **32˚C**/60%RH for 3 days | 32.6 ± 3.4[##] | 41.9 ± 3.1[##] |

[**]: Significant at $P<0.01$ when % dimensional change is compared to that of product-A
[##]: $p<0.001$ when compared to samples at 25˚C/60%RH

- Krishnaiah et al. (2014) *Int J Pharm*, 477:73-80.

www.fda.gov

**FDA**
**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Cold flow measurement tool

- Can be useful in selecting the best adhesive, excipient, drug substance ratios and formulations.

- Can assist in developing the appropriate product quality control method and potentially justifying acceptance criterion for cold flow

- Understanding the long term cold flow characteristics specific to each product is necessary to establish a quality product

- Cold flow should be included in stability protocol along with results at the time of submission for both ANDA and NDAs.

- Refer to *USP <Chapter 3> Topical and Transdermal Drug Products- Product Quality Tests*

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

International Journal of Pharmaceutics 477 (2014) 73–80



Contents lists available at ScienceDirect

## International Journal of Pharmaceutics

journal homepage: www.elsevier.com/locate/ijpharm

# Cold flow of estradiol transdermal systems: Influence of drug loss on the *in vitro* flux and drug transfer across human epidermis


CrossMark

Yellela S.R. Krishnaiah *, Yang Yang, Robert L. Hunt, Mansoor A. Khan

*Division of Product Quality Research, Office of Testing and Research, Office of Pharmaceutical Sciences, Center for Drug Evaluation and Research, Food and Drug Administration, Silver Spring, MD, USA*

ARTICLE INFO

Article history:
Received 19 August 2014
Received in revised form 4 October 2014
Accepted 7 October 2014
Available online 11 October 2014

Keywords:
Cold flow
Transdermal
Flux
In vitro permeation
Human epidermis
Estradiol

ABSTRACT

The objective was to quantify drug loss due to cold flow (CF) in marketed estradiol transdermal drug delivery systems (TDDS), and study its influence on the *in vitro* flux and drug transfer across contacting skin. TDDS samples (products-*A* and *B*) were induced with CF at 25 and 32 °C/60% RH by applying 1-kg force for 72 h. CF was measured as percent dimensional change and amount of drug loss/migration in CF region. *In vitro* drug permeation studies were conducted across human epidermis from TDDS excluding CF region, and CF region alone against control (without CF). In both products, significantly higher percentage of CF (dimensional change and drug migration) was observed at 32 °C compared to 25 °C. *In vitro* flux from both products excluding CF region either at 25 or 32 °C was the same, but significantly lower compared to control. Drug transferred from CF region of product-*A* after 8 h was the same at 25 and 32 °C, but significantly higher in product-*B*. Flux from both products together with CF region at 32 °C was significantly lower than that observed at 25 °C. Results showed that excessive CF at storage (25 °C) and clinical usage (32 °C) conditions may have implications on product performance and safety of estradiol TDDS.

Published by Elsevier B.V.

# Cold flow induction method for drug loss/ drug transfer studies



**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

## *Automatic Franz Diffusion Cell System for in vitro* drug permeation study



*www.prosense.net/files/MicroettePlus.pdf*

- **Source:** Cooperative Human Tissue Network (CHTN, Charlottesville, VA).
- **Type:** Surgically discarded human skin (after abdomonoplasty) of living female subjects (age 20-55 years)
- **Sample:** Heat-separated human epidermis
- **Protocol:** Research Involving Human Subjects Committee (RIHSC #12-015-D)

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Cold flow reduced drug flux

*Krishnaiah et al. (2014), Int J Pharm, 477: 73-80.*




(B)



Punched-out 11 mm TDDS

Mean (±S.D.) amount of drug permeated from **estradiol TDDS** product-*A* and product-*B* samples before cold flow induction (control) and after cold flow induction at 25°C and 32°C (excluding cold flow region) across human epidermis (n=6)

2015AAPS_Sunrise Session

35

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

## Cold flow also reduced the overall drug flux





Mean (±S.D.) amount of drug permeated from **estradiol TDDS along with cold flow region** of product-*A* and product-*B* samples induced with cold flow at 25°C and 32°C across human epidermis (n=6)

*Krishnaiah et al. (2014), Int J Pharm, 477: 73-80.*

2015AAPS_Sunrise Session

36

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

# Drug transfer due to CF is far higher than that due to DRE after labeled period of use



Mean (±S.D.) *in vitro* amount of drug transferred from drug-containing human epidermis (DRE) pretreated with application of estradiol TDDS (Product-B) to the contacting human epidermis (n=6) at A) 8 h, B) 16 h and C) 24 h. The amount of drug transferred from cold flow  (CF) region of estradiol TDDS (Products-B) across human epidermis at A) 8 h, B) 12 h and C) 24 h were also presented for comparison (n=6). CF was induced at 25 and 32 ˚C/60% RH for 3 days. *- Krishnaiah YSR, Yang Y, Khan MA (2014) / FDA internal data*

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Conclusions

- Percent of cold flow (CF) decreased with increase of sample diameter
- Increased with increase in induction temperature
- Increased as induction time prolonged, but not beyond 3 days
- The method can be applied to discriminate differences in formulation designs of TDDS products
- *In vitro* skin permeation study showed that excessive cold flow decreased delivery rate of estradiol TDDS
- Drug transfer occurred from cold flow region of TDDS products

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Further reading on various methods for cold flow

- Evaluated marketed TDDS for cold flow using wiping method, macroscopic observations and microscopic method (qualitative)

- Variable outcome in the three methods demonstrated the importance of understanding scientific product development throughout the TDDS lifecycle

- Reference:  *Wokovich et al (2015) Cold flow measurement of transdermal drug delivery systems (TDDS), International Journal of Adhesion and Adhesives, 59 (2015) 71-76.*

**U.S. Food and Drug Administration**
Protecting and Promoting Public Health

www.fda.gov

# Studies in Progress

- Understanding the scientific basis for excessive cold flow
- Development of science-based quality standards for cold flow in TDDS
- Model development for prediction of cold flow occurrence based on Rheology and real time CF measurement data
- Hyperspectral imaging for measurement of CF in TDDS at real-time storage conditions (i.e., without inducing cold flow)
- Hyperspectral imaging as a Process Analytical Tool (PAT) in the manufacture of TDDS







**Hyperspectral Imaging System**

**Dynamic Mechanical Analyzer**

**Hybrid rheometer**

www.fda.gov

# Acknowledgements

## Funding Support

**Office of Women's Health, US Food and Drug Administration**
**(Grant ID: 750312CDR)**

## Resourceful Discussion

**Caroline Strasinger, PhD**
Office of Life-cycle Drug Products, OPQ
Chair, CDER Transdermal Working Group and other Members
**Sam Raney, PhD**
Office of Generic Drugs (ORS/DTP)
**Rong Wang, PhD**
Office of Generic Drugs (OB/DB1)

2015AAPS_Sunrise Session                    41

U.S. Food and Drug Administration
Protecting and Promoting Public Health

www.fda.gov

# Acknowledgements…..

- Usha Katragadda, PhD
- Yang Yang, PhD
- Naresh Pavurala, PhD
- Xiaoming Xu, PhD
- Robert Hunt, MS
- Lucinda Buhse, PhD
- Patrick Faustino, PhD
- Siddiqui Akhtar, PhD
- Mansoor Khan, PhD (currently with Texas A&M University)

2015AAPS_Sunrise Session

42

# EXHIBIT 12

# Utility of lidocaine as a topical analgesic and improvements in patch delivery systems

tandfonline.com/doi/full/10.1080/00325481.2019.1702296







## ABSTRACT

### ABSTRACT

Interest in and use of topical analgesics has been increasing, presumably due to their potential utility for relief of acute and chronic pain. Topically applied agents with analgesic properties can target peripheral nociceptive pathways while minimizing absorption into the plasma that leads to potential systemic adverse effects.

Clinical trials have found 5% lidocaine patches to be effective and well tolerated for the treatment of post-herpetic neuralgia (PHN) with a minimal risk of toxicity or drug–drug interactions. With this patch formulation, the penetration of lidocaine into the skin produces an analgesic effect without producing a complete sensory block. Use of topical lidocaine is supported by clinical practice guidelines, including first-line treatment by the American Academy of Neurology (guidelines retired 2018), the European Federation of Neurological Societies and second-line by the Canadian Pain Society.

FDA approved 5% lidocaine patches in 1999, and a 1.8% topical lidocaine system in 2018 – both indicated for the treatment of pain secondary to PHN. The 1.8% system offers a more efficient delivery of lidocaine that is bioequivalent to 5% lidocaine patches, but with a 19-fold decrease in drug load (i.e., 36 mg versus 700 mg) as well as superior adhesion that allows the patch to maintain contact with the skin during the 12-h administration period.

Although topical lidocaine formulations have advanced over time and play an important role in the treatment of PHN, a variety of other conditions that respond to topical lidocaine have been reported in the literature including PHN, lower back pain, carpal tunnel syndrome, diabetic peripheral neuropathy, and osteoarthritis joint pain. Other neuropathic or nociceptive pain syndromes may respond to topical lidocaine in select cases and warrant further study. Clinicians should consider local anesthetics and other topical agents as part of their multimodal treatments of acute and chronic pain.

## 1. Introduction

The treatment of pain remains a clinical challenge, and health-care professionals are faced with choosing from a limited selection of analgesics and nonpharmacologic therapies. The toxicities of over-the-counter and prescription systemic agents such as acetaminophen, NSAIDs, and opioids are well documented and often lead to treatment limiting adverse effects [1–5]. In a training module on 'Treating Chronic Pain without Opioids', CDC recommends that clinicians consider topical agents including lidocaine as alternative first-line therapies, as they are thought to be safer than systemic medications [6].

Interest in and use of topical analgesics has been increasing, presumably due to their potential utility for relief of acute and chronic pain and relative lack of systemic adverse effects. These agents are available in a variety of formulations, both prescription and OTC,

including gels, salves, liquids, sprays, and patches. One topical agent that has been frequently used by clinicians is the local anesthetic, lidocaine. This review offers an overview of lidocaine and its utility as a topical analgesic for musculoskeletal and neuropathic pain.

The well-accepted concept of multimodal analgesia involves interrupting the inflammatory cascade and pain signals at various points along neural pathways. Pain is mediated by specialized sensory neurons known as nociceptors located in the skin, soft tissues, muscles, and virtually all organs except for the brain [7]. Peripheral nociceptors are made up of small A delta and C fibers – so called 'first-order neurons' that convey pain signals through the dorsal horn into second-order cells located in the spinal cord [7]. From here, ascending signals relay the message to higher cortical centers, primarily the thalamus and cortex, for further modulation and pain processing [7,8]. Our understanding of the physiological processes that transmit pain has progressed over the years, with increasing appreciation for contribution by modulation of the pain signal in the periphery. Four major processes thought to be involved in pain pathway include, perception, transduction, transmission, and modulation [7,8].

Local anesthetics have the potential to interrupt transduction and transmission of nerve impulses. Specifically, lidocaine produces analgesia by blocking voltage-gated sodium channels, which are responsible for the propagation of action potentials [9]. When lidocaine binds, it induces a conformational change in the channel that blocks the influx of sodium, therefore preventing depolarization [10]. Sodium channels are expressed on A delta and C fibers and blockage results in a reduction of the ectopic discharges thought to underlie certain aspects of persistent pain [11].

## 2. Neuropathic pain

Neuropathic pain (NP) is a pathological process in the peripheral or central nervous system (CNS) defined by International Association for the Study of Pain (IASP) as pain caused by a lesion or disease of the somatosensory nervous system [12]. While many NP conditions are initiated by damage to the peripheral nervous system, their chronicity appears to rely on maladaptive processes within the CNS. Neuronal hyperexcitability and central sensitization lead to altered pain processing so that pain occurs spontaneously, and responses to noxious and innocuous stimuli are pathologically amplified [13]. The resulting symptoms include allodynia (pain which results from a stimulus that normally would not induce pain) and hyperalgesia. Patients experience paroxysms of burning, shooting, electrical sensations, as well as painful and non-painful numbness [14]. Examples of NP include postherpetic neuralgia (PHN), diabetic peripheral neuropathy (DPN), carpal tunnel syndrome, complex regional pain syndrome, and post-traumatic/post-surgical pain [15]. Pharmacologic treatments options for NP include antidepressants, anticonvulsants, topical local anesthetics and opioids [16,17].

Clinical practice guidelines for NP have been published by a number of organizations, including the European Federation of Neurological Societies (EFNS) [18], the National Institute for Health and Care Excellence (NICE) of the UK [19], the International Association for the Study of Pain [20], and the Canadian Pain Society (CPS) [21].

PHN is a painful neuropathic condition characterized by persistent allodynia or hyperalgesia in the area of a previous herpes zoster eruption [22]. It typically occurs in a unilateral dermatomal fashion, with the most common sites being the thoracic nerves and the ophthalmic division of the trigeminal nerve [23]. It is more common in the elderly and immune-compromised patients and has been reported to increase healthcare resource utilization and negatively impact quality of life (QoL) [22,24]. Various treatment guidelines are available, most of which recommend medications such as tricyclic antidepressants, gabapentin, lidocaine patch, and opioids for treating the pain of postherpetic neuralgia ( ) [18,20,25].

Utility of lidocaine as a topical analgesic and improvements in patch delivery systems
https://doi.org/10.1080/00325481.2019.1702296

Published online:

03 January 2020
Table 1. Clinical practice guideline recommendations – postherpetic neuralgia.

  Download CSV    Display Table

Clinical trials have found 5% lidocaine patch to be effective and well tolerated for the treatment of PHN with a minimal risk of systemic adverse effects or drug–drug interactions [26–28]. In the US, prescription strength lidocaine patches are FDA-approved only for the relief of pain associated with PHN. They have been recommended as a first-line treatment of PHN by the American Academy of Neurology guidelines (retired in 2018) [25], the European Federation of Neurological Societies [18] and second-line by the Canadian Pain Society ( ) [21].

# 3. Lidocaine

Lidocaine is an amide anesthetic and class 1-b antiarrhythmic. It was first synthesized and approved in the US in the 1940s. [29] It has utility both systemically and topically as an anesthetic and analgesic agent and is available in both prescription and over the counter (OTC) formulations including gels, creams and ointments, sprays, and patches (plasters). Lidocaine is a stable, crystalline, colorless solid whose hydrochloride salt is water-soluble [10]. Structurally, lidocaine contains an amide group as well as a tertiary amine. As an amine, lidocaine is in equilibrium between a positively charged cation and an uncharged, lipid soluble, free base. The uncharged, free base of lidocaine can readily penetrate the lipid

matrix of the outer layer of skin. Lidocaine has a pKa of 7.9 and slightly basic conditions will favor formation of the free base and increase penetration. Lidocaine has an n-octanol/water coefficient of 43/1 at pH 7.4, making it lipophilic favoring distribution in tissues [30].

Lidocaine's absorption is dependent upon the total dose administered, the route by which it is delivered, and blood supply to the site [10]. Similar to other local anesthetics, the mechanism of action of lidocaine for local or regional anesthesia is by reversible blockade of nerve fiber impulse firing. When applied topically, lidocaine needs to permeate through the skin to act as an anesthetic or analgesic. The outer layer of skin is made up of keratinized stratified squamous epithelium that it forms a permeability barrier that keeps water both in and out of the body. This barrier is largely produced by a lipid matrix that exists between the cells of the stratified squamous endothelium. Compounds that are polar and water-soluble cannot penetrate this barrier, but lipid-soluble compounds like lidocaine can and therefore reaches areas where peripheral nerve fibers are found.

Topical lidocaine absorption will also be affected by the thickness and surface area of the stratum corneum at the site of application, local vascularity and the duration of application. Typically, the maximal penetration depth of lidocaine when applied topically is from 8 to 10 mm [31]. Absorption is higher at mucosal sites [10] such as the mouth where lidocaine sprays are used for dental, anesthetic and surgical procedures. With currently available patches, the penetration of lidocaine into the skin produces an analgesic effect without producing a complete sensory block [32].

Lidocaine pharmacokinetics have been studied in healthy volunteers, patients with chronic pain, and those with cardiac arrhythmias [10]. An intravenous bolus of lidocaine followed by continuous infusion typically yields therapeutic plasma levels in the range of 1.5–5 mcg/ml, with toxicity expected above those levels [10]. In the systemic circulation, lidocaine is rapidly metabolized by the liver and has a half-life of 1.5 to 2 h [32]. Metabolites produced from lidocaine include monoethylglycinexylidide (MEGX) and glycinexylidide (GX), both of which have activity similar to, but less potent than that of lidocaine [30].

## 3.1. Lidocaine formulations

Topically, lidocaine is available in gels, ointments (creams), sprays and patches – also referred to as plasters in some parts of the world, and more recently recognized by FDA as a 'topical delivery system' (TDS) dosage form [33]. Prescription formulations have a multitude of indications, including the production of local or regional anesthesia by topical application to mucous membranes, infiltration and nerve blocks. As of now, lidocaine patch formulations are approved only for the treatment of PHN [30,32].

Also available OTC, lidocaine has many uses including for the treatment of insect bites, minor burns, sunburn, other skin irritations, hemorrhoids, and back pain. These OTC products are not indicated for more advanced pain syndromes like neuropathic pain. The lidocaine concentration in these formulations is limited to a maximum of 4%, lower than the concentration in prescription formulations. It is noted that in 2003 FDA has expressed safety concerns over external (topical) analgesics in the patch, poultice, and plaster form and consequentially ruled that these dosage forms have not been determined to be generally recognized as safe and effective [34]. Marketing and promotion of OTC products fall under different regulatory requirements than prescription drugs; this leads to labeling of many of these products with indications (actual or implied) that are not supported by well-controlled clinical safety and efficacy studies. These preparations often lack openly available data on pharmacokinetics, with unknown maximum plasma concentration potentials – even with use as directed. As systemic absorption varies based on formulation, safety may be an issue with some OTC preparations – especially with multiple repetitive applications. There have been reports of great individual variability in absorption and metabolism for these products [35]. A 2012 study compared five commonly available lidocaine preparations (three of which were OTC) and their levels of systemic absorption when applied to the face. The OTC preparations had the highest serum lidocaine and MEGX levels. There were significant inter-individual differences between the serum levels of MEGX and lidocaine in four out of five groups [35]. This study demonstrated that although topical anesthetics are considered safe, some individuals had unpredictably high absorption levels that could possibly result in adverse events [35]. This study also demonstrated that the concentration of lidocaine, the formulation of the drug, and the individual patient all have significant effects on serum levels of lidocaine, especially with OTC preparations that may not have undergone the rigorous clinical trials or safety studies in humans as required by FDA for approved prescription products [35].

Lidocaine may be combined with other anesthetics, such as prilocaine in a mixture of local anesthetics. An example of this is EMLA$^{TM}$, a topical cream, disc or patch (not available in all countries) containing 2.5% lidocaine and 2.5% prilocaine. With this product, local analgesia or anesthesia is achieved after 60 min with a duration of at least 2 h [36]. A gram of EMLA$^{TM}$ cream contains 25 mg of lidocaine and 25 mg of prilocaine. EMLA$^{TM}$ cream is indicated for topical analgesia of intact skin in connection with needle or catheter insertion, superficial surgical procedures or topical analgesia of leg ulcers. When using the cream, dosage and application time recommendations need to be carefully followed, especially in infants and children, as application to large surface areas for an extended amount of time can lead to adverse events including methemoglobinemia, seizures and life-threatening cardiovascular collapse [36].

## 3.2. Safety of topical lidocaine

Topical lidocaine is generally regarded as safe. Adverse reactions are typically dose-related and similar in nature to those observed with other local anesthetics. The most common adverse events are application site reactions, including skin irritation that is usually mild and transient [15,28,30,32]. Applying lidocaine topically allows the targeted delivery of lidocaine with low systemic exposure, hence a lower risk of systemic toxicity than with mucosal or intravenous administration. While the risk of systemic absorption of topical products is relatively low, overuse of OTC agents, compounding lidocaine in higher doses, using on broken or inflamed skin and occluding the site of application can lead to excessive exposure; patients should be counseled against use by these means [30,32,36]. Adverse systemic side effects may include dizziness, drowsiness, muscle twitches, seizures, respiratory distress, loss of consciousness, and cardiac arrest. [30,32,36] Caution should also be used while using lidocaine in patients receiving Class I antiarrhythmic drugs as the toxic effects are additive and potentially synergistic [30,32,36]

## 4. Five percent lidocaine hydrogel patches

Lidoderm®, the first lidocaine patch introduced in the US received FDA approved in 1999. It is a prescription 5% lidocaine hydrogel patch indicated for the treatment of neuropathic pain secondary to PHN [30]. The patches consist of an aqueous adhesive material (hydrogel) containing 5% lidocaine by weight – with 700 mg of lidocaine in 14 g of the adhesive material applied to a non-woven backing material and non-perforated polyethylene terephthalate (PET) release liner [30]. Per the label, up to three patches can be applied to the painful area for up to 12 h on, followed by 12 h off. The patches can be cut into smaller pieces to conform to localized painful areas. Analgesic data from PHN studies suggest that some subjects using lidocaine patches achieved pain relief within 30 min [30].

Clinical trials that led to the approval of the 5% lidocaine hydrogel patch included a double-blind, crossover study and an enriched enrollment trial for relief of pain secondary to PHN [26,28]. Patients (n = 35) with PHN had the 5% lidocaine hydrogel patch, a placebo patch, or no treatment in separate sessions lasting 12 h. The 5% lidocaine patch reduced pain intensity at all time points from 30 min to 12 h compared to the placebo patch or to no-treatment. The patch was well tolerated without systemic side effects [26]. In the enriched enrollment trial, 32 patients who had been using the patch for at least 1 month were randomized to continue on the patch or to a placebo patch. The primary endpoint of the 14-day study was 'time to exit', whereby subjects were allowed to exit based on their pain relief score. The median time to exit for the 5% lidocaine hydrogel patch was greater than 14 days, while with the vehicle patch it was 3.8 days – suggesting an analgesic benefit to the active treatment. At study completion, 25/32 (78.1%) of subjects preferred the lidocaine patch treatment phase as compared with 3/32 (9.4%) placebo (P < 0.001). No statistical difference was noted between the active and placebo treatments with regards to side effects [28].

A small survey on a 5% lidocaine-medicated plaster examined long-term treatment in patients with localized neuropathic pain conditions [37]. Patients were queried about ease and duration of use, pain relief, tolerability and the development of tolerance over time. After 36 months, half of the initial responders to the plaster continued its use with no obvious decline in effectiveness. After 5 years, 40% continued treatment and maintained effective analgesia. There were no intolerable adverse effects leading to discontinuation, but application site reactions were noted when using the patch beyond the indicated duration [37].

A review of studies that focused on data related to safety and tolerability of the 5% lidocaine hydrogel patch found that the patch demonstrated good tolerability in both the short- and long term with a minimal risk for systemic adverse drug reactions [38]. Mean peak blood lidocaine concentrations for the 5% lidocaine hydrogel patch were reported to be 0.13 µg/mL [30], approximately 1/10 the blood concentration required to treat cardiac arrhythmia [30] and about 1/38 the concentration that produces toxicity [15]. Mild to moderate application site reactions were the most common adverse event associated with use of lidocaine patches [15,28,30,32].

Clinical use and practice guidelines for lidocaine patches vary. FDA has approved lidocaine patches for the treatment of pain secondary to PHN [30,32]. Clinical guideline recommendations from the American Academy of Neurology (AAN), European Federation of Neurological Societies (EFNS) and Canadian Pain Society (CPS) for the treatment of PHN are summarized in . Lidocaine patches are recommended as first-line treatment by the AAN and EFNS and second-line by the CPS, though the AAN guidelines were retired in 2018 [18,21,25].

Although lidocaine patches are approved for the treatment of pain secondary to PHN in the US, wide-spread off-label use for other pain syndromes is reported. A study published in 2012 showed that over 80% of usage of these patches was off-label, and 74% of the patients were prescribed this therapy for the treatment of non-neuropathic pain [39].

# 5. Utility of topical lidocaine

Although there is a lack of consensus among experts regarding the role of topical lidocaine in the treatment of pain, its use has been reported as beneficial in a variety of conditions which will be reviewed below.

## 5.1. Postherpetic neuralgia

A retrospective cohort analysis was done that assessed health-care utilization secondary to PHN and examined the medical records of a matched cohort of nearly 40,000 PHN patients treated between 2010 and 2014 [40]. This report found that recommended first-line

8/23/22,
Case 4:22-cv-02625-HSG Document 22-3 Filed 08/24/22 Page 53 of 210
Utility of lidocaine as a topical analgesic and improvements in patch delivery systems

medications including lidocaine patch, pregabalin, and tricyclic antidepressants – were underutilized in PHN patients. Instead, second- or third-line treatments (i.e. opiates and capsaicin) or NSAIDs (which are not recommended and have been shown in a meta-analysis to be ineffective for NP [41]) were frequently used as the initial treatment [40]. After no treatment (32% of patients), opioids were the most common initial treatment used (22% of PHN patients), followed by gabapentin (15% of PHN patients) and NSAIDs (9% of PHN patients). Lidocaine patches were only used initially in 8% of PHN patients. The use of opioid therapy initially led to higher excess health-care costs relative to the costs of matched patients who were started on recommended first-line therapies. The data suggest an opportunity for improved adherence to painful PHN practice guidelines for first-line therapy [40]. Greater adherence to the guidelines also has the potential to lead to less use of opioids and therefore decreased risks associated with their usage [40].

There is evidence that using lidocaine patches as an adjunct or in combination with other therapies can be effective with relief of pain secondary to PHN [15]. A post hoc analysis of two open-label, nonrandomized, prospective, multicenter clinical trials in PHN patients who experienced insufficient pain relief with NSAIDS, opioids, TCAs, and gabapentenoids found that adding the lidocaine patches to their existing therapy resulted in significant effects in reducing pain and improving the QoL [15]. This further supports the use of topical lidocaine in the multimodal treatment of NP.

Thus, there is enduring evidence for the effectiveness of lidocaine patches for treating pain secondary to PHN with a low risk of systemic adverse events. Better education is needed so that clinicians can appropriately follow NP guidelines including the use of first-line therapies such as topical lidocaine for refractory painful PHN.

## 5.2. Diabetic peripheral neuropathy

Although not indicated for the treatment of DPN, some studies suggest that topical lidocaine may be a useful therapy for the treatment of DPN. Reviews on the use of lidocaine patches to treat DPN have been published [42,43]. Two studies on treatment of pain associated with DPN of 4 weeks duration directly compared lidocaine patches to oral pregabalin [44,45] and there are three open-label studies of the patches in DPN [46–48]. The results of a systematic review of treatments for DPN of that compared the lidocaine patch to other interventions including placebo suggested that the lidocaine patches were comparable for pain reduction to amitriptyline, capsaicin, gabapentin, and pregabalin and may be associated with fewer and less significant adverse side effects as compared to these mostly systemic agents[42]. The authors of the review concluded that the results are limited by the number and size of the studies and that further studies are warranted[42].

## 5.3. Carpal tunnel syndrome

Three pilot studies suggest that topical lidocaine may be effective and safe in treating carpal tunnel syndrome [49–51]. In the first of these studies, daily use of the 5% lidocaine hydrogel patch was compared to a single injection of lidocaine plus methylprednisolone for 4 weeks in 40 randomized patients[49]. In the second study, the 5% lidocaine hydrogel patch was compared to naproxen 500 mg twice daily for 6 weeks of treatment in 100 randomized patients[50], and the third study compared EMLA cream (lidocaine 2.5% plus prilocaine 2.5%) to a single injection of methylprednisolone acetate 40 mg in 65 randomized patients for 4 weeks of treatment[51]. In each of these studies, effective pain relief was reported for the topical lidocaine groups [49–51]. Suggesting topical lidocaine may be useful for treatment of pain secondary to carpal tunnel syndrome. As this painful condition represents a significant source of disability, further studies are warranted.

## 5.4. Lower back pain (LBP)

Chronic LBP may consist of both nociceptive and neuropathic components for which lidocaine patches may be of benefit [52]. Treatment of patients with moderate to severe LBP with the lidocaine patch was studied in two uncontrolled, open-label, 6-week, pilot studies [53,54]. There were 71 and 131 subjects in these two studies. In each study, the patch significantly reduced pain intensity and improved the patients' QoL [53,54]. Several studies suggest that the lidocaine patch can be combined with oral therapies or used as an add-on therapy. A prospective, open-label, add-on, 2-week, pilot study of 28 patients with moderate to severe LBP who had only a partial response to gabapentin-containing analgesic regimens found the lidocaine patch provided significant improvements of all composite measures of the neuropathic pain scale [47]. In an open-label, multicenter, 2-week, pilot study of 71 patients with LBP and a partial response to gabapentin-containing analgesic regimens, add-on treatment with the lidocaine patch led to significant improvements in pain intensity and pain relief scores and to significant improvements for all domains of QoL measurements [48]. Although lidocaine is not indicated for LBP, these limited studies suggest that lidocaine patches combined with oral therapies may be a treatment option for patients with LBP [52]. As low back pain is a significant cause of disability and opioid utilization in the US, further research on topical analgesics in this condition is clearly warranted.

## 5.5. Osteoarthritis pain

The efficacy of the lidocaine patch has been studied in trials in a total of 257 patients with osteoarthritis (OA) of the knee. A prospective, open-label, 2-week, multicenter, monotherapy study of the lidocaine patch in 20 patients who had inadequate relief of pain with current analgesics found that use of the lidocaine patch led to significant improvement in the WOMAC (Western Ontario and McMaster Universities Arthritis Index) score, in pain intensity and in QoL measurements [55]. A prospective, open-label, 2-week, multicenter, add-on therapy trial of the lidocaine patch in 137 patients with OA of the knee and who had an incomplete response to stable analgesic therapy found significant improvement in pain

intensity, WOMAC sum score and QoL [56]. The third study, a prospective, open-label, 2-week, multicenter, monotherapy, and add-on therapy trial of 100 subjects with OA of the knee found significant improvement in all four Neuropathic Pain Scale composite measures for both monotherapy and for add-on therapy [57]. Although it is not indicated for treatment of OA, these open-label trials suggest that the lidocaine patch could prove useful as an adjunct therapy for OA, although confirmation is needed from randomized, controlled trials.

## 6. New developments in topical lidocaine formulations

### 6.1. *Anhydrous lidocaine topical system 1.8%*

A new prescription topical lidocaine patch uses a novel drug delivery technology for topical lidocaine (ZTlido™, Scilex Pharmaceuticals, Inc.) [32]. It received FDA approval for treating PHN and entered the US market late in 2018. This new patch system (note: FDA has redefined this dosage form from 'patch' to 'system', but the terms are interchangeable for this discussion) offers significant advantages over the hydrogel lidocaine patch and its generic equivalents. With the 1.8% system, there is more efficient delivery of lidocaine that requires a lower drug load to achieve the same therapeutic effect and superior adhesion that allows the patch to remain in better contact with the skin during the 12-h dosing period [32].

With the original 5% lidocaine patch and most of its generics, the lidocaine is included as part of a hydrogel adhesive mixture [30]. These patches have high water content within the gel polymer system that results in a thicker and heavier adhesive patch. The original 5% lidocaine hydrogel patch contains 700 mg of lidocaine, yet only delivers a small amount of lidocaine to and through the skin [30]. Approximately 3 ± 2% of the lidocaine in the patch reaches systemic circulation and at least 665 mg remains in the patch after use [30].

Accidental exposure to the large amount of residual drug remaining in the patch may present safety issues not only to the patient but also to others including family members, caregivers, children, and pets [30]. A Guidance for Industry was issued by FDA concerning this issue with transdermal drug delivery systems (TTDS), transmucosal drug delivery systems (TMDS), and topical patches [58]. Safety issues may arise with these drug delivery systems because of the large amount of drug remaining in the used product. The Guidance gives examples of adverse events arising from overdosing because of a patient's failure to remove TTDS after the end of the intended use period, and children dying from inadvertent exposure to discarded TTDS [58]. Prescribing information for 5% lidocaine patches and associated generics contain warnings about the 'large' amount of lidocaine remaining in the used patch, accidental exposure in children and pets, and excessive dosing from applying the patches for longer than recommended [30].

In contrast, the recently approved 1.8% lidocaine topical system contains only 36 mg of lidocaine per patch (compared to 700 mg in the hydrogel patch) [30,32]. It consists of a thin, single-layer anhydrous adhesion system that serves two functions: (1) less drug is needed within the patch to achieve therapeutic effect, and (2) improved adhesion. These improvements are made without compromise to the dermal safety of the product, which is reflected in the same local tolerance between the 1.8% lidocaine topical system and 5% lidocaine patches. The delivery of lidocaine from the anhydrous 1.8% lidocaine topical system is more efficient than it is from the 5% lidocaine hydrogel patch resulting in a significant difference in bioavailability (~48% versus ~3%). Despite the significant difference in the amount of lidocaine in the patches, a single-dose, crossover, pharmacokinetic (PK) bioequivalence study showed that the anhydrous 1.8% lidocaine topical system demonstrated equivalent exposure (AUC) and peak concentration ($C_{max}$) as the 5% lidocaine hydrogel patch [32,59]. These bioequivalence data demonstrate that 1.8% lidocaine topical systems deliver an equivalent amount of lidocaine as the 5% lidocaine hydrogel patch despite having a significantly lower drug load (36 mg versus 700 mg) and consequentially a lower product strength (1.8% versus 5%) [30,32]. Likewise, only a small amount of lidocaine will remain in the transdermal lidocaine 1.8% system patch after use, which is reflected in the label and contrasts with the 5% lidocaine patch labels that warn against the large amount of residual drug [30,32].

The 5% lidocaine patch and the 1.8% lidocaine topical system are similar in size (10 cm x 14 cm), but the adhesive composition and biopharmaceutical dynamics also allows for a significantly thinner patch (system) (0.8 mm vs. 1.71 mm). The thinness of 1.8% topical lidocaine system along with the malleability of the nonaqueous polymer adhesive allows for a pliable patch that maintains contact with the skin during activity and at contour-challenged areas of the body. Like the 5% patch, the 1.8% lidocaine topical system can be cut into smaller pieces to conform to localized painful areas of the skin [30,32].

## 7. Adhesion of lidocaine patches

A commonly reported issue with topical patch products including the 5% lidocaine hydrogel patch is adhesion. FDA Adverse Events Reporting System found that for the lidocaine patch, about 70% of concerns reported regarded poor product adhesion [60]. This is a much higher rate compared with other patch products such as buprenorphine, fentanyl or nicotine patches [60]. Sustained and uniform adhesion of the patch is important for drug delivery and hence effectiveness.

An October 2018 draft FDA guidance provided recommendations for the design and conduct of studies evaluating the adhesive performance of a transdermal or topical delivery system (TDS) [33]. For the comparative assessment of adhesion, a 5-point adhesion scale was recommended in which each score corresponds to a specified range of adhered surface area for the TDS [33]. In a 54 subject clinical adhesion performance study with the 1.8%

lidocaine topical system, 47 subjects (87%) had adhesion scores of 0 (≥90% adhered) for all evaluations performed every 3 h during the 12 h of administration, seven subjects (13%) had adhesion scores of 1 (≥75% to <90% adhered) for at least one evaluation, and no subjects had scores of 2 or greater (<75% adhered) [32]. At the 12-h time point, 49 subjects (91%) had a score of 0 (≥90% adhered), supporting the advanced adhesion technology utilized in the formulation [32].

The superior adhesion profile of the 1.8% lidocaine topical system relative to 5% lidocaine patches was also demonstrated in a separate comparative clinical adhesion study [61,62]. With the 1.8% lidocaine topical system, 75% of the patches maintained ≥90% adhesion for 12 h compared while only 13.6% of the 5% lidocaine hydrogel patches maintained this level of adhesion over the same treatment period [61,62]. In a third study, the adhesion of the 1.8% lidocaine topical system was compared with a generic (Mylan Pharmaceuticals Inc. Morgantown, WV) 5% lidocaine patch [62]. The 1.8% system maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h) whereas the generic 5% patch had a mean adhesion of 80% at Time 0 (i.e., immediately after patch application) that progressively fell below a mean of 50% before 6 h [62]. This specific 5% lidocaine (Mylan) generic was selected for this third study because is not a hydrogel adhesive system and like 1.8% lidocaine topical system, it too involves a thin single-layer nonaqueous adhesive and has a lower drug load versus the original patch (140 mg versus 700 mg) [63]. Yet this 5% generic non-hydrogel system was observed to have distinctly worse adhesion profile compared to both the original 5% lidocaine patch and 1.8% lidocaine topical system [62]. While this disparity is expected relative to 1.8% lidocaine topical system, this finding is surprising relative to the original 5% lidocaine patch as the generics are expected to have comparable adhesion performance (along with bioequivalent PK and comparable dermal irritation profile). Further studies may be warranted to confirm the disparity.

The superior adhesion profile of the 1.8% lidocaine topical system should contribute to consistent drug delivery, minimize inappropriate patch replacements, and may have potential patient compliance and pharmacoeconomic benefits. Equally important is that the improvement in adhesion does not come at a sacrifice to dermal sensitization and irritation. In a provocative dermal sensitization and irritation clinical study (1.8% lidocaine topical system versus 5% lidocaine patch), both products presented with no sensitization [59], with a mean irritation score of 0.37 versus 0.04, respectively, on a 0–7 scale where a score of 0 is no irritation and a score of 7 is a strong reaction spreading beyond the application site. Although the 1.8% lidocaine topical system presented with statistically worse irritation, the mean irritation scores for both products were well below a score of 1 (barely perceptible erythema) are not considered clinically significant [59]. These data, along with formal irritation assessments performed in other sponsor-conducted studies, lead to 1.8% lidocaine topical systems having the same local tolerance/application site reactions language in the labels [30,32,59].

## 8. Conclusions

Topical analgesic benefits include targeted drug delivery, avoidance of the oral route and relative lack of systemic adverse effects. Local anesthetics block nociceptive signals and are of benefit when treating acute and chronic nociceptive and neuropathic pain. Lidocaine has proven effective as a topical analgesic, with a variety of prescription and OTC formulations available. There is a general lack of data regarding the safety, effectiveness, and pharmacokinetics of OTC lidocaine preparations. A newer and thinner topical lidocaine patch system has shown superior adhesion and a more efficient and consistent delivery of lidocaine, which may prove to be of benefit when treating neuropathic pain secondary to PHN. Prescription lidocaine patches are FDA approved for the treatment of pain related to PHN and are included in neuropathic pain management guidelines, which should be a focus of education for clinicians who treat these patients.

Table 1. Clinical practice guideline recommendations – postherpetic neuralgia.

| | First line | Second line | Third line | Fourth line |
|---|---|---|---|---|
| AAN (Dubinsky et al [25]. (Guidelines retired Feb. 2018) | Gabapentin Lidocaine Patch Tricyclic antidepressants Pregabalin Opioids | Topical aspirin Topical capsaicin Methylprednisolone | Acupuncture Benzydamine cream Dextromethorphan Indomethacin Lorazepam Vincristine iontophoresis Vitamin E Zimelidine | Biperidin Carbamazepine Chlorprothixene Cryocautery Dorsal root entry zone lesion Extract of *Ganoderma lucidum* He:Ne laser irradiation Ketamine Methylprednisolone, iontophoresis Morphine sulfate, epidural Nicardipine Piroxicam, topical Stellate ganglion block Triamcinolone, intralesional |

| | First line | Second line | Third line | Fourth line |
|---|---|---|---|---|
| CPS [21] | Gabapentinoids<br>Tricyclic antidepressants | Tramadol<br>Opioids<br>Lidocaine Patch | Cannabinoids | SSRIs<br>Lamotrigine<br>Lacosamide<br>Topiramate<br>Valproic acid<br>Methadone |
| EFNS [18] | Gabapentinoids<br>Tricyclic antidepressants<br>Lidocaine Patch | Topical Capsaicin<br>Opioids | | |

AAN, American Academy of Neurology; CPS, Canadian Pain Society; EFNS, European Federation of Neurological Societies; SNRIs, Serotonin and norepinephrine reuptake inhibitors.

## Acknowledgments

Technical editorial and medical writing support for the development of this manuscript were provided by James Bergstrom, PhD.

## Declaration of interest

Dr. Gudin reports other from AcelRx Pharmaceuticals, other from BioDelivery Sciences International, other from Averitas Pharma, other from KemPharm, other from Mallinckrodt Pharmaceuticals, other from Nektar Therapeutics, other from Quest Diagnostics, other from Scilex Pharmaceuticals, other from Salix Pharmaceuticals, and other from Virpax Pharmaceuticals outside the submitted work.

Dr. Nalamachu has received honorarium from Scilex and received consulting fee/honorarium/research grants from Collegium, Endo, Pfizer, BDSI, Pernix, Daichi and Lilly in the past 1 year.

## Additional information

### Funding

An educational grant for editorial support was provided by Scilex Pharmaceuticals.

# References

- Bhala N, Emberson J, Merhi A, et al. Vascular and upper gastrointestinal effects of non-steroidal anti-inflammatory drugs: meta-analyses of individual participant data from randomised trials. Lancet. 2013;382(9894):769–779.
- Lee WM. Public health: acetaminophen (APAP) hepatotoxicity—isn't it time for APAP to go away?. J Hepatol. 2017;67:1324–1331.
- Kumar L, Barker C, Emmanuel A. Opioid-induced constipation: pathophysiology, clinical consequences, and management. Gastroenterol Res Pract. 2014;2014:1–6. [Crossref], [Google Scholar]
- Bawor M, Dennis BB, Samaan MC, et al. Methadone induces testosterone suppression in patients with opioid addiction. Sci Rep. 2014;4:6189. , [Google Scholar]
- Brennan MJ. The effect of opioid therapy on endocrine function. Am J Med. 2013;126(Suppl 1):S12–S18. [Crossref], [PubMed], [Google Scholar]
- Center for Disease Control. Nonopioid treatments for chronic pain: principals of chronic pain treatment. [cited June 12 2019]. Available from: https://www.cdc.gov/drugoverdose/pdf/nonopioid_treatments-a.pdf [Google Scholar]
- Basbaum AI, Bautista DM, Scherrer G, et al. Cellular and molecular mechanisms of pain. Cell. 2009;139:267–284. , [Google Scholar]
- Institute of Medicine (US) Committee on Pain, Disability, and Chronic Illness Behavior. Pain and disability: clinical, behavioral, and public policy perspectives. In: Osterweis M, Kleinman A, Mechanic D, editors. The Anatomy and Physiology of Pain. National Academies Press (US); 1987. Chapter 7. [cited 2019 May 30]. Available from: https://www.ncbi.nlm.nih.gov/books/NBK219254/ [Google Scholar]
- Sheets MF, Hanck DA. Molecular action of lidocaine on the voltage sensors of sodium channels. J Gen Physiol. 2003;121:163–175. , [Google Scholar]
- Weinberg L, Peake B, Tan C, et al. Pharmacokinetics and pharmacodynamics of lignocaine: A review. World J Anesthesiol. 2015;4:17–29. [Crossref], [Google Scholar]
- Mick G, Correa-Illanes G. Topical pain management with the 5% lidocaine medicated plaster – a review. Curr Med Res Opin. 2012;28:937–951. , [Google Scholar]
- Finnerup NB, Haroutounian S. Neuropathic pain: an updated grading system for research and clinical practice. Pain. 2016;157:1599–1606. , [Google Scholar]
- Costigan M, Scholz J, Woolf CJ. Neuropathic Pain: A maladaptive response of the nervous system to damage. Annu Rev Neurosci. 2009;32:1–32. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]
- Staats PS, Argoff CE, Brewer R, et al. Neuropathic pain: incorporating new consensus guidelines into the reality of clinical practice. Adv Stud Med. 2004;4:S550–S566. [Google Scholar]
- Nalamachu S, Gould EM, Gannaitoni AR. Use of the lidocaine patch 5% in the Treatment of neuropathic pain. J Neuropathic Pain Symptom Palliation. 2006;2:3–13. [Taylor & Francis Online], [Google Scholar]

- Finnerup NB, Attal N, Haroutounian S, et al. Pharmacotherapy for neuropathic pain in adults: systematic review, meta-analysis and updated NeuPSIG recommendations. Lancet Neurol. 2015;14:162–173. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Fornasari D. Pharmacotherapy for neuropathic pain: A review. Pain Ther. 2017;6(Suppl 1):S25–S33. [Crossref], [PubMed], [Google Scholar]

- Attal N, Cruccu G, Baron R, et al. EFNS guidelines on the pharmacological treatment of neuropathic pain: 2010 Revision. Eur J Neuro. 2010;17:1113–1123. [Crossref], [Google Scholar]

- National Institutute for Health and Care Excellence (UK). The pharmacological management of neuropathic pain in adults in non-specialist settings. NICE Clinical Guidelines, No. 173. 2013 (updated Nov). 2018 [cited 2019 Jun 10]. Available from: https://www.nice.org.uk/guidance/cg173 [Google Scholar]

- International Association for the Study of Pain. Pharmacological management of neuropathic pain. Pain Clin Updates. 2010;18:1–8. [Google Scholar]

- Moulin DE, Boulanger A, Clark AJ, et al. Consensus statement: pharmacological management of chronic neuropathic pain: revised consensus statement from the Canadian pain society. Pain Res Manag. 2014;18:328–335. [Crossref], [Google Scholar]

- Nalamachu S, Morley-forster P. Diagnosing and managing postherpetic neuralgia. Drugs Aging. 2012;29:863–869. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Sampathkumar P, Drage LA, Martin DP. Herpes Zoster (shingles) and postherpetic neuralgia. Mayo Clin Proc. 2009;8:274–280. [Crossref], [Google Scholar]

- Dubinsky RM, Kabbani H, El-Chami Z, et al. Practice parameter: treatment of postherpetic neuralgia. An evidence-based report of the quality standards subcommittee of the american academy of neurology. Neurology. 2004;63:959–965. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Rowbotham MC, Davies PS, Verkempinck C, et al. Lidocaine patch: double-blind controlled study of a new treatment method for post-herpetic neuralgia. Pain. 1996;65:39–44. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Rowbotham MC, Davies PS, Fields HL. Topical lidocaine gel relieves postherpetic neuralgia. Ann Neurol. 1995;37:246–253. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Galer BS, Rowbotham MC, Perander J, et al. Topical lidocaine patch relieves postherpetic neuralgia more effectively than a vehicle topical patch: results of an enriched enrollment study. Pain. 1999;80:533–538. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Gordh T, Gordh T, Lindqvist K. Lidocaine: the original local anesthetic. Anesthesiology. 2010;113:1433–1437. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]

- Endo Pharmaceuticals Inc., Malvern, PA. LIDODERM® Patch Prescribing Information. January, 2015. [Google Scholar]
- Baron R, Allegri M, Correa-Illanes G, et al. The 5% lidocaine-medicated plaster: its inclusion in international treatment guidelines for treating localized neuropathic pain, and clinical evidence supporting its use. Pain Ther. 2016;5:149–169. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]
- Scilex Pharmaceuticals. ZTLido™ Prescribing Information. 2018 Apr. [Google Scholar]
- FDA guidance document. Assessing adhesion with transdermal delivery systems and topical patches for ANDAs. Draft Guidance for Industry. Oct, 2018. [cited 2019 Jul 31]. Available from: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/assessing-adhesion-transdermal-delivery-systems-and-topical-patches-andas-draft-guidance-industry [Google Scholar]
- FDA. External analgesic drug products for over-the-counter human use; reopening of the administrative record and amendment of tentative final monograph. Fed. Reg. 42324, July 17, 2003 [cited 2019 Jul 31]. Available from: https://www.federalregister.gov/documents/2003/07/17/03-17934/external-analgesic-drug-products-for-over-the-counter-human-use-reopening-of-the-administrative [Google Scholar]
- Oni G, Brown S, Kenkel J. Comparison of five commonly-available, lidocaine-containing topical anesthetics and their effect on serum levels of lidocaine and its metabolite monoethylglycinexylidide (MEGX). Aesthet Surg J. 2012 May;32(4):495–503. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]
- AstraZeneca. EMLA® product monograph. 2017 Aug. [Google Scholar]
- Willhelm IR, Tzabazis A, Likar R, et al. Long-term treatment of neuropathic pain with a 5% lidocaine medicated plaster. Eur J Anaesthesiol. 2010;27:169–173. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]
- Navez ML, Monella C, Bosl I, et al. 5% lidocaine medicated plaster for the treatment of postherpetic neuralgia: a review of the clinical safety and tolerability. Pain Ther. 2015;4:1–15. [Crossref], [PubMed], [Web of Science ®], [Google Scholar]
- Kesselheim AS, Myers JA, Solomon DH, et al. The prevalence and cost of unapproved uses of top-selling orphan drugs. PLoS ONE. 2012;7:e31894. Epub 2012 Feb 21.
- Gudin J, Fudin J, Wang E, et al. Treatment patterns and medication use in patients with postherpetic neuralgia. J Manag Care Spec Pharm. 2019 Dec;25(12):1387–1396. [Google Scholar]
- Moore RA, Chi CC, Wiffen PJ, et al. Oral nonsteroidal anti-inflammatory drugs for neuropathic pain. Cochrane Database Syst Rev. 2015;(10):CD010902. [Google Scholar]
- Wolff RF, Bala MM, Westwood M, et al. 5% lidocaine medicated plaster in painful diabetic peripheral neuropathy (DPN): a systematic review. Swiss Med Wkly. 2010;140:297–306.

- Yang X-D, Fang P-F, Xiang D-X, et al. Topical treatments for diabetic neuropathic pain (review). Exp Ther Med. 2019;17:1963–1976.
- Baron R, Mayoral V, Leijon G, et al. 5% lidocaine medicated plaster versus pregabalin in post-herpetic neuralgia and diabetic polyneuropathy: an open-label, non-inferiority two-stage random control trial. Curr Med Res Opin. 2009;25:1663–1676.
- Baron R, Mayoral V, Leijon G, et al. Efficacy and safety of combination therapy with 5% lidocaine medicated plaster and pregabalin in post-herpetic neuralgia and diabetic polyneuropathy. Curr Med Res Opin. 2009;25:1677–1687.
- Barbano RL, Herrmann DN, Hart-Gouleau S, et al. Effectiveness, tolerability, and impact on quality of life of the 5% lidocaine patch in diabetic polyneuropathy. Arch Neurol. 2004;61:914–918.
- Argoff CE, Galer BS, Jensen MP. Oleka N and Gammaitoni AR: effectiveness of the lidocaine patch 5% on pain qualities in three chronic pain states: assessment with the neuropathic pain scale. Curr Med Res Opin. 2004;20(Suppl 2):S21–S28.
- White WT, Patel N. Drass M and Nalamachu S: lidocaine patch 5% with systemic analgesics such as gabapentin: A rational polypharmacy approach for the treatment of chronic pain. Pain Med. 2003;4:321–330.
- Nalamachu S, Crockett RS, Mathur D. Lidocaine patch 5% for carpal tunnel syndrome: how it compares with injections: A pilot study. J Family Prac. 2006;55:209–214.
- Nalamachu S, Crockett RS, Gammaitoni AR, et al. A comparison of the lidocaine patch 5% vs Naproxen 500 mg twice daily for the relief of pain associated with carpal tunnel syndrome: A 6-week, randomized, parallel-group study. Medscape J Med. 2006;8(3):33–42. [Google Scholar]
- Moghataderi AR, Jazayeri SM, Azizi S. EMLA cream for carpal tunnel syndrome: how it compares with steroid injection. Electromyogr Clin Neurophysiol. 2009;49:287–289. [PubMed], [Google Scholar]
- Baron R, Binder A, Attal N, et al. Neuropathic low back pain in clinical practice. Eur J Pain. 2016;20:861–873.
- Galer BS, Gammaitoni AR, Olekai N, et al. Use of the Lidocaine patch 5% in reducing intensity of various pain qualities reported by patients with lower back pain. Curr Med Res Opin. 2004;20(Suppl 2):S5–S12.
- Gimbel J, Linn R, Hale M, et al. Lidocaine patch treatment in patients with low back pain: results of an open-label, nonrandomized pilot study. Am J Ther. 2005 Jul-Aug;12(4):311–319. [Crossref], [PubMed], [Google Scholar]
- Galer BS, Sheldon E, Patel N, et al. Topical lidocaine patch 5% may target a novel underlying pain mechanism in osteoarthritis. Curr Med Res Opin. 2004;20:1455–1458.
- Burch F, Codding C, Patel N, et al. Lidocaine patch 5% improves pain, stiffness, and physical function in osteoarthritis pain patients. A prospective, multicenter, open-label effectiveness trial. Osteoarthritis Cartilage. 2004;12:253–255.

- Gammaitoni AR, Galer BS, Onawola R, et al. Lidocaine patch 5% and its positive impact on pain qualities in osteoarthritis: results of a pilot 2-week,open-label study using the neuropathic pain scale. Curr Med Res Opin. 2004;20(Suppl 2):S13–19.
- FDA.gov. FYs 2013-2017 GDUFA science and research report: transdermal drug products. 2018 [cited 2019 Feb 13]. Available from: https://www.fda.gov/ForIndustry/UserFees/GenericDrugUserFees/ucm605293.htm [Google Scholar]
- Patel K, Gudin JA, Vought K, et al. A randomized, comparative pharmacokinetic (PK) study of ZTLIDO™ lidocaine topical system 18% (36 mg) versus LIDODERM® lidocaine patch 5% (700 mg). Presented at PAINWeek; 2018 Sep 5–8; Las Vegas, NV. [Google Scholar]
- FDA adverse events reporting system 9FAERS public dashboard. Data as of December 31. 2018 [cited 2019 Feb 13]. Available from: https://www.fda.gov/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-latest-quarterly-data-files [Google Scholar]
- Gudin J, Nalamachu S, Argoff C, et al. Adhesion performance of 3 lidocaine patch formulations. Presented at PAINWeek; 2018 Sept 5–8; Las Vegas, NV. [Google Scholar]
- Scilex Corporation. Presentation to the securities and exchange commission. SEC Archives. 2019 Apr. [cited 2019 Jul 31]. Available from: https://www.sec.gov/Archives/edgar/data/850261/000114420419019578/tv518886_ex99-1.htm (Slides 10 and 11) [Google Scholar]
- Mylan Pharmaceuticals, Inc. Lidocaine patch prescribing information. 2018 Nov. [Google Scholar]

# EXHIBIT 13

# Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects

ncbi.nlm.nih.gov/pmc/articles/PMC7914064/



J Pain Res. 2021; 14: 513–526.

Published online 2021 Feb 23. doi: 10.2147/JPR.S287153
PMCID: PMC7914064

PMID: 33654425

Jeffrey Gudin,[1,2] Lynn R Webster,[3] Emileigh Greuber,[4] Kip Vought,[4] Kalpana Patel,[4] and Louis Kuritzky[5]
Author information Article notes Copyright and License information Disclaimer
This article has been cited by other articles in PMC.

## Abstract

### Purpose

The primary objective was to evaluate adhesion performance of the lidocaine topical system 1.8% for 12 hours in healthy human subjects in three studies: as a single product (Study 1) and versus other lidocaine topical products (lidocaine patch 5% and lidocaine medicated plaster 5% [Study 2] and generic lidocaine patch 5% [Study 3]). Safety of the lidocaine topical system 1.8%, with a skin irritation focus, was a secondary objective.

### Patients and Methods

All three studies were open-label, randomized, Phase 1 adhesion performance studies in healthy adult volunteers (N=125). Lidocaine topical products were applied for 12 hours per test, per study arm. Adhesion of all test products was scored at 0, 3, 6, 9, and 12 hours post-application. Skin irritation was scored after product removal or when a product detached.

## Results

Overall, the majority (≥75%) of subjects treated with the lidocaine topical system 1.8% demonstrated ≥90% adhesion (FDA adhesion score 0) throughout the 12-hour administration period versus 13.6% of subjects treated with lidocaine patch 5%, 15.9% of subjects treated with lidocaine medicated plaster 5%, and 0% of subjects treated with the generic lidocaine patch 5%. There were no complete detachments with the lidocaine topical system 1.8%, whereas 4.5% of lidocaine patch 5% and lidocaine medicated plaster 5% detached, and 29% of generic lidocaine patch 5% detached. Minimal skin irritation was observed with each lidocaine topical product.

## Conclusion

Across three studies, lidocaine topical system 1.8% demonstrated superior adhesion performance versus the three other products tested. Skin irritation was minimal across products and studies.

## Clinicaltrials.gov

NCT04312750, NCT04320173, NCT04319926.

**Keywords:** lidocaine topical system, lidocaine patch, lidocaine medicated plaster, adhesion, postherpetic neuralgia

## Introduction

An estimated 1 million individuals in the United States are diagnosed with herpes zoster (shingles) each year following reactivation of a childhood infection with varicella-zoster virus.[1,2] According to the US Centers for Disease Control and Prevention and health authorities in other countries, the incidence of herpes zoster has been gradually increasing in adults for several years, for reasons that are not well understood, although rates among older adults have plateaued since 2008.[1] Postherpetic neuralgia (PHN) is the most common long-term complication of herpes zoster and is generally diagnosed in individuals who have recovered from the herpes zoster skin rash but continue to experience pain for at least 3 months.[3] Depending on their age and the PHN definition used, 20% to 50% of individuals with herpes zoster will experience PHN.[3,4] Advanced age and immunocompromised states are significant risk factors for developing both herpes zoster and PHN, as approximately half of all PHN cases occur in individuals aged >60 years.[3,4]

PHN is characterized by neuropathic pain isolated to the dermatome(s) affected by the virus and can be debilitating. It is a chronic condition that can persist for years in some patients and is often challenging to treat.[2–4] It is a major driver in herpes zoster–related disease burden and cost.[5] Currently, there is no available cure for PHN; thus, medical management

focuses on palliative treatments and strategies to shorten the duration or lessen the symptom burden.[3] Due to the persistent and often refractory nature of the neuropathic pain associated with PHN, combination therapy with systemic and topical analgesics is often utilized in an attempt to optimize patient outcomes.[2] Systemic therapies may include antidepressants, anticonvulsants, and opioids; opioids have remained the most frequently used first-line therapy, despite lack of support by the current body of evidence and potential for abuse or diversion.[3,6]

Topical patches and other delivery systems have been developed to deliver drugs, such as lidocaine, locally for the treatment of PHN.[2–4,7] Topical delivery may have clinical advantages, including specifically targeting the site of pain with the delivery of drugs to the affected area, thereby posing a low risk of systemic toxicity or drug–drug interactions and potentially avoiding some of the adverse events (AEs) associated with commonly used systemic medications.[7–9] This is particularly important in older patients, who may have impaired hepatic and/or renal function, and for those in whom AEs can be a limiting factor in treatment compliance.[3]

Lidocaine is an amide-type local anesthetic agent that stabilizes neuronal membranes by inhibiting the ionic fluxes required for initiation and conduction of nerve impulses (ie, pain signals).[10] Because topically applied lidocaine is reported to penetrate only about 8 to 10 mm into the skin, it is well suited for targeted use in peripherally localized pain.[11,12] Penetration of lidocaine after application of the lidocaine patch 5% was sufficient to produce an analgesic effect, but less than the amount necessary to produce a complete sensory block.[13] In 1999, the US Food and Drug Administration (FDA) granted approval for Lidoderm® (lidocaine patch 5%; Endo Pharmaceuticals Inc., Malvern, PA) as the first medication specifically indicated for the treatment of PHN.[8,13,14] The drug product was approved in Europe in 2007, designated as lidocaine "medicated plaster".[15] Generic lidocaine patch 5% products were introduced to the market by Actavis Laboratories UT Inc. (Salt Lake City, UT) in August 2012 and Mylan Pharmaceuticals Inc. (Morgantown, WV) in August 2015.[16,17]

FDA recently moved to use of a standardized nomenclature for topical or transdermal dosage forms, referred to as "systems" instead of "patches." In February 2018, FDA approved ZTlido® (lidocaine topical system 1.8%; Scilex Pharmaceuticals Inc., San Diego, CA), which is indicated for relief of pain associated with PHN.[10] The lidocaine topical system 1.8%, lidocaine medicated plaster 5%, and lidocaine patch 5% products are all topical dosage forms (ie, they all deliver lidocaine topically to the site of pain). The lidocaine topical system 1.8% is a thin and flexible anhydrous lidocaine delivery system that was developed to provide transcutaneous lidocaine exposure equivalent to the prescription lidocaine 5% products (lidocaine patch 5% and lidocaine medicated plaster 5% in the United States and European Union, respectively), with a significantly reduced drug load per system (36 mg vs 700 mg).[10,13] Approval of the lidocaine topical system 1.8% was based, in part, on its

demonstrated bioequivalence to the lidocaine patch 5%, allowing for comparable pain relief with greater bioavailability of lidocaine.[18,19] Thus, with the same surface area, 140 cm$^2$, one dose of the lidocaine topical system 1.8% provides lidocaine exposure equivalent to one lidocaine patch 5%.[10,19]

Although it has been established that topical lidocaine provides effective analgesia for individuals with PHN, it is generally understood that the adhesive performance of a topical or transdermal delivery system is an essential factor in bioavailability because suboptimal adhesion may affect drug exposure and achievement of a therapeutic dose.[20,21] FDA has received numerous reports of adhesion failure—including edge curling, partial lifting, or complete detachment of patches—that have resulted in improper dosing as well as repeat application, leading to increased cost. Approximately 69% of AEs reported to the FDA Adverse Event Reporting System for topical lidocaine 5% patches from 2013 to 2018 were related to product adhesion issues (1347 adhesion issues out of 1936 reported total AE cases).[22]

Three studies were conducted to characterize the adhesion of the lidocaine topical system 1.8%. The first study was designed to assess the adhesion performance of the topical system in healthy human subjects over 12 hours, a maximum application period described in the product labeling.[10] The subsequent two studies then compared the adhesion performance of the lidocaine topical system 1.8% to that of three other prescription products in common use: lidocaine patch 5%, and lidocaine medicated plaster 5% in Study 2, as well as a newer US generic lidocaine patch 5% from Mylan Pharmaceuticals Inc. in Study 3 (Table 1). Safety of the lidocaine topical system 1.8% was also monitored throughout the studies.

## Table 1

Characteristics of Studied Lidocaine Topical Products

| | Lidocaine Topical System 1.8% | Lidocaine Patch 5% | Lidocaine Medicated Plaster 5% | Mylan Lidocaine Patch 5% |
|---|---|---|---|---|
| **Formulation** | Nonaqueous polymer | Hydrogel | Hydrogel | Nonaqueous polymer |
| **Lidocaine content** | 36mg (18 mg per gram of adhesive: 1.8%) | 700mg (50 mg per gram of adhesive: 5%) | 700 mg (50 mg per gram of adhesive: 5%) | 140 mg (50 mg per gram of adhesive: 5%) |
| **Bioavailability** | ~ 45% | ~3 ± 2% | ~3 ± 2% | ~11 ± 4% |
| **Residual drug** | ~20 mg | ≥ 665 mg | ≥ 665 mg | ~115 mg |
| **Release liner** | Perforated | Not perforated | Not perforated | Not perforated |

| | Lidocaine Topical System 1.8% | Lidocaine Patch 5% | Lidocaine Medicated Plaster 5% | Mylan Lidocaine Patch 5% |
|---|---|---|---|---|
| **Size** | 10 cm x 14 cm | 10 cm x 14 cm | 10 cm x 14 cm | 10 cm x 14 cm |
| **Thickness** | 0.08 cm | 0.16 cm | 0.16 cm | 0.02 cm |
| **Weight** | 2 g adhesive | 14 g adhesive | 14 g adhesive | 2.8 g adhesive |

Open in a separate window

**Notes**: ZTLIDO[®] (lidocaine topical system) 1.8% Prescribing Information. 11/2018. LIDODERM[®] (lidocaine patch 5%) Prescribing Information. 01/2015. VERSATIS[®] (lidocaine medicated plaster 5%) Prescribing information. 07/2018. Mylan Lidocaine Patch 5% Prescribing information. 01/2015.

# Methods

## Study Design

All three studies were Phase 1 adhesion performance studies. Study 1 was an open-label, single-treatment, single-period, single-application study; Study 2 was an open-label, randomized, single-treatment, 3-period, single-application study; and Study 3 was an open-label, randomized, 2-treatment, 2-period, single-dose study. The studies were conducted at single clinical sites in the United States: Studies 1 and 3 at AXIS Clinicals, Dilworth, MN, and Study 2 at TKL Research Inc., Fair Lawn, NJ. Study 1 was approved by the Salus Institutional Review Board, and Studies 2 and 3 were approved by the IntegReview Board (both central IRBs in Austin, TX). All three studies were conducted in accordance with the ethical principles originating from the Declaration of Helsinki and amendments, ICH Guideline for Good Clinical Practice, FDA Guidance for Industry: Assessing Adhesion With Transdermal and Topical Delivery Systems for ANDAs, and local regulatory requirements.[23,24] Study 2 was also performed in accordance with Appendix II (In Vivo Skin Adhesion) of the European Medicines Agency Guideline on the Pharmacokinetic and Clinical Evaluation of Modified Release Dosage Forms.[25] These studies were registered at Clinicaltrials.gov with the clinical trial registration numbers: NCT04312750, NCT04320173, and NCT04319926.

## Subjects

The studies were performed in healthy adult human volunteers with similar inclusion and exclusion criteria. Eligible subjects were men or women ≥18 years of age, with a body mass index between 18 and 36 kg/m$^2$ (Study 1) or 18 and 30 kg/m$^2$ (Studies 2 and 3). Subjects were nonsmokers and generally healthy, as documented by medical history, physical

examination (including evaluation of cardiovascular, gastrointestinal, respiratory, musculoskeletal, and central nervous systems), and vital signs assessments, with no evidence of underlying disease during check-in and screening performed within 28 days of check-in. Female subjects could not be pregnant or lactating, and those of childbearing age were instructed to practice medically acceptable contraception throughout the study. All subjects provided prior written informed consent and were able to comply with study procedures.

Exclusion criteria included evidence of allergy or known hypersensitivity to lidocaine, local anesthetics of the amide type, or any of the components of the lidocaine topical system formulations; any major illness in the last 3 months or any significant ongoing chronic medical illness; history of addiction, abuse, and misuse of any drug; alcohol abuse within the prior 12 months; ingestion of prescription medication or any hormonal medication (except hormonal contraceptives) at any time in 14 days prior to study product application; and use of over-the-counter medications within the prior 5 days.

Of relevance to dermatologic adhesion studies, subjects could not have the following: history of significant dermatologic cancers (eg, melanoma, squamous cell carcinoma), except basal cell carcinomas that were superficial and did not involve the investigative site; presence of any current dermatologic condition (eg, psoriasis, eczema, atopic dermatitis) or any skin condition such as scratches, cuts, scars, abrasions, excessive hair, tattoos, moles, recently shaved skin, uneven skin texture, irritated skin (redness, rash, blisters, etc.), or excessively oily skin at the application areas that may have affected the application or adhesive properties of the study products; and medical history of hyperhidrosis, or otherwise history of excessive sweating under non-exercising conditions.

## Treatments

Prior to topical product application, the hair on the application site was clipped if necessary (not shaved) by clinical staff. The area was checked to ensure the absence of any skin conditions (eg, broken skin, moles, uneven skin texture) and was cleaned only with water (no soaps or cleansing agents) and allowed to air-dry. Each product was applied away from any significant folds or creases and at least 1 inch away from the spine. The application involved pressing the product firmly into place, holding it with the palm of the hand for up to 15 seconds, and smoothing it to prevent trapping of air bubbles. No overlays, adhesive tapes, bandages, or similar products were applied during the application period.

In Study 1, a single lidocaine topical system 1.8% was applied to a fixed area on either the left or right side (per randomization schedule) of the lower/middle back. In Study 2, one of the three products, the lidocaine topical system 1.8%, lidocaine patch 5%, or lidocaine medicated plaster 5%, was applied over a predetermined fixed area on either the left or right side of the upper back (per randomization schedule). Each subject received all three

products (one in each study period), with the order of products determined by randomization to one of six treatment sequences. The lidocaine topical system 1.8% was randomized to be applied on one side, and the lidocaine patch 5% or lidocaine medicated plaster 5% was applied contralaterally at the same anatomical location during their respective subsequent periods. In Study 3, one lidocaine topical system 1.8% or one generic lidocaine patch 5% was applied over a predetermined fixed area on the upper back (per randomization schedule). Each subject received both products (one in each application period), with the order of products determined by randomization.

Throughout all studies, products were worn for 12 hours (±15 minutes) in each application period, which occurred during daylight hours (morning to evening). Products were removed and discarded per protocol guidelines, and the application site was gently wiped with dry gauze. Washout intervals occurred between consecutive application periods when more than one product was evaluated: a 7-day washout was used between periods I and II and periods II and III in Study 2, and a 12-hour washout was used between periods I and II in Study 3.

## Subject Compliance

The use of soap or topical products (eg, lotion, oil, makeup, powder) was not permitted on the study product application site for 48 hours prior to product application and throughout the entire duration of the study. Subjects were instructed not to wash off or wet the application area until after the 12-hour post-removal irritation assessment was performed. They were instructed to avoid rubbing, pulling, scratching, or touching the product or performing any other activity that might cause the product to be displaced. Specifically, they were to avoid putting pressure between the product and other objects (eg, walls, chairs, beds) for prolonged periods. They could not participate in any strenuous activity but could ambulate and perform activities freely if these required no physical exertion or did not hamper product adhesion. They were not allowed to press down or re-adhere any product that was lifting or detaching. Subjects were also required to avoid exposing the product to external sources of direct heat (eg, hair dryers, heating pads, heat lamps, saunas).

## Prior and Concomitant Therapy

Subjects could not use prescription medications, except for hormonal contraception, within 14 days prior to the first product application and throughout the study. Over-the-counter medications were not allowed within the prior 5 days, but occasional use of acetaminophen, supplements, and vitamins was permitted. In addition, subjects refrained from using antiarrhythmic drugs, such as tocainide and mexiletine, and local anesthetics within 14 days prior to product application and throughout the study. Finally, subjects were prohibited from using nicotine-containing products (eg, e-cigarettes, patches, gum, chewing tobacco) within 30 days prior to product application and from consuming alcohol and poppy seed–containing foods within 48 hours prior to product application.

## Study Objectives

The primary objective of these studies was to evaluate the adhesion performance of the lidocaine topical system 1.8% for 12 hours in healthy human subjects: as a single product (Study 1) and in comparison with other available topical products (lidocaine patch 5% and lidocaine medicated plaster 5% [Study 2] and generic lidocaine patch 5% [Study 3]). An additional secondary objective throughout all studies was to monitor AEs and ensure the safety of the lidocaine topical system 1.8%, with a focus on skin irritation.

## Study Assessments

### Adhesion

In all studies, product adhesion was assessed immediately after application (0 hours) and at 3, 6, 9, and 12 hours (±15 minutes; before product removal) after application. Assessments in Study 1 were performed by a trained scorer using the FDA-recommended 5-point adhesion scale.[24] The FDA scale ranges from 0 to 4, where 0 represents ≥90% of the product adhered (essentially no part of the product lifting off the skin), 1 represents 75% to <90% adhered (only some edges of the product lifting off the skin), 2 represents 50% to <75% adhered (less than half the product lifting off the skin), 3 represents >0% to <50% adhered (more than half the product lifting off the skin but not detached), and 4 represents 0% adhered (complete product detachment). The mean cumulative adhesion score was calculated by summing the scores at 3, 6, 9, and 12 hours and dividing the total by the total number of observations per subject.

In Studies 2 and 3, the degree of adhesion was assessed by a trained scorer using a transparent grid with evenly spaced dots. The grid was demarcated to the exact size of each lidocaine product. The dot matrix grid was gently laid over the product on the skin, and areas of adhesion were outlined; dots excluded from adhering areas were counted to identify the exact surface area of lift-off and allowing the determination of the total amount of product adhesion as a percentage (ie, percent adhesion). In Study 2, the percent adhesion for each individual product was also transposed to the FDA 5-point scale as the primary dataset for analysis. However, an ad-hoc analysis of the percent adhesion data for each product was also performed as it is more discrete in detecting differences in adhesion performance. In Study 3, the degree of adhesion for both lidocaine products was assessed using the dot matrix method described above and reported as total percent adhesion with no transposition to other scales.

If a subject reported that a product was becoming detached, adhesion assessments were performed within 10 minutes. For products that had completely detached prior to the end of a 12-hour application period in Studies 2 and 3, a score of 0% was carried through in the adhesion analysis for all remaining observations in that application period.

## Safety

In Study 1, skin irritation at the application site of the lidocaine topical system 1.8% was evaluated at 30 minutes (+10 minutes) and 2 hours (±15 minutes) after product removal using an 8-point scale of dermal response (where 0 represents no evidence of irritation; scores then range from 1 [representing mild, barely perceptible erythema] to 7 [representing a strong reaction, extending beyond the application site]) and a scale of other effects, including glazed appearance, peeling and cracking, dried or serous exudates covering at least a portion of the application site, and small petechial erosions and/or scabs).[26] In Study 2, skin irritation at the application site was also evaluated at 30 minutes (+15 minutes), 2 hours (±15 minutes), and 12 hours (±30 minutes) after product removal to confirm whether any irritation observed immediately after removal was associated with mechanical removal of the patch. If the product was detached or otherwise removed prior to the conclusion of the 12-hour application period, an irritation assessment was made at the time of detachment and at all subsequent time points in what would have been the full 12-hour application period had detachment not occurred. AEs were monitored and recorded at specified time points throughout the study. In Study 3, dermal AEs were reported, but no formal skin irritation assessments were performed.

## Statistical Analyses

In Study 1, descriptive statistics (mean, standard deviation, median, minimum, and maximum) for cumulative adhesion score and mean cumulative adhesion score were generated. Statistical analysis was performed using SAS® Version 9.4 (SAS Institute Inc., Cary, NC). In Study 2, mean adhesion scores were analyzed using analysis of variance (ANOVA) with effects of sequence, subjects within sequence, period, and treatment. Sequence was tested against subjects within sequence for significance ($P<0.05$); period and treatment were tested against the residual error ($P<0.05$). A 2-sided 90% confidence interval (CI; equivalent to two 1-sided 95% tests) was constructed on the difference (test minus reference) between treatment means. Proportions of subjects for secondary endpoints were compared between treatment groups using Cochran-Mantel-Haenszel statistics blocking on subject. In Study 3, statistical significance for a treatment effect was determined by ANOVA. A sample size of 24 for Study 3 was calculated for this 2-way crossover design based on the analysis of Study 2. Because the generic lidocaine patch 5% is required to demonstrate comparable (statistically noninferior) adhesion to the reference product lidocaine patch 5% used in Study 2 to support its marketing approval, it was assumed that Study 3 would be adequately powered at 80% with 24 subjects, based on the effect size and coefficient of variation observed for lidocaine patch 5% in Study 2. Statistical analysis was performed using SAS® Version 9.3 (SAS Institute Inc., Cary, NC).

## Results

## Subject Disposition and Baseline Characteristics

A total of 125 subjects were randomized in these studies, and all received treatment. In Study 1, 54 were enrolled and completed the study. In Study 2, 47 subjects were enrolled and 44 (93.6%) completed the study, while 3 (6.4%) discontinued when they were unable to reach the study site due to severe weather. In Study 3, 24 subjects were enrolled and completed the study. Throughout, no subjects discontinued due to AEs (eg, unacceptable skin irritation) or were excluded due to a protocol deviation, and 122 subjects who completed the studies were included in the per-protocol adhesion analyses (54, 44, and 24 subjects in Studies 1, 2, and 3, respectively).

Overall, subjects ranged from 18 to 64 years of age. The majority of subjects were female in Studies 1 (70.4%) and 3 (62.5%), while male subjects predominated in Study 2 (74.5%). Across the three studies, the majority of subjects were white (85.2%, 46.8%, and 62.5% in Studies 1, 2, and 3, respectively) (Table 2). All subjects were healthy, with vital signs within the normal range.

## Table 2

Subject Demographics and Baseline Characteristics

| Characteristics | Study 1 (n=54) | Study 2 (n=47) | Study 3 (n=24) |
|---|---|---|---|
| **Age, years** | | | |
| Mean (SD) | 30.1 (12.5) | 43.1 (10.8) | 34.79 (13.39) |
| Median | 25.0 | 47.0 | 32.00 |
| Range | 18–58 | 19–59 | 19–64 |
| **Sex, n (%)** | | | |
| Male | 16 (29.6%) | 35 (74.5%) | 9 (37.5%) |
| Female | 38 (70.4%) | 12 (25.5%) | 15 (62.5%) |
| **Race, n (%)** | | | |
| White | 46 (85.2%) | 22 (46.8%) | 15 (62.5%) |
| Black | 5 (9.3%) | 21 (44.7%) | 4 (16.7%) |
| Asian | 2 (3.7%) | 3 (6.4%) | 3 (12.5%) |
| Other | 1 (1.9%) | 1 (2.1%) | 0 (0%) |

Open in a separate window
**Abbreviation**: SD, standard deviation.

## Adhesion Analysis

### Study 1

Among the 54 subjects included in the analysis, 27 received the lidocaine topical system 1.8% on the left side of the lower/middle back and 27 received the product on the right side. Adhesion evaluations performed every 3 hours during the 12 hours of administration used the FDA rating scale. Overall, mean cumulative adhesion scores across all time points ranged from 0 (>90% adhered) to 1 (≥75% to <90% adhered), and the mean of these scores was 0.04 ± 0.138 (Table 3).

### Table 3

Mean Adhesion Scores Using FDA Scales for Lidocaine Topical System 1.8%, Lidocaine Patch 5%, and Lidocaine Medicated Plaster (Studies 1, 2, and 3)

| | Study 1 | Study 2 | | | Study 3* | |
|---|---|---|---|---|---|---|
| **Parameters** | **Lidocaine Topical System 1.8% (n=54)** | **Lidocaine Topical System 1.8% (n=44)** | **Lidocaine Patch 5% (n=44)** | **Lidocaine Medicated Plaster 5% (n=44)** | **Lidocaine Topical System 1.8% (n=24)** | **Generic Lidocaine Patch 5% (n=24)** |
| Mean cumulative adhesion score (FDA scale), mean ± SD | 0.04 ± 0.138 | 0.20 ± 0.38 | 1.01 ± 0.66 | 0.89 ± 0.66 | 0.17 ± 0.48 | 2.63 ± 0.58 |
| Minimum score* | 0 | 0 | 0 | 0 | 0 | 0 |
| Maximum score* | 1 | 3 | 4 | 4 | 2 | 4 |

Open in a separate window
**Note**: *Percent adhesion data were converted to corresponding FDA adhesion rating scale scores for Study 3.

More than 90% of subjects had a score of 0 at every time point from 0 to 12 hours after application. At the end of the 12-hour study period, 49 of 54 subjects (90.7%) had a score of 0, while the 5 remaining subjects had a low score of 1, indicating that only some edges of the lidocaine topical delivery system 1.8% lifted off the skin (Figure 1A). No subject had a meaningful degree of detachment (score ≥3). Cumulatively across all time points, 47 subjects (87%) had an adhesion score of 0 for all evaluations performed every 3 hours

during the 12 hours of administration, 7 subjects (13%) had an adhesion score of 1 (≥75% to <90% adhered) for at least one evaluation, and no subject had a score of 2 or greater (<75% adhered).





Open in a separate window

Figure 1

Adhesion assessments at the end of the dosing period (12 hours). The proportion of subjects with at least 90% adhesion (using the FDA adhesion rating scale) at the end of the 12-hour application period and the proportion of subjects who had experienced 0% adhesion (complete detachment) at any time point throughout the study in (**A**) Study 1 (n=54); (**B**) Study 2 (n=44); and (**C**) Study 3 (n=24).

## Study 2

A total of 47 subjects were randomized to 1 of 6 treatment sequences specifying the order of application of the 3 products, and 44 subjects who completed the study were included in the analysis. Lidocaine topical system 1.8% showed a superior adhesion profile compared to both lidocaine patch 5% and lidocaine medicated plaster 5% (Tables 3 and4).4). The mean cumulative adhesion score using the FDA-rating scale was 0.20 ± 0.38 for lidocaine topical system 1.8%, compared to 1.01 ± 0.66 and 0.89 ± 0.66 for the lidocaine patch 5% and lidocaine medicated plaster 5%, respectively. At the 0-hour time point, the mean (90% CI) adhesion score, determined using the FDA rating scale, was 0.003 (−0.040, 0.047) for the lidocaine topical system 1.8%, 0.049 (0.006, 0.093) for the lidocaine patch 5%, and 0.047 (0.004, 0.091) for lidocaine medicated plaster 5%. These scores were not significantly different ($P$=0.2141 and $P$=0.2350 for the lidocaine topical system 1.8% vs lidocaine patch 5% and lidocaine medicated plaster 5%, respectively); however, all subsequent time points showed superior adhesion of the lidocaine topical system 1.8% versus both the lidocaine patch 5% and lidocaine medicated plaster 5% ($P$<0.0001 for all comparisons).

## Table 4

Mean Percent Adhesion Over Time for Lidocaine Topical System 1.8% and Lidocaine Patch/Plaster 5% Comparators (Studies 2 and 3)

| Mean Percent Adhesion Score | Study 2 | | | Study 3 | |
|---|---|---|---|---|---|
| | Lidocaine Topical System 1.8% (n=44) | Lidocaine Patch 5% (n=44) | Lidocaine Medicated Plaster 5% (n=44) | Lidocaine Topical System 1.8% (n=24) | Generic Lidocaine Patch 5% (n=24) |
| 0 hours (mean ± SD) | 100.0 ± 0.0 | 97.2 ± 2.9 | 97.2 ± 3.9 | 99.5 ± 0.7 | 77.6 ± 17.3 |
| 3 hours (mean ± SD) | 96.9 ± 7.3 | 84.7 ± 13.1 | 86.0 ± 15.0 | 97.0 ± 4.8 | 51.9 ± 22.2 |
| 6 hours (mean ± SD) | 95.0 ± 8.6 | 78.5 ± 18.0 | 80.9 ± 16.8 | 96.3 ± 5.5 | 40.8 ± 22.9 |
| 9 hours (mean ± SD) | 91.8 ± 10.5 | 70.9 ± 22.2 | 75.7 ± 20.0 | 94.7 ± 7.1 | 31.2 ± 23.4 |
| 12 hours (mean ± SD) | 88.7 ± 13.8 | 63.3 ± 24.2 | 68.4 ± 24.4 | 93.4 ± 7.2 | 26.8 ± 23.0 |
| Mean cumulative adhesion % (mean ± SD) | 93.1 ± 9.8 | 74.4 ± 18.3 | 77.8 ± 17.4 | 95.3 ± 5.9 | 37.7 ± 21.3 |

Open in a separate window

Analysis of the mean percent adhesion score determined from the raw data showed the superior adhesion of the lidocaine topical system 1.8% over both the lidocaine patch 5% and lidocaine medicated plaster 5% at baseline (ie, Time 0) and at each time point from 3 to 12 hours after application (*P*<0.0001 for all comparisons) (Figure 2A and Table 4). In contrast to analyses of FDA rating scale data, this analysis of percent adhesion data discretely revealed the superiority of the lidocaine topical system 1.8% at the 0-hour time point (ie, immediate difference after product application).



Open in a separate window

Figure 2

Mean percent adhesion over time. Mean percent adhesion scores were evaluated every 3 hours over the 12-hour application period. (**A**) In Study 2, there was a significant difference favoring the lidocaine topical system 1.8% over the lidocaine patch 5% and lidocaine medicated plaster 5% at baseline and at each time point after application (P<0.0001). (**B**) In Study 3, there was a significant difference favoring the lidocaine topical system 1.8% over the generic lidocaine patch 5% at baseline and at each time point after application (P<0.0001 for all comparisons).

At each time point during the 12-hour application period, a greater proportion of subjects had an FDA adhesion score of 0 (≥90% adhered) for the lidocaine topical system 1.8% compared with the lidocaine patch 5% or lidocaine medicated plaster 5%. At 12 hours after application, a significantly higher number of subjects had an FDA adhesion score of 0 (≥90% adhered) for the lidocaine topical system 1.8% (33 subjects, 75.0%) than for the lidocaine patch 5% (6 subjects, 13.6%) or lidocaine medicated plaster 5% (7 subjects, 15.9%) (Figure 1B).

Taken together, all analyses after the 0-hour time point showed superior adhesion of the lidocaine topical system 1.8% compared with the other products. Furthermore, no lidocaine topical system 1.8% completely detached during this study, whereas 2 each of both the lidocaine patch 5% and lidocaine medicated plaster 5% completely detached (Figure 1B).

Photographs depicting adhesion of the lidocaine topical system 1.8%, lidocaine patch 5%, and lidocaine medicated plaster 5% were taken immediately following product application at 0 hours and after 12 hours (±15 minutes) of wear. Representative images are shown in Figure 3A.





Open in a separate window

Figure 3

Representative adhesion performance with the FDA score (denoted in red) in Studies 2 and 3. Subjects were treated with the lidocaine topical system 1.8% (top rows in panels **A** and **B**), lidocaine patch 5% (middle row in **A**), lidocaine medicated plaster 5% (bottom row in **A**), or generic lidocaine patch 5% (bottom row in **B**). Photographs were taken immediately following product application (0 hours) and at the end of the study after 12 hours (±15 minutes) of wear.

## Study 3

All 24 subjects who were randomized to one of the two treatment sequences that specified the order of application of the two products were included in the analysis. Among subjects treated with the lidocaine topical system 1.8%, the direct mean (95% CI) percent adhesion score over time was 95.33% (89.40% and 101.26%) versus 37.67% (31.74% and 43.60%) for the generic lidocaine patch 5% (Table 4). This difference was statistically significant (*P*<0.0001). All subjects treated with the lidocaine topical system 1.8% (24 of 24 [100%]) demonstrated mean percent adhesion scores that were greater than those for subjects treated with the generic lidocaine patch 5%.

Subjects treated with the lidocaine topical system 1.8% were able to maintain a mean percent adhesion score approaching 100% throughout the duration of the 12-hour assessment period. In contrast, the mean percent adhesion of the generic lidocaine patch 5% was approximately 80% immediately after application, and this decreased to below 40% over the 12 hours of the application period (Figure 2B). At each assessment time point, adhesion scores were significantly greater for the lidocaine topical system 1.8% than for the generic lidocaine patch 5% (*P*<0.0001 at 0, 3, 6, 9, and 12 hours after application).

Only 6 of 24 (25%) subjects treated with the lidocaine topical system 1.8% demonstrated an adhesion score <90% at 12 hours. In contrast, 24 of 24 (100%) subjects treated with the generic lidocaine patch 5% had scores below this level at 12 hours (ie, no subject had ≥90% adhesion).

In addition, 37.5% of subjects experienced substantial detachment (to <10% adhesion) while using the generic lidocaine patch 5%, including 7 (29.1%) complete detachments (Figure 1C). Representative photographs comparing adhesion of the lidocaine topical system 1.8% and generic lidocaine patch 5% following product application at 0 hours and after 12 hours (±15 minutes) of wear are shown in Figure 3B.

## Safety

A comprehensive assessment of skin irritation was performed in Study 1 at 0.5 (+10 minutes) and 2 hours (±15 minutes) after removal of the lidocaine topical system 1.8%. The mean irritation score at 0.5 hours was 0.52 ± 0.64, well below a score of 1, which indicates mild, barely perceptible erythema. The score significantly decreased to 0.30 ± 0.46 by 2

hours ($P$=0.0092). Four subjects (7.4%) were observed to have an irritation score of 2 (definite erythema, minimal edema, or minimal papular response) at 0.5 hours, and these cases resolved to scores ≤1 by 2 hours. No subject had a score >2 at either time point.

Skin irritation assessments were also performed at 0.5, 2, and 12 hours after product removal in Study 2. All subjects had scores of 0 (no irritation) or 1 at each time point. Mean irritation scores over the entire 12-hour period for all subjects were comparable and not significantly different: 0.114 ± 0.03186 for lidocaine topical system 1.8%, 0.067 ± 0.2504 for lidocaine patch 5%, and 0.065 ± 0.2478 for lidocaine medicated plaster 5% ($P$=0.1656) (Figure 4).



Open in a separate window
Figure 4
Mean irritation scores after product removal in Study 2. Irritation at the application site was assessed at 0.5 hours (+10 minutes), 2 hours (±15 minutes), and 12 hours (±30 minutes) after product removal. Irritation was graded using an 8-point scale of dermal response . Overall mean scores across all time points were not significantly different between the lidocaine topical system 1.8% and lidocaine patch 5% or lidocaine medicated plaster 5% ($P$=0.1656 for both comparisons). *Horizontal line represents a score of 2, defined as definite erythema, minimal edema, or minimal papular response and is considered clinically meaningful irritation.

No AEs were reported during Studies 1 and 2; however, three mild-grade AEs were reported during Study 3. Two AEs involving pruritus were reported in subjects treated with the lidocaine topical system 1.8% during the first period of product assessment (one on the left forearm and one inferior to the application site); they resolved completely on follow-up. One AE (mild headache) was reported in a subject treated with the generic lidocaine patch 5% during the second period of product wear, also with a complete resolution on follow-up. Although formal assessments of skin irritation were not performed, no subjects reported unacceptable skin irritation during use or after removal of the lidocaine topical system 1.8% or generic lidocaine patch 5%. No serious AEs or deaths were reported throughout the entire study, and no clinically significant findings were reported for any subject who participated in the post-study safety assessments.

## Discussion

Adhesion is a critical attribute of a topical system, in addition to efficacy and safety, and it is important that the product maintains adhesion throughout the indicated wear period. The lidocaine topical system 1.8% met this standard in three different studies and performed better than comparator products with the same indications and wear time (12 hours). This was attributed to its unique drug-in-adhesive nonaqueous polymer system specifically formulated to maintain tackiness over time while delivering comparable levels of the drug to the lidocaine patch 5% and generic product. To our knowledge, Studies 2 and 3 reported here are the first adhesion performance studies to directly compare four prescription products currently available for the topical delivery of lidocaine. The high degree of adhesion (≥90%) observed in more than 90% of subjects at the end of 12 hours of product administration in Study 1 is a benchmark performance attribute for this product type.

Despite the fact that topical and transdermal drug delivery systems have been in clinical use for several decades, concerns about product adhesion to skin and how this may affect drug dosing persist.[20,21] The effective dose absorbed from a topical or transdermal system can be affected by many factors, including characteristics related to the product's adhesion performance, the total surface area of application (which may be affected by partial lifting), and the duration of application (affected by total product loss).[20] Using the parameter of actual percent adhesion, these results demonstrate significant superiority of adhesion performance over 12 hours for the lidocaine topical system 1.8% versus all 3 comparator products: lidocaine patch 5%, lidocaine medicated plaster 5%, and generic lidocaine patch 5%. Given the improvement in adhesion performance using percent adhesion, the use of percent adhesion assessments in addition to, or in replacement of, the FDA 5-point scale should be considered, especially in comparative studies where the FDA scale may not have sufficient sensitivity to discern meaningful differences in adhesion performance.

Significantly, fewer subjects (2.3%) treated with the lidocaine topical system 1.8% experienced product detachment of 50% or greater compared with the lidocaine patch 5% (20.5%) or lidocaine medicated plaster 5% (15.9%). More than one-third of subjects experienced substantial detachment (reduction to <10% adhesion) of the generic lidocaine patch 5%. No lidocaine topical system 1.8% became completely detached, whereas 2 detachments (4.5%) occurred with both the lidocaine patch 5% and lidocaine medicated plaster 5%, and 7 detachments (29.1%) occurred with the generic lidocaine patch 5%.

These differences in adhesion performance are expected to be clinically important. Although up to 30% of patients might experience poor adhesion and need to replace the comparator prescription lidocaine topical products, our results suggest that less than 1% of patients would have this problem with the lidocaine topical system 1.8% under the conditions studied. Accordingly, one could anticipate that the number of patients needed to treat to prevent one poor adhesion episode through the utilization of the lidocaine topical system 1.8% compared with the other products is 25.

The poor adhesion performance observed for the generic Mylan lidocaine patch 5% in Study 3 indicates that the study was overpowered relative to the hypothesis that the product would have comparable performance to that established by the Lidoderm Patch 5% reference product in Study 2; the results were surprising, considering the comparable adhesion data reported in the independent study conducted by Mylan in support of its abbreviated new drug application (ANDA). Although the study designs were comparable, the studies were conducted at separate sites using different subjects using different time points, which could explain the difference. Also, Studies 2 and 3 may differ from the Mylan ANDA study in that subjects were allowed to remain ambulatory during the treatment periods, whereas the FDA adhesion guidance only prevents the use of artificial means to affect adhesion performance (tape reinforcement, overlays, pressing, etc.).[24] Because patients should expect comparable adhesion performance when switched to generic topical and transdermal products, perhaps this regulatory guidance should be revisited to incorporate design features that more rigorously challenge adhesion performance relative to real-world use.

The lidocaine topical system 1.8% was well tolerated throughout the studies, with no unacceptable skin irritation necessitating early removal. The mild irritation observed in Studies 1 and 3 shortly after product removal spontaneously resolved within 2 hours, suggesting that this is a transient effect, most likely associated with mechanical removal of the product and improved adhesion. The results confirm the safety and tolerability profile of lidocaine topical patch products. These qualities make lidocaine topical products an attractive option for treating frail and elderly patients with PHN.[27] The superior adhesion of the lidocaine topical system 1.8% compared with three comparator lidocaine products may offer patients' advantages with regard to effective drug delivery, safety, and convenience—especially for older individuals with mobility or physical limitations—with the potential to increase patient compliance.

Assessment every 3 hours during the 12-hour periods of product wear throughout these adhesion performance studies is consistent with best practices in FDA guidance and represents a strength of the study design.[24] The uniform spacing of observations over time is recommended to avoid a disproportionate weighting of adhesion at early time points (when adhesion might be relatively better) and is a key factor for an accurate assessment.

Several limitations of these adhesion performance studies should be mentioned. The volunteer subjects in these studies ranged in age from 18 to 64 (median ages of 47 and 32 years in Studies 2 and 3, respectively) and were younger than the patient population most often diagnosed with PHN—individuals over the age of 60.[3] These older patients may have distinct skin properties (texture, thickness, moisture, etc.) that could affect adhesion in a real-world setting.[28] Unlike patients for whom these topical products are indicated, the healthy study subjects did not have or were not recovering from herpes zoster rash. The products studied here were applied to the lower, middle, or upper back, such placement was selected as a standardized area of administration and convenience for frequent assessments. It is not known whether their adhesive capacity can be extrapolated to other anatomical sites.

Finally, throughout the studies, subjects were restricted in performing activities (such as strenuous exercise, exposure to water, and excessive heat or sweating) that could affect product adhesive properties outside a clinical study setting. These restrictions and other factors, such as climate differences (eg, temperature, humidity), may affect the generalizability of the results. In a separate study, the lidocaine topical system 1.8% was able to withstand conditions of moderate physical exercise (exercise bike) and heat (heating pad) with no meaningful degree of detachment.[29] In addition, products were only evaluated during 12-hour daylight periods, but many patients with PHN experience nighttime pain and would be expected to use lidocaine products while sleeping. It is not known how these variables would affect the adhesion of the lidocaine topical system 1.8%, nor whether its superior adhesion relative to the other products reported here would be maintained. Regardless, the lidocaine topical system 1.8% demonstrated superior adhesion to the comparator products tested.

## Conclusions

The lidocaine topical system 1.8% demonstrated optimum adhesion performance (≥90% adhesion) in the majority of subjects during a 12-hour period of administration. Adhesion superiority was consistently demonstrated versus three comparator products—lidocaine patch 5%, lidocaine medicated plaster 5%, and generic lidocaine patch 5%—over 12 hours of wear, using actual mean percent adhesion scores and with translation to an adhesion scale. No detachments of the lidocaine topical system 1.8% occurred. Application and use of all lidocaine topical products were safe and well tolerated. For patients with pain associated with PHN, these results support the use of the lidocaine topical system 1.8% as an effective and practical treatment that may be preferable to other topical lidocaine options.

## Acknowledgments

The authors would like to thank the clinical investigators, clinical staff, and volunteers who made these studies possible. Roger Aitchison of North Rim Consulting provided valuable statistical analyses. Nirzari Parikh, PhD, of Synergy Medical Education provided medical writing support. Dr. Gudin is now affiliated with University of Miami, Miller School of Medicine, Department of Anesthesiology, Perioperative Medicine and Pain Management, Miami, FL, USA.

## Funding Statement

This research was supported by Scilex Pharmaceuticals Inc.

## Data Sharing Statement

The authors certify that this manuscript reports original clinical trial data. Individual participant data that underlie the results reported in this article after deidentification (text, tables, and figures) are available, including the study protocol. Data requests should be submitted in the form of a research proposal to moc.amrahpxelics@sriaffa_lacidem for up to 36 months after the publication date.

## Disclosure

Dr. Gudin has been an advisor, consultant, speaker bureau member, or shareholder in the past year for Averitas Pharma, BioDelivery Sciences International, Inc., Daiichi Sankyo, Hisamitsu Pharmaceutical Co. Inc., Nektar, Quest Diagnostics, Salix Pharmaceuticals, Scilex Pharmaceuticals Inc., and Virpax Pharmaceuticals. Dr. Webster is affiliated with PRA Health Sciences and has been an advisor or consultant for Alcobra, BioDelivery Sciences International, Inc., Bonti, Charleston Laboratories, Daiichi Sankyo, Depomed, Egalet, Elysium Pharmaceuticals, Ensysce Biosciences, Indivior, Inspirion Pharmaceuticals, Insys Therapeutics, Jefferies, KemPharm, Mallinckrodt Pharmaceuticals, Merck, Neurana, Pain Therapeutics, Pernix, Pfizer, Salix, Shionogi, Teva, Trevena, Trevi Therapeutics, Vallon, and Vector Pharma. Drs. Greuber, Vought, and Patel are employees of Scilex Pharmaceuticals Inc. Dr. Kuritzky has no relationships to disclose; the opinions in this article do not represent those of his institutional affiliation (University of Florida). The authors report no other conflicts of interest in this work.

## References

1. Centers for Disease Control and Prevention. Shingles (herpes zoster); 2019. Available from: https://www.cdc.gov/shingles/. Accessed March10, 2020.

2. Hadley GR, Gayle JA, Ripoll J, et al. Post-herpetic neuralgia: a review. *Curr Pain Headache Rep*. 2016;20(3):17. doi: 10.1007/s11916-016-0548-x [PubMed] [CrossRef] [Google Scholar]

6. Gudin J, Fudin J, Wang E, et al. Treatment patterns and medication use in patients with postherpetic neuralgia. *J Manag Care Spec Pharm*. 2019;25(12):1387–1396. doi: 10.18553/jmcp.2019.19093 [PubMed] [CrossRef] [Google Scholar]

7. Gudin J, Nalamachu S. Utility of lidocaine as a topical analgesic and improvements in patch delivery systems. *Postgrad Med*. 2020;132(1):28–36. doi: 10.1080/00325481.2019.1702296 [PubMed] [CrossRef] [Google Scholar]

8. Davies PS, Galer BS. Review of lidocaine patch 5% studies in the treatment of postherpetic neuralgia. *Drugs*. 2004;64(9):937–947. doi: 10.2165/00003495-200464090-00002 [PubMed] [CrossRef] [Google Scholar]

9. Stanos SP, Galluzzi KE. Topical therapies in the management of chronic pain. *Postgrad Med*. 2013;125(suppl sup1):25–33. doi: 10.1080/00325481.2013.1110567111 [PubMed] [CrossRef] [Google Scholar]

10. ZTLIDO™ (lidocaine topical system) [prescribing information]. San Diego, CA: Scilex Pharmaceuticals Inc; 2018. [Google Scholar]

13. LIDODERM® (lidocaine patch 5%) [prescribing information]. Malvern, PA: Endo Pharmaceuticals Inc.; 2018. [Google Scholar]

14. US Food and Drug Administration. Drug approval package: lidoderm (lidocaine) patch; 2005. Available from: https://www.accessdata.fda.gov/drugsatfda_docs/nda/99/20612.cfm. Accessed March10, 2020.

15. VERSATIS® (700 mg medicated plaster). Summary of product characteristics. Uxbridge, UK: Grünenthal Ltd.; 2018 [Google Scholar]

16. Lidocaine patch 5% [prescribing information]. Parsippany, NJ: Actavis Laboratories UT Inc.; 2015. [Google Scholar]

17. Lidocaine patch 5% [prescribing information]. Morgantown, WV: Mylan Pharmaceuticals Inc.; 2018 [Google Scholar]

18. ZTlido—a new lidocaine patch for postherpetic neuralgia. *Med Lett Drugs Ther*. 2019;61(1568):41–43. [PubMed] [Google Scholar]

20. Wokovich AM, Prodduturi S, Doub WH, et al. Transdermal drug delivery system (TDDS) adhesion as a critical safety, efficacy and quality attribute. *Eur J Pharm Biopharm*. 2006;64(1):1–8. doi: 10.1016/j.ejpb.2006.03.009 [PubMed] [CrossRef] [Google Scholar]

21. Cilurzo F, Gennari CG, Minghetti P. Adhesive properties: a critical issue in transdermal patch development. *Expert Opin Drug Deliv*. 2012;9(1):33–45. doi: 10.1517/17425247.2012.637107 [PubMed] [CrossRef] [Google Scholar]

22. US Food and Drug Administration. FDA Adverse Events Reporting System (FAERS) public dashboard. Data as of March 31, 2018. Accessed July27, 2018.

23. World medical association declaration of Helsinki: ethical principles for medical research involving human subjects. *JAMA*. 2013;310(20):2191–2194. doi: 10.1001/jama.2013.281053

[PubMed] [CrossRef] [Google Scholar]

24. US Food and Drug Administration. Guidance for Industry. Assessing adhesion with transdermal and topical delivery systems for ANDAs, October 2018. Accessed June17, 2019.

25. European Medicines Agency. Guideline on the pharmacokinetic and clinical evaluation of modified release dosage forms, June 2015. Accessed February19, 2020.

26. US Food and Drug Administration. Guidance for industry. Assessing the irritation and sensitization potential of transdermal and topical delivery systems for ANDAs. Rockville, MD, USA; 2018: Available from: https://www.fda.gov/media/117569/download. Accessed September16, 2020. [Google Scholar]

28. Wey S-J, Chen D-Y. Common cutaneous disorders in the elderly. *J Clin Gerontol Geriatrics*. 2010;1(2):36–41. doi: 10.1016/j.jcgg.2010.10.010 [CrossRef] [Google Scholar]

# EXHIBIT 14

# A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects

ncbi.nlm.nih.gov/pmc/articles/PMC7319520/



J Pain Res. 2020; 13: 1485–1496.

Published online 2020 Jun 22. doi: 10.2147/JPR.S237934
PMCID: PMC7319520

PMID: 32606914

Jeffrey Gudin,[1] Charles Argoff,[2] Jeffrey Fudin,[3] Emileigh Greuber,[4] Kip Vought,[4] Kalpana Patel,[4] and Sri Nalamachu[5]
Author information Article notes Copyright and License information Disclaimer
This article has been cited by other articles in PMC.

## Abstract

### Purpose

This study was designed to characterize drug delivery with lidocaine topical system 1.8% vs lidocaine patch 5% through 2 PK studies.

### Patients and Methods

Two Phase 1, single-center, open-label, randomized PK studies were performed in healthy adults. In Study 1, 56 subjects received a single intravenous bolus of 0.7 mg/kg of lidocaine as a lead-in to allow for the accurate determination of apparent dose of both products. After a 7-day washout period, subjects were randomized to receive either lidocaine topical system 1.8% or lidocaine patch 5% for 12 hours followed by another 7-day washout period, after which subjects crossed over to receive the other treatment for 12 hours. In Study 2, 54 subjects were randomized to receive either lidocaine topical system 1.8% or lidocaine patch 5% for 12 hours. After a 7-day washout period, subjects crossed over to receive the other treatment. Adhesion and skin irritation assessments were performed after application of the

products in Study 2. In both studies, serial blood samples were collected to measure the plasma concentration of lidocaine after product application. Safety assessments and adverse events were monitored in both studies.

## Results

The comparative PK analysis demonstrated that the two products, despite their difference in drug load and strength, are bioequivalent. Both products were well tolerated. In Study 2, dermal response scores (skin tolerability after removal) were similar between lidocaine topical system 1.8% and lidocaine patch 5%, with a mean irritation score per patch <1 (barely perceptible erythema), which is not considered to be clinically significant.

## Conclusion

Bioequivalence was demonstrated between lidocaine topical system 1.8% and lidocaine patch 5%. A comparison of the single-time adhesion scores at 12 hours in Study 2 favored lidocaine topical system 1.8% over lidocaine patch 5%. Both products were well tolerated as a single application in healthy adult human subjects.

## ClinicalTrials.gov

NCT04144192, NCT04149938.

**Keywords:** postherpetic neuralgia, topical, lidocaine, pharmacokinetics

## Introduction

Each year in the United States, an estimated one million individuals are diagnosed with herpes zoster (HZ), or shingles.[1] HZ is caused by reactivation of latent varicella-zoster virus in the dorsal root ganglia and typically presents as a unilateral, painful, blistering rash in the affected dermatome(s).[2] It most often occurs in patients ≥50 years old; women are at greater risk than men.[3] Approximately 20% of HZ patients will develop postherpetic neuralgia (PHN), a complication characterized by neuropathic pain within the zoster-affected dermatome(s) that is sustained for at least 3 months after the rash has healed.[1,4] PHN pain is often associated with allodynia and hyperalgesia and can persist for years.[5] Pharmacologic treatment usually includes oral medications, such as antidepressants, anticonvulsants, and opioids, as well as topical analgesics, such as the lidocaine patch.[6,7] Advantages of topical drug delivery systems include providing targeted site-specific therapy while minimizing entry and level of drugs in the systemic circulation; this therapy often avoids or reduces side effects or toxicities of commonly used oral medications.[8]

8/23/22, Case 4:22-cv-02625-HSG Document 22-2 Filed 08/24/22 Page 94 of 210
Randomized, Open-Label Bioequivalence Study to Compare a Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects
3/24

Lidocaine is an amide local anesthetic that blocks sodium ion channels required for the initiation and conduction of neuronal impulses.[9] Blocking sodium channels in the dermal nociceptors of A delta and C fibers reduces the frequency of ectopic discharges that contribute to neuropathic pain. Topical patches and other delivery systems have been developed to deliver lidocaine locally for the treatment of PHN.[1,4,10,11] In 1999, the US Food and Drug Administration (FDA) approved lidocaine patch 5% (Lidoderm®, Endo Pharmaceuticals Inc., Malvern, PA) for the relief of pain associated with PHN. The lidocaine patch 5% contains 700 mg of lidocaine (5% = 50 mg per gram adhesive) in an aqueous ("hydrogel") matrix.[12] The analgesic efficacy of topical lidocaine in PHN has been demonstrated in several randomized clinical trials, which show that patients experience pain relief within hours of application of lidocaine patches and that treatment is well tolerated.[13,14] Topical lidocaine remains an effective treatment option for PHN over time, with up to 4 years of available safety and efficacy data on long-term treatment outcomes.[15,16] Additionally, topical lidocaine has been reported to have analgesic effects in other conditions, such as lower back pain, diabetic peripheral neuropathy, carpal tunnel syndrome, and osteoarthritis pain.[11]

In 2018, a novel topical system (ie, patches, now referred to as "topical systems" by the FDA) consisting of lidocaine dissolved in an organic acid/polyalcohol solvent system in a polymer-based adhesive matrix was FDA-approved for the relief of PHN pain (ZTlido® [lidocaine topical system 1.8%], Scilex Pharmaceuticals Inc., Mountain View, CA). Each topical system contains 36 mg of lidocaine (1.8% = 18 mg per gram adhesive).[9]

Similar to lidocaine patch 5%, lidocaine topical system 1.8% was designed with a skin contact area of 140 cm$^2$ and is indicated to be worn for 12 hours per day (maximum of 3 topical systems per day). The nonaqueous formulation of lidocaine topical system 1.8% results in improved biopharmaceutical efficiency and drug delivery compared with lidocaine patch 5%, such that bioequivalent plasma levels are achieved with ~19-fold lower drug load (36 mg *vs* 700 mg) and lower strength (1.8% vs 5%). The lidocaine topical system 1.8% was developed to have optimal adhesion (ie, maintaining contact with the skin over the 12-hour administration period) and to be thinner and lighter than lidocaine patch 5% so that it can better adhere to contour-challenged areas of the body and maintain contact during normal activities and moderate exercise. A comparison of lidocaine topical system 1.8% and lidocaine patch 5% product attributes is provided in Table 1.

## Table 1

Characteristics of Lidocaine Topical System 1.8% and Lidocaine Patch 5%

| Attribute | Lidocaine Topical System 1.8% (ZTlido®)[9] | Lidocaine Patch 5% (Lidoderm®)[12] |
| --- | --- | --- |

| Attribute | Lidocaine Topical System 1.8% (ZTlido®)[9] | Lidocaine Patch 5% (Lidoderm®)[12] |
|---|---|---|
| Formulation | Nonaqueous polymer matrix | Aqueous polymer matrix |
| Lidocaine content | 36 mg (18 mg per gram adhesive) | 700 mg (50 mg per gram adhesive) |
| Size | 10 cm × 14 cm | 10 cm × 14 cm |
| Thickness | 0.08 cm | 0.16 cm* |
| Weight | 2 g adhesive | 14 g adhesive |
| Bioavailability | ~48% | 3% ± 2% |

Open in a separate window

**Note:** *Approximate thickness based on product utilized in studies.

To characterize drug delivery with lidocaine topical system 1.8% compared with lidocaine patch 5%, 2 separate pharmacokinetic (PK) studies were performed in normal, healthy volunteers. Study 1 was designed to characterize the PK of lidocaine topical system 1.8%, including apparent dose, and Study 2 was designed to confirm comparable PK between lidocaine topical system 1.8% and lidocaine patch 5%. Safety, adhesion, and skin tolerability of both formulations were also assessed.

# Materials and Methods

## Study Design

Two Phase 1 comparative PK studies were conducted at a single clinical site (TKL Research, Fair Lawn, NJ), approved by an IntegReview ethical review board (IRB; Austin, TX), and conducted in accordance with the ethical principles originating from the Declaration of Helsinki and amendments and the International Conference on Harmonization Good Clinical Practice guidelines and local regulatory requirements. All subjects provided signed informed consent. The studies were not prospectively registered because the studies described were Phase 1 trials, and FDA guidelines state that Phase 1 trials are not applicable drug clinical trials and therefore are not required to be registered. The studies were retrospectively registered at the request of the Editor at ClinicalTrials.gov with the clinical trial registration numbers NCT04144192 and NCT04149938.

Study 1 was a single-center, open-label, randomized study conducted to characterize the comparative single-dose PK and safety of lidocaine topical system 1.8% versus lidocaine patch 5% and included a single-dose PK lead-in period of lidocaine 0.7 mg/kg bolus

intravenous (IV) injection. The lidocaine IV injection lead-in period was included to allow for the determination of the apparent dose of both products via IV clearance ($IV_{CL}$).

Study 2 was a single-center, open-label, randomized, two-period crossover study conducted to characterize the comparative single-dose PK and safety of lidocaine topical system 1.8% and lidocaine patch 5% and to evaluate adhesion performance and dermal irritation. Apparent dose of lidocaine topical system 1.8% was also determined in Study 2 based on the residual drug analysis of skin, used product, product envelopes, and release liners, which allowed for comparison with the apparent dose observed for the product in Study 1 via $IV_{CL}$. It is noted that Study 1 was performed with tape reinforcement of both products to ensure continuous contact of the products to the skin. Study 2 was performed without tape reinforcement or any other mechanical reinforcement of the products, consistent with the respective prescribing information.

## Patients

Inclusion criteria for Study 1 required men and women ≥18 years of age to be healthy, verified by clinical hematology and chemistry laboratory test results and vital signs measurements. Female subjects were not pregnant and used an acceptable form of birth control if they were of childbearing potential. Key exclusion criteria included use of a prescription medication within 14 days or over-the-counter medications within 7 days prior to administration of study medication, known hypersensitivity or allergy to any of the components of the lidocaine topical system formulation, and any serious illness in the 4 weeks preceding the beginning of treatment that resulted in missed work or hospitalization. Study 1 actively recruited 4 geriatric subjects (ie, subjects ≥65 years of age) who were able to meet all the inclusion and exclusion criteria, which was challenging given the exclusion of prescription product use within 14 days of the study.

Key inclusion criteria for Study 2 were similar to those for Study 1, with the inclusion of healthy (confirmed by medical history, laboratory work, and physical exam) men and women between ≥18 and ≤65 years of age. Female subjects were not pregnant and used an acceptable form of birth control if they were of childbearing potential. Subjects were free of any systemic or dermatologic disorder, which, in the opinion of the investigator, would have interfered with the study results or increased the risk of adverse events (AEs). Key exclusion criteria for Study 2 included unwillingness to refrain from using systemic/topical analgesics for 72 hours prior to enrollment and during the study, current use of opioids, planned dental procedures within 30 days of enrollment, and known hypersensitivity or allergy to any of the components of the product formulations. Key exclusion criteria for the PK portion of Study 2 included use of any drug treatment at the time of the study, use of a prescription medication within 14 days prior to administration of study medication or over-the-counter products (including natural food supplements, vitamins, garlic as a supplement) within 7 days prior to enrollment, and during the PK phase, unwillingness to restrict caffeine or grapefruit juice.

## Treatments

Study 1 assessed the comparative PK of lidocaine topical system 1.8% and lidocaine patch 5%, with an IV lead-in period. Subjects (N=56) first received a single IV bolus of 0.7 mg/kg of lidocaine administered on Day 1 using prefilled syringes of lidocaine (20 mg/mL or 100 mg/5 mL, 2% solution; Hospira, Inc., Lake Forest, IL). Following a 7-day washout period, subjects were randomized to receive either lidocaine topical system 1.8% or lidocaine patch 5% (Period 1; Day 7). After the 7-day washout period, subjects crossed over and received the other treatment (Period 2; Day 15). For both periods, each treatment consisted of the application of a set of three lidocaine topical systems 1.8% or three lidocaine patches 5% to the skin of each subject's back with tape reinforcement over a 12-hour administration period. Tape reinforcement consisted of the use of 3M™ Transpore™ surgical tape (3M, St. Paul, MN) on the four corners of the product. If lifting was observed, additional tape reinforcement was allowed along the product edges. Taping of the surface of the product or use of occlusive overlays was not allowed in the study.

In Study 2, subjects were randomized to receive either lidocaine topical system 1.8% or lidocaine patch 5% (Period 1; Day 1). After a 7-day washout period, subjects crossed over and received the other treatment (Period 2; Day 7). Subjects were confined from Day −1 until Day 3 (after PK blood draw), and from Day 7 until Day 10 (after PK blood draw). Following an overnight fast of at least 10 hours, subjects received three lidocaine topical systems 1.8% or three lidocaine patches 5% applied for 12 hours to a defined area of normal skin on the back; all subjects completed a 7-day washout period following Period 1 and Period 2. During Periods 1 and 2, products were evaluated for degree of adhesion by the trained scorer using the FDA-recommended rating scale, and serial PK samples were collected for the determination of lidocaine plasma concentration at predose (time 0) and at scheduled time points up to 48 hours (Day 3 [Period 1] and Day 10 [Period 2]).[17]

## Blood Sampling and Determination of Drug Concentrations

In both Studies 1 and 2, serial blood samples were collected via venipuncture to measure the plasma concentration of lidocaine at predetermined times after application of the product. Blood samples (5 mL at each time point in Study 1 and 6 mL at each time point in Study 2) were taken during each treatment period at preapplication and then after product application at 2, 4, 6, 9, 10, 11, 12, 13, 14, 16, 18, 20, 22, 24, and 48 hours. In Study 1, samples were taken at 5, 10, 20, 30, 45, 60, and 90 minutes and 2, 3, 4, 8, and 12 hours postdose for the lidocaine IV lead-in period. Blood was collected into heparinized or EDTA-containing tubes and centrifuged at 3000 rpm for 10 minutes at 4°C. Plasma was transferred to plastic tubes and frozen until analysis.

## Bioanalytical Methods

Plasma concentrations of lidocaine were determined using a validated liquid chromatography with tandem mass spectrometry method. The assay was linear in the range of 0.500 ng/mL to 300 ng/mL for Study 1 and 0.200 ng/mL to 300 ng/mL for Study 2. The lower limit of quantification was 0.500 ng/mL in Study 1 and 0.200 ng/mL in Study 2.

## Safety Assessments

Safety assessments included clinical laboratory tests (blood chemistry, hematology, urine analysis), physical examination, vital signs (blood pressure, pulse rate, body temperature), and resting standard 12-lead electrocardiogram at screening, before product administration, and at specified time points throughout Studies 1 and 2. In the Study 1 lidocaine IV lead-in period, subjects had continuous cardiac monitoring during the IV bolus and up to 4 hours post-administration. AEs were monitored throughout both studies.

## Adhesion Assessments

In Study 2, adhesion of the products was assessed immediately after application and at 3, 6, 9, and 12 hours, just prior to product removal. Adhesion was scored according to the FDA-recommended scale, where 0: ≥90% adhered (essentially no lift off the skin); 1: ≥75% to <90% adhered (some edges only lifting off the skin); 2: ≥50% to <75% adhered (less than half of the system lifting off the skin); 3: <50% adhered but not detached (more than half the system lifting off the skin without falling off); and 4: 0% (complete detachment).[17]

## Skin Irritation Assessments

In Study 2, dermal response was evaluated after product removal according to the scoring system recommended by FDA guidance.[18] The scoring system is based on a scale of 0 to 7 (0=no evidence of irritation; 1=minimal erythema, barely perceptible; 2=definite erythema; 3=erythema and papules/pustules; 4=definite edema; 5=erythema, edema, and papules; 6=vesicular eruption; 7=strong reaction spreading beyond the application site).

## Statistical Analyses

In Studies 1 and 2, all statistical processing was performed using the SAS® system (Version 9.2). In Study 1, all PK parameters were summarized by treatment period, using mean, standard deviation (SD), 95% confidence interval (CI), minimum, median, and maximum. $C_{max}$, $AUC_{0-t}$, and $AUC_{0-\infty}$ were tested for bioequivalence between the two product treatments. The log-transformed quantities were analyzed in a mixed effects analysis of variance model, with treatment, sequence, and period as fixed effects and subject within sequence as a random effect. Estimates of the difference between treatment least square means were obtained from the model with 90% CIs. These estimates and CIs were back-transformed onto the original scale to provide estimates of the geometric means for each

treatment and the ratio of the geometric means. By convention, if the 90% CI of the ratio of geometric means was within 80% to 125%, then the two treatments were considered bioequivalent.

## Results

### Patient Disposition and Baseline Characteristics

In Study 1, a total of 58 subjects were enrolled and 56 (96.6%) completed the study. One subject discontinued because of an AE (urticaria) during the IV lead-in period, and 1 subject withdrew consent. The median age was 39.5 years with four subjects over the age of 65. More than half of subjects were women (62.1%) (Table 2). In Study 2, a total of 54 subjects were randomized; 28 subjects were randomized to Sequence 1 and 26 subjects were randomized to Sequence 2. All subjects (100%) in both Sequence 1 and Sequence 2 completed the study. Among all subjects, the mean age was 41.1 years with an SD of 10.3 years. Thirty-nine subjects (72.2%) were men, and 15 subjects (27.8%) were women (Table 3).

### Table 2

Demographics and Baseline Characteristics (Study 1)

|  | <65 Years (n=54) | ≥65 Years (n=4) | All Subjects (N=58) |
|---|---|---|---|
| Age (years) | | | |
| Mean (SD) | 36.8 (9.9) | 68.5 (4.4) | 39.0 (12.5) |
| Median | 37.0 | 66.5 | 39.5 |
| Minimum, maximum | 20, 55 | 66, 75 | 20, 75 |
| Gender, n (%) | | | |
| Male | 20 (37.0) | 2 (50.0) | 22 (37.9) |
| Female | 34 (63.0) | 2 (50.0) | 36 (62.1) |
| Ethnicity, n (%) | | | |
| Hispanic or Latino | 21 (38.9) | 0 | 21 (36.2) |
| Non-Hispanic or Latino | 33 (61.1) | 4 (100.0) | 37 (63.8) |
| Race, n (%) | | | |

|  | <65 Years (n=54) | ≥65 Years (n=4) | All Subjects (N=58) |
|---|---|---|---|
| White | 28 (51.9) | 2 (50.0) | 30 (51.7) |
| Black or African American | 23 (42.6) | 2 (50.0) | 25 (43.1) |
| American Indian or Alaska Native | 1 (1.9) | 0 | 1 (1.7) |
| Asian | 1 (1.9) | 0 | 1 (1.7) |
| Other | 1 (1.9) | 0 | 1 (1.7) |

Open in a separate window

**Abbreviation:** SD, standard deviation.

## Table 3

Demographics and Baseline Characteristics (Study 2)

|  | Sequence 1 [Lidocaine Topical System 1.8% → Lidocaine Patch 5%] (n=28) | Sequence 2 [Lidocaine Patch 5% → Lidocaine Topical System 1.8%] (n=26) | Overall (N=54) |
|---|---|---|---|
| Age (years) |  |  |  |
| Mean (SD) | 41.3 (10.8) | 40.8 (9.9) | 41.1 (10.3) |
| Median | 41.0 | 45.0 | 42.5 |
| Minimum, maximum | 20, 58 | 25, 59 | 20, 59 |
| Gender, n (%) |  |  |  |
| Male | 20 (71.4) | 19 (73.1) | 39 (72.2) |
| Female | 8 (28.6) | 7 (26.9) | 15 (27.8) |
| Ethnicity, n (%) |  |  |  |
| Hispanic or Latino | 6 (21.4) | 5 (19.2) | 11 (20.4) |
| Non-Hispanic or Latino | 22 (78.6) | 21 (80.8) | 43 (79.6) |

| | Sequence 1 [Lidocaine Topical System 1.8% → Lidocaine Patch 5%] (n=28) | Sequence 2 [Lidocaine Patch 5% → Lidocaine Topical System 1.8%] (n=26) | Overall (N=54) |
|---|---|---|---|
| Race, n (%) | | | |
| White | 15 (53.6) | 13 (50.0) | 28 (51.9) |
| Black or African American | 12 (42.9) | 13 (50.0) | 25 (46.3) |
| American Indian or Alaska Native | 1 (3.6) | 0 (0.0) | 1 (1.9) |

Open in a separate window

**Abbreviation:** SD, standard deviation.

## PK Assessments

In Study 1, 56 of 58 subjects completed all portions of the study and were included in the PK analysis. The PK of lidocaine delivered as a 0.7 mg/kg IV dose was characterized by a high $C_{max}$ (1778.39 ± 2555.09 ng/mL), short $T_{max}$ (median of 0.13 hours [0.1–4.0 hours]), and short $T_{1/2}$ (2.92 ± 0.52 hours) (Table 4, Figure 1). Compared with the IV bolus, the PK profiles of both the lidocaine topical system 1.8% and lidocaine patch 5% were characterized by a more than 20-fold lower $C_{max}$ (80.45 ± 25.53 ng/mL for lidocaine topical system 1.8% and 75.38 ± 29.96 ng/mL for lidocaine patch 5%), a longer $T_{max}$ (median of 13.95 hours [range 9.0–20.0 hours] for lidocaine topical system 1.8% and 12.69 hours [range 9.1–24.0 hours] for lidocaine patch 5%), and a longer $T_{1/2}$ (5.56 ± 1.67 hours for lidocaine topical system 1.8% and 6.27 ± 1.77 hours for lidocaine patch 5%). Mean lidocaine plasma concentrations versus time profiles for lidocaine topical system 1.8% and lidocaine patch 5% are shown in Figure 2 and demonstrate a similar PK profile.

## Table 4

Pharmacokinetic Parameter Estimates of Lidocaine in Plasma (per Protocol Population) (Studies 1 and 2)

| Pharmacokinetic Parameter | Lidocaine Topical System, 1.8% | Lidocaine Patch, 5% | Lidocaine (0.7 mg/kg) IV |
|---|---|---|---|
| **Study 1** | | | |

| Pharmacokinetic Parameter | Lidocaine Topical System, 1.8% | Lidocaine Patch, 5% | Lidocaine (0.7 mg/kg) IV |
|---|---|---|---|
| Number of Subjects | 56 | 56 | 56 |
| $C_{max}$ (ng/mL) | 80.5 (25.53) | 75.4 (30.0) | 1778.39 (2555.09) |
| $AUC_{0-t}$ (ng·h/mL) [±SD] | 1160.3 (394.5) | 1121.0 (453.1) | 1981.94 (1660.51) |
| $AUC_{0-inf}$ (ng·h/mL) [±SD] | 1207.4 (387.6) | 1183.4 (437.4) | 1998.56 (1667.92) |
| $T_{max}$ (hour) [range][a] | 14.0 (9.0, 20.0) | 12.7 (9.1, 24.0) | 0.13 (0.1, 4.0) |
| $T_{1/2}$ (hour) [±SD] | 5.6 (1.7) | 6.3 (1.8) | 2.92 (0.52) |
| $k_e$ (hr$^{-1}$) [±SD] | 0.13 (0.03) | 0.12 (0.03) | 0.24 (0.04) |
| **Study 2** | | | |
| Number of Subjects | 54 | 54 | |
| $C_{max}$ (ng/mL) | 75.1 (28.0) | 86.6 (42.3) | |
| $AUC_{0-t}$ (ng·h/mL) [±SD] | 1242.9 (432.5) | 1420.8 (586.0) | |
| $AUC_{0-inf}$ (ng·h/mL) [±SD] | 1253.7 (432.5) | 1435.5 (588.9) | |
| $T_{max}$ (hour) [range][a] | 13.9 (4.0, 18.0) | 11.0 (4.0, 17.9) | |
| $T_{1/2}$ (hour) [±SD] | 5.4 (1.0) | 6.2 (1.6) | |
| $k_e$ (hr$^{-1}$) [±SD] | 0.13 (0.03) | 0.12 (0.03) | |

Open in a separate window

**Note:** [a]Median value.

**Abbreviations:** $C_{max}$, maximum plasma drug concentration; $AUC_{0-t}$, area under the curve from time 0 to the time of the last measurable concentration; SD, standard deviation; $AUC_{0-inf}$, area under the plasma concentration-time curve from time 0 to infinity; $T_{max}$, time point at which the maximum plasma concentration was observed; $T_{1/2}$, elimination half-life; $K_e$, elimination rate constant; IV, intravenous.



Open in a separate window

Figure 1

Mean lidocaine plasma concentrations versus time profiles for IV lidocaine 0.7 mg/kg, semilog scale (N = 56) (Study 1). Time = 0 is pre-dose measurement.

**Abbreviation:** IV, intravenous.



Open in a separate window

Figure 2

Mean lidocaine plasma concentrations versus time profiles for lidocaine topical system 1.8% (N = 56) and lidocaine patch 5%, semilog scale (N = 54) (Study 1). Time = 0 is pre-dose measurement.

Bioequivalence was assessed by calculating the 90% CI for the geometric least square means ratio of lidocaine topical system 1.8%/lidocaine patch 5% for $AUC_{0-t}$, $AUC_{0-inf}$, and $C_{max}$, all of which were entirely within the acceptance range of 0.8 to 1.25, indicating that the products have a very similar rate and extent of absorption. The 90% CIs of all parameters were within the range of 80% to 125%, demonstrating that lidocaine topical system 1.8% and lidocaine patch 5% are bioequivalent (Table 5).

## Table 5

Analysis of Bioequivalence (Study 1)

|  | n | Ratio of Geometric Means | 90% CI |
|---|---|---|---|
| $C_{max}$ (ng/mL) | 56 | 111.22 | 103.82, 119.15 |
| $AUC_{0-t}$ (ng·h/mL) | 56 | 106.41 | 99.85, 113.41 |
| $AUC_{0-inf}$ (ng·h/mL) | 54 | 104.57 | 98.84, 110.63 |

Open in a separate window
**Abbreviations:** $C_{max}$, maximum plasma drug concentration; $AUC_{0-t}$, area under the curve from time 0 to the time of the last measurable concentration; $AUC_{0-inf}$, area under the plasma concentration-time curve from time 0 to infinity; CI, confidence interval.

In Study 2, a total of 54 subjects were enrolled and included in the PK analysis. Like in Study 1, the PK parameters of lidocaine from lidocaine topical system 1.8% and lidocaine patch 5% were similar (Table 4). Mean lidocaine plasma concentrations versus time profiles for lidocaine topical system 1.8% and lidocaine patch 5% are shown in Figure 3. The bioequivalence of lidocaine topical system 1.8% compared with lidocaine patch 5% is presented in Table 6. The ratio of geometric least square means and 90% CIs for $AUC_{0-t}$, $AUC_{0-\infty}$, and $C_{max}$ were entirely within the acceptance range of 0.8 to 1.25 for the PK parameter population and by period.

## Table 6

Analysis of Bioequivalence (Study 2)

|  | n | Ratio of Geometric Means | 90% CI |
|---|---|---|---|
| $C_{max}$ (ng/mL) | 54 | 90.7 | 85.0, 96.8 |
| $AUC_{0-t}$ (ng·h/mL) | 54 | 89.1 | 84.9, 93.5 |
| $AUC_{0-inf}$ (ng·h/mL) | 53 | 88.6 | 84.4, 93.0 |

Open in a separate window

**Note:** Log-transformed quantities are analyzed in a mixed effects analysis of variance model, with treatment, sequence, and period as fixed effects and subject within sequence as a random effect.

**Abbreviations:** $C_{max}$, maximum plasma drug concentration; $AUC_{0-t}$, area under the curve from time 0 to the time of the last measurable concentration; $AUC_{0-inf}$, area under the plasma concentration-time curve from time 0 to infinity; CI, confidence interval.



Open in a separate window

Figure 3

Mean lidocaine plasma concentrations versus time profiles for lidocaine topical system 1.8% and lidocaine patch 5% (Study 2).

## Apparent Dose

In Study 1, systemic exposure for both lidocaine topical system 1.8% and lidocaine patch 5% was estimated by applying the clearance rate observed after IV lidocaine bolus by the formula $Dose_{APP-IV} = CL_{IV} \times AUC_{PRODUCT}$ to ascertain the dose absorbed from the products.

The results are described in Table 7 and show that 43.99 ± 17.62 mg of lidocaine was absorbed from three lidocaine topical systems 1.8% and 43.74 ± 18.22 of lidocaine was absorbed from three lidocaine patches 5%. While both products deliver the same amount of lidocaine, the bioavailability is very different due to the difference in drug load per system/patch (41% ± 16% for lidocaine topical system 1.8% *vs* 2% ± 1% for lidocaine patch 5%). These results are consistent with the prescribing information for lidocaine patch 5%, which indicates a bioavailability of 3% ± 2%, albeit on the lower side of the labeled range.[12]

## Table 7

Summary of Apparent Dose Absorbed (Studies 1 and 2)

| Product | Study 1 | | Study 2 | |
| | $Analysis_{IVClearance}$ | | $Analysis_{IVResidual}$ | |
| | Dose Absorbed/3 Products (mg) (SD) | Fraction of Applied Dose Absorbed (%) | Dose Absorbed/3 Products (mg) (SD) | Fraction of Applied Dose Absorbed (%) |
| --- | --- | --- | --- | --- |
| Lidocaine topical system 1.8% | 43.99 ± 17.62 | 41 ± 16 | 47.9 ± 8.8 | 44 ± 8 |
| Lidocaine patch 5% | 43.74 ± 18.22 | 2 ± 1 | – | – |

Open in a separate window
**Abbreviations:** IV, intravenous; SD, standard deviation.

In Study 2, systemic exposure for lidocaine topical system 1.8% was estimated by measuring the amount of residual lidocaine in the used topical system, liner, envelope, and surface of the skin and subtracting the total residual amount from the amount of lidocaine in an unused topical system. The total residual amount of lidocaine recovered was 18.4 ± 2.94 mg/topical system (of the possible 36 mg). As shown in Table 7, 47.9 ± 8.8 mg of lidocaine was absorbed from three lidocaine topical systems 1.8%, with estimated bioavailability of 44% ± 8%. These results are consistent with the apparent dose determined by $IV_{CL}$ observed with lidocaine topical system 1.8% in Study 1.

## Adhesion Assessments

In addition to characterizing the PK profile, Study 2 also included assessments of product adhesion. Lidocaine topical system 1.8% had a cumulative mean adhesion score of 0.22 that was statistically superior to lidocaine patch 5%, with a mean score of 0.86 (*P*<0.001). None

of the lidocaine topical systems 1.8% had a score greater than 2. In contrast, 5.0% (8 patches) of the lidocaine patches 5% had a score of 3 (>0% to <50% adhered), and 3.1% (5 patches) became completely detached (score of 4) (Table 8).

## Table 8

Summary of Adhesion (Study 2)

| Parameter | Lidocaine Topical System 1.8% | Lidocaine Patch 5% |
|---|---|---|
| Subjects with <50% adherence for at least one patch (%) | | |
| 2 hours | 0 | 2 (3.8) |
| 6 hours | 0 | 5 (9.4) |
| 9 hours | 0 | 7 (13.2) |
| 12 hours | 0 | 8 (15.1) |
| Number of patches completely detached (%) | | |
| 2 hours | 0 | 1 (0.6) |
| 6 hours | 0 | 2 (1.3) |
| 9 hours | 0 | 3 (1.9) |
| 12 hours | 0 | 5 (3.1) |
| Mean (90% CI) adherence score at 12 hours | 0.22 (0.08, 0.36) | 0.86 (0.72, 1.00) |
| *P* value (1-sample *t*-test, test vs reference) | <0.001 | |

Open in a separate window

**Abbreviation:** CI, confidence interval.

## Skin Irritation Assessments

In Study 2, skin irritation was assessed after product removal. The mean sums of irritation scores for the three patches per subject (ie, total score for all three patches) for lidocaine topical system 1.8% and lidocaine patch 5% at 12 hours following application were quite similar. At 12 hours, 63.0% of subjects treated with lidocaine topical system 1.8% and 55.6% of subjects treated with lidocaine patch 5% had an irritation score of 0, indicating no evidence of irritation. Overall, 20 of 54 (37.0%) lidocaine topical system 1.8% subjects

compared with 24 of 54 (44.4%) lidocaine patch 5% subjects had at least some evidence of irritation. At a 90% CI, the mean sums of irritation scores were 1.15 and 1.31, respectively, which is not a significant difference ($P$=0.406). The mean irritation score per patch was <1, which is not considered to be clinically significant (Table 9).

## Table 9

Summary of Irritation Analysis (Study 2)

| | Lidocaine Topical System 1.8% (N=54) | Lidocaine Patch 5% (N=54) |
|---|---|---|
| Subjects' maximum irritation score across all 3 patches (%) | | |
| 0 | 34 (63.0) | 30 (55.6) |
| 1 | 18 (33.3) | 24 (44.4) |
| 2 | 2 (3.7) | 0 |
| Subjects by sum of irritation scores for all patches (%)* | | |
| 0 | 34 (63.0) | 30 (55.6) |
| 1–2 | 3 (5.6) | 1 (1.9) |
| 3–4 | 15 (27.8) | 23 (42.6) |
| 5–6 | 2 (3.7) | 0 |
| Mean (90% CI) sum of irritation scores | 1.15 (0.91, 1.38) | 1.31 (1.08, 1.55) |
| $P$ value (1-sample $t$-test, test vs reference) | 0.406 | |

Open in a separate window

**Notes:** *The mean sums of irritation scores are for the three patches per subject (ie, total score for all three patches) for lidocaine topical system 1.8% and lidocaine patch 5% at 12 hours following application. Irritation Scale: 0=No evidence of irritation; 1=Minimal erythema, barely perceptible; 2=Definite erythema, readily visible, or minimal edema, or minimal popular response; 3=Erythema and papules; 4=Definite edema; 5=Erythema, edema, and papules; 6=Vesicular eruption; 7=Strong reaction spreading beyond test site.

**Abbreviation:** CI, confidence interval.

## Safety

In Study 1, 12 subjects (20.7%) experienced a total of 17 AEs; one subject experienced an AE that led to study discontinuation, which was not related to the study drug. The overall incidence of AEs was 3.6% in subjects receiving lidocaine topical system 1.8% and 10.5% in subjects receiving lidocaine patch 5% (Table 10). In the group of subjects receiving lidocaine topical system 1.8%, one subject experienced dizziness, headache, and abdominal pain, and a second subject experienced urticaria. All of these AEs were considered possibly related to study medication. In the group of subjects receiving lidocaine patch 5%, one subject experienced anemia and a second subject experienced elevated alanine transaminase levels that were considered possibly related to study medication.

## Table 10

Overall Summary of Adverse Events (Study 1)

| System Organ Class | Preferred Term | 0.7 mg/kg Lidocaine IV (N=58) | Lidocaine Topical System 1.8% (N=56) | Lidocaine Patch 5.0% (N=57) |
|---|---|---|---|---|
| Subjects with any AE, n (%) | | 5 (8.6%) NR=5 (8.6%) R=0 | 2 (3.6%) NR=0 R=2 (3.6%) | 6 (10.5%) NR=4 (7.0%) R=2 (3.5%) |
| Blood, lymphatic disorders, n (%) | Anemia | 0 | 0 | 2 (3.5%) NR=1 (1.8%) R=1 (1.8%) |
| Gastrointestinal disorders, n (%) | Abdominal discomfort | 0 | 0 | 1 (1.8%) NR=1 (1.8%) R=0 |
| | Abdominal pain | 0 | 1 (1.8%) NR=0 R=1 (1.8%) | 0 |
| | Nausea | 0 | 0 | 1 (1.8%) NR=1 (1.8%) R=0 |
| Injury, poisoning, and procedural complications, n (%) | Sunburn | 1 (1.7%) NR=1 (1.7%) R=0 | 0 | 0 |
| Laboratory evaluations, n (%) | Elevated alanine transaminase | 0 | 0 | 1 (1.8%) NR=0 R=1 (1.8%) |

| System Organ Class | Preferred Term | 0.7 mg/kg Lidocaine IV (N=58) | Lidocaine Topical System 1.8% (N=56) | Lidocaine Patch 5.0% (N=57) |
|---|---|---|---|---|
| Nervous system disorders, n (%) | Dizziness | 1 (1.7%) NR=1 (1.7%) R=0 | 1 (1.8%) NR=0 R=1 (1.8%) | 0 |
| | Headache | 1 (1.7%) NR=1 (1.7%) R=0 | 1 (1.8%) NR=0 R=1 (1.8%) | 2 (3.5%) NR=2 (3.5%) R=0 |
| Skin and subcutaneous disorders, n (%) | Hyperhidrosis | 1 (1.7%) NR=1 (1.7%) R=0 | 0 | 0 |
| | Pruritus | 0 | 0 | 1 (1.8%) NR=1 (1.8%) R=0 |
| | Urticaria | 1 (1.7%) NR=1 (1.7%) R=0 | 1 (1.8%) NR=0 R=1 (1.8%) | 0 |

Open in a separate window

**Notes:** Counts reflect numbers of subjects reporting one or more AEs that map to the MedDRA preferred term. TEAEs included definitely related, probably related, and possibly related. AEs were analyzed based on the last treatment subjects were on prior to AE occurrence. Denominator for percentages was number of subjects exposed to the given treatment.

**Abbreviations:** AE, adverse event; IV, intravenous; MedDRA, Medical Dictionary for Regulatory Activities; NR, not related; R, related; TEAE, treatment-emergent adverse event.

In Study 2, two AEs were recorded among two subjects (3.7%). One subject (1.9%) receiving lidocaine topical system 1.8% experienced acne and one subject (1.9%) receiving lidocaine patch 5% experienced syncope. Neither AE was judged to be treatment-related. There were no serious or severe AEs and no AEs that led to discontinuation of study medication or the study (Table 11).

## Table 11

Overall Summary of Adverse Events (Safety Population) (Study 2)

| System Organ Class | Preferred Term (Verbatim) | Lidocaine Topical System 1.8% (N=54) | Lidocaine Patch 5% (N=54) | Overall (N=54) |
|---|---|---|---|---|

| System Organ Class | Preferred Term (Verbatim) | Lidocaine Topical System 1.8% (N=54) | Lidocaine Patch 5% (N=54) | Overall (N=54) |
|---|---|---|---|---|
| Subjects with any AE, n (%) | | 1 (1.9%) | 1 (1.9%) | 2 (3.7%) |
| Nervous system disorders, n (%) | Syncope | 0 | 1 (1.9%) Mild, notrelated | 1 (1.9%) |
| Skin and subcutaneous tissue disorders, n (%) | Acne | 1 (1.9%) Mild, not related | 0 | 1 (1.9%) |

Open in a separate window

**Abbreviation:** AE, adverse event.

## Discussion

The PK profiles of two different lidocaine-containing topical systems/patches (ZTlido[®] 1.8% and Lidoderm[®] 5%) were compared in two studies in normal, healthy subjects with regard to the systemic rate of exposure ($AUC_{0-t}$, $AUC_{0-inf}$) and the extent of absorption ($C_{max}$). The geometric means for these PK parameters were similar, and their 90% CIs were within the predefined bioequivalence range of 80% to 125%.[19] Thus, based on these results, it can be concluded that the two products, despite their differences in drug load and strength, are bioequivalent. Both Study 1 and Study 2 were performed to support marker approval in the United States by establishing a pharmaceutical bridge between lidocaine topical system 1.8% and lidocaine patch 5%. In Study 1, the products were reinforced at the corners with tape to ensure that there was no lifting from the skin; however, taping may have the potential to alter drug absorption. Study 2 replicated the design of Study 1 without tape reinforcement. Both studies confirm bioequivalence between lidocaine topical system 1.8% and lidocaine patch 5%. While Study 2 shows that the two products are bioequivalent without tape reinforcement, the disparate adhesion performance noted may be a clinical/PK performance consequence in the real world, as single-dose PK studies inherently limit subject mobility within confinement of the clinic that is not representative of real-life challenges.

Both products were well tolerated, with an overall incidence of treatment-related adverse events treatment-related AEs in the lidocaine topical system 1.8% group and the lidocaine patch 5% group of 3.6% and 3.5%, respectively, in Study 1. No treatment-related AEs were observed in Study 2 for either product. Dermal response scores (skin tolerability after removal) were similar between lidocaine topical system 1.8% and lidocaine patch 5%.

In addition to demonstrating bioequivalence between lidocaine topical system 1.8% and lidocaine patch 5% and showing that the two products have comparable safety and skin tolerability profiles, the data from the present study highlight that lidocaine topical system

1.8% presents several advantages over lidocaine patch 5%, in terms of drug load, residual drug after use, and adhesion. Lidocaine topical system 1.8% delivers the same amount of lidocaine as lidocaine patch 5% with a 19-fold reduction in drug load. It also has low residual drug content after use (~18 mg). Topical delivery systems that minimize drug load and residual drug have an inherently lower risk of inadvertent exposure or systemic safety risks (eg, in the event of dose-dumping). Lidocaine topical system 1.8% is also a lighter, thinner "patch" that demonstrated superior adhesion to lidocaine patch 5% at the end of the labeled wear duration (12 hours).[9,12] Adequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others.[20] This risk is emphasized in the lidocaine patch 5% label with a statement on level of residual drug (665 mg) and bolded warning pertinent to the risk of this level of residual drug. The label for lidocaine topical system 1.8% maintains a warning of risks associated with residual drug, but only states that a used product has "residual drug after use" and has an unbolded warning. This study shows that lidocaine topical system 1.8% is an efficient lidocaine delivery system with improved adhesion relative to lidocaine patch 5% and comparable dermal safety and reduction of residual drug after use.

Importantly, these data demonstrate the discrepancy between product strength and the amount of drug that is delivered to the patient. In this case, a lidocaine topical system with a product strength of 1.8% and 36 mg drug load is bioequivalent (ie, delivers the same level of drug) to a lidocaine patch with a product strength of 5% and 700 mg drug load. This is counterintuitive, as one could reasonably expect that a topical system or patch with a higher strength (2.8-fold) and increased drug load (19-fold) would deliver significantly more drug to the skin; however, topical system delivery technologies have advanced such that product strength and drug load are not necessarily indicators of biopharmaceutical efficiency, and thus, can be misleading and may contribute to physician, pharmacy, and patient confusion over strength and dose.

## Conclusion

Overall, bioequivalence was demonstrated between lidocaine topical system 1.8% and lidocaine patch 5%, and thus, these products can be expected to have similar efficacy in managing PHN pain. A statistical comparison of the single-time adhesion scores at 12 hours was statistically significant in favor of lidocaine topical system 1.8% over lidocaine patch 5%. Both products were well tolerated as a single application in healthy adult human subjects. It may be reasonable to anticipate that as topical system/patch technology progresses, the strength presentations as a percentage of drug-to-adhesive will become increasingly meaningless. Likewise, the drug load within these topical products may not be an adequate indication of drug delivery or exposure.

## Acknowledgments

The authors would like to thank study investigator Phillip LaStella, Principal Investigator of TKL Research Inc., and Monil Shah for the design and management of the study, the clinical staff, and the volunteers who made this study possible. Sandi Staros, PhD, of Synergy Medical Education, provided medical writing support.

## Data Sharing Statement

The authors certify that this manuscript reports original clinical trial data. Individual participant data that underlie the results reported in this article after deidentification (text, tables, figures, and appendices) are available, including the study protocol. Data requests should be submitted in the form of a research proposal to moc.amrahpxelics@sriaffA_lacideM for up to 36 months after the publication date.

## Disclosure

The abstract of this paper was presented at the PAINWeek 2018 Conference (September 4–8, 2018; Las Vegas, NV) as a poster presentation with interim findings. The poster's abstract was published in "Poster Abstracts" in 2018 *Postgraduate Medicine*: Patel K, Gudin J, Vought K, Shah M, Grimes D, LaStella P, Greuber E. A Randomized, Comparative Pharmacokinetic (PK) Study of ZTlido™ Lidocaine Topical System 1.8% (36 mg) Versus Lidoderm® Lidocaine Patch 5% (700 mg). (2018) PAINWeek Abstract Book 2018, *Postgrad Med*, 130:sup1, 1–91, DOI: 10.1080/00325481.2018.1512253.

In the past year, Dr. Gudin has been an advisor, consultant, or speaker's bureau member for Averitas Pharma, BioDelivery Sciences International, Inc., Daiichi Sankyo, Hisamitsu Pharmaceutical Co. Inc., Nektar Therapeutics, Salix Pharmaceuticals, and Scilex Pharmaceuticals Inc. Dr. Fudin has been an advisor, consultant, or speaker's bureau member for Abbott Laboratories, AcelRx Pharmaceuticals, Acutis Diagnostics Inc., AstraZeneca, BioDelivery Sciences International, Inc., Daiichi Sankyo, Firstox Laboratories, GlaxoSmithKline, Human Half-Cell, Inc., Quest Diagnostics, Salix Pharmaceuticals, and Scilex Pharmaceuticals Inc. Dr. Nalamachu has been a consultant/speaker and has received honorarium and grants from Allergan, AstraZeneca, BioDelivery Sciences International, Inc., Collegium Pharmaceuticals, Daiichi Sankyo, Depomed (Assertio Therapeutics), Eli Lilly and Company, Endo Pharmaceuticals, Ferring Pharmaceuticals, Insys Pharmaceuticals, Pernix Therapeutics, Pfizer Inc., Purdue Pharmaceuticals, and Scilex Pharmaceuticals Inc. Drs. Vought and Greuber have patent application 62/762753 pending to Scilex Pharmaceuticals Inc., and Dr Vought is head of R&D responsible for the design and conduct of the study. Drs. Greuber, Patel, and Vought are employees of Scilex Pharmaceuticals Inc., and they report grants and personal fees from Scilex Pharmaceuticals Inc. The authors report no other conflicts of interest in this work.

# References

3. Le P, Rothberg M. Herpes zoster infection. *BMJ*. 2019;364:kk5095. doi: 10.1136/bmj.k5095 [PubMed] [CrossRef] [Google Scholar]

4. Hadley GR, Gayle JA, Ripoll J, et al. Post-herpetic neuralgia: a review. *Curr Pain Headache Rep*. 2016;20(3):17. doi: 10.1007/s11916-016-0548-x [PubMed] [CrossRef] [Google Scholar]

5. Jones J. Postherpetic neuralgia. *J Pain Palliat Care Pharmacother*. 2015;29(2):180–181. doi: 10.3109/15360288.2015.1037520 [PubMed] [CrossRef] [Google Scholar]

6. Johnson RW, Rice AS, Solomon CG. Clinical practice. Postherpetic neuralgia. *N Engl J Med*. 2014;371(16):1526–1533. doi: 10.1056/NEJMcp1403062 [PubMed] [CrossRef] [Google Scholar]

7. Kondamudi PK, Tirumalasetty PP, Malayandi R, Mutalik S, Pillai R. Lidocaine transdermal patch: pharmacokinetic modeling and in vitro-in vivo correlation (IVIVC). *AAPS PharmSciTech*. 2016;17(3):588–596. doi: 10.1208/s12249-015-0390-1 [PubMed] [CrossRef] [Google Scholar]

8. Stanos SP, Galluzzi KE. Topical therapies in the management of chronic pain. *Postgrad Med*. 2013;125(4 Suppl 1):25–33. doi: 10.1080/00325481.2013.1110567111 [PubMed] [CrossRef] [Google Scholar]

9. ZTLIDO®. *(Lidocaine Topical System): [Prescribing Information]*. San Diego, CA, USA: Scilex Pharmaceuticals; 2018. [Google Scholar]

11. Gudin J, Nalamachu S. Utility of lidocaine as a topical analgesic and improvements in patch delivery systems. *Postgrad Med*. 2020;132(1):28–36. doi: 10.1080/00325481.2019.1702296. [PubMed] [CrossRef] [Google Scholar]

12. LIDODERM®. *(Lidocaine Patch 5%): [Prescribing Information]*. Malvern, PA, USA: Endo Pharmaceuticals; 2018. [Google Scholar]

13. Rowbotham MC, Davies PS, Verkermpinck C, Galer BS. Lidocaine patch: double-blind controlled study of a new treatment method for post-herpetic neuralgia. *Pain*. 1996;65(1):39–44. doi: 10.1016/0304-3959(95)00146-8 [PubMed] [CrossRef] [Google Scholar]

14. Galer B, Rowbotham M, Perander J, Friedman E. Topical lidocaine patch relieves postherpetic neuralgia more effectively than a vehicle topical patch: results of an enriched enrollment study. *Pain*. 1999;80(3):533–538. doi: 10.1016/S0304-3959(98)00244-9 [PubMed] [CrossRef] [Google Scholar]

15. Hans G, Sabatwoski R, Binder A, Boesl I, Rogers P, Baron R. Efficacy and tolerability of 5% lidocaine medicated plaster for the topical treatment of post-herpetic neuralgia: results of a long-term study. *Curr Med Res Opin*. 2009;25(5):1295–1305. doi: 10.1185/03007990902901368 [PubMed] [CrossRef] [Google Scholar]

16. Sabatwoski R, Hans G, Tacken I, Kapanadze S, Buchheister B, Baron R. Safety and efficacy outcomes of long-term treatment up to 4 years with 5% lidocaine medicated plaster in patients with post-herpetic neuralgia. *Curr Med Res Opin*. 2012;28(8):1337–1346. doi: 10.1185/03007995.2012.707977 [PubMed] [CrossRef] [Google Scholar]

17. Guidance for Industry. Assessing adhesion with transdermal and topical delivery systems for ANDAs. Rockville, MD, USA; 2018. Available from: https://www.fda.gov/media/98634/download. Accessed July30, 2019. [Google Scholar]

18. Guidance for Industry. Assessing the irritation and sensitization potential of transdermal and topical delivery systems for ANDAs. Rockville, MD, USA; 2018: Available from: https://www.fda.gov/media/117569/download. Accessed July30, 2019. [Google Scholar]

19. Guidance for Industry. Statistical approaches to establishing bioequivalence. Rockville, MD, USA; 2001. Available from: https://www.fda.gov/media/70958/download. Accessed July30, 2019. [Google Scholar]

20. Wokovich AM, Prodduturi S, Doub WH, Hussain S, Buhse LF. Transdermal drug delivery system (TDDS) adhesion as a critical safety, efficacy and quality attribute. *Eur J Pharm Biopharm*. 2006;64(1):1–8. doi: 10.1016/j.ejpb.2006.03.009 [PubMed] [CrossRef] [Google Scholar]

# EXHIBIT 15

# A Randomized, Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System 1.8% During Physical Activity and Heat Treatment in Healthy Subjects

ncbi.nlm.nih.gov/pmc/articles/PMC7293912/



J Pain Res. 2020; 13: 1359–1367.

Published online 2020 Jun 10. doi: 10.2147/JPR.S238268
PMCID: PMC7293912

PMID: 32606902

Jeffrey Fudin,[1,2,3,4] Erica L Wegrzyn,[1,2,3] Emileigh Greuber,[5] Kip Vought,[5] Kalpana Patel,[5] and Sri Nalamachu[6]

Author information Article notes Copyright and License information Disclaimer

This article has been cited by other articles in PMC.

## Associated Data

### Data Citations

## Abstract

### Purpose

This study compares the pharmacokinetic (PK) profile, adhesion, and safety of lidocaine topical system 1.8%, a novel lidocaine topical system approved to treat postherpetic neuralgia, under conditions of heat and exercise vs normal conditions.

## Materials and Methods

This open-label, 3-period, 3-treatment crossover study randomized 12 healthy adults to receive three lidocaine topical systems 1.8% during each of three treatment periods, with 7-day washouts between treatments. The product was applied to the mid-lower back and was removed after 12 hours. During Treatment A, subjects exercised on a bicycle for 30 minutes at 0, 2.5, 5.5, and 8.5 hours. During Treatment B, heat (temperature set at 36.7–40.3°C) was applied at 0 and 8.5 hours. Treatment C was normal conditions. The PK profile of each subject under exercise and heat conditions was compared to normal conditions. Skin irritation, adhesion, and adverse events were assessed.

## Results

Twelve subjects completed the study. Exposure to external heat resulted in increased peak plasma concentration of lidocaine with a mean $C_{max}$ of 160.3±100.1 ng/mL vs 97.6±36.9 ng/mL under normal conditions, with no effect on the extent of exposure (AUC). Concentrations returned to normal within 4 hours after the heat was removed. No clinically relevant differences in absorption were observed under exercise conditions with a mean $C_{max}$ of 90.5±25.4 ng/mL and no effect on the extent (AUC) of lidocaine exposure was observed relative to normal conditions. No systems detached during the study. Adverse events were mild, with none leading to discontinuation.

## Conclusion

Transient heat exposure resulted in increased lidocaine plasma concentrations compared to normal conditions, whereas exercise had no effect. The effects of heat appear to be immediate, reversible, and below systemic therapeutic threshold in antiarrhythmic treatment (1000–1500 ng/mL), and well below the safe systemic threshold of 5000 ng/mL. Lidocaine topical system 1.8% remained adhered to the skin and was well tolerated under all conditions. ClinicalTrials.gov: NCT04150536.

**Keywords:** herpes zoster, shingles, neuropathic pain, dermal

## Introduction

Postherpetic neuralgia (PHN) is a chronic neuropathic pain condition that is a common complication of herpes zoster virus infections (shingles), particularly in older patients. The pain may persist for several (>3) months after the rash has resolved and is described as burning, sharp, jabbing, deep, and aching; it may be associated with allodynia. Itching and numbness have also been reported. PHN presents a significant individual and societal healthcare burden, but is often undiagnosed and poorly managed, with a 30% pain reduction considered clinically significant but a goal that is only met about 50% of the time.[1]

Before prescribing treatment for PHN, providers must consider several patient-specific factors, such as age, comorbidities, and any medications used for treating comorbidities, to avoid potentially additive side effects. As the incidence of PHN increases with age,[2] it is also important to consider age-related physiologic changes and pharmacokinetic (PK) implications, including impaired hepatic and renal function, that can increase the risk of adverse events (AEs).[3] This is important given the potential AE profiles of oral medications for PHN that may include serotonin-norepinephrine reuptake inhibitors, tricyclic antidepressants, gabapentinoids, anticonvulsants, and opioids.[4–6]

Lidocaine is an amide local anesthetic agent that stabilizes neuronal membranes by inhibiting the ionic fluxes required for initiation and conduction of impulses. Application of topical lidocaine has been shown to be efficacious for the treatment of neuropathic pain, with a low risk of systemic effects.[1,2] ZTlido® is a novel lidocaine topical system (Scilex Pharmaceuticals Inc., Mountain View, CA, USA) that was approved by the US FDA in 2018 for the relief of pain associated with PHN. Each topical system contains 36 mg of lidocaine in a thin, nonaqueous adhesive matrix (18 mg per gram adhesive: 1.8%).[7] Lidocaine topical system 1.8% was developed to deliver a bioequivalent level of the drug as Lidoderm® (lidocaine patch 5%; Endo Pharmaceuticals, Malvern, PA, USA), a hydrogel patch containing 700 mg of lidocaine.[8] Like Lidoderm, ZTlido was designed to deliver sufficient lidocaine to produce an analgesic effect, but less than that needed to produce a complete sensory block.[7]

Systemic lidocaine exposure from topically applied patches (now referred to as "topical systems" by FDA) is limited under normal wear conditions. For many drugs, however, delivery through the skin, and thus serum drug concentrations, can be affected by heat and exercise, which may alter circulation and blood flow, resulting in increased drug delivery and higher drug exposure.[9,10] It is known that the absorption of local anesthetic agents, including lidocaine, from topical creams, can be increased if skin temperature is elevated by exercising, covering the skin, or using an external heat source.[11] There have been reports of serious adverse events, including irregular heartbeat, seizures, difficulty breathing, and death after the improper use of local anesthetic numbing creams.[11] The concentration of lidocaine required for systemic toxicity is ≥5000 ng/mL[12] which is several-fold higher than the systemic exposure from prescription lidocaine patches and systems (~100 ng/mL) under normal use conditions.[7,8] The effects of heat and exercise on drug delivery are dependent on many factors, including drug load, concentration, and the inactive ingredient composition, and should, therefore, be determined on a product-specific basis.

Adhesion under conditions of heat and exercise is also a potential concern, as drug delivery depends on product adherence to the skin throughout the administration period. Activities of daily living can impact the application of topical systems and ultimately decrease efficacy if dermal adhesion is poor.

Consistent with regulatory expectations and to appropriately characterize and label the product, this study was conducted to characterize the PK and adhesion of lidocaine topical system 1.8% under conditions of heat and exercise.

# Materials and Methods

## Measures and Outcomes

This open-label, randomized, 3-treatment, 3-sequence, 3-period crossover study was conducted at one clinical site (AXIS Clinicals, Dilworth, MN, USA) in accordance with ICH Guideline for Good Clinical Practice (GCP), approved by Salus Institutional Review Board (IRB), and conducted in accordance with the Declaration of Helsinki. The bioanalytical facility was blinded to the randomization code. This study was registered with ClinicalTrials.gov, NCT04150536.

## Study Objectives

The primary objective of this study was to evaluate the PK characteristics and adhesion performance of lidocaine topical system 1.8% (administered as 3 topical systems) in fasting healthy human subjects during physical exercise, heat exposure, and normal conditions. The secondary objective was to conduct a formal irritation assessment at the end of each treatment period and to monitor AEs and safety concerns in healthy subjects with the use of the product.

## Subjects

Eligible men and women were 18 years of age and older, with a body mass index (BMI) between 18.00 and 32.49 kg/m$^2$. Subjects were generally healthy, as documented by medical history, physical examination, and vital signs assessments, with no evidence of underlying disease during check-in and screening performed within 28 days of check-in. Female subjects were not pregnant and used contraception during the study if they were of child-bearing potential. All subjects provided written informed consent and were able to comply with study procedures.

## Exclusion Criteria

Subjects were excluded if they had any major medical illness 3 months prior or any significant history or ongoing chronic medical illness affecting the major body systems, including the skin; allergy or known hypersensitivity to lidocaine, amide-type local anesthetics, or any component of the product formulation. Subjects with conditions that might affect the application of the product or its adhesive properties (including psoriasis, eczema, atopic dermatitis, damaged or irritated epidermal layer, and excessive hair or oil on

the skin) were excluded. History of addiction, abuse, and misuse of any drug; use of any nicotine-containing products within 30 days; or alcohol abuse within 12 months prior to product application were also reasons for study exclusion.

## Treatments

Per randomization schedule, all subjects received three lidocaine topical systems 1.8%, each containing 36 mg of lidocaine, during three separate treatment periods (Period-I, Period-II, Period-III). Each period included four subjects per treatment (Treatments A, B, C). Subjects were randomized to three different treatment sequences (ABC, BCA, and CAB). In each period, the product was applied to clean, dry skin that was free of lotion, soap, or oil in the mid-lower back after an overnight fast (≥10 hours) in each of three randomly allocated treatment plans, with a 7-day washout between treatments. The three topical systems (total lidocaine dose of 108 mg) were each worn for 12 hours. No overlays, adhesive tape, or similar products were applied.

- Treatment A: 3 lidocaine topical systems 1.8% with physical exercise

- Treatment B: 3 lidocaine topical systems 1.8% with application of heat

- Treatment C: 3 lidocaine topical systems 1.8% under normal conditions

### Physical Exercise

Subjects were instructed to perform an exercise regimen for 30 minutes on an exercise bicycle (Exerpeutic 1000-High Capacity Magnetic Recumbent Exercise Bike, Exerpeutic, China), achieving a heart rate of approximately 108 beats per minute. Exercise was performed immediately after product application and at 2.5, 5.5, and 8.5 hours after product application, with a window of ±10 minutes. Heart rate was continuously monitored during exercise.

### Heat Application

Heat was applied using a standard 3-setting heating pad (CVS XL 3 Setting Moist Dry Heating Pad and Controller), with precautions followed for heat application per manufacturer guidelines (ie, a blanket or towel placed between the pad and the product to reduce risk of skin burning). The temperature was set on "medium" (36.7–40.3°C tested over 1 hour with Etekcity Lasergrip 774 Infrared Thermometer, Etekcity Corporation, Anaheim, CA, USA), and the heating pad was applied for 20 minutes immediately and at 8.5 hours after product application.

## Study Assessments

The PK of each treatment condition was evaluated by the estimation of lidocaine concentrations in plasma, using a validated liquid chromatography–tandem mass spectrometry (LC-MS/MS) method. The calibration range of the procedure was 0.2000 ng/mL to 200.0 ng/mL, with a lower limit of quantification of 0.2000 ng/mL. PK parameters such as maximum plasma concentration ($C_{max}$), area under the plasma concentration–time curve between times zero and t ($AUC_{0-t}$), AUC between time zero and infinity ($AUC_{0-\infty}$), time to $C_{max}$ ($t_{max}$), percentage extrapolation (calculated as $AUC_{\%extrapolation}=[AUC_{0-\infty}-AUC_{0-t}]\times100/AUC_{0-\infty}$), elimination rate constant ($K_{el}$), and elimination half-life ($t_{1/2}$) were calculated following blood collection by venipuncture pre-dose and at 2, 4, 6, 9, 10, 11, 12, 13, 14, 16, 18, 20, 22, 24, and 48 hours post-dose.

Skin irritation at the lidocaine topical system application site was evaluated pre-application (0 hours), 30 minutes (with a window period of ±10 minutes) after product removal and 2 hours after product removal using the FDA-recommended 8-point scale of dermal response (0=no evidence of irritation; 1=minimal erythema, barely perceptible; 2=definite erythema; 3=erythema and papules/pustules; 4=definite edema; 5=erythema, edema, and papules; 6=vesicular eruption; 7=strong reaction spreading beyond the test site) and a scale of other effects (including glazed appearance, peeling and cracking, dried serous exudates covering at least part of the application site, and small petechial erosions and/or scabs).[13] Product adhesion was assessed immediately after (0 hours) and at 0.5, 3, 6, 9, and 12 hours (before system removal) after application, with a degree of adhesion recorded using the FDA-recommended rating scale, where 0: ≥90% adhered (essentially no lift off the skin); 1: ≥75% to <90% adhered (some edges only lifting off the skin); 2: ≥50% to <75% adhered (less than half the system lifting off the skin); 3: <50% adhered but not detached (more than half the system lifting off the skin without falling off); and 4: 0% (complete detachment).[14]

## Statistical Analysis

The randomization schedule was prepared using SAS® Release 9.4 (SAS Institute Inc., Cary, NC, USA). Data set preparation and analysis of the PK parameters were performed using a non-compartmental model with WinNonlin Professional Software version 5.01 (Pharsight Corporation, Sunnyvale, CA, USA).

Descriptive statistics were computed for all PK parameters for lidocaine topical system 1.8% (total lidocaine dose=108 mg) under each treatment condition (exercise, heat, and normal). Bioequivalence comparisons of PK parameters for the exercise and heat treatments vs normal conditions were performed using PROC GLM of SAS® Release 9.4. Analysis of variance (ANOVA) was calculated for untransformed and natural log-transformed $C_{max}$, $AUC_{0-t}$, and $AUC_{0-\infty}$ using the treatment received, the period at which it was given, the sequence of treatment, and the subject effect (nested within the sequence). Sequence effect was tested using the subject nested within sequence mean square from the ANOVA as the error term. ANOVA calculations included least square mean. The level of significance was

set at α=0.05, except for the significance of the sequence effect involved in the model (set at α=0.1). 90% confidence intervals (CIs) for the ratio of the Treatments (A, B and C) products averages (geometric least-square means) were calculated by first calculating the 90% CI for the differences in the averages (least-square means) of the log-transformed data and then taking the antilogs of the obtained confidence limits. By convention, if the 90% CI of the ratio of geometric means was within 80% to 125%, then the treatments were considered bioequivalent.

## Adverse Events and Safety

AEs were recorded after spontaneous reporting by subject or physician observation within ±30 minutes of the scheduled time. Vital sign assessments (blood pressure, heart rate, respiratory rate and temperatures) were taken at pre-dose, 4, 10, and 24 hours post-dose. A 12-lead electrocardiogram was recorded at screening (all within normal limits).

# Results

## Subject Disposition and Baseline Characteristics

A total of 12 subjects, aged between 19 and 62 years with BMI values between 21.95 and 30.91 kg/m$^2$ (Table 1), completed the study. Subjects were randomized to each of the three treatments according to the predetermined schedule; all subjects completed their assigned schedule without any discontinuations or withdrawals. Plasma concentrations of 12 subjects were included in PK and statistical analyses; all subjects were included in the adhesion analysis.

## Table 1

Demographics and Baseline Characteristics

|  | N=12 |
| --- | --- |
| Age, years, mean±SD (range) | 46.17±15.94 (19–62) |
| Sex, n, M/F | 3/9 |
| Race, n, Black/White | 1/11 |
| BMI, kg/m$^2$ (mean±SD) | 27.81±2.91 |

Open in a separate window
**Abbreviations:** SD, standard deviation; BMI, body mass index.

## PK Assessments

## Comparison of Physical Exercise and Normal Conditions

Mean values of the primary PK parameters $C_{max}$, $AUC_{0-t}$, and $AUC_{0-\infty}$ were lower during physical exercise (Treatment A) than during normal conditions (Treatment C) by 7%, 11%, and 10%, respectively.

The 90% confidence interval for physical exercise (Treatment A) vs normal conditions (Treatment C) ratios of Ln-transformed PK parameters fell within the range of 79.65 to 112.73, suggesting that the effects of physical exercise on the rate and extent of lidocaine absorption from the topical system were not significant (Figure 1, Tables 2 and and33).

## Table 2

Summary Statistics of Pharmacokinetic Parameters of Lidocaine Topical System 1.8% with Physical Exercise, Heating, and Normal Conditions

| Statistics | | $C_{max}$ (ng/mL) | $AUC_{0-t}$ (h·ng/mL) | $AUC_{0-\infty}$ (h·ng/mL) | AUC% Extrapolation | $t_{max}$* (h) | $K_{el}$ (h⁻¹) | $t_{1/2}$ (h) |
|---|---|---|---|---|---|---|---|---|
| Treatment A | N | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | Mean | 90.48 | 1328.81 | 1344.08 | 1.36 | 9.00 | 0.13 | 5.60 |
| | SD | 25.413 | 461.660 | 458.187 | 2.211 | 9.00–18.00 | 0.024 | 1.113 |
| | CV (%) | 28.1 | 34.7 | 34.1 | 162.3 | 30.0 | 18.9 | 19.9 |
| Treatment B | N | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | Mean | 160.28 | 1718.71 | 1731.272 | 0.90 | 9.00 | 0.14 | 5.39 |
| | SD | 100.061 | 1004.005 | 1005.036 | 1.112 | 9.00–16.05 | 0.029 | 1.338 |
| | CV (%) | 62.4 | 58.4 | 58.1 | 124.0 | 21.2 | 21.5 | 24.8 |
| Treatment C | N | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | Mean | 97.59 | 1487.39 | 1501.10 | 1.07 | 11.50 | 0.14 | 5.23 |
| | SD | 36.869 | 590.007 | 588.428 | 1.535 | 9.00–14.00 | 0.030 | 1.203 |
| | CV (%) | 37.8 | 39.7 | 39.2 | 143.2 | 18.9 | 21.5 | 23.0 |

Open in a separate window

**Notes:** *For $t_{max}$, median and range have been represented instead of mean and SD. Treatment A: with physical exercise; Treatment B: with heating; Treatment C: under normal conditions.

**Abbreviations:** SD, standard deviation; CV, coefficient of variation.

## Table 3

Geometric Least Square Mean, Ratios, 90% Confidence Interval, ISCV and Power for Lidocaine Topical System 1.8% (in Transformed Data)

| Parameter | Geometric Mean | | | Intra-Subject CV (%) | (A/C) Ratio, % | 90% Confidence Intervals (A/C) | (B/C) Ratio, % | 90% Confidence Intervals (B/C) |
|---|---|---|---|---|---|---|---|---|
| | A | Treatment B | C | | | | | |
| $C_{max}$, ng/mL | 87.27 | 134.44 | 91.72 | 24.4 | 95.14 | 80.30–112.73 | 146.57 | 123.71–173.66 |
| $AUC_{0-t}$, h·ng/mL | 1264.16 | 1513.10 | 1400.70 | 17.9 | 90.25 | 79.65–102.26 | 108.02 | 95.34–122.40 |
| $AUC_{0-\infty}$, h·ng/mL | 1281.92 | 1526.88 | 1416.04 | 17.4 | 90.53 | 80.15–102.25 | 107.83 | 95.46–121.79 |

Open in a separate window

**Notes:** Treatment A: with physical exercise; Treatment B: with heating; Treatment C: under normal conditions.

**Abbreviations:** ISCV, intrasubject coefficient of variation; CV, coefficient of variation.



Open in a separate window

Figure 1

Mean plasma lidocaine concentration after application of three lidocaine topical systems (1.8%; 108 mg) vs time with physical exercise, heat exposure, and under normal conditions. Treatment A: with physical exercise; Treatment B: with heating; Treatment C: under normal conditions.

The median plasma lidocaine $t_{max}$ was 9 hours for physical exercise (Treatment A) and 11.5 hours for normal conditions (Treatment C). The observed half-life was similar for Treatment A (5.602 hours) and Treatment C (5.230 hours) (Figure 1, Tables 2 and and33).

## Comparison of Heating and Normal Conditions

The mean values of $C_{max}$, $AUC_{0-t}$, and $AUC_{0-\infty}$ were higher during heat application (Treatment B) than during normal conditions (Treatment C) by 64%, 16%, and 15%, respectively (Figure 1, Tables 2 and and33).

The 90% confidence interval for heat application (Treatment B) vs normal conditions (Treatment C) ratios of Ln-transformed $C_{max}$ (123.71–173.66 ng/mL) fell outside the 80% to 125% limits that are standard for bioequivalence determination, suggesting that heat exposure caused a significant increase in lidocaine absorption, resulting in a higher $C_{max}$ than under normal conditions (Figure 1, Tables 2 and and33).

The corresponding ranges for $AUC_{0-t}$ (95.34–122.40 h·ng/mL) and $AUC_{0-\infty}$ (95.46–121.79 h·ng/mL) were within the 80% to 125% range, suggesting that the effects of heating on these parameters were not significant (Figure 1, Tables 2 and and33).

Figure 1 shows that the effects of heating were mainly evident at the 9-hour time point (immediately following 20 minutes of heating starting at 8.5 hours), with little difference observed among the three treatments at other time points at which lidocaine concentrations were measured (Figure 1, Tables 2 and and33).

Lidocaine concentrations at 9 hours were 171.8±96.3 ng/mL after heating compared with 88.5±25.4 ng/mL for Treatment A and 92.9±39.7 ng/mL for Treatment C (Figure 1, Tables 2 and and33).

Thus, the effects of heating on lidocaine absorption appeared to be immediate and reversible, with no suggestion of dose dumping or discontinuation of drug delivery. Given the timing of heat application used in this study, heating increased the $C_{max}$ via an immediate effect at the 9-hour time point, with the little overall effect on the AUC.

The median $t_{max}$ was 9 hours for Treatment B and 11.5 hours for Treatment C. The observed half-life was similar for Treatment B (5.390 hours) and Treatment C (5.230 hours) (Figure 1, Tables 2 and and33).

The observed intrasubject coefficient of variation for $C_{max}$ was found to be 24.4%, indicating a higher variability in exposure during Treatment B (Figure 1, Tables 2 and and33).

## Adhesion and Irritation Analysis

Adhesion analysis included all topical systems from 12 subjects; no systems detached during the study across all three treatment periods or were removed early for unacceptable irritation, and no subjects dropped out of the study before the end of the 12-hour application period (Table 4). The mean irritation scores for 12 subjects for all treatments were <1 (1=minimal erythema) after product removal.

## Table 4

Summary Statistics of Adhesion Performance Evaluation of Lidocaine Topical System 1.8% with Physical Exercise, Heating, and Normal Conditions

| Statistics | Treatment* | N | Minimum | Maximum | Mean | SD | CV (%) |
|---|---|---|---|---|---|---|---|
| **Adhesion Score** | A | 12 | 0 | 2 | 0.33 | 0.389 | 116.8 |
| | B | 12 | 0 | 1 | 0.07 | 0.132 | 190.3 |
| | C | 12 | 0 | 0 | 0.00 | 0.000 | 0 |

Open in a separate window

**Notes:** *Treatment A: with physical exercise; Treatment B: with heating; Treatment C: under normal conditions.

**Abbreviations:** SD, standard deviation; CV, coefficient of variation.

Under normal conditions (Treatment C), all subjects had ≥90% adhesion throughout the administration period. Under heat conditions (Treatment B), a slight degree of lifting (score of 1, ≥75% to <90%) was observed for 2 subjects at 9 and 12 hours, respectively, and at 12 hours for a third subject. Product lifting was observed for 6 subjects (50%) under exercise conditions (Treatment A), with 2 subjects having a score of 2 (≥50% to <75% adhered) at some point during the 12-hour administration period. Three subjects observed to have lifting after exercise had improved adhesion at later time points within the 12-hour administration period. No subject was observed to have a score of ≥3 (>0% to <50% adhered) or complete detachment.

## Adverse Events and Safety

A total of six AEs were spontaneously reported by four subjects during the study (Table 5); three events occurred in two subjects in Period-I. One of these subjects had a headache (twice), which was considered possibly related to the study drug and treatment (Treatment B; heat). The second subject reported lightheadedness secondary to exercise treatment (Treatment A), which was considered unrelated to the study drug. Another AE (headache) was reported in a subject during Period-II (Treatment C), which was considered possibly related to the study drug.

## Table 5

Summary of Adverse Events

| Subject Number | Period Number | Treatment Received | Adverse Event | Severity | Related to Drug |
|---|---|---|---|---|---|
| S04 | III | B | Head cold | Mild | Not related |
| S05 | I | B | Headache | Moderate | Possibly related |
| | | | | Mild | Possibly related |
| | II | C | Headache | Moderate | Possibly related |
| S09 | I (Washout) | A | Menstrual cramps | Mild | Not related |

| Subject Number | Period Number | Treatment Received | Adverse Event | Severity | Related to Drug |
|---|---|---|---|---|---|
| S12 | I | A | Light headedness secondary to exercise | Mild | Not related |

Open in a separate window

**Notes:** Treatment A: with physical exercise; Treatment B: with heating; Treatment C: under normal conditions.

AEs considered unrelated to the study drug were one subject with menstrual cramps during the Period-I washout. Another subject reported a head cold in Period-III that was also not considered related to the study drug.

The most common AE was headache, which occurred in three subjects. No deaths or serious AEs were reported during the study. Vital assessments conducted throughout all treatment periods were within normal limits for all subjects.

## Discussion

The results of this study show that the effects of four 30-minute episodes of physical exercise on the rate and extent of lidocaine absorption from topical system 1.8% were not significant, thus, allowing for safe use of the product during moderate physical activity, as reflected in the product's prescribing information.[7]

Localized heating of lidocaine topical system 1.8% for 20 minutes at two different time periods resulted in a significant increase in lidocaine absorption, reflected in a higher $C_{max}$ than that observed under normal conditions, but did not significantly impact the extent of drug delivery ($AUC_{0-t}$ or $AUC_{0-\infty}$). The effects of heat on absorption appeared to be immediate and reversible, showing that the product does not undergo dose dumping or discontinuation of drug delivery. While heat exposure induces a significant increase in $C_{max}$, the level observed (172 ng/mL) was well below the systemic safety threshold of 5000 ng/mL for the avoidance of related AEs and the IV levels used to treat cardiac arrhythmias (1000–1500 ng/mL).[12] These changes appear generally consistent with data in the literature for other topical and transdermal products and are an expected thermodynamic outcome.[10]

Subjects were generally healthy, and vital signs were within normal ranges at rest, during heat exposure, and during physical activity. Overall, the application of lidocaine topical system 1.8% was well tolerated; six AEs reported by four subjects, with the most common AE being headache. Of the six reported AEs, only three were considered associated with the study drug, all of which were headache and observed in the same subject. No localized dermatologic AEs (ie, irritation, itching, blisters) were reported by any subject.

Limitations of the present study include the small size of the study population (N=12), ECG monitoring at baseline only and the lack of a comparator. Comparative examinations of the effects of heat and exercise between lidocaine topical system 1.8% and lidocaine patch 5% would have been of interest and should be investigated further. However, the potential deleterious effects (eg complete or partial dose-dump of drug) of these conditions with lidocaine patch 5% cannot be reasonably hypothesized or safe-guarded relative to the high drug load within the product (700 mg). The extent and seriousness of heat exposure effects on in vivo drug absorption, pharmacodynamics, and possible adverse events of topical products are dependent on the physicochemical and pharmacological properties of the drug(s) and the drug delivery system formulation design and need to be evaluated on a case-by-case basis.[15]

## Conclusion

The results of this study show that administration of three lidocaine topical systems 1.8%, each containing 36 mg of active compound produced sustained plasma lidocaine concentrations and was well tolerated in healthy subjects under normal conditions, with physical exercise, and with localized heating for 20 minutes with a heating pad. There was no significant effect observed on the PK profile under the exercise conditions. While heat exposure induces a significant increase in Cmax, the concentrations observed are well below (~30-fold) the systemic safety threshold for the avoidance of related AEs and 6- to 10-fold below the IV levels used to treat cardiac arrhythmias. Adequate adhesion of the system was maintained under both conditions, and the dermal irritation profile was benign.

## Acknowledgments

The authors would like to thank the investigators, their clinical staff, and the subjects who made this study possible. Nirzari Parikh, PhD, of Synergy Medical Education, provided medical writing support. This article is the sole work of the authors; stated opinions or assertions do not reflect the opinions of employers or employee affiliates listed. The article was not prepared as part of the authors' duties as federal employees where applicable.

## Funding Statement

The project supported by Shandong Key Research and development Program (Grant No. 2018GSF118110).

## Data Sharing Statement

The authors certify that this manuscript reports original clinical trial data. Individual participant data that underlie the results reported in this article after deidentification (text, tables, figures, and appendices) are available from Medical Affairs Department at Scilex

Pharmaceuticals Inc. at Medical_Affairs@scilexpharma.com including the study protocol. Data requests should be submitted in the form of a research proposal for up to 36 months after the publication date.

## Ethics Approval and Informed Consent

The sponsors and investigators state that they have obtained appropriate IRB approval from Salus Institutional Review Board in Austin, Texas or have followed the principles outlined in the Declaration of Helsinki for all human or animal experimental investigations. In addition, for investigations involving human subjects, informed consent has been obtained from the participants involved.

## Disclosure

Dr Jeffrey Fudin is a speaker for Abbott Laboratories, AstraZeneca, and Acutis Diagnostics, Inc; part of the advisory board, speakers bureau, and consulting for AcelRx Pharmaceuticals, BioDelivery Sciences International, GlaxoSmithKline (GSK), Salix Pharmaceuticals, and Daiichi-Sankyo Incorporated; received non-financial support by collaborating publications for Scilex Pharmaceuticals; consultant for Firstox; advisory board for Human Half-Cell, Inc and Quest Diagnostics, outside the submitted work. Drs. Greuber, Vought, and Patel are full-time employees of Scilex Pharmaceuticals Inc. Dr Vought has a patent 62/762,753 pending to Scilex Pharmaceuticals Inc and was responsible for the design and conduct of the study. Dr. Nalamachu has been a consultant/speaker and has received an honorarium from BDSI, DSI, Endo, Insys, Scilex Pharmaceuticals Inc., Purdue, Pfizer Inc., Eli Lilly and Company, Collegium Pharmaceutical, Pernix Therapeutics, Daiichi-Sankyo, and AstraZeneca. Dr Erica Wegrzyn reports personal fees from Remitigate LLC and Tower Health Pain & Addiction Symposium; is an Associate Editor in Chief for *Journal of Pain Research*, outside the submitted work. The authors report no other conflicts of interest in this work.

## References

1. Hadley GR, Gayle JA, Ripoll J, et al. Post-herpetic neuralgia: a review. *Curr Pain Headache Rep*. 2016;20(3):17. [PubMed] [Google Scholar]

3. Bettinger JJ, Wegrzyn EL, Fudin J. Pain management in the elderly: focus on safe prescribing. *Pract Pain Manag*. 2017;17(3). [Google Scholar]

7. *ZTLIDO® (Lidocaine Topical System): Prescribing Information*. San Diego, California, USA: Scilex Pharmaceuticals; 2018. [Google Scholar]

8. *LIDODERM® (Lidocaine Patch 5%): Prescribing Information*. Malvern, Pennsylvania, USA: Endo Pharmaceuticals; 2018. [Google Scholar]

9. Lenz TL. The effects of high physical activity on pharmacokinetic drug interactions. *Expert Opin Drug Metab Toxicol*. 2011;7(3):257–266. doi: 10.1517/17425255.2011.553190 [PubMed] [CrossRef] [Google Scholar]

10. Vanakoski J, Seppala T. Heat exposure and drugs: a review of the effects of hyperthermia on pharmacokinetics. *Clin Pharmacokinet*. 1998;34(4):311–322. doi: 10.2165/00003088-199834040-00004 [PubMed] [CrossRef] [Google Scholar]

11. US Food and Drug Administration. Public health advisory: life-threatening side effects with the use of skin products containing numbing ingredients for cosmetic procedures [archive]. February 6, 2007. [updated August 19, 2013]. Available from: https://wayback.archive-it.org/7993/20171105015424/https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm054718.htm. Accessed May8, 2020.

12. Benowitz NJ, Meister W. Clinical pharmacokinetics of lignocaine. *Clin Pharmacokinet*. 1978;3:177–201. doi: 10.2165/00003088-197803030-00001 [PubMed] [CrossRef] [Google Scholar]

13. Guidance for Industry. *Assessing the Irritation and Sensitization Potential of Transdermal and Topical Delivery Systems for ANDAs*. U.S. Department of Health and Human Services, Food and Drug Administration, ed. Rockville, MD, USA; 2018. Available from: https://www.fda.gov/media/117569/download. Accessed July 30, 2019. [Google Scholar]

14. Food and Drug Administration. *Assessing Adhesion with Transdermal and Topical Delivery Systems for ANDAs - Guidance for Industry*. U.S. Department of Health and Human Services, Food and Drug Administration, ed. Rockville, MD, USA; 2018. Available from: https://www.fda.gov/media/117569/download. Accessed July 30, 2019. [Google Scholar]

# EXHIBIT 16



December 28, 2018

Division of Dockets Management (HFA-305)
Food and Drug Administration
5630 Fishers Lane, Room 1061
Rockville, Maryland 20852

## CITIZEN PETITION

Scilex Pharmaceuticals, Inc. ("Scilex") submits this Citizen Petition under 21 U.S.C. §§ 321, 352, and 355 and 21 C.F.R. § 10.30 to request that the Commissioner of Food and Drugs ("FDA" or "Agency") take the following actions with respect to unapproved, lidocaine-containing drug products in patch, plaster, poultice, and comparable delivery systems (abbreviated collectively hereafter as "patches" or "patch dosage forms"). A continuing stream of such products are unlawfully distributed in interstate commerce, outside the scope of FDA's over-the-counter ("OTC") drug monograph development process for external analgesic drugs or any reasonable enforcement discretion. Most significantly, as discussed in Section B.4 of this petition, these products raise important patient and third-party safety and effectiveness questions, demand enhanced controls, and should properly be vetted as part of FDA's other current activities to apply modern regulatory science and controls to patch dosage forms and their complex delivery mechanisms.

### A. ACTION REQUESTED

Scilex respectfully requests that FDA:

1. Initiate all administrative and judicial actions necessary to remove from the market, and to prevent the further marketing of, lidocaine-containing drug products in patch, plaster, poultice, or comparable delivery systems that have not been approved pursuant to a new

Division of Dockets Management (HFA-305)
December 28, 2018
Page 2

drug application ("NDA") or an abbreviated new drug application ("ANDA") submitted under 21 U.S.C. § 355 and implementing regulations;[1]

2. Strictly apply the provisions of 21 U.S.C. § 355, 21 C.F.R. Part 330, and related regulatory decisions, which do not allow the marketing or distribution of lidocaine-containing patch dosage form drug products that were introduced into United States ("U.S.") commerce after the OTC drug review was initiated on May 11, 1972;[2]

3. Finalize the Tentative Final Monograph for External Analgesic Drug Products for Over-the-Counter Human Use, as amended[3] (the "TFM" or "External Analgesics TFM"), which expressly excludes lidocaine-containing products in patch dosage forms from its scope because of concerns about the safety and efficacy of these products;

4. Publish an immediately applicable enforcement policy guidance document that will apply until the final OTC External Analgesics Monograph is codified, and that affirms that lidocaine-containing drug products marketed in nonprescription patch dosage forms ("OTC lidocaine patches") and that are marketed without approved NDAs or ANDAs do not conform to the terms of the External Analgesics TFM, are outside the scope of any enforcement discretion that may exist pursuant to Compliance Policy Guide 450.200[4] or

---

[1] For clarity, this petition is focused on lidocaine-containing patch dosage form drug products, and does not address the lidocaine-containing cream, lotion, or ointment dosage form drug products that were reviewed as part of the OTC External Analgesic Monograph development process. This petition also does not address non-lidocaine external analgesic patch, plaster, or poultice dosage forms that may be marketed under the External Analgesics TFM, but acknowledges that the issues (and requested actions) in this petition may apply to the broader category.

[2] 21 C.F.R. § 330.13(e) (establishing that conditions for marketing ingredients recommended for OTC use under the OTC drug review "appl[y] only to conditions under consideration as part of the OTC drug review initiated on May 11, 1972, and evaluated under the [expert panel review and monograph development] procedures set forth in § 330.10." Separate regulations apply to OTC drugs initially marketed in the U.S. after the OTC drug review began in 1972. Id. (cross-referencing 21 C.F.R. § 330.14).

[3] 48 Fed. Reg. 5852, Feb. 8, 1983, amended by 68 Fed. Reg. 42324, July 17, 2003 ("FDA is amending the tentative final monograph ... to clarify the status of patch, plaster, or poultice dosage forms for OTC external analgesic drug products.... This proposed rule indicates that these dosage forms have not been determined to be generally recognized as safe and effective for any OTC external analgesic drug products at this time" (emphasis added)).

[4] FDA, Compliance Policy Guide Sec. 450.200, "Drugs – General Provisions and Administrative Procedures for Recognition as Safe and Effective" (revised March 1995), available at https://www.fda.gov/iceci/compliancemanuals/compliancepolicyguidancemanual/ucm074388.htm.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 3

other relevant statements of enforcement discretion, and may be the subject of immediate enforcement action without further notice;[5] and

5. Initiate and regularly review drug listing and other marketplace information to identify lidocaine-containing products in patch dosage forms and take appropriate administrative and judicial action to ensure their compliance with the Federal Food, Drug, and Cosmetic Act, implementing regulations, and findings pursuant to this petition.

## B.  STATEMENT OF GROUNDS

### 1.    Introduction

Patch dosage forms are complex drug delivery systems, and the biopharmaceutics are highly dependent on the formulation and material construct.  Patches can deliver drugs to the stratum corneum or upper layers of the skin (as in the case of topical dermatological products); through the stratum corneum to the nerves in dermis (as in the case of topical analgesic products); or through the skin to enter systemic circulation (as in the case of transdermal products).  To mediate delivery through the skin, the drug must be formulated in an appropriate vehicle, consisting of adhesives, solvents, and in some cases chemical penetration enhancers, to ensure effective delivery to the site action.  This complex drug-vehicle formulation is coated on a backing material that provides an occlusive or semi-occlusive physical barrier that can help drive sustained drug delivery to the skin.  The selection of formulation adhesives, active ingredient(s) and differing salt forms, permeation enhancers, and solvents have consequences for product performance both in terms of drug flux and adhesion. The physical nature of the adhesive layer(s) and thickness in combination with different types of backing materials also provide varying levels of occlusion that directly impact drug flux.

Patch technology has evolved immensely since the first patch product for scopolamine was approved by the FDA in 1979.[6]  Early patch designs contained drug reservoirs in which a drug was suspended within a semisolid matrix and encapsulated within a pouch that adhered to the skin, with drug delivery controlled by a rate-controlling membrane.  Newer products feature thinner, drug-in-matrix formulations manufactured by solvent casting or hot-melt

---

[5] The Agency recently published a similar guidance titled "Enforcement Policy – Over-the-Counter Sunscreen Drug Products Marketed Without an Approved Application; Guidance for Industry; Availability," 83 Fed. Reg. 23917, May 23, 2018.

[6] See NDA 017874.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 4

processes.[7,8]   FDA has recognized the innovations in patch drug delivery technology and manufacturing over the past several decades and the significance of patch performance characteristics to safe and effective use in human patients.[9]   Recognition of these complexities has led to FDA's formation of the Center for Drug Evaluation and Research ("CDER") Transdermal Working Group that participates in the review of these product types and is involved in developing science-based regulatory standards to help industry with patch product development and manufacturing.   The Generic Drug User Fee Amendments ("GDUFA"), first enacted in 2012 and recently updated, also established a regulatory science research program that has enabled FDA to develop and publish several detailed guidances for industry related to topical and transdermal product development and to fund research on how safety risks related to patches are affected by product formulation and design.   These standards are being applied to new, generic, and OTC products reviewed under NDA and ANDA regulations; however, there is no regulatory mechanism to implement and enforce these important standards to products that are subject (or claim to be subject) to OTC monographs per 21 C.F.R. § 330.13.  FDA is also recognizing new topical and transdermal patches (broadly categorized as topical or transdermal "system" dosage forms) as combination drug-device products requiring implementation of both drug and device quality compliance standards (see 21 C.F.R. Parts 210, 211, and 4) in their development and commercial manufacturing with supportive market application review by the Center for Devices and Radiological Health ("CDRH").

---

[7] Paudel KS, Milewski M, Swadley CL, Brogden NK, Ghosh P, Stinchcomb AL. "Challenges and opportunities in dermal/transdermal delivery." *Ther. Deliv.* 2010; 1(1):109-31.

[8] Kandavilli S, Nair V, Panchagnula R. "Polymers in transdermal drug delivery systems." *Pharm. Tech.* 2002; 26(5):62-80.

[9] E.g., FDA, "Assessing Adhesion With Transdermal and Topical Delivery Systems for ANDAs; Revised Draft Guidance for Industry; Availability," 83 FR 50942, Oct. 10, 2018 (acknowledging that factors such as surface area dosed and product adherence impact drug delivery, variability, and unintentional exposure of third parties); FDA, "Assessing the Irritation and Sensitization Potential of Transdermal and Topical Delivery Systems for Abbreviated New Drug Applications; Draft Guidance for Industry; Availability," 83 Fed. Reg. 50945, Oct. 10, 2018 (discussing, for example, that the components and composition of a transdermal ("TDS") formulation, including the nature of the drug substance and/or the degree to which the TDS materials occlude the transmission of water vapor from the skin, in conjunction with other factors such as environmental humidity or the condition of the skin, may have the potential to irritate the skin or lead to a sensitization reaction, and that reactions can be unpleasant, affect patient compliance, and/or adhesion of the TDS to the skin).  See also FDA Public Workshop addressing current regulatory science initiatives concerning topical dermatological drug products, Oct. 20, 2017 (discussing complexity of formulations and complexity of dermatological routes of administration, among other topics); Strasinger C, Raney SG, Tran DC, Ghosh P, Newman B, Bashaw ED, Ghosh T, Shukla CG. "Navigating sticky areas in transdermal product development." *J Control. Release.* 2016; 233:1-9; Choi SH, Wang Y, Conti DS, Raney SG, Delvadia R, Leboeuf AA, Witzmann K. "Generic drug device combination products: Regulatory and scientific considerations." *Int. J. Pharm.* 2018; 544(2):443-454.  The academic scholarship uses the broader term "transdermal" when addressing these dosage forms, but is addressing the scope of both topical and transdermal drug delivery.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 5

Patches are an attractive dosage form for topical analgesic agents, because drug delivery can be localized to the affected areas for a sustained amount of time, first-pass hepatic metabolism is avoided, and systemic exposure is limited relative to other routes of administration, such as oral. Lidocaine is a small-molecule, amide-type local anesthetic agent that stabilizes neuronal membranes by inhibiting the ionic fluxes required for the initiation and conduction of impulses and is amenable to topical administration. Lidocaine has been approved for prescription use for topical and injection anesthesia, and is used intravenously in the control of cardiac arrhythmias. Several topical prescription lidocaine products have been approved pursuant to NDAs or ANDAs for anesthetic and analgesic indications, as shown in Table 1.

FDA has also considered lidocaine for nonprescription (OTC) uses. Following specific review of the available data, the ingredient lidocaine was classified as Category I (generally recognized by qualified experts as safe and effective ("GRAS/E") and not misbranded) in the final OTC monograph for anorectal drug products.[10] It was also determined to be GRAS/E and not misbranded as a male genital desensitizer in spray dosage form in accordance with the External Analgesics final monograph.[11] Lidocaine cream, ointment, and lotion dosage forms were included in the External Analgesics TFM as a treatment for temporary pain and itch relief associated with minor burns, sunburns, cuts, scrapes and minor skin irritations.[12] A comparison of the prescription and nonprescription topical lidocaine formulations and dosage forms is provided in Table 1.

**Table 1     Topical Lidocaine Prescription and Over-the-Counter Drug Products\***

| Product | Strength | Dosage Form(s) | Indication | Regulatory Status[13] (Reference Listed Drug Application Number, if applicable) |
|---------|----------|----------------|------------|-------------------------------------|
| Lidocaine | 5% | Ointment | Indicated for production of anesthesia of accessible mucous membranes of the oropharynx; it is also useful as an anesthetic lubricant for intubation and for the temporary relief of pain associated with minor burns, including sunburn, abrasions of the skin, and insect bites | Prescription (ANDA 080198) |

---

[10] 55 Fed. Reg. 31776, Aug. 3, 1990.

[11] 57 Fed. Reg. 27654, Jun. 19, 1992.

[12] 48 Fed. Reg. 5852, Feb. 8, 1983.

[13] FDA recognizes lidocaine's use in OTC drug products for oral healthcare but has determined there are inadequate data to establish general recognition of safety and effectiveness for this use.     21 C.F.R. § 310.545(a)(14).

Division of Dockets Management (HFA-305)
December 28, 2018
Page 6

| Product | Strength | Dosage Form(s) | Indication | Regulatory Status[13] (Reference Listed Drug Application Number, if applicable) |
|---|---|---|---|---|
| Lidocaine HCl | 4% | Solution | Indicated for the production of topical anesthesia of accessible mucous membranes of the oral and nasal cavities and proximal portions of the digestive tract | Prescription (ANDA 088803) |
| XYLOCAINE® (lidocaine HCl) | 2% | Jelly | Indicated for prevention and control of pain in procedures involving the male and female urethra, for topical treatment of painful urethritis, and as an anesthetic lubricant for endotracheal intubation (oral and nasal) | Prescription (NDA 008816) |
| EMLA® (lidocaine; prilocaine) | 2.5%; 2.5% | Cream | Topical anesthetic for use on: - normal intact skin for local analgesia - genital mucous membranes for superficial minor surgery and as pretreatment for infiltration anesthesia | Prescription (NDA 019941) |
| PLIAGLIS* (lidocaine; tetracaine) | 7%; 7% | Cream | Topical local analgesia for superficial dermatological procedures such as dermal filler injection, pulsed dye laser therapy, facial laser resurfacing, and laser-assisted tattoo removal | Prescription (NDA 021717) |
| ZINGO™ (lidocaine HCl) | 0.5 mg | Powder | Indicated for use on intact skin to provide topical local analgesia prior to venipuncture or peripheral intravenous cannulation, in children 3–18 years of age and adults | Prescription (NDA 022144) |
| LIDODERM* (lidocaine) | 5% | Patch | Pain associated with post-herpetic neuralgia | Prescription (NDA 020612) |
| ZTLIDO™ (lidocaine) | 1.8% | Patch | Pain associated with post-herpetic neuralgia | Prescription (NDA 207962) |
| SYNERA* (lidocaine; tetracaine) | 70 mg; 70 mg | Patch | Local anesthetic indicated for use on intact skin to provide local dermal analgesia for superficial venous access and superficial dermatological procedures such as excision, electrodessication and shave biopsy of skin lesions | Prescription (NDA 021623) |
| Lidocaine | 2 – 5% | Cream, Lotion, Ointment | Temporary relief of local discomfort associated with hemorrhoids | Nonprescription 21 C.F.R. § 346.10(f) Anorectal Drug Products for OTC Human Use Final Monograph |
| Lidocaine | 10 mg | Spray | Male genital desensitizer | Nonprescription 21 C.F.R. § 348.10(a)(2) External Analgesics for OTC Human Use |
| Lidocaine and lidocaine HCl | 0.5% - 4% | Cream, Ointment, Lotion | Temporary relief of pain and itch associated with minor burns, sunburn, minor cuts, scrapes, insect bites or minor skin irritations | Nonprescription External Analgesics Tentative Final Monograph, 1983 |

\* Data on prescription topical lidocaine products is from the Orange Book ("Approved Drug Products with Therapeutic Equivalence Evaluations"; November 2018). Application numbers correspond to the Orange Book Reference Listed Drug; generic equivalents may also have been approved. Discontinued topical lidocaine products are not included.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 7

While lidocaine has a long history as a prescription and nonprescription drug product dating back to the 1940s, safety issues – particularly with topical delivery – continue to be recognized, prompting several FDA public health advisories in recent years.

In 2007, FDA issued a public health advisory following reports of several serious adverse events, including the deaths of two women, aged 22 and 25 years old, who had applied topical anesthetics to their legs to lessen the pain of laser hair removal. The pharmacy-compounded cream formulations contained multiple anesthetics including lidocaine. The women wrapped their legs with plastic wrap to increase the creams' numbing effects. FDA noted that "anesthetic drugs in these products can pass through the skin into the blood stream, and if too much gets into the blood, patients can experience serious harm. More drug passes into the blood stream when the product is applied over a large area of skin, when it stays on the skin for a long time, and when the skin is covered after application of the cream. Anesthetic drugs may also pass into the blood stream if the skin is irritated or has a rash, or if the skin temperature goes up. Exercise, covering the skin with a wrap, or use of a heating pad can all increase the skin temperature."[14]  In 2009, FDA again warned about potential serious adverse events associated with topical lidocaine, when it issued a public health advisory on the risks of lidocaine use during mammography or other medical procedures and warned these risks increase "after covering the skin with any type of material or dressing."[15]

In 2018, FDA issued a safety announcement on the risk of methemoglobinemia, a potentially fatal blood disorder caused by local anesthetics, and required manufacturers of all prescription local anesthetics to standardize warning information about the risk of methemoglobinemia in product labeling across this class of products.[16]  While most of the adverse events were associated with oral benzocaine used for teething and mouth pain, case reports were identified in the literature where patients developed methemoglobinemia while

---

[14] Public Health Advisory: Life-Threatening Side Effects with the Use of Skin Products Containing Numbing Ingredients for Cosmetic Procedures, Feb 6, 2007. Available at: https://wayback.archive-it.org/7993/20171105015424/https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatien tsandProviders/ucm054718.htm.

[15] Public Health Advisory: Potential Hazards of Skin Products Containing Numbing Ingredients for Relieving Pain from Mammography and Other Medical Tests and Conditions, Jan. 16, 2009. Available at: https://wayback.archive-it.org/7993/20171105132310/https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatien tsandProviders/ucm110625.htm.

[16] Safety Announcement: Risk of serious and potentially fatal blood disorder prompts FDA action on oral over-the-counter benzocaine products used for teething and mouth pain and prescription local anesthetics, May 23, 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/ucm608265.htm.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 8

using 5% topical lidocaine patches[17,18] or combination lidocaine/prilocaine creams.[19] Patients with glucose-6-phosphate dehydrogenase deficiency, congenital or idiopathic methemoglobinemia, cardiac or pulmonary compromise, infants under 6 months of age, and patients with concurrent exposure to oxidizing agents or their metabolites are more susceptible to developing clinical manifestations of the condition. Prescription topical anesthetics are labeled with warnings related to methemoglobinemia along with guidance to closely monitor for associated symptoms and signs of the effect, and the fact that the products and other oxidizing agents should be discontinued in specific circumstances. The warnings also note that patients may warrant supportive care (i.e., oxygen therapy or hydration) with severe clinical presentation requiring treatment with methylene blue, exchange transfusion, or hyperbaric oxygen. The prescription labels also outline risks associated with concomitant use of other drugs associated with methemoglobinemia.

OTC lidocaine product manufacturers (subject to the 1983 External Analgesics TFM) were not required to update their labeling to warn about the risk of methemoglobinemia or the risks associated with concomitant use with other drugs associated with the condition. Manufacturers voluntarily adding warnings or administration modifications not included in the External Analgesics TFM (unless otherwise subject to an Agency directive) may result in the product being out of compliance with the monograph and ultimately considered a misbranded drug product.

Although lidocaine is generally considered to be a safe and effective drug ingredient for many purposes, these recent safety issues highlight that, when lidocaine is applied topically, a significant amount of drug can be absorbed that can result in serious, sometimes life-threatening, adverse events. While the products leading to these advisories were not patch products, they all showed that drug concentration, vehicle, occlusion, and area of exposure are factors that can contribute to this risk. Patch products, by their nature, are occlusive, as the skin is covered by a physical barrier consisting of an adhesive layer, or layers, on a backing material. FDA recognized this potential safety issue comparing lidocaine patches versus cream/lotion OTC formulations in its review of the NDA for prescription lidocaine patch, Lidoderm®: "Topical lidocaine 0.5% to 4% is recognized as an effective topical analgesic for

[17] Weingarten TN, Gleich SJ, Craig JR, Sprung J. "Methemoglobinemia in the Setting of Chronic Transdermal Lidocaine Patch Use." *Pain Medicine*. 2012; 13: 976-977.

[18] Acevedo FA, Kim EJ, Chyatte DA, Nielsen VG. "Rare cause of delirium and hypoxemia after coronary bypass surgery: transdermal lidocaine patch-associated methemoglobinemia." *Int. J. Legal Med.* 2018; 132: 767 – 769.

[19] Shamriz O, Cohen-Glickman I, Reif S, Shteyer E. "Methemoglobinemia Induced by Lidocaine-Prilocaine Cream." *IMAJ* 2014; 16:250-254.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 9

purposes of the external analgesic tentative final monograph.    Either increasing the concentration to 5% or adding an occlusive dressing should be considered to provide at least much as much efficacy (**but would raise questions of safety**)" [emphasis added].[20]

While the External Analgesics TFM concerns OTC lidocaine products in cream, ointment, or lotion dosage forms, unfortunately, OTC lidocaine patches have been marketed under the guise of being compliant with the TFM in recent years (Attachment 1).  Of particular concern, these patches can differ significantly in design, drug load, residual drug, product size and shape, and heat effects, all of which present safety and efficacy issues that should be evaluated against all applicable regulatory standards established for these products,  prior to marketing.  The NDA and ANDA approval processes consider product characteristics and performance on a product-specific basis, taking into account the latest developments in regulatory science, and safeguarding against ineffective and/or unsafe products in the market.    The present, unapproved marketing of OTC lidocaine patches *undermines the applicable regulatory process and subverts FDA's role in protecting public health*, exposing consumers to products that have not demonstrated clinical benefit and may pose significant safety risks.

FDA previously proposed and should affirm for several reasons discussed herein – the most significant of which is safety – that lidocaine-containing patch dosage form drug products are outside the scope of the External Analgesics TFM.  Indeed, given current and future advancements in patch technology for improving drug delivery (i.e., amount of delivered drug and level of percutaneous absorption), these safety risks require and deserve careful consideration.

## 2.    Lidocaine-Containing Patch Dosage Form Drug Products Are Outside the Scope of the External Analgesics TFM

FDA created the OTC drug review program in 1972 "to evaluate the safety and effectiveness of OTC drug products marketed in the United States before May 11, 1972."[21]  In fact, the Agency regulations governing the OTC drug review expressly state: "This section applies only to conditions under consideration as part of the OTC drug review initiated on May 11, 1972, and evaluated under the procedures set forth in § 330.10."[22]

---

[20] NDA 020612 Summary Basis of Approval, Deputy Director's Review, Dec 2, 1998.

[21] FDA, "Over-the-Counter (OTC) Drug Monograph Process," available at https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/ucm317137.htm.

[22]  21 C.F.R. § 330.13(e).

Division of Dockets Management (HFA-305)
December 28, 2018
Page 10

The Agency and the courts have both recognized that the OTC drug review was a
retrospective approach to apply 1962 statutory amendments to the Federal Food, Drug, and
Cosmetic Act to a large number of OTC products, with a common group of active ingredients,
that were already in the marketplace:

> In 1962, Congress amended the definition of "new drugs" to include all drugs
> "not generally recognized among experts ... as safe and effective for use under
> the conditions prescribed, recommended, or suggested in the labeling thereof."
> Drugs first marketed before 1938 were exempted from both the safety and
> efficacy requirements of the Act provided that they were not subsequently
> relabeled. Similarly, drugs marketed between 1938 and 1962 as GRAS, and thus
> without an NDA, were exempted from the newly-imposed efficacy requirement
> as long as the conditions for use suggested by the labeling remained unchanged.
>
> ...The efficacy requirement became operative immediately for drugs not
> classified as "new drugs." For such drugs to be classified as GRAS/E, there must
> be an "expert consensus ... founded upon 'substantial evidence'" of the drug's
> effectiveness and safety.
>
> ...In 1972, upon completion of the [Drug Efficacy Study Implementation (DESI)
> Review of products that had been marketed pursuant to new drug applications],
> FDA turned its attention to pharmaceuticals marketed under the Act's GRAS/E
> exemption, which include primarily over-the-counter drugs.... A drug efficacy
> study undertaken by the National Academy of Science-National Research Council
> (NAS-NRC) had concluded, after reviewing 420 drugs broadly representative of
> the OTC market that only one-fourth of the drugs reviewed were actually
> effective. In response, FDA began a comprehensive review of all OTC drugs to
> determine whether they were properly marketable under the GRAS/E
> exemption. Instead of evaluating each of the hundreds of thousands of those
> drugs individually, however, FDA classified the medications according to their
> comparatively few active ingredients, and directed the OTC drug review to be
> conducted in four phases. First, advisory panels of qualified experts are
> appointed to *analyze existing test data* and make recommendations in the form
> of monographs establishing the conditions under which each OTC drug could be
> marketed without an NDA. In Phase II, FDA reviews these monographs and
> publishes them in the Federal Register for public comment on the *safety and
> effectiveness of the products under examination*. The third stage of the program
> obligates FDA to review comments, to publish a tentative final monograph, and
> to offer the public the opportunity to object formally ... to the *findings made*

Division of Dockets Management (HFA-305)
December 28, 2018
Page 11

*with respect to individual drugs.* In the fourth and final part of the OTC review, FDA promulgates a final monograph containing the agency's conclusive and legally binding determinations on the conditions under which a drug is considered GRAS/E.[23]

Both the 1979 Advanced Notice of Proposed Rulemaking ("ANPR") entitled "External Analgesic Drug Products Monograph for Over-The-Counter Human Use; Establishment of a Monograph and Notice of Proposed Rulemaking,"[24] and 1983 External Analgesics TFM identified multiple active ingredients – including lidocaine -- that were found to be GRAS/E at specified concentrations and labeling for use as OTC topical analgesics in cream, ointment, and lotion dosage forms. Analgesic patches were not, however, originally considered by FDA during the 1979 ANPR, nor were they included in the External Analgesics TFM published in 1983.[25] In 2003, FDA affirmatively considered the coverage of patch dosage forms when responding to an industry request to market counterirritant products pursuant to the External Analgesics TFM. Following review, FDA explained that the expert panel had discussed poultices and plasters with respect to only one counterirritant active ingredient (allyl isothiocynate), and further explained that the Agency had "surveyed several standard texts that listed currently marketed topical drug products containing counterirritants and did not find any plaster or poultice dosage forms listed therein."[26]

Scilex has been unable to identify evidence that the expert panel or FDA considered lidocaine-containing patch products in the course of developing the TFM. No relevant products have been identified in more recent submissions to FDA.[27]

---

[23] Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987; emphasis added).

[24] 44 Fed. Reg. 69768, Dec 4, 1979.

[25] 48 Fed. Reg. 5852, Feb. 8, 1983.

[26] 68 Fed. Reg. at 42325. Cf. Letter from William Gilbertson, Pharm.D., Director, Monograph Review Staff, Office of OTC Evaluation, Center for Drug Evaluation and Research to AAC Consulting Group (Dec. 10, 1993) (Attachment 2) (Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products "was especially concerned about vehicles that could increase absorption. ... Ointments, pastes, creams, and oleaginous vehicles were discussed..., but not gels. In fact, a gel dosage form was not marketed at the time the Panel evaluated this ingredient. Based on that discussion, we do not currently find a gel dosage form to be acceptable for 1 percent hydrocortisone drug products without further information.").

[27] For example, the Consumer Healthcare Products Association ("CHPA") has continued to submit information concerning counterirritant patch dosage forms to the docket; however, these submissions do not provide information or attempt to argue that lidocaine-containing patch products are within the scope of the TFM. E.g., Letter from CHPA to Docket No. 78N-0301, Feb. 27, 2012 (Attachment 3).

Division of Dockets Management (HFA-305)
December 28, 2018
Page 12

Attachment 1 identifies drug listings and initial marketing dates for currently marketed lidocaine-containing patch dosage form products purportedly compliant with the External Analgesics TFM identified from FDA's current DailyMed database.[28] Although we acknowledge that this database may not be comprehensive, it includes information prepared by product sponsors. From the sponsors' submitted information, it seems clear that lidocaine OTC patch products have been introduced into the U.S. market <u>decades</u> after 1972.

### 3.   Lidocaine-Containing Patch Dosage Form Drug Products Are "New Drugs" Within the Scope of the Federal Food, Drug, and Cosmetic Act and Require Product-Specific Evaluations and Approval

The External Analgesics TFM does not include conditions under which lidocaine-containing OTC patch drug products might be generally recognized as safe and effective and not misbranded. For example, the directions for use in the TFM do not address how to apply and remove a patch, and the dosage forms covered by the monograph do not address patches. In fact, the considerations below show that there is lack of consensus about the safety or effectiveness of patches, and they must be regulated as "new drugs" in accordance with 21 U.S.C. § 321(p).[29]

The inclusion of only cream, ointment, and lotion dosage forms was challenged after the publication of the TFM, with ***requests from manufacturers to include alternate dosage forms like gels or patches; however, FDA maintained the inclusion of select dosage forms was***

---

[28] Available at dailymed.nlm.nih.gov.

[29] The term "new drug" includes "any drug … the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use." It also includes "any drug … the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions." 21 U.S.C. §321(p). Any contention that a drug product is generally recognized as safe and effective within the meaning of 21 U.S.C. § 321(p) is required to be supported by submission of the same quantity and quality of scientific evidence that is required to obtain approval of a new drug application for the product. 21 C.F.R. § 314.200(e)(1). Scilex is aware that FDA adopted a regulation setting forth criteria and procedures by which certain OTC drugs initially marketed in the U.S. after the OTC drug review began in 1972 might be considered within the OTC drug monograph system (i.e., time and extent applications). However, that regulation requires both (1) a determination that a condition appears to be generally recognized as safe and effective for OTC use in the U.S., and (2) a subsequent public process, with opportunity for interested parties to submit comments and data. To Scilex's knowledge, neither of these events has occurred (nor could they be justified).

*purposeful because only dosage forms marketed at the time the TFM was drafted were considered in determining whether the ingredient was GRAS/E for OTC human use.*[30,31] In 2003, FDA reopened the Administrative Record of the External Analgesics TFM to classify patches, poultices, and plasters as Category III conditions (more data needed) and to expressly exclude them – *with respect to all products, not only counterirritants* – from the monograph. In the 2003 revision to the External Analgesic TFM, FDA proposed amending the introductory language in 21 C.F.R. §§ 348.10 and 348.12 to include the following language:

> The active ingredients of the product consist of any of the following, within the established concentration for each ingredient, *but not for use in a patch, plaster, or poultice dosage form.*[32]

In the proposed rule preamble, FDA was explicit with its rationale relative to safety and effectiveness:

> FDA stated (Ref. 5) that in order for poultice and plaster dosage forms to be generally recognized as safe and effective and to develop any additional labeling that may be needed for such dosage forms, it is necessary to obtain more information, specifically:
>
> 1. The safe and effective concentration of the drug ingredient(s), especially under the occlusion of a plaster.
> 2. Data on percutaneous absorption under occlusion.
> 3. The length of contact time that it is safe to leave the poultice or plaster on the skin; how often the plaster or poultice needs to be changed for effective use.
> 4. The frequency of application that is considered safe and effective.
> 5. Whether or not directions and a warning are necessary regarding checking the area at specified intervals for erythema to prevent blistering, and what time intervals are recommended.

---

[30] Letter from William Gilbertson, Pharm.D., Director, Monograph Review Staff, Office of OTC Evaluation, CDER, FDA to AAC Consulting Group Inc. on excluding a hydrocortisone gel dosage form for OTC use (Dec. 10, 1993) (see n. 26, *supra*). See also 68 Fed. Reg. 42324, 42325, July 17, 2003 (specific to the External Analgesic TFM, FDA description of the Panel's limited discussion of a poultice or plaster with respect to a single counterirritant active ingredient, and further explaining that the Agency had "surveyed several standard texts that listed currently marketed topical drug products containing counterirritants and did not find any plaster or poultice dosage forms listed therein.").

[31] 68 Fed. Reg. at 42326.

[32] Id. (emphasis added).

6. The age groups for whom poultices and plasters are recommended for safe use.
7. Labeling of currently marketed products.[33]

FDA's concerns about patch dosage forms in 2003 can be supplemented with additional factors that are now appreciated to contribute to safety and efficacy of products delivered percutaneously. Beside factors related to dosing such as drug concentration, duration, surface area, frequency of use, and patient age that FDA outlined above, there are other factors that influence percutaneous absorption[34,35,36] and should be considered in determining whether a patch product may be considered safe and effective, namely:

- Vehicle-related factors: Drug concentration in a patch dosage form, by itself, does not inform on the percutaneous absorption potential. The solubility of the drug within the chosen adhesive matrix and effects of the vehicle on the skin integrity are known to affect drug bioavailability.

- Exposure and application-related factors: Drug absorption from patches may be affected by climate (heat and humidity); use during exercise; and where on the body the patch is applied, as it is appreciated that there is anatomical regional variation in absorption.

- Patient-related factors: In addition to age of the patient, general health, genetic differences, and differences in hair and pore density will contribute to population variability in drug absorption.

All of these factors are considered by FDA during their assessments of drug products in order to balance the risks against the benefit of a product. There is nothing inherent in OTC lidocaine patch products that suggest that these factors are benign to the consumers. Rather, the only formulation constraint for these products is the product strength (up to 4%), which

---

[33] Id.

[34] Wester RC, Maibach HI. "Cutaneous pharmacokinetics: 10 steps to percutaneous absorption." *Drug Metab. Rev.* 1983; 14:169-205.

[35] Ngo MA, Maibach HI. "15 Factors of percutaneous penetration of pesticides." In: Knaak JB, Timchalk C, Tonero-Velez R, editors. Parameters for pesticide QSAR and PBPK/PD models of human risk assessment. Vol. 1099. Danvers (MA): Oxford University Press; 2012, p. 67-86.

[36] Li BS, Cary JH, Maibach HI. "Should we instruct patients to rub topical agents into skin? The evidence" *J. Dermatolog. Treat.* 2018; 19:1-5.

does not reconcile any of these factors relative to the amount of delivered drug, and the level and rate of percutaneous absorption of the drug.

There is precedent for treating OTC patch products pursuant to the NDA – rather than the monograph – process. In 2008, FDA approved NDA 022029 for Salonpas Pain Relief Patch (containing TFM ingredients methyl salicylate and menthol). The Deputy Division Director Review and Basis for Action explained FDA's findings:

> The active ingredients in this product were reviewed in 1979 by an Expert Panel for Over-the-Counter (OTC) Topical Analgesic Drug Products, and were found to be generally recognized as safe and effective (GRAS/E) (Category 1). However, the Tentative Final Monograph (TFM) for OTC External Analgesic Drug Products published by FDA in 1983 ... provides for topically applied ointments, lotions, or creams containing methyl salicylate in the range of 10%-60% and menthol in the range of 1.25%-16% ... but does not include this dosage form of topical patch. Hence, a New Drug Application was required to obtain approval for marketing.[37]

It appears that some of the OTC lidocaine patch manufacturers have recognized and tried to avoid the designation of the patch dosage form -- for example by labeling a product as a "pain relieving ointment on a breathable adhesive pad" [e.g., IcyHot Lidocaine Patch Plus Menthol; emphasis added].[38] The inference is that the product is actually an "ointment" in conformance with the External Analgesics TFM; however, the designation is undermined by the inclusion of "patch" in the formal product nomenclature and the notation of the number of "patches" included in the secondary packaging.

These product formulations identified as an "ointment on a breathable pad" do not meet the regulatory definition of an ointment. In accordance with the CDER Data Standards Manual (Dosage Form), an ointment is described as[39]:

---

[37] NDA 022029, Memorandum from Sharon Hertz, M.D., Feb. 29, 2008, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/022029TOC.cfm. See also Summary Review at 2. Despite containing active ingredients at levels allowed by the External Analgesics TFM and claiming an indication provided for by the TFM, formal review and approval of both clinical and nonclinical data on this formulation were required by the FDA before commercialization. The Summary Basis of Approval for Salonpas® Pain Relief Patch discusses the regulatory pathway for patches, noting, "Analgesic patch formulations are subject to approval via an NDA."

[38] See example labeling in Attachment 4.

[39] CDER Data Standards Manual (Dosage Form) available at: http://wayback.archive-it.org/7993/20171115111312/https://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequir ements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071666.htm.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 16

> A semisolid dosage form, usually containing <20% water and volatiles and >50% hydrocarbons, waxes, or polyols as the vehicle. This dosage form is generally for external application to the skin or mucous membranes.

Whereas a patch is described as:

> A drug delivery system that often contains an adhesive backing that is usually applied to an external site on the body. Its ingredients either passively diffuse from, or are actively transported from, some portion of the patch. Depending upon the patch, the ingredients are either delivered to the outer surface of the body or into the body. A patch is sometimes synonymous with the terms "extended release film" and "system."

By their nature, these OTC patch formulations are not ointments, as ointments lack the necessary adhesive properties for the product to function properly (i.e., hydrocarbons, waxes and polyols lack these adhesive properties). Because the vehicle is adhesive, and applied to a backing material, these products are indeed "patches" as labeled in the product names.

Despite FDA's determination that patches should be excluded from the External Analgesics TFM in 2003, in the past ~5 years, approximately 100 patch products have been listed on DailyMed as OTC lidocaine patches. According to the self-reported drug product listing information, these drug products contain between 11-5000 mg lidocaine/patch.

At a minimum, current safety considerations demonstrate the questionable state of unapproved, marketed drug products. Specific issues regarding the safe and effective use of these products are described below.

### 4.   Safety and Effectiveness of OTC Lidocaine Patches Have Not Been Established

   a.   Questions of Efficacy

      i.   Are OTC lidocaine patches effective for pain relief[40]?

As FDA discussed in the 2003 proposed rule to amend the External Analgesics TFM, safe and effective concentrations of active drug ingredients under occlusion need to be

---

[40] Indication outlined in the External Analgesics TFM proposed 21 C.F.R. § 348.50(b)(2).

demonstrated before it can be determined whether external analgesic drugs are GRAS/E in this kind of dosage form with their specific labeling. Most of the currently marketed OTC lidocaine patch products contain lidocaine content of up to 4%, which was presumably chosen based on the acceptable concentration range of 0.5% to 4% in creams, lotions, and ointments, allowed under the External Analgesics TFM. However, the percentage of drug in a cream or ointment may not correlate with the percentage of drug per mass adhesive needed to be effective in a patch. Creams, lotions, and ointments are applied differently than patch products, typically by rubbing into the skin. FDA noted this in its review of the development program for the Salonpas® Pain Relief Patch, for example, which was formulated with l-menthol and methyl salicylate at concentrations allowed for creams, ointments, and lotions per the TFM:

> There is a concern about the efficacy of the proposed patch product because of the difference in the way of drug application between patch and cream/ointment products. The cream/ointment products have been massaged into the painful area to demonstrate analgesic efficacy, where the patch is applied directly to the painful area. The equivalence in systemic absorption alone is not considered sufficient to provide a bridge between the efficacy of these different formulation. ... Therefore, additional clinical studies to demonstrate efficacy of the drug combination patch against placebo patch are required. [41]

OTC lidocaine creams, ointments, and lotions also are applied by rubbing into the skin versus a patch application, which sits on top of the skin. As such, there are questions as to whether, and to what extent, lidocaine patch products formulated at concentrations contemplated by the external analgesic TFM would be effective for temporary pain relief. One recently appreciated phenomenon is that rubbing/massaging drugs into the skin can enhance percutaneous absorption of some drugs and is another factor that should be studied when formulating topical drug products. [42] How drug bioavailability compares from patch versus rubbed-in cream, lotion, and ointment dosage forms has not been characterized, and this

---

[41] NDA 022029 Summary Basis of Approval, Administrative Comments. We note that the NDA process yielded pediatric study data leading FDA to find Salonpas Pain Patch ineffective in children, with exclusionary labeling required pursuant to the NDA ("Children under 18 years of age: Do not use; this product has not been shown to work in children."). In uncomfortable juxtaposition, multiple, unapproved Salonpas patches with similar formulation continue to be affirmatively labeled as appropriate for use in children 12 years of age and older. See FDA, Pediatric Postmarketing Pharmacovigilance Review for NDA 022029 (July 1, 2016), available at https://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/PediatricAdvisoryCommittee/UCM519748.pdf.

[42] Li BS, Cary JH, Maibach HI. "Should we instruct patients to rub topical agents into skin? The evidence" *J. Dermatolog. Treat.* 2018; 19:1-5.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 18

distinction in the method of application warrants further investigation because it may have consequences in determining whether patch products have the same safety and efficacy as OTC TFM-compliant dosage forms (i.e., creams, ointments and lotions).

> ii.     Are OTC lidocaine patch dosing regimens supported by adhesive performance?

One of the key differences between creams, ointments, and lotions versus topical patches is that patches are drug/device combination products. The efficacy of a patch product is inherently tied to its device performance characteristics; that is, its ability to remain adhered to the skin throughout the entire labeled wear period. FDA has recognized the criticality of adhesion to efficacy and safety of the patches[43] and in 2018 issued a draft guidance to industry emphasizing the relationship between adhesion and efficacy in patch development:

> The amount of drug delivered into and through the patient's skin from a TDS [transdermal or topical delivery system] is dependent, in part, on the surface area dosed. It is expected that entire contact surface area of a TDS should remain consistently and uniformly adhered to the patient's skin throughout the duration of wear under the conditions of use included in the product labeling. When a TDS loses its adherence during wear, the amount of drug delivered to the patient may be reduced.[44]

While this guidance is for generic topical systems (including patches) subject to an ANDA, the regulatory standard and underlying basis have been applied to new drug products subject to an NDA. The assessment of adhesion performance is expected to be evaluated under normal-wear conditions and exercise. Likewise, the Agency has required that the use of reinforcement measures (e.g., tape reinforcement and overlays) be characterized relative to their effects on biopharmaceutic performance.

As FDA stated in its 2003 External Analgesics amended TFM on patch dosage forms, in order to determine if patches, plasters and poultices are effective, more information is needed on the length of contact time the product needs to be placed on the skin and the frequency of application. Most of the patch products listed in Attachment 1 are labeled for 8 to 12 hours of

---

[43] Wokovich AM, Prodduturi S, Doub WH, Hussain AS, Buhse LF. "Transdermal drug delivery system (TDDS) adhesion as a critical safety, efficacy and quality attribute." *Eur. J. Pharm. Biopharm.* 2006; 64(1): 1-8.

[44] Guidance for Industry: Assessing Adhesion With Transdermal and Topical Systems for ANDAs, October 2018. Available at:

https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM504157.pdf.

wear, presumably based on the External Analgesics TFM that allows application of cream, ointment and lotion products not more than 3 or 4 times daily.  It should be demonstrated that patch products are effective when used as directed and that the patch remains in contact with the skin throughout this period.

        b.    Questions of Safety

              i.    Is the drug load in OTC lidocaine patches safe?

While most OTC lidocaine patches claim a strength of up to 4% lidocaine, the total drug load in the patch can vary greatly.  Strength is expressed as a mass of drug relative to the mass of the adhesive per patch; however, there are no uniform standards on the size or thickness of a patch.  According to the DailyMed database, current or recently marketed OTC lidocaine patches contain between 11 and 5000 mg (a 500x greater drug load) lidocaine on a per unit basis (see Attachment 1), self-reported by the respective manufacturers.  There are also varying sizes of OTC lidocaine patches up to 12 cm x 20 cm (e.g., Odor Free Aspercreme® Lidocaine Patch XL), which is nearly a two-fold increase in surface area exposure of prescription Lidoderm® 5% and associated generics (10 cm x 14 cm).

Patches containing hundreds of milligrams of lidocaine present a significant risk of overexposure, particularly if the patches are applied when skin temperature is elevated, for example, because a heating pad/blanket is used, or the patch is worn while using a sauna or hot tub.  FDA has recognized that patch design and formulation may affect drug exposure in response to heat and has recently funded research efforts to better understand the effects of heat on generic patch products.  Recent data from that initiative show application of heat enhanced drug delivery from prescription lidocaine patches, as serum lidocaine concentrations increased by up to ~5-7 fold after applying heating pad to the patch for 90 minutes.[45]  Many of the OTC lidocaine patch products do not warn against heat exposure – although this is not surprising because the External Analgesics TFM did not review or provide coverage for patch products; therefore, the warnings in the TFM do not address unique aspects of this dosage form.  Some manufacturers have voluntarily included warnings associated with heat exposure; however, these label additions are not contemplated by the External Analgesic TFM and consequentially may render these products misbranded.

---

[45] Thomas S, Shukla S, Hammell D, Hazem H, Stinchcomb A. "In Vitro and In Vivo Evaluation of Two Lidocaine Topical Delivery Systems With or Without the Influence of Transient Heat Exposure." AAPS PharmSci360, Washington DC, Nov 4-7, 2018.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 20

Patch drug load also presents safety risk for use during exercise. Exercise has been shown to increase skin perfusion of some transdermal patch products, likely due to vasodilation and increased blood circulation. The effects of exercise may be product-specific; for example, percutaneous absorption from nicotine and nitroglycerin patches increased during exercise;[46,47] however, no effect on pharmacokinetics was observed with norelgestromin and ethinyl estradiol patches.[48] Because biopharmaceutic performance for patch dosage forms is a function of the drug chemistry and formulation, each product should be individually evaluated for these effects. Most of the OTC lidocaine patches do not caution against exercising while wearing the product, and changing the TFM labeling relative to exercise exposure may render the product misbranded.

It is emphasized that most of these patch products are labeled as a percentage strength, without providing the total drug content per patch. For other topical dosage forms like creams, ointments, and lotions, the amount of drug administered can easily be determined by weighing the mass of product and applying the strength factor as illustrated in the table below. In contrast, the amount of drug applied for patch products cannot easily be determined because the exact mass of adhesive applied cannot be estimated due to the contributing mass of the backing materials. Inasmuch as patches are manufactured in a variety of sizes and thicknesses, the drug exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk.

| Dosage Form | Strength | Amount Applied | Applied Dose [Strength x Amount Applied] |
|---|---|---|---|
| Cream, ointment, lotion | 4% | 1 g | 40 mg |
| Patch | 4% | Unknown (Mass of adhesive not specified on product labeling) | Unknown |

---

[46] Barkve TF, Langseth-Manrique K, Bredesen JE, Gjesdal K. "Increased uptake of transdermal glyceryl trinitrate during physical exercise and during high ambient temperature." *Am. Heart J.* 1986; 112: 537-541.

[47] Klemsdal TO, Gjesdal K, Zahlsen K. "Physical Exercise Increases Plasma Concentrations of Nicotine During Treatment with a Nicotine Patch." *Br. J. Clin. Pharmacol.* 1995; 39:677-679.

[48] Abrams LS, Skee D, Natarajan J, Wong FA. "Pharmacokinetic overview of Ortho Evra/Evra." *Fertil. Steril.* 2002; 7(2 Suppl 2): S3-12.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 21

Because there are no constraints on patch dimensions or adhesive thickness, the amount of drug in the product can be arbitrarily, and significantly, increased by increasing the patch size or adhesive thickness while maintaining the drug-to-adhesive ratio at 4%.

> ii.   How does patch design and formulation affect systemic exposures?

When lidocaine is applied topically to provide pain relief, its site of action is not the skin, but the nerve endings beneath the surface of skin and can be considered a "topical product for transdermal treatment of local tissue sites."[49]   Because of this, lidocaine patches are formulated to allow the drug to penetrate through the stratum corneum.   Because blood capillaries extend into the upper layers of dermis and are near the nerve endings on which lidocaine acts, there is significant systemic absorption of lidocaine from topical application, so much so that FDA recommends pharmacokinetic bioequivalence studies to evaluate generic versions of Lidoderm® 5%, rather than clinical endpoint studies, as is the case typically the case for topically-acting products.[50]

One of the key features that distinguish patch dosage forms from other topical dosage forms is that patches provide an occlusive physical barrier that covers the applied dose during wear.   Occlusion is a widely recognized means to enhance percutaneous absorption of drugs. Occlusion can increase skin hydration, raise skin temperature, alter pH, and prevent the accidental removal or evaporation of an applied compound, which in effect results in a higher applied dose.[51]   Occlusion has been shown to triple the serum concentrations of a topical 4% lidocaine anesthetic cream applied to the face.[52]   Interestingly, in this study, the authors noted high inter-subject variability in lidocaine absorption that was not related to dose or exposure. While it was not possible to predict who would be sensitive to topical lidocaine, the authors

---

[49] Paudel KS, Milewski M, Swadley CL, Brogden NK, Ghosh P, Stinchcomb AL. "Challenges and opportunities in dermal/transdermal delivery." *Ther. Deliv.* 2010; 1(1):109-31.

[50]   FDA   Draft   Guidance   on   Lidocaine,   October   2018.   Available   at:
https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm086293.pdf.

[51] Wester RC, Maibach HI. "Cutaneous pharmacokinetics: 10 steps to percutaneous absorption." *Drug Metab. Rev.* 1983; 14:169-205.

[52] Oni G, Brown S, Burrus C, Grant L, Watkins J, Kenkel M, Barton F, Kenkel J. "Effect of 4% Topical Lidocaine Applied to the Face on Serum Levels of Lidocaine and Its Metabolite, Monoethylgycinexylidide." *Aesthetic Surgery J.* 2010; 30(6): 853-858.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 22

note: "these findings have important ramifications for *unsupervised patient application*, particularly in conjunction with occlusive dressings."[53]

The adhesive layer can also be occlusive and influence percutaneous absorption depending on the adhesive components and thickness. Because there are no constraints on the backing materials or adhesive components/thickness used for these patches, there is no standardization of their occlusion as it pertains to drug absorption. While some of these OTC lidocaine patch products incorporate a "breathable" backing cloth, these materials still remain potentially occlusive, especially as they contain and hold the adhesive layer (also with varying levels of occlusiveness) on top of the skin.

In addition to occlusive backings that can promote drug diffusion through the skin, topical lidocaine products are formulated with the inactive ingredients that can help to drive drug delivery. The formulation is critical in determining the systemic exposure to lidocaine, as was illustrated by a study by Oni, et al.[54], in which 25 subjects were treated with one of five different lidocaine creams (three OTC creams and two prescription preparations); and serum levels of lidocaine and its metabolite monoethylglycinexylidide (MEGX) were measured 90, 120, 150, 240, and 480 minutes after cream application. The creams included LMX-4 (4% lidocaine; Biopelle/Ferndale Laboratories, Ferndale, Michigan), Topicaine (4% lidocaine; Ebsa Laboratories, Jupiter, Florida), 2.5% lidocaine/2.5% prilocaine (generic EMLA preparation; High Tech Pharmaceuticals, Amityville, New York), LET (4% lidocaine, 1:2000 epinephrine, and 0.5% tetracaine), and BLT (20% benzocaine, 6% lidocaine, and 4% tetracaine) and were applied to the subject's face and neck and covered with an occlusive dressing for 60 minutes. The results showed the OTC products were associated with *greater* levels of lidocaine in the bloodstream than the prescription preparations. Interestingly, although three of the tested products contained 4% lidocaine, they had very different absorption profiles. This is likely due to formulation: one of the drugs was formulated with alcohol, another was liposomal drug-delivery system, and the third was an emollient-based product. It is known that alcohols and lipids can act as skin permeation enhancers and to increase drug absorption profiles. The authors also noted that the 2.5% lidocaine-containing formula had greater absorption than the 4% and 6% formulations.

The effect of formulation differences on biopharmaceutics also occurs with patch dosage forms. For example, Lidoderm® 5% has 700 mg lidocaine/patch with 700 mg being the

---

[53] Id. (emphasis added).

[54] Oni G, Brown S, Kenkel J. "Topical Anesthetics and Their Effect on Serum Levels of Lidocaine and Its Metabolite Monoethylglycinexylidide (MEGX)." *Aesthetic Surgery Journal.* 2012; 32(4):495-503.

"administered" amount of drug, but only delivers a small fraction of the administered drug (i.e., the Lidoderm® 5% Prescribing Information states a bioavailability of $3 \pm 2\%$).[55] In contrast, ZTLIDO™ 1.8% has 36 mg drug contained within a thinner adhesive layer (consequently a lower strength of 1.8%) but has a bioavailability of ~50% due to its biopharmaceutic efficiency of the formulation, and delivers the same amount of drug to the skin as Lidoderm® 5%, despite the difference in strength.[56]  It is emphasized that ZTLIDO™ 1.8% and Lidoderm® 5% have comparable (bioequivalent) pharmacokinetics, but ZTLIDO™ 1.8% is less than half the strength of Lidoderm® 5%.  This is solely a function of the product formulations and confirms that patch product strength (expressed as a percentage) does not identify the amount of delivered drug for these products.  However, this nuance is likely lost to consumers who have a reasonable expectation that product strength inherently confers a standardized delivered drug dose with correlation between strength and apparent dose (i.e., higher strength products deliver more drug).  This standardization is maintained for drugs subject to formal FDA review as represented by Mylan's Lidocaine Patch 5% that is a generic (bioequivalent) version of Lidoderm® 5%, but with significantly less drug load (140 versus 700 mg).  The Mylan generic product notably contrasts with Lidoderm® 5% in adhesive formulation (i.e., polyisobutylene polymer system versus a hydrogel system), adhesive thickness (i.e., 0.27 versus 1.59 mm), and backing material (i.e., film versus nonwoven cloth), which presumably led to the improved biopharmaceutic efficiency allowing for the reduced drug load while maintaining the same product strength (5%) and rate/extent of delivered drug.[57]

Attachment 1 shows that OTC lidocaine patches have manufacturer-self-reported drug levels ranging from 11 to 5000 mg, but the amount of delivered drug is unknown as it is contingent on the biopharmaceutic properties of the adhesive/patch systems.  Conceivably, an 11 mg lidocaine adhesive formulation with superior biopharmaceutic efficiency could deliver comparable levels of drug to the 5000 mg formulation with far inferior biopharmaceutic efficiency.  This broad variability alone is reason enough why patches should not be allowed dosage forms in a final External Analgesics OTC Monograph.  However, the significant safety risk is the prospect of a 5000 mg OTC lidocaine patch with a high bioavailability, which can deliver toxic levels of drug to the system (i.e., it is established that topically applied lidocaine results in systemic exposure).  The application of heat and exercise can also dramatically exacerbate these safety risks.  Patch product formulations have evolved over time with significant improvements in percutaneous absorption of the drugs (e.g., ZTLIDO™ 1.8% versus Lidoderm®

[55] Lidoderm® Prescribing Information, November 2018.

[56] ZTLIDO™ Prescribing Information, November 2018.

[57] Lidocaine Patch 5% Prescribing Information, November 2018; http://lidocainepatch.mylan.com/en/health-care-professionals.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 24

5%), and should be anticipated to continue to evolve, to the extent that OTC lidocaine patch manufacturers should be required to characterize and qualify safety and efficacy.

It is noted that the difficulty of determining what strength means in terms of efficacy for patch product has been used to promote nonprescription products as "similar" to the prescription strength lidocaine products. This raises questions about disincentives to follow well-established regulatory processes. As one reported example, Hisamitsu was developing a lidocaine 5% patch as a generic to Lidoderm® 5% but decided instead to pursue an OTC lidocaine 4% patch because it was a faster way to the market.[58] Since then, Hisamitsu has promoted the similarity of its OTC Salonpas Lidocaine Patch 4% to the prescription strength lidocaine products: "Salonpas has engineered this patch to be as close as possible to the prescription Lidocaine patch. We use the same hydrogel technology, same patch size and shape. We use the same type of individual, child resistant pouches and use the maximum concentration you can get without a prescription."[59] Highlighting the similarity of OTC and prescription lidocaine patch products can be misleading to consumers, because the safety and efficacy of the OTC products have not been reviewed by FDA, nor has the bioavailability, adhesion, or irritation potential of these products been assessed in comparison to the FDA-approved reference product that is being promoted as having near similarity in strength. Given the safety issues associated with topical lidocaine use and uncertainty of what strength means relative to systemic exposure, safety and efficacy data for each unique formulation should be reviewed before marketing.

These risks are compounded by the direct-to-consumer advertising that sometimes includes high-profile celebrities (e.g., Shaquille O'Neal (The Shaq) for IcyHot Lidocaine Patches Plus Menthol) to promote the product. Such promotion highlights the efficacy of the product, but essentially understates potential safety considerations. Admittedly, the risks of lidocaine overexposure should be less for Mr. O'Neal (due to his size) versus the average adult or children ≥12 years of age for which the product is labeled.

---

[58] Spicer M. "With OTC Lidocaine, Salonpas Takes Path of Less Resistance to Market." *Tan Sheet*, 21 Oct 2016. Available at: https://pink.pharmaintelligence.informa.com/PS119368/With-OTC-Lidocaine-Salonpas-Takes-Path-Of-Less-Resistance-To-Market (Attachment 5). Significantly, FDA has acknowledged: "[I]t has become clear that one unintended consequence of [its TFM] enforcement approach is that it creates negative incentives for those who manufacture or market these OTC drugs to conduct studies or otherwise respond to safety concerns as to do so may hasten a determination that their product is not GRAS/GRAE." 81 Fed. Reg. 84465, Dec. 23, 2016. The failure to complete the process likewise creates a major loophole enabling drug manufacturers to launch unapproved new drugs into the market without important FDA review or expectation of agency reaction.

[59] Salonpas Product Description. Available at: https://www.walmart.com/ip/Salonpas-Lidocaine-Pain-Relieving-Gel-Patch-Pack-of-16/320482334 (Attachment 6).

Division of Dockets Management (HFA-305)
December 28, 2018
Page 25

### iii.    Are the inactive ingredients in lidocaine OTC patches safe?

Because patch dosage forms are not within the scope of the External Analgesics TFM review, the question of patch bioavailability and appropriate vehicles were not considered by the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products (the "Expert Panel" or "Panel") or FDA. However, the concern that new vehicles could be introduced in the future that have better percutaneous absorption characteristics was not lost on the Panel. In a May 1976 meeting, the Expert Panel "expressed concern regarding the use of the new vehicles, with properties similar to DMSO [dimethylsulfoxide], which may increase the absorption of ingredients beyond what the Panel determined to be safe and effective. The Panel concluded at that meeting that, 'Ingredients reviewed by this Panel were categorized on the basis of their use in currently employed topical vehicles,' (Ref. 78)."[60]

The use of novel excipients is not compliant with 21 C.F.R. § 330.1(e), which requires OTC product to contain only suitable inactive ingredients that are safe in the amounts administered and do not interfere with the effectiveness of the preparation or with suitable tests or assays to determine if the product meets its professed standards of identity, strength, quality, and purity. FDA's Inactive Ingredient ("IIG") Database lists suitable excipients and their maximum potency delineated by routes of administration and dosage form. Ingredients that do not have a prior history of safety and suitability in a product type are subject to pre-market approval by FDA through NDA procedures.[61,62] FDA has also been very consistent in noting to industry that inclusion of an ingredient qualified as safe for cosmetic products and 21 C.F.R. Part 182 as GRAS (or direct/indirect food ingredients per 21 C.F.R. Parts 172-186) are not sufficient alone to qualify safety of these ingredients for use in pharmaceutical products. Furthermore, FDA has informed Scilex that the inclusion of an excipient in the IIG database alone for the same product form and route of administration does not necessarily qualify the safety of that excipient for its specific topical system as the dosage form may impart biopharmaceutical properties and exposure levels (dermal and systemic) that are not qualified by the underlying safety studies supporting their inclusion and maximum potencies listed in the IIG database for comparable or same dosage forms and routes of administration. In these

---

[60] 55 Fed. Reg. 6947, Feb. 27, 1990.

[61] FDA Small Business Assistance. "Bringing an Over-the-Counter (OTC) Drug to Market: Choosing a Regulatory Pathway for Your Drug, Factor #5 Make sure your product's inactive ingredients are safe and suitable." Available at: https://www.accessdata.fda.gov/scripts/cder/training/OTC/topic5/images/factor%205.pdf.

[62] Guidance for Industry: Determining Whether to Submit an ANDA or 505(b)(2) Application, Draft Guidance, October 2017. Available at:
https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM579751.pdf.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 26

cases, dermal toxicology studies are warranted for the safety qualification of the excipient. Furthermore, systemic toxicology studies may be warranted unless data are generated demonstrating that the novel excipients (or components of the excipient in the case of polymers) do not present risk of systemic exposure.

It is often the case that topical patches require sophisticated formulation excipients that allow for homogenous distribution of the drug, and allow the product to adhere to the skin and be easily removed after the administration period. These patch formulation challenges may require the use of excipients that are considered novel or novel for a topical patch formulation. This is especially the case for the newer products coming onto the market that involve novel adhesive polymers that not only allow for product adhesion but can also improve on the product's bioavailability. Adhesive polymers, in particular, represent a safety concern as many adhesives are not available with a defined pharmaceutical grade and differences in rheological properties, impurities, and lot-to-lot variability may affect their biocompatibility and performance. Adhesive polymers may contain impurities such as initiators, crosslinkers, solvents, or monomeric/dimeric species that need to be characterized for safety. Because of the high variability of quality of adhesives, FDA has suggested that changing adhesive suppliers would warrant comparative clinical endpoint studies for (A)NDA products.[63] OTC manufacturers should be held to the same standards regarding adhesive excipient safety characterization, performance, and control of suppliers.

Although monograph products are only allowed to use qualified, suitable excipients, there is no effective basis to verify that excipients in unapproved OTC lidocaine patches are qualified and suitable. As a case in point, Attachment 7 lists the inactive ingredients for the OTC lidocaine patch products and surveys them against FDA's IIG database. Of the 115 formulation excipients used in these products, 45 are novel (i.e., are not included in FDA's IIG Database) and 38 are novel to topical/transdermal drug delivery systems or films. Therefore, more than half of the inactive ingredients manufacturers have selected to formulate OTC lidocaine patches are novel for the dosage form and warrant safety qualification via animal toxicology studies. At a minimum, dermal toxicology studies are warranted, and systemic toxicology studies may be warranted unless data are available confirming that the excipient (or components of the excipient) do not present risk of systemic exposure. Many of the OTC lidocaine products listed in the DailyMed database have at least one novel excipient identified for the patch dosage form.

---

[63] Berendt, R. "How to Resolve Current Challenges in ANDAs in Transdermal Delivery Systems (TDS): Complex Generic Drug Product Development Workshop," Sep. 13, 2018.

iv.    Are lidocaine combination drug patch products safe?

The External Analgesics TFM allows manufacturers to combine lidocaine with other active ingredients; however, manufacturers have taken liberty in addressing: acceptable combination of active ingredients (i.e., lidocaine in combination with other active ingredients); combining with active ingredients that are identified as Category III; or exceeding the allowable product strength for lidocaine and/or combined active ingredient. Specific examples are provided below.

**Acceptable combination of active ingredients:** According to the 1983 External Analgesics TFM (Proposed 21 C.F.R. § 348.20: permitted combinations of external analgesic active ingredients), any active ingredient identified in Proposed 21 C.F.R. § 348.10(a) (including lidocaine) may be combined with an active ingredient in 21 C.F.R. § 348.10(b) (benzyl alcohol, camphor, camphorated metacresol, juniper tar, menthol, phenol, phenolate sodium, and resorcinol) or 21 C.F.R. § 348.10(c) (diphenhydramine hydrochloride, tripelennamine hydrochloride). It is further noted that the TFM does not allow for combination of active ingredients listed in 21 C.F.R. § 348.10(a) (including lidocaine) with active ingredients listed in 21 CFR § 348.12 (including capsaicin and methyl salicylate).

The most common combination for the OTC lidocaine patch products is lidocaine 4% with menthol 1%, which conforms to the permitted ingredient combinations per 21 C.F.R. § 348.20 (i.e., although not the patch dosage form, which is not a recognized dosage form by the External Analgesic TFM). Exception product combinations exist, however, including the following:

-  LidoPro Patch (lidocaine 4%, menthol 5%, methyl salicylate 4%)
-  1st Medex Patch (capsaicin 0.0375%, lidocaine 4%, menthol 5%, methyl salicylate 20%)
-  Medi-Sulting Topical Pain Relief Patch (capsaicin 0.035%, lidocaine 0.5%, menthol 5%, methyl salicylate 20%)
-  Permavan External Patch (trolamine salicylate 10%, dextromethorphan hydrobromide 4%, lidocaine 4%)
-  Velma Pain Relief Patch (lidocaine 4%, menthol 2%, methyl salicylate 2%)
-  Zims Max Freeze Patch (menthol 5%, lidocaine 4%, methyl salicylate 0.04%)

None of these products conform to 21 C.F.R. § 348.20 in that they combine more than one active ingredient with lidocaine. In some cases, the product combines lidocaine with active ingredients from 21 C.F.R. § 348.10(c) (Permavan with dextromethorphan hydrobromide, and the dextromethorphan hydrobromide strength (4%) exceeds the monograph highest accepted strength (2%)). Permavan also includes trolamine salicylate, which is designated as a Category

III drug in the External Analgesics TFM. Except for Permavan, these products all include methyl salicylate (i.e., counterirritant from 21 C.F.R. § 348.12), which is not a permitted combination with lidocaine. Capsaicin (counterirritant listed in 21 C.F.R. § 348.12) is included in the 1st Medex and Medi-Sulting, which is again not a permitted combination with lidocaine.

Because lidocaine is not permitted to be combined with counterirritant active ingredients in 21 C.F.R. § 348.12, LidoPro, 1st Medex, Medi-Sulting, Velma, and Zims all exceed the allowable strength for menthol (1%).

It is important to note that the combination of lidocaine with other active ingredients in a patch dosage form may increase percutaneous absorption in ways that were not appreciated when the External Analgesics TFM was promulgated in 1983. Menthol, for example, is a vasodilator that has been shown to enhance lidocaine permeation when formulated as a eutectic lidocaine-menthol mixture in vitro models of skin permeation.[64] Addition of menthol and ethanol in a tetracaine gel formulation also enhanced in vivo absorption of a tetracaine.[65] There are several lidocaine combination patch OTC products on the market (see Appendix 1). While the combination of lidocaine with menthol is allowed in accordance with the External Analgesics TFM, its potential effect on percutaneous absorption of lidocaine (and other drugs) was not considered along with the other contributing factors such as formulation components and occlusion of the patch products.

> v. What is the dermal irritation and sensitization potential of OTC lidocaine patches?

Unlike creams, ointments, and lotions where application site reactions and hypersensitivities can be visually observed when they occur, patches are occlusive, and these adverse events are not readily observed until after patch removal (typically labeled 8-12 hours). The External Analgesics TFM does not require label warning against dermal safety risks specific to patches or means to mitigate the risk (e.g., periodic observations). Because companies marketing products under a monograph may not deviate from the warnings in the rulemaking (unless formally directed by FDA), these OTC lidocaine patch products consequently lack very important product-specific warning language. Some OTC lidocaine patch manufacturers include

---

[64] Kang L, Jun HW, McCall JW. "Physicochemical studies of lidocaine-menthol binary systems for enhanced membrane transport." *Int. J. Pharm.* 2000; 206(1-2):35-42.

[65] Fang C, Liu Y, Ye X, Rong ZX, Feng XM, Jiang CB, Chen HZ. "Synergistically enhanced transdermal permeation and topical analgesia of tetracaine gel containing menthol and ethanol in experimental and clinical studies." *Eur. J. Pharm. Biopharm.* 2008; 68:735-40.

dermal safety warnings on their product label – using varied wording – not contemplated by
the TFM, and this is another reason that they may be misbranded.

When FDA determined that patch dosage forms should be excluded from the External
Analgesics TFM in 2003, part of the reasoning was that there not sufficient information on how
often to check the application area for erythema to prevent blistering and what time intervals
are recommended. The risks for local skin reactions and the directions for safe use will often be
specific to the formulation. Local tolerance is typically a function of the inactive ingredients
involved in the adhesive formulation (versus the drug itself). Separate from the formulation,
there is also potential mechanical irritation associated with adhesion relative to application and
removal of the product as a function of the adhesive strength.

The need to study dermal irritation/sensitization for each formulation was highlighted in
a recent FDA Draft Guidance for ANDA applicants[66]:

> The components and composition of a TDS formulation, including the nature of
> the drug substance and/or the degree to which the TDS materials occlude the
> transmission of water vapor from the skin, in conjunction with other factors such
> as the environmental humidity or the condition of the skin, may have the
> potential to irritate the skin or lead to a sensitization reaction. Such reactions
> can be unpleasant to the patient and may affect patient compliance, skin
> permeability, and/or adhesion of the TDS to the skin.    The collective
> consequence of these potential effects could create uncertainty about the
> resulting drug delivery profile and uncertainty about the rate and extent of drug
> absorption from the TDS. Therefore, applicants should perform a comparative
> assessment of the T [test] and R [reference] TDS products using an appropriately
> designed skin I/S [irritation and sensitization] study with human subjects to
> demonstrate that the potential for a skin irritation or sensitization reaction with
> the T TDS is no worse than the reaction observed with the R TDS.

Because of the formulation-specific nature of dermal sensitization and irritation, FDA
requires each manufacturer of a generic topical delivery system to characterize the irritation
and sensitization potential of the product against the reference product, even though dermal
irritation and sensitization were well-characterized for the reference product containing the
same active ingredient. For generic products, this necessitates a careful balance between
adhesion performance and sensitization/irritation potential while maintaining bioequivalence

---

[66] Draft Guidance to Industry: Assessing the Irritation and Sensitization Potential of Transdermal and Topical
Delivery Systems for ANDAs, October 2018. Available at:
https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM622672.pdf.

and product strength. It is not currently mandated, and highly unlikely that manufacturers have voluntarily undertaken studies to ensure, that OTC lidocaine patch products have adequately undergone clinical/nonclinical dermal safety evaluation/characterization. There also lacks a standard reference product or general benchmark against which to standardize the sensitization/irritation profiles of these products.

c.   Risk of Inadvertent Exposure

i.   How much residual drug remains in used patches and what risk does this pose?

FDA has recently expressed concern with inadvertent exposures to children or pets from patch products and has encouraged designing patches to minimize residual drug after use.[67] In FDA's 2018 Guidance for Industry on adhesion, the Agency notes:

> During the product's labeled wear period, a TDS is reasonably expected to encounter torsional strains arising from body movements, changes in environmental temperature or humidity such as the daily exposure to water (e.g., during routine showering), and contact with clothing, bedding or other surfaces. TDS products that do not maintain consistent and uniform adhesion with the skin during the labeled wear period can experience varying degrees of TDS detachment, including complete detachment, at different times during the product wear. … When the potential for complete detachment of the TDS increases, the risk of unintentional exposure of the drug product to an unintended recipient (e.g., a household member who may be a child) also increases.[68]

Residual drug in lidocaine patches that have detached or patches that are not properly disposed after use present a significant safety concern relative to accidental exposure. Lidoderm® 5% and the associated generics have bolded text relative to the safety risks of the high level of residual drug remaining in the product after use.[69] For prescription

---

[67] Guidance for Industry: Residual Drug in Transdermal and Related Drug Delivery Systems, August 2011, available at:

https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM220796.pdf.

[68] Guidance for Industry: Assessing Adhesion With Transdermal and Topical Systems for ANDAs, October 2018, available at:

https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM504157.pdf.

[69] Lidoderm® Prescribing Information, November 2018.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 31

products the residual drug levels after use are determined and included in the labeling; however, the External Analgesics TFM is silent on this risk and many OTC lidocaine patch products do not recognize residual drug risks or provide instructions of safe disposal.[70] This is a particular concern for OTC lidocaine patch products with a combination of a higher level of drug and low bioavailability.

ii.      Is the packaging for OTC lidocaine patches safe?

In accordance with 16 C.F.R. § 1700.14(a)(23), products containing more than 5 mg of lidocaine in a single package (i.e., retail unit) shall be packaged in accordance with the provisions of § 1700.15(a) and (b) that require child-resistant packaging to protect children under 5 years of age from serious personal injury or serious illness resulting from ingesting lidocaine. Some of the OTC lidocaine patch products listed in the attached table note the use of resealable pouches, which pose particular concerns about child-resistance. Most of the products do not acknowledge or note the presence of child-resistant packaging. If a drug and its packaging are in violation of applicable regulations under the Poison Prevention Packaging Act, that drug is misbranded under the Federal Food, Drug, and Cosmetic Act.[71]

### 5.      OTC Labeling and Monograph Compliance

The foregoing discussion identifies several patch-specific labeling deficiencies burdening the current process (e.g., lack of product-appropriate directions for how to apply and remove patches; monitoring for potential dermal irritation; lack of provisions to warn about residual drug in the product; lack of provisions to warn about the effects of heat or other conditions of use (e.g., exercise) on safety and efficacy). As discussed, the TFM did not provide for patch-specific labeling for these products because the dosage form was not contemplated at the time the TFM was being promulgated. This has lead manufacturers to undergo some level of labeling contortions to attempt to adapt their lidocaine OTC patch product labeling to TFM-specific requirements.

Even more generally, the TFM is outdated with respect to current lidocaine safety information that may affect the labeling of all lidocaine-containing dosage forms. For example, lidocaine prescription products are labeled with contraindications to patients with known history of sensitivity to local anesthetics of the amide type. OTC lidocaine patch products present the same risk and potentially the same drug exposure as prescription lidocaine

---

[70] Products that attempt to voluntarily include cautionary language run into separate compliance considerations vis-à-vis restrictions against the TFM labeling.

[71] 21 U.S.C. § 352(p).

Division of Dockets Management (HFA-305)
December 28, 2018
Page 32

products. However, the monograph labeling is without these contraindications. Other labeling issues that also should be considered for lidocaine-containing OTC products include risks related to methemoglobinemia; pregnancy; lactation; risks in pediatrics; and concomitant medication use. OTC lidocaine patch products are inconsistent in the way they address these risks. It also is conceivable that the risks could affect the conclusions of qualified experts about safety of particular products, and whether and how labeling might enable consumers to understand and manage risks. At the same time, OTC lidocaine patch manufacturers may not broadly update or modify the safety warnings of the product (however well-intentioned) as they may then be out of compliance with the External Analgesics TFM and considered misbranded.

## 6.    Conclusions

Percutaneous drug delivery is complex, and the science and technologies have evolved over the past ~35 years since the External Analgesics TFM was first drafted. Scilex agrees with FDA's 2003 determination that patch dosage forms are properly excluded from the final External Analgesics OTC monograph. The dosage form-specific concerns raised were based on sound regulatory science, and understanding of the complexity of patch dosage forms has only increased in the 15 years since the TFM was first amended to exclude these products.

In the meantime, innovation has led to a proliferation of lidocaine OTC patches being introduced to the market. These lidocaine OTC patch products do not conform to the 1983 TFM for external analgesics. Most significantly, for reasons set forth in detail herein, the advancements in technology present the potential safety risks identified by FDA when designating the dosage form as Category III in 2003.

How lidocaine OTC patch products are designed and formulated; the degree of occlusion; the selection of adhesives and penetration enhancers all impact the safety and efficacy of the lidocaine OTC patch products. There are numerous complex scientific issues to consider in developing lidocaine OTC patch products, including consistency of adhesion characteristics, amount of residual drug after use, effects of heat/exercise, and potential for dermal irritation/sensitization, all of which necessitate a thorough review of the safety and efficacy of each patch formulation prior to marketing. It cannot be assumed that these safety risks are not present with the current products based on their pharmacovigilance. Post-marketing surveillance reports to document marketing experience, adverse events, and complaints, while of interest, are plagued by underreporting[72] and are not in and of themselves

---

[72] Food and Drug Administration, Center for Drug Evaluation and Research, Summary Minutes of the Nonprescription Drugs Advisory Committee (NDAC) Meeting, September 4-5, 2014.

sufficient evidence to confirm the safety and efficacy (let alone GRAS/E status) of an OTC drug product. It is reasonable to assume that there will be continuous advancement of OTC lidocaine patch technology that will consequently and increasingly affect the safety risks of these products.

Given the widespread availability of OTC lidocaine patch products, it is likely that the average consumer may perceive these products as "safe," may not follow directions presented on maximum numbers of patches to use or how long to leave products on; be aware of proper administration, removal, and disposal of the product; or be properly warned of potential adverse effects. Some manufacturers seem to be aware and concerned of these issues with emphasized labeling on the administration, removal, disposal, and additional safety warnings on patch products; however, this attempt to reconcile the dosage form labeling to the 1983 External Analgesics TFM paradoxically places the product out of compliance with the monograph making them misbranded. Rather than continuing to allow the number of unproven and risky OTC lidocaine patch products to proliferate, Scilex asks FDA to use its full regulatory and enforcement authorities to ensure that only legally marketed lidocaine patch products are available to the American public.

## C. ENVIRONMENTAL IMPACT

The actions requested in this Citizen Petition are subject to the categorical exclusion under 21 C.F.R. § 25.31.

## D. ECONOMIC IMPACT

Scilex will provide information on the economic impact of this petition at the request of the Commissioner of Food and Drugs.

---

https://wayback.archiveit.org/7993/20170404152726/https://www.fda.gov/downloads/AdvisoryCommittees/Co
mmitteesMeetingMaterials/Drugs/NonprescriptionDrugsAdvisoryCommittee/UCM421304.pdf.

Division of Dockets Management (HFA-305)
December 28, 2018
Page 34

## E.  CERTIFICATION

The undersigned certifies, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

Sincerely,

Kip Vought
Vice President, Global R&D
Scilex Pharmaceuticals, Inc.
Telephone:  949.441.2270
Fax:  949.916.3010
kvought@scilexpharma.com

Attachments

## ATTACHMENT 1

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| Absorbine Jr. Lidocaine | 69693-414 | 2017 | Lidocaine 4% | Duration not labeled While number of patches is not labeled, it states do not use on a large area of body with multiple patches, particularly over raw or blistered area 3-4 patches daily Maximum 7 days | 246 | 10 cm x 14 cm | Not labeled to keep from heat exposure Does not restrict use with other topical analgesic products |
| Aspercreme Lidocaine Patch | 62168-0584 | 2016 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 246 | 10 cm x 14 cm | |
| Aspercreme Lidocaine Patch Odor Free | 41167-0584 | 2016 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 246 | 10 cm x 14 cm | |
| Aspercreme Lidocaine Patch XL | 62168-0585 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 411.4 | 12 cm x 20 cm | |
| Aspercreme Lidocaine Patch XL Odor Free | 41167-0585 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 422 | 12 cm x 20 cm | |
| Assured Pain Relief | 69159-100 | 2017 | Lidocaine 4% | NMT 8 hours NMT 1 patch at a time 3-4 times daily Maximum 7 days | 4000 in 100,000 | 10 cm x 14 cm | |
| Avalin External Analgesic Patch | 33358-901 | 2015 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time 3-4 times dailyMaximum 5 days | 40 in 1,000 | Not labeled | Allows for administration to children ≥2 years Does not restrict exposure to heat |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not restrict use with other topical analgesic products |
| Benepatch | 69418-002 | 2015 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not labeled | Does not restrict exposure to heat\n\nDoes not restrict use with other topical analgesic products |
| CareOne Maximum Strength Lidocaine Pain Relief Patch | 60000-911 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Coralite Lidocaine Pain Relief | 65923-159 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 560 | 10 cm x 14 cm | |
| Coralite Odor Free Pain Relief Lidocaine Patch | 65923-149 | 2018 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 in 1,000 | 10 cm x 14 cm | |
| CVS Hot and Cold | 66902-218 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | 10 cm x 14 cm | |
| CVS Pain Relief Patch | 66902-203 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | 10 cm x 14 cm | |
| Discount Drug Mark Pain Relief Patches | 53943-911 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Dollar General Pain Relieving Patch | 55910-912 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 14 cm | |
| Elite Pain Relief Patch | 69418-004 | 2015 | Lidocaine 4% Allantoin 2% Petrolatum 30% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/daily Maximum 5 days | 4000 in 100,000 | Not labeled | Does not restrict use with other topical analgesic products\n\nDoes not restrict exposure to heat |
| Endoxcin | 45861-006 | 2014 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/daily Maximum 5 days | 4000 in 100,000 | 8.5 cm x 12.5 cm | Does not restrict use with other topical analgesic products\n\nDoes not restrict exposure to heat |
| Family Wellness Pain Relief Lidocaine Patch | 55319-959 | 2018 | Lidocaine 4% | NMT 12 hours 1 patch at a time Maximum 7 days | 40 in 1,000 | 10 x 14 cm | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| FirstDoc Cold and Hot Pain Relief Patch | 70355-001 | 2015 | Lidocaine 4% Menthol 5% Methyl Salicylate 4% | Duration not labeled 1 patch at a time NMT 4 times/day Maximum 7 days | 4000 in 100,000 | Not labeled | Product exceeds menthol strength allowed by 21 CFR 348.10(b)  Notes that package is not child resistant  Does not restrict use with other topical analgesic products |
| Good Neighbor Pharmacy Maximum Strength Lidocaine Pain Relief Patch | 46122-450 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Harris Teeter 4% Lidocaine Pain Relief Patch | 72036-911 | 2018 | Lidocaine 4% | NMT 8 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Hot and Cold Lidocaine with Menthol Pain Relief Patch | 71318-001 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time NMT 1 patch/day Maximum 7 days | 40 | Not labeled | Does not restrict use with other topical analgesic products |
| Hot and Cold Lidocaine with Menthol | 69159-004 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | Not labeled | |
| Hot and Cold Lidocaine with Menthol Pain Relief Patch | 76168-099 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch/daily Maximum 7 days | 40 | 10 cm x 14 cm | Does not restrict use with other topical analgesic products |
| IcyHot Lidocaine Patch Plus Menthol | 62168-1720 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time NMT 2 patch/daily (implied) Maximum 7 days | 240 | 10 cm x 14 cm | |
| IcyHot Lidocaine Patch Plus Menthol | 41167-1720 | 2018 | Lidocaine 4% Menthol 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 240 | 10 cm x 14 cm | |
| LenzaPro Patch | 70512-011 | 2018 | Lidocaine 4% Menthol 4% | Duration not labeled NMT 1 patch at a time, but does not restrict multiple patches NMT 2 times/day Maximum patches/day not labeled Maximum 7 days | 40 in 1,000 | Not labeled | Product exceeds menthol strength allowed by 21 CFR 348.10(b)  Multiple patches/pouch (does not comply with child-resistance requirements)  Does not restrict use with other topical analgesic products |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not restrict exposure to heat |
| LenzaPatch | 45861-017 63187-162 | 2013 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | 8.5 cm x 12.5 cm Not labeled | Does not restrict use with other topical analgesic products Does not restrict exposure to heat |
| LidAll Lidocaine Patch | 64533-000 | 2013 | Lidocaine 4% Menthol 1% | Duration not labeled No restriction to number of patches in a single administration, but does state do not use on a large area of body with multiple patches, particularly over raw or blistered area NMT 3 applications/day Maximum 7 days | 4000 in 100,000 | 8.5 cm x 12.5 cm | Multiple patches/pouch (does not comply with child-resistance requirements) Does not restrict use with other topical analgesic products Does not restrict exposure to heat |
| Lidenza Patch | 69329-017 | 2013 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not listed | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel) Does not restrict use with other topical analgesic products Does not restrict exposure to heat |
| Lidocare Lidocaine (Arm, Neck, and Leg) Patch | 69993-450 | 2016 | Lidocaine 4% | 8-12 hours No restriction to number of patches in a single administration NMT 3 applications/day Maximum 7 days | 11 | 3.175 cm x 15.24 cm | |
| Lidocare Lidocaine (Back and Shoulder) Patch | 69993-400 | | | | 4000 | 6.35 cm x 15.24 cm | |
| Lido-Flex Shoulder Patch | 69313-636 | 2014 | Lidocaine 4% | 8-12 hours No restriction to number of patches in a single administration, but does say not to apply excessive quantity of patches within a 24 hour period NMT 3 applications/day Maximum 7 days | 25.3 in 0.24 | Not labeled (various sizes and shape for each product) | Label notes that the packaging is not child resistant Does not restrict use with other topical analgesic products |
| Lido-Flex Elbow Patch | 69313-633 | | | | 21.5 in 0.24 | | |
| Lido-Flex Back Patch | 69313-632 | | | | 29 in 0.24 | | |
| Lido-Flex Knee Patch | 69313-635 | | | | 25.8 in 0.24 | | |
| Lido-Flex Heel Patch | 69313-634 | | | | 22.7 in 0.24 | | |
| Lido-Flex Strip Double Patch | 69313-637 | | | | 28.1 in 0.24 | | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| Lidonexe | 69329-002 | 2014 | Lidocaine 4% Menthol 1% | NMT 8 hours 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not labeled | Does not restrict use with other topical analgesic products<br><br>Does not restrict exposure to heat |
| LidoPatch | 10882-528 | 2015 | Lidocaine 3.6% Menthol 1.25% | NMT 12 hours NMT 1 patch/day Maximum 7 days | 505 | 10 cm x 14 cm | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Restricts to adult use only, but does not identify excluded pediatric age groups<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure |
| LidoPatch | 10882-527<br><br>70267-001 | 2016 | Lidocaine 3.6% or 3.99% depending on packaging configuration Menthol 1.25% | NMT 12 hours NMT 1 patch/day Maximum 7 days | 0.36 or 40, depending on packaging configurations<br>0.36 | 10 cm x 14 cm | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Restricts to adult use only, but does not identify excluded pediatric age groups<br><br>Does not restrict use with other topical analgesic products |
| LidoPatch | 50682-527 | 2012 | Lidocaine 3.99% Menthol 1% | NMT 12 hours NMT 1 patch/daily Maximum 7 days | 40 | 10 cm x 14 cm | Restricts to adult use only, but does not identify excluded pediatric age groups<br><br>Does not restrict use with other topical analgesic products |
| LidoPatch | 10882-527 | 2012 | Lidocaine 3.99% Menthol 1.25% | NMT 12 hours NMT 1 patch/daily Maximum 7 days | 40 | 10 cm x 14 cm | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Restricts to adult use only, but does not identify excluded pediatric age groups |

## ATTACHMENT 1

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| Absorbine Jr. Lidocaine | 69693-414 | 2017 | Lidocaine 4% | Duration not labeled While number of patches is not labeled, it states do not use on a large area of body with multiple patches, particularly over raw or blistered area 3-4 patches daily Maximum 7 days | 246 | 10 cm x 14 cm | Not labeled to keep from heat exposure Does not restrict use with other topical analgesic products |
| Aspercreme Lidocaine Patch | 62168-0584 | 2016 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 246 | 10 cm x 14 cm | |
| Aspercreme Lidocaine Patch Odor Free | 41167-0584 | 2016 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 246 | 10 cm x 14 cm | |
| Aspercreme Lidocaine Patch XL | 62168-0585 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 411.4 | 12 cm x 20 cm | |
| Aspercreme Lidocaine Patch XL Odor Free | 41167-0585 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Number of patches daily not labeled, but states 1 patch/12 hours Maximum 7 days | 422 | 12 cm x 20 cm | |
| Assured Pain Relief | 69159-100 | 2017 | Lidocaine 4% | NMT 8 hours NMT 1 patch at a time 3-4 times daily Maximum 7 days | 4000 in 100,000 | 10 cm x 14 cm | |
| Avalin External Analgesic Patch | 33358-901 | 2015 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time 3-4 times dailyMaximum 5 days | 40 in 1,000 | Not labeled | Allows for administration to children ≥2 years Does not restrict exposure to heat |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not restrict use with other topical analgesic products |
| Benepatch | 69418-002 | 2015 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not labeled | Does not restrict exposure to heat<br><br>Does not restrict use with other topical analgesic products |
| CareOne Maximum Strength Lidocaine Pain Relief Patch | 60000-911 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Coralite Lidocaine Pain Relief | 65923-159 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 560 | 10 cm x 14 cm | |
| Coralite Odor Free Pain Relief Lidocaine Patch | 65923-149 | 2018 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 in 1,000 | 10 cm x 14 cm | |
| CVS Hot and Cold | 66902-218 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | 10 cm x 14 cm | |
| CVS Pain Relief Patch | 66902-203 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | 10 cm x 14 cm | |
| Discount Drug Mark Pain Relief Patches | 53943-911 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Dollar General Pain Relieving Patch | 55910-912 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 14 cm | |
| Elite Pain Relief Patch | 69418-004 | 2015 | Lidocaine 4% Allantoin 2% Petrolatum 30% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/daily Maximum 5 days | 4000 in 100,000 | Not labeled | Does not restrict use with other topical analgesic products<br><br>Does not restrict exposure to heat |
| Endoxcin | 45861-006 | 2014 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/daily Maximum 5 days | 4000 in 100,000 | 8.5 cm x 12.5 cm | Does not restrict use with other topical analgesic products<br><br>Does not restrict exposure to heat |
| Family Wellness Pain Relief Lidocaine Patch | 55319-959 | 2018 | Lidocaine 4% | NMT 12 hours 1 patch at a time Maximum 7 days | 40 in 1,000 | 10 x 14 cm | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---------|----------|---------------------|----------|----------------|---------------------|------------------|-------|
| FirstDoc Cold and Hot Pain Relief Patch | 70355-001 | 2015 | Lidocaine 4% Menthol 5% Methyl Salicylate 4% | Duration not labeled 1 patch at a time NMT 4 times/day Maximum 7 days | 4000 in 100,000 | Not labeled | Product exceeds menthol strength allowed by 21 CFR 348.10(b) Notes that package is not child resistant Does not restrict use with other topical analgesic products |
| Good Neighbor Pharmacy Maximum Strength Lidocaine Pain Relief Patch | 46122-450 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Harris Teeter 4% Lidocaine Pain Relief Patch | 72036-911 | 2018 | Lidocaine 4% | NMT 8 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Hot and Cold Lidocaine with Menthol Pain Relief Patch | 71318-001 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time NMT 1 patch/day Maximum 7 days | 40 | Not labeled | Does not restrict use with other topical analgesic products |
| Hot and Cold Lidocaine with Menthol | 69159-004 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | Not labeled | |
| Hot and Cold Lidocaine with Menthol Pain Relief Patch | 76168-099 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch/daily Maximum 7 days | 40 | 10 cm x 14 cm | Does not restrict use with other topical analgesic products |
| IcyHot Lidocaine Patch Plus Menthol | 62168-1720 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time NMT 2 patch/daily (implied) Maximum 7 days | 240 | 10 cm x 14 cm | |
| IcyHot Lidocaine Patch Plus Menthol | 41167-1720 | 2018 | Lidocaine 4% Menthol 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 240 | 10 cm x 14 cm | |
| LenzaPro Patch | 70512-011 | 2018 | Lidocaine 4% Menthol 4% | Duration not labeled NMT 1 patch at a time, but does not restrict multiple patches NMT 2 times/day Maximum patches/day not labeled Maximum 7 days | 40 in 1,000 | Not labeled | Product exceeds menthol strength allowed by 21 CFR 348.10(b) Multiple patches/pouch (does not comply with child-resistance requirements) Does not restrict use with other topical analgesic products |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not restrict exposure to heat |
| LenzaPatch | 45861-017 | 2013 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | 8.5 cm x 12.5 cm | Does not restrict use with other topical analgesic products |
| | 63187-162 | | | | | Not labeled | |
| | | | | | | | Does not restrict exposure to heat |
| LidAll Lidocaine Patch | 64533-000 | 2013 | Lidocaine 4% Menthol 1% | Duration not labeled No restriction to number of patches in a single administration, but does state do not use on a large area of body with multiple patches, particularly over raw or blistered area NMT 3 applications/day Maximum 7 days | 4000 in 100,000 | 8.5 cm x 12.5 cm | Multiple patches/pouch (does not comply with child-resistance requirements) Does not restrict use with other topical analgesic products Does not restrict exposure to heat |
| Lidenza Patch | 69329-017 | 2013 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not listed | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel) Does not restrict use with other topical analgesic products Does not restrict exposure to heat |
| Lidocare Lidocaine (Arm, Neck, and Leg) Patch | 69993-450 | 2016 | Lidocaine 4% | 8-12 hours No restriction to number of patches in a single administration NMT 3 applications/day Maximum 7 days | 11 | 3.175 cm x 15.24 cm | |
| Lidocare Lidocaine (Back and Shoulder) Patch | 69993-400 | | | | 4000 | 6.35 cm x 15.24 cm | |
| Lido-Flex Shoulder Patch | 69313-636 | 2014 | Lidocaine 4% | 8-12 hours No restriction to number of patches in a single administration, but does say not to apply excessive quantity of patches within a 24 hour period NMT 3 applications/day Maximum 7 days | 25.3 in 0.24 | Not labeled (various sizes and shape for each product) | Label notes that the packaging is not child resistant Does not restrict use with other topical analgesic products |
| Lido-Flex Elbow Patch | 69313-633 | | | | 21.5 in 0.24 | | |
| Lido-Flex Back Patch | 69313-632 | | | | 29 in 0.24 | | |
| Lido-Flex Knee Patch | 69313-635 | | | | 25.8 in 0.24 | | |
| Lido-Flex Heel Patch | 69313-634 | | | | 22.7 in 0.24 | | |
| Lido-Flex Strip Double Patch | 69313-637 | | | | 28.1 in 0.24 | | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not restrict use with other topical analgesic products |
| LidoPlus Maximum Strength Pain Relief Patch | 70372-724 | 2016 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch/daily Maximum 7 Days Warns that should be discontinued if symptoms clear and occur again within a few days | 600 | 10.16 cm x 15.24 cm | Does not restrict use with other topical analgesic products |
| Lidosport Pain Relief Patch | 70372-725 | 2016 | | | | | Does not warn against heat exposure<br><br>Makes numerous label claims that are inconsistent with the TFM 21 CFR 348 monograph, including (under patient medical information):<br>- States that studies support that the two active ingredients significantly reduce pain and inflammation.<br>- Notes MOA of both drugs including lidocaine's ability to not just preventing pain signals from propagating to the brain, but by stopping them before they begin.<br>- Menthol MOA improves efficacy over other topical applications due to its vasodilation properties.<br>- Superior therapy to oral analgesics such as NSAIDs and opioids (due to safety)<br>- Suggests that the product can be used in a multimodal pain treatment setting – including chronic pain indications<br>- States that the drugs only act locally and do not enter the bloodstream, but later notes that the drugs penetrate to deeper tissues (joints and muscles)<br>- Lists several off-label indications that the product |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | can be used: low back pain, dermal procedures, laser treatments, body hair removal, body art, cosmetic procedures, other conditions/procedures where topical anesthetics are medically necessary |
| LidoPro Patch | 68788-9975 | 2015 | Lidocaine 4% Menthol 5% Methyl salicylate 4% | 8-12 hours 1 patch at a time NMT 2 patches/day | 0.04 (units not provided) | Not labeled | 21 CFR 348.20 does not permit combination of lidocaine with active ingredients listed in 21 CFR 348.12 (methyl salicylate) |
| LidoPro Patch | 53225-1023 | 2014 | | | 4 in 100 | | |
| | | | | | | | Product exceeds menthol strength allowed by 21 CFR 348.10(b) |
| | | | | | | | Multiple patches/pouch (does not comply with child-resistance requirements) |
| | | | | | | | Does not restrict use with other topical analgesic products |
| Lidothal Relief Medicated Patch | 71437-463 69561-463 | 2017 | Lidocaine 4% Menthol 1% | NMT 8 hours 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not labeled | Does not warn against heat exposure |
| | | | | | | | Does not restrict use with other topical analgesic products |
| Lidothol Medicated Patch | 68788-7405 53225-1025 | 2018 | Lidocaine 4.5% Menthol 5% | 8-12 hours 1 patch at a time NMT 2 patches/daily | 4500 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel) |
| | | | | | | | Exceeds lidocaine and menthol strengths allowed by 21 CFR 348.10(a) and 21 CFR 348.10(b) respectively |
| | | | | | | | Multiple patches/pouch (does not comply with child-resistance requirements) |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not warn against heat exposure<br><br>Product exceeds lidocaine strength allowed by 21 CFR 348.10(a) |
| Lidozen Patch | 63187-917<br><br>71574-400 | 2017 | Lidocaine 4%<br>Menthol 1% | NMT 8 hours<br>1 patch at a time<br>NMT 4 patches/day<br>Maximum 5 days | 40 in 1000 | Not labeled<br><br>12.5 cm x 8.5 cm | Does not warn against heat exposure<br><br>Does not restrict use with other topical analgesic products |
| Limencin Patch | 50488-1201 | 2014 | Lidocaine 4%<br>Menthol 4% | Duration not labeled<br>1-2 patches daily<br>No maximum duration | 40 | Not labeled | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Multiple patches/pouch (does not comply with child-resistance requirements)<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure<br><br>Makes significant label claims similar to those made for LidoPlus |
| Lorenza Pain Relief Patch | 69379-014 | 2015 | Lidocaine 4%<br>Menthol 1% | 8 hours<br>NMT 1 patch at a time<br>NMT 4 patches/day<br>Maximum 5 days | 4000 in 100,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel)<br><br>Does not restrict use with other topical analgesic products |
| Maximum Strength Lidocaine Patch | 76168-067 | 2017 | Lidocaine 4% | NMT 12 hours<br>NMT 1 patch at a time<br>Maximum 7 days | 40 | 10 cm x 14 cm | Does not warn against heat exposure |
| Maximum Strength Lidocaine Patch | 71318-002 | 2017 | Lidocaine 4% | NMT 12 hours<br>NMT 1 patch at a time<br>Maximum 7 days | 40 | Not labeled | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| 1st Medex Patch with Lidocaine 4% | 72137-555 72137-113 | 2018 | Lidocaine 4% Capsaicin 0.0375% Menthol 5% Methyl salicylate 20% | Duration not labeled 1-2 patches daily No maximum duration | Not provided in mass | Not labeled | 21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (capsaicin and methyl salicylate)<br><br>Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Multiple patches/pouch (does not comply with child-resistance requirements)<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure<br><br>NDC 72137-113 is listed as an RX product, but with no NDA reference (or identified in the Orange Book) and has an OTC type label (i.e., drug facts panel) |
| Medi-Patch and Lidocaine | 76074-153 76074-163 | 2012 | Lidocaine 0.5% Capsaicin 0.035% Menthol 5% Methyl salicylate 20% | Duration lot listed NMT 3 times a day Maximum 7 days | 250 | Not listed | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel)<br><br>Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Does not restrict use with other topical analgesic products |
| Medi-Sulting Topical Pain Relief | 63187-067 76074-123 | 2012 | Lidocaine 0.5% Capsaicin 0.035% Menthol 5% Methyl salicylate 20% | Duration not labeled Number of patches in single administration not labeled NMT 4 patches daily Maximum 7 days | 500 in 100,000 | Not labeled | 21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (capsaicin and methyl salicylate) |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Does not restrict use with other topical analgesic products |
| Meijer Maximum Strength Lidocaine Patch Plus Menthol | 41250-841 | 2018 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4,000 in 100,000 | 10 cm x 14 cm | |
| Meijer Pain Relief Patches | 41250-972 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4000 in 100,000 | 10 cm x 13.97 cm | |
| Mencaine | 53225-1090 | 2017 | Lidocaine 4.5% Menthol 5% | 8-12 hours 1 patch at a time NMT 2 patches/day | 4.5 in 100 | Not labeled | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Product exceeds lidocaine strength allowed by 21 CFR 348.10(a) |
| MTX Topical Pain | 69889-026 | 2016 | Lidocaine 4% Menthol 1% | NMT 8 hours 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | 12.5 cm x 8.5 cm | Does not warn against heat exposure |
| Nulido Lidocaine Patch Plus Menthol | 53149-2200 | 2018 | Lidocaine 4% Menthol 1% | NMT 12 hours 1 patch at a time Number of patches daily not labeled Maximum 7 days | 4000 in 100,000 | 10 cm x 14 cm | Multiple patches/pouch (does not comply with child-resistance requirements) |
| Odourless Lidocaine Pain Relieving Patch | 69159-003 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | Not labeled | |
| Odynia-R Regular | 69647-001 | 2015 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 3 patches/day Maximum 7 days | 4000 in 100,000 | Not labeled | Does not restrict use with other topical analgesic products |
| Odynia-U Ultra Patch | 69647-002 69647-003 | 2015 | Lidocaine 4 % Capsicum 0.03 % | NMT 8 hours NMT 3 patches/day Maximum 7 days | 4000 in 100,000 | Not labeled | Does not restrict use with other topical analgesic products |
| Pain Relief Patches | | | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4,000 in 100,000 | 10 cm x 13.97 cm | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| Permavan External Patch | 69379-010 | 2015 | Lidocaine 4% Trolamine salicylate 10% Dextromethorph an hydrobromide 4% | 8 hours 1 patch at a time Maximum 4 patches/daily Maximum use 5 days | 4000 in 100,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel)<br><br>21 CFR 348.20 does not permit the combination of lidocaine with antihistamines listed in 21 CFR 348.10© (dextromethorphan hydrobromide 4%)<br><br>Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Trolamine salicylate is listed as a Category III drug by the Panel and Agency in 21 CFR 348. |
| Point Relief Lidospot | 51452-727 | 2016 | Lidocaine 4% Menthol 1% | NMT 12 hours 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | 10.16 cm x 15.24 cm | Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure |
| Point Relief Lidospot with Menthol | 51452-912 | 2018 | Lidocaine 4% Menthol 1% | NMT 12 hours 1 patch at a time Maximum 7 days | 4,000 ion 100,000 | 10 cm x 15 cm | |
| Premier Value Pain Relief Patches | 68016-066 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4,000 in 100,000 | 10 cm x 13.97 cm | |
| Premier Scar Patch | 69512-020 | 2015 | Lidocaine 4 % Allantoin 2 % Petrolatum 30 % | NMT 8 hours 1 patch at a time Maximum 5 days | 5,000 in 100,000 (incorrectly labeled) | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel)<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| Pure-Aid Maximum Strength Lidocaine Patch | 67510-0280 | 2018 | Lidocaine 4% | 2 patches for up to 24 hours NMT 1 patch at a time Maximum 7 days | 240 | 10 cm x 14 cm | |
| Pure-Aid Maximum Strength Lidocaine Plus Menthol Patch | 67510-0284 | 2018 | Lidocaine 4% Menthol 1% | 2 patches for up to 24 hours NMT 1 patch at a time Maximum 7 days | 240 | 10 cm x 14 cm | |
| Quality Choice Pain Relief Patches | 63868-309 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 4,000 in 100,000 | 10 cm x 13.97 cm | |
| Re-Lieved Lidocaine Pain Patch | 71662-000 | 2017 | Lidocaine 4% | NMT 12 hours 1 patch at a time (implied) 1-2 patches daily Maximum 7 days | 18 | 7.62 cm x 15.24 cm | |
| Releevia LM Patch | 69329-032 | 2013 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 4000 in 100,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel)<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure |
| Remaxazon External Patch | 69379-285 | 2015 | Lidocaine 4% Glucosamine 5% Chondroitin Sulfate Sodium 3% Capsaicin 0.0285% | NMT 8 hours NMT 1 patch at a time Maximum 5 days | 4000 in 100,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel)<br><br>21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (capsaicin)<br><br>Does not restrict use with other topical analgesic products |
| Renuu Patch | 69329-012 | 2014 | Allantoin 2 % Lidocaine 5 % Petrolatum 30 % | NMT 8 hours NMT 1 patch at a time Maximum 7 days | 5,000 in 100,000 (Incorrectly labeled) | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel) |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not restrict use with other topical analgesic products <br><br> Does not warn against heat exposure |
| Ricora | 69418-006 | 2015 | Lidocaine 4% Menthol 1% | NMT 8 hours NMT 1 patch at a time Maximum 5 days | 4 in 1,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel) <br><br> Does not restrict use with other topical analgesic products <br><br> Does not warn against heat exposure |
| Rite Aid Hot and Cold Lidocaine with Menthol Pain Relief Patch | 76168-302 76168-304 | 2017 | Lidocaine 4% Menthol 1% | NMT 12 hours NMT 1 patch at a time NMT 1 patch/daily Maximum 7 days | 40 | 10 cm x 14 cm | Does not restrict use with other topical analgesic products |
| Rite Aid Maximum Strength Lidocaine Patch | 76168-305 76168-308 | 2017 | Lidocaine 4% | NMT 12 hours NMT 1 patch at a time Maximum 7 days | 40 | 10 cm x 14 cm | Does not warn against heat exposure |
| SalonPas Lidocaine 4% Pain Relieving Gel-Patch | 46581-830 | 2016 | Lidocaine 4% | NMT 8 hours 1 patch at a time 3-4 patches/day Maximum of 7 days | 560 | 10 cm x 14 cm | Does not restrict use with other topical analgesic products |
| Scadexe | 69329-040 | 2015 | Allantoin 2 % Lidocaine 4 % Petrolatum 30 % | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 7 days | 4000 in 100,000 | Not labeled | Does not restrict use with other topical analgesic products <br><br> Does not warn against heat exposure |
| Silvera Pain Relief Patch | 69379-037 | 2014 | Lidocaine 1% Menthol 5% Capsaicin 0.0375% | 8 hours 1 patch at a time Maximum 4 patches/daily Maximum use 5 days | 1000 in 100,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label (i.e., drug facts panel) <br><br> 21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (capsaicin) |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Does not restrict use with other topical analgesic products |
| Siterol | 69440-007 | 2015 | Lidocaine 3.99% Menthol 1% | NMT 8 hours NMT 1 patch at a time NMT 4 patches/day Maximum 5 days | 3,990 in 100,000 | 12 cm x 7.6 cm | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure |
| Solmara | 69833-011 | 2015 | Lidocaine 4% Menthol 5% | NMT 2 times/day Duration not listed | 4000 | Not listed | Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>Multiple patches/pouch (does not comply with child-resistance requirements)<br><br>Does not restrict use with other topical analgesic products<br><br>Does not warn against heat exposure |
| Soothee Patch | 69592-001 | 2014 | Lidocaine 0.5% Menthol 5% Capsaicin 0.0375% Methyl Salicylate 2% | NMT 8 hours in 24 hour period NMT 4 patches/day Apply NMT 3 times/day | 0.5 in 10,000 | Not listed | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label<br><br>Product exceeds menthol strength allowed by 21 CFR 348.10(b)<br><br>21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (capsaicin) |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Multiple patches/pouch (does not comply with child-resistance requirements)

Does not warn against heat exposure |
| Soundbody Lidocaine Patch | 67510-0283 | 2018 | Lidocaine 4% | NMT 12 hours
2 patches for up to 24 hours
Maximum 7 days | 240 | 10 cm x 14 cm | |
| Soundbody Lidocaine with Menthol Patch | 67510-0636 | 2018 | Lidocaine 4%
Menthol 1% | NMT 1 patch at a time
2 patches for up to 24 hours
Maximum 7 days | 40 | 10 cm x 14 cm | |
| TDS Pharm Lidocaine Maximum Strength Patch | 42912-0150 | 2017 | Lidocaine 4% | 1 patch at a time
NMT 12 hours
Maximum 6 days | 246 | 10.3 cm x 14.5 cm | |
| Terocin Lidocaine, Menthol Patch | 50090-3538
50488-1001
55700-0048
68071-4593
68788-9555 | 2013 | Lidocaine 4%
Menthol 4% | Duration not labeled
Number of patches in single administration not labeled
1 to 2 patches daily
Maximum use not labeled | 600 | Not labeled | Multiple patches are provided in the pouch (not compliant with child resistance requirements)

Product exceeds menthol strength allowed by 21 CFR 348.10(b)

Elaborate label that far exceeds 21 CFR 348 including suggestions of opioid sparing

Does not restrict use with other topical analgesic products

Does not warn against heat exposure |
| Thera Care Pain Therapy | 71101-911 | 2018 | Lidocaine 4% | NMT 8 hours
NMT 1 patch at a time
Maximum 7 days | 4000 in 100,000 | 10 cm x 14 cm | |
| Topcare Pain Relief Patches | 36800-156 | 2017 | Lidocaine 4% | NMT 12 hours
NMT 1 patch at a time
Maximum 7 days | 4,000 in 100,000 | 10 cm x 14 cm | |
| Ultimate Lidocaine Pain Relief Patch | 69159-920 | 2016 | Lidocaine 4%
Menthol 1% | 8 hours
Number of patches at a time not labeled
Number of patches daily not labeled
Maximum 7 days | 4000 in 100,000 | Not labeled | |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| Velma Pain Relief Patch | 69379-016 | 2014 | Lidocaine 4% Menthol 2% Methyl salicylate 2% | 8 hours 1 patch at a time Maximum 4 patches/daily Maximum use 5 days | 4000 in 100,000 | Not labeled | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label

21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (methyl salicylate)

Product exceeds menthol strength allowed by 21 CFR 348.10(b)

Does not restrict use with other topical analgesic products |
| Venia Premium Pain Patch | 69512-700 | 2015 | Lidocaine 4% Menthol 1% | NMT 2 applications per day | 4 in 100 | Not listed | Multiple patches are provided in the pouch (not compliant with child resistance requirements)

Does not restrict use with other topical analgesic products

Does not warn against heat exposure |
| Vexa | 49430-053 | 2015 | Lidocaine 4% Allantoin 2% Petrolatum 30% | NMT 8 hours NMT 4 patches/day | 4 | 12.5 cm x 8.5 cm | Listed as an RX product, but with no NDA reference (or identified in the *Orange Book*) and has an OTC type label

Does not warn against heat exposure |
| Viva Patch | 53225-1030 | 2016 | Lidocaine 2.5% Camphor 2% Methyl Salicylate 4% | 8 – 12 hours NMT 2 patches/day NMT 1 patch at a time | 2.5 in 100 | Not labeled | Multiple patches are provided in the pouch (not compliant with child resistance requirements)

Does not restrict use with other topical analgesic products |

| Product | NDC Code | Marketing Start Date | Strength | Administration | mg Lidocaine/ Patch | Patch Dimensions | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Does not list inactive ingredients; only onion and alpha-tocopherol |
| Walgreens Maximum Strength Pain Relief Patch | 0363-9110 | 2018 | Lidocaine 4% | NMT 8 hours NMT 1 patch at a time Maximum 7 days | 4,000 in 100,000 | 10 cm x 14 cm | |
| Zims Max Freeze | 66902-213 | 2016 | Lidocaine 4% Menthol 1% | Duration not labeled Number of patches in single administration not labeled 1 to 2 patches daily Maximum use 7 days | 40 | 7.6 cm x 12.7 cm (M) 10.2 cm x 14 cm (L) 10.2 cm x 20.3 cm (XL) | |
| Zims Max Freeze Patch | 66902-113 | 2016 | Menthol 5% Lidocaine 4% Methyl salicylate 0.04% | Duration not labeled Number of patches in single administration not labeled 1 to 2 patches daily Maximum use not labeled | 40 | 7.6 cm x 12.7 cm (M) 10.2 cm x 14 cm (L) 10.2 cm x 20.3 cm (XL) | 21 CFR 348.20 does not allow for combination of lidocaine with counterirritants listed in 21 CFR 348.12 (methyl salicylate)  Product exceeds menthol strength allowed by 21 CFR 348.10(b) |

# EXHIBIT 17





Tuesday
February 27, 1990

Part IV

# Department of Health and Human Services

**Food and Drug Administration**

21 CFR Part 348
External Analgesic Drug Products for
Over-the-Counter Human Use;
Amendment of Tentative Final
Monograph; Notice of Proposed
Rulemaking

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 348**

**[Docket No. 78N–301H]**

**RIN 0905–AA06**

**External Analgesic Drug Products for Over-the-Counter Human Use; Amendment of Tentative Final Monograph**

**AGENCY:** Food and Drug Administration, NNS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing a notice of proposed rulemaking amending the tentative final monograph (proposed rule) for over-the-counter (OTC) external analgesic drug products. This proposed rulemaking would establish conditions under which products containing hydrocortisone or its hydrocortisone acetate equivalent for topical use in concentrations from 0.25 to 1 percent are generally recognized as safe and effective and not misbranded. FDA is issuing this notice of proposed rulemaking after considering a citizen petition [Docket No. 78N–0301/CP00005] that requested OTC status for products containing hydrocortisone above 0.5 percent up to 1 percent. This proposal is part of the ongoing review of OTC drug products conducted by FDA.

**DATES:** Written comments, objections, or requests for oral hearing on the proposed regulation before the Commissioner of Food and Drugs by April 30, 1990. Written comments on the agency's economic impact determination by April 30, 1990.

**ADDRESSES:** Written comments, objections, or requests for oral hearing to the Dockets Management Branch (HFA–305), Food and Drug Administration, Rm. 4–62, 5600 Fishers Lane, Rockville, MD 20857.

**FOR FURTHER INFORMATION CONTACT:** William E. Gilbertson, Center for Drug Evaluation and Research (HFD–210), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–295–8000.

**SUPPLEMENTARY INFORMATION:** In the Federal Register of December 4, 1979 (44 FR 69768), FDA published, under § 330.10(a)(6) [21 CFR 330.10(a)(6)], an advance notice of proposed rulemaking to establish a monograph for OTC external analgesic drug products, together with the recommendations of the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic,

Burn, and Sunburn Prevention and Treatment Drug Products (the Panel), which was the advisory review panel responsible for evaluating data on the active ingredients in these drug classes. Interested persons were invited to submit comments by March 6, 1980. Reply comments in response to comments filed in the initial comment period could be submitted by April 3, 1980.

In the advance notice of proposed rulemaking, the Panel recommended that hydrocortisone and hydrocortisone acetate be categorized as safe and effective for antipruritic use at concentrations of 0.25 to 0.5 percent. The Panel provided a chart of the controlled studies that demonstrated effectiveness of topical hydrocortisone (44 FR 69768 at 69822) and noted that a 1-percent concentration of hydrocortisone was used in a number of these studies.

The agency's proposed regulation, in the form of a tentative final monograph, for OTC external analgesic drug products was published in the Federal Register of February 8, 1983 (48 FR 5852). In that tentative final monograph, the agency agreed with the Panel and tentatively concluded that hydrocortisone and hydrocortisone acetate at concentrations of 0.25 to 0.5 percent were safe and effective for the proposed OTC uses and that the benefits of OTC availability outweigh any potential misuse that may occur (48 FR 5854).

Subsequently, the agency received a citizen petition (Ref. 1) containing additional safety and effectiveness data in support of OTC status for 1 percent hydrocortisone and hydrocortisone acetate equivalent to 1 percent hydrocortisone. FDA has evaluated these data and, in this amendment to the tentative final monograph, is stating its position on hydrocortisone 1 percent and hydrocortisone acetate equivalent to 1 percent hydrocortisone for OTC use. Final agency action on this matter will occur with the publication at a future data of a final monograph, which will be a final rule establishing a monograph for OTC external analgesic drug products.

Although the agency is proposing in this amendment to the tentative final monograph to switch hydrocortisone at a concentration above 0.5 percent up to 1 percent and hydrocortisone acetate equivalent to above 0.5 percent up to 1 percent hydrocortisone from their present status as prescription drugs, currently subject to an approved new drug application, to OTC status, OTC marketing may not begin at this time. In the Federal Register of June 3, 1983 (48 FR 24925), FDA explained the enforcement policy for drugs that were

originally on prescription status but which were being proposed for OTC marketing under the OTC drug review. As noted there, 21 CFR 330.13 permits OTC marketing of a drug previously limited to prescription use prior to publication of a final monograph provided that certain conditions are met. To qualify for such treatment, the drug must, at a minimum, have been considered by an OTC drug advisory review panel and either been recommended for OTC marketing by the panel or subsequently determined by FDA to be suitable for OTC marketing. Hydrocortisone at a 1-percent concentration and above was evaluated by the Panel in its consideration of the prescription-to-OTC switch of hydrocortisone preparations; however, the Panel recommended that the concentration of OTC drug products be limited to 0.25 to 0.5 percent hydrocortisone (44 FR 69768 at 69813 to 69824).

Hydrocortisone 1 percent and hydrocortisone acetate equivalent to 1 percent hydrocortisone were also specifically considered by the Dermatologic Drugs Advisory Committee (the Committee) at its meeting held on November 18, 1985 (Ref. 2), but the Committee did not recommend OTC marketing status because of concerns about adverse reactions not being recognized or reported, inappropriate promotion, credibility of advertising, and appropriate labeling.

FDA concludes that public comments submitted in response to the proposed switch in status should be evaluated before a final agency decision on OTC status is made and before OTC marketing begins. Therefore, hydrocortisone above 0.5 percent up to 1 percent and hydrocortisone acetate equivalent to above 0.5 percent up to 1 percent hydrocortisone do not qualify for early OTC marketing under the terms of the enforcement policy set out in § 330.13. Until the comments to this proposal are reviewed, hydrocortisone above 0.5 percent up to 1 percent and hydrocortisone acetate equivalent to above 0.5 percent up to 1 percent hydrocortisone remain prescription drugs subject to the terms and conditions specified in their approved applications.

The agency advises that the conditions under which the drug products that are subject to this monograph would be generally recognized as safe and effective and not misbranded (monograph conditions) will be effective 12 months after the date of publication of the final monograph in the

Federal Register. On or after that date, no OTC drug product that is subject to the monograph and that contains a nonmonograph condition, i.e., a condition that would cause the drug to be not generally recognized as safe and effective or to be misbranded, may be initially introduced or initially delivered for introduction into interstate commerce unless it is the subject of an approved application. Further, any OTC drug product subject to this monograph that is repackaged or relabeled after the effective date of the monograph must be in compliance with the monograph regardless of the date the product was initially introduced or initially delivered for introduction into interstate commerce. Manufacturers are encouraged to comply voluntarily with the monograph at the earliest possible date.

If the agency determines that any labeling for a condition included in the final monograph should be implemented sooner than the 12-month effective date, a shorter deadline may be established. Similarly, if a safety problem is identified for a particular condition, a shorter deadline may be set for removal of that condition from OTC drug products.

## I. Background Information

### A. Introduction

Hydrocortisone has been marketed in the United States since 1952 as a prescription drug. On December 4, 1979, FDA's Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products recommended to the agency that hydrocortisone could be considered safe and effective for OTC use at concentrations of 0.25 to 0.5 percent (44 FR 69768). Based on the Panel's recommendations, the agency allowed OTC marketing of products containing 0.25 to 0.5 percent hydrocortisone to begin on December 4, 1979. During the years of OTC marketing, it has been shown from the experience of consumers and physicians, and from data from clinical investigators, that 0.25- to 0.5-percent concentration of hydrocortisone does not provide the optimal therapy in all individuals for all the conditions for which the drug may be used. It has been suggested that a 1-percent concentration of hydrocortisone would provide a more effective treatment for pruritus and inflammation associated with the conditions listed in the current labeling for the lower concentrations of hydrocortisone and hydrocortisone acetate (i.e., the temporary relief of itching associated with minor skin

irritations and rashes due to "eczema," "insect bites," "poison ivy, poison oak, or poison sumac," "soaps," "detergents," "cosmetics," "jewelry," and external "genital," "feminine," and "anal itching"). As a result, FDA has received several requests to amend the tentative final monograph for OTC external analgesic drug products to include 1 percent hydrocortisone and hydrocortisone acetate for OTC use.

### B. Petition To Amend Tentative Final Monograph

The citizen petition requesting OTC marketing status for hydrocortisone 1 percent and hydrocortisone acetate equivalent to 1 percent hydrocortisone, as antipruritic active ingredients in cream, ointment, lotion, and spray dosage forms, was submitted on May 26, 1987 (Ref. 3). The petitioner pointed out that, after 7 years of OTC marketing, 0.5 percent hydrocortisone may not provide optimal therapy for the various conditions for which it is indicated, that 1 percent hydrocortisone would be more effective (based on consumer experience and data in the literature), and that risks are estimated to be minimal while benefits would be substantial. The petition discussed the history of hydrocortisone use, its safety and effectiveness, its approval for OTC use in foreign countries, drug experience reports, and the proposed OTC labeling. The petition included extensive data and information from published studies on issues related to the safety and effectiveness of topical hydrocortisone.

In further support of the petition to switch 1 percent hydrocortisone from prescription to OTC status, a manufacturers' association provided additional information (Ref. 4) which it believed would be helpful to the agency in evaluating the citizen petition. The association stated that the additional data provide further support that optimal therapy can be provided by the 1-percent concentration of hydrocortisone and that consumers will not be at any additional risk by the marketing of a more effective product for pruritic conditions indicated on current OTC drug product labels for 0.5 percent hydrocortisone. The manufacturers' association noted that over 130 million OTC units of 0.5 percent hydrocortisone had been bought in this country to date, and most of the negative reports received by manufacturers of these products involved a lack of effectiveness.

After carefully reviewing the safety and effectiveness data and other information submitted, the agency tentatively concludes that they support a proposal to amend the tentative final

monograph for OTC external analgesic drug products in 21 CFR part 348 to include concentrations above 0.5 up to 1 percent hydrocortisone and hydrocortisone acetate equivalent to 0.5 to 1 percent hydrocortisone. Accordingly, the agency is publishing this notice of proposed rulemaking to invite public comment on the proposed switch of concentrations of hydrocortisone above 0.5 percent up to 1 percent from prescription to OTC status.

### C. The Panel and Committee Deliberations

The Panel's report indicates that the first effort to change hydrocortisone to OTC status occurred in 1956 (44 FR 69768 at 69813). Public hearings were held from August 15 to 17, 1956, to examine a petition request for possible transfer to OTC status. Based on these hearings, the petition was denied in the Federal Register of January 17, 1957 (22 FR 353).

At its January 21, 1975 meeting, the Panel was informed that no one among the physicians contacted had any strong feelings against hydrocortisone being OTC (Ref. 5). At the May 22, 1975 meeting, there was an extended discussion whether the Panel ought to recommend a higher concentration than 0.5 percent (Ref. 6). However, at the March 4 through 5, 1976 meeting, the Panel voted not to approve 1 percent hydrocortisone for OTC status by a vote of 5 to 1 with 1 abstention and approved 0.25 to 0.5 percent hydrocortisone for OTC status by a vote of 6 to 1 (Ref. 7). The Panel's decision at that time was based on the fact that there was no marketing history for hydrocortisone at any concentration for OTC use. At its final meeting on May 22 and 23, 1978, the Panel adopted its report on external analgesic drug products for OTC use, which included its recommendation for 0.25 to 0.5 percent hydrocortisone for OTC status (Ref. 8).

Two other OTC drug advisory review panels proposed 1 percent hydrocortisone for inclusion in OTC drug monographs. The Advisory Review Panel on OTC Miscellaneous External Drug Products (Miscellaneous External Panel) proposed 0.25 to 1 percent hydrocortisone for use (e.g., to relieve itching) on dandruff, seborrheic dermatitis, and psoriasis, but classified the ingredient in Category III because the studies were inadequate to support effectiveness for this use (47 FR 54646 at 54674 and 54675). The Advisory Review Panel on OTC Antimicrobial II Drug Products (Antimicrobial II Panel) recommended combinations of up to three antifungals with hydrocortisone

Case 4:22-cv-02625-HSG   Document 22-2   Filed 08/24/22   Page 193 of 210

0.5 to 1 percent for fungal infections of the skin [47 FR 12480 at 12554 and 12555]. However, the agency dissented from the Antimicrobial II Panel's recommendation [47 FR 12481].

At the November 18, 1985 meeting of the Dermatologic Drugs Advisory Committee [the Committee] (Ref. 9), the question of whether to switch 1 percent hydrocortisone from prescription to OTC status was discussed. Four physicians spoke in favor of the switch. The reasons given were that most people make rational decisions about home treatment; there had been no toxicity from local absorption, no abuse, no serious local or systemic side effects, and no exacerbation of local infection with 1 percent; that local toxicity resulted only when the drug had been applied for 3 or 4 months; and 0.5 percent products had not been effective for some uses. However, one physician stated the following caveats: the product should not be labeled for use around the eyes or for use on infants and small children. The Committee felt that greater absorption results from these uses with a potential for ocular, cutaneous, and systemic toxicity.

Two physicians (one presenting the position of the American Academy of Dermatology) spoke in opposition to the OTC status of the 1-percent concentration (Ref. 2). They expressed several concerns: (1) consumers would find the 1-percent product more effective than the 0.5 percent and thus tend to use the product for prolonged periods, which would lead to greater absorption and adverse effects, (2) potential use in some products of vehicles that enhance absorption of hydrocortisone, and (3) inappropriate advertising.

On the question of switching 1 percent hydrocortisone from prescription to OTC status, the Committee vote resulted in a tie (4 to 4). Most members felt that the drug was safe and effective. However, there were concerns about adverse reactions not being recognized or reported, inappropriate promotion, advertising credibility, and appropriate labeling [Ref. 9]. One committee member pointed out that side effects were not reported because they were minimal and not significant and, therefore, were ignored. Another member would have voted for 1 percent hydrocortisone becoming OTC if there could be assurance about the advertising and labeling issues. Still another member referred to the Panel's opinion that OTC drug products should contain the lowest effective dosages, and pointed out that 0.5 percent hydrocortisone was not effective in most cases in 15 years of practice, implying that 1 percent

hydrocortisone was the lowest effective dose.

The Federal Trade Commission (FTC), not FDA, is the agency that has the primary responsibility for regulating OTC drug advertising. However, FDA has the authority to regulate OTC drug advertising that constitutes labeling under the Federal Food, Drug, and Cosmetic Act (the act). See, e.g., *United States* v. *Article of Drug . . . B-Complex Cholinos Capsules,* 362 F.2d 923 (3d Cir. 1966); *V.E. Irons, Inc.* v. *United States,* 244 F.2d 34 (10 Cir.); *cert. denied,* 354 U.S. 923 (1957). In addition, for an OTC drug to be generally recognized as safe and effective and not misbranded, the advertising for the drug must satisfy the FDA regulations in § 330.1(d) (21 CFR 330.1(d)), which state that "The advertising for the product prescribes, recommends, or suggests its use only under the conditions stated in the labeling."

Although the Panel had discussed advertising and promotion of OTC hydrocortisone, its report did not include any statements of concern about either advertising or promotion of such products. The agency has considered the advertising of hydrocortisone-containing drug products over the ten years since these products were first marketed OTC and has not observed any major problems regarding advertising or promotion. The agency has contacted FTC (Ref. 10) and that agency also has not observed any major problems regarding advertising or promotion of OTC hydrocortisone drug products. Based on the above, the agency does not consider hypothetical advertising problems to be sufficient basis to disallow the OTC marketing of drug products containing above 0.5 percent up to 1 percent hydrocortisone.

### D. Tentative Final Monograph for OTC External Analgesic Drug Products

The agency included hydrocortisone and hydrocortisone acetate at concentrations equivalent to 0.25 to 0.5 percent hydrocortisone in the tentative final monograph for OTC external analgesic drug products that was published in the Federal Register of February 8, 1983 (48 FR 5852). During the comment period following publication of that proposal, the agency did not receive any comments relating to the switch of 1 percent hydrocortisone to OTC status.

### E. Foreign Marketing Experience

The petitioner and the manufacturers' association have indicated that 1 percent hydrocortisone for OTC use has been approved in several foreign countries: Sweden (1983), Denmark (1984), Norway (1985), and Great Britain

(1986). In addition, a "switch petition" is currently under review in Germany. Information regarding the basis for approval for OTC marketing in Sweden and Great Britain was provided (Ref. 11).

Hydrocortisone at a maximum strength of 1 percent was switched from prescription-to-OTC marketing status in Sweden on October 1, 1983. However, information was provided to consumers regarding self-medication to help them distinguish between mild and severe disease conditions for which the product would be considered appropriate for use. Swedish drug companies gave information about hydrocortisone drugs in the mass media. The Swedish Board of Health and Welfare developed directives to drug companies giving detailed instructions about the labeling of hydrocortisone. The label indications stated that the drug was only intended for mild eczema, to be used 2 to 3 times a day, and not to be used longer than a week without contacting a physician. Hydrocortisone was not to be used on wounds or near the eyes, and not on children under 2 years of age. Hydrocortisone was available in cream, ointment, powder, solution, and liniment dosage forms. The most suitable dosage form to use depended on the symptoms of the eczema.

It was noted that all drugs in Sweden are distributed through the Apoteksbolaget (a government-owned company for Swedish pharmacies) (Ref. 12). OTC sale of drugs outside of this organization is forbidden. The personnel in the organization were instructed by dermatologists and pharmacists about mild eczema, and written information was distributed to all pharmacy personnel. A pamphlet was developed for customers who wanted to learn more about OTC hydrocortisone. A customer survey (Ref. 12) was undertaken by the Apoteksbolaget and the Department of Social Pharmacy to analyse the effect of OTC use of hydrocortisone 3 months before the October 1, 1983, switch and 1 and 9 months afterwards. The results indicated that misuse of the drug (defined as frequent use) seldom occurred. Six of 104 customers noted skin changes as mild side effects. Opinions of Swedish physicians toward the switch were divided. However, among the dermatologists there was, in general, a positive attitude toward OTC hydrocortisone.

The agency notes that the information regarding Sweden's marketing of 1 percent hydrocortisone without prescription did not include any information on safety and effectiveness considerations. However, the agency

Case 4:22-cv-02625-HSG   Document 22-2   Filed 08/24/22   Page 194 of 210

recognizes that Sweden exerts continuing control over the dispensing of OTC drugs by its method of distribution. Also, in addition to labeling instructions, instructions regarding OTC hydrocortisone use were given to individual customers by the government-owned pharmacies. From the information available from Sweden, there appeared to be no problems related to the OTC marketing of 1-percent hydrocortisone products.

Included in the manufacturers' association's submission on foreign marketing was a copy of the Medicines Act Information Letter issued by Great Britain's Department of Health and Social Security (DHHS) to product license holders (Ref. 13). This letter provides detailed information to industry concerning what constitutes an acceptable application. Guidance was provided for companies with an interest in marketing OTC topical hydrocortisone preparations and the following conditions were listed:

(1) Only Hydrocortisone and Hydrocortisone Acetate preparations will be considered;

(2) The maximum strength is 1 percent;

(3) The vehicle must be a cream or ointment;

(4) The suitability of the cream or ointment base and its possible effect on bioavailability of the Hydrocortisone will be considered by the licensing authority. Excipients which significantly increase the bioavailability at the maximum strength will not be suitable;

(5) Evidence of clinical efficacy and/or bioavailability will be required for low strengths or novel formulations;

(6) The only indications are to be irritant dermatitis, contact allergic dermatitis and insect bite reactions. These indications may be worded in advertising and labeling * * *, but the term "eczema" should not be used; "rash" and "dermatitis" would need qualification;

(7) The contraindications should be: use on the eyes/face, anogenital region, broken or infected skin including cold sores, acne and athlete's foot. These contraindications should appear in advertising and labeling * * *;

(8) The product should not be recommended for use on children under 10 years of age without medical supervision;

(9) The product label should carry the following warning: "Do not use in pregnancy without medical advice;"

(10) The dosage instruction should be: "Use sparingly over a small area once/twice a day for a maximum period of one week;"

(11) The labeling must state: "If the condition is not improved, consult your doctor;"

(12) The label should state clearly "Contains Hydrocortisone," except where the product name includes hydrocortisone and appears on the label;

(13) The package size must be between 10 and 15 grams;

(14) Any package insert should be limited to the information required by the Medicines (Leaflets) Regulations 1977. The DHSS will wish, for the time being, to approve all promotional copy.

The agency notes the following differences between FDA's monograph proposals for hydrocortisone (February 8, 1983 and this document) and the practice in Great Britain:

(1) Only cream and ointment dosage forms are allowed in Great Britain; FDA proposes to allow lotion and spray products as well.

(2) Both countries have expressed concern about the effect of bases or vehicles on bioavailability and a need to show clinical effectiveness for low concentrations or unusual formulations. (The agency's conclusions on suitable dosage forms are discussed in Part V. paragraph C. below—*Discussion of Vehicles in Submissions*.)

(3) Great Britain does not propose to allow eczema as an indication, while FDA does.

(4) Great Britain requires advertising and labeling to include contraindications against use on the eyes/face, anogenital region, broken or infected skin, including cold sores, acne, and athlete's foot. FDA proposes to require a label warning to avoid contact with the eyes.

FDA does not include specific contraindications (non-use situations) in the labeling as Great Britain does; FDA handles this by stating the use conditions in the indications for the product. FDA does require when the product is labeled for external genital or feminine itching that it bear a warning stating "Do not use if you have a vaginal discharge. Consult a doctor."

(5) Great Britain recommends that the product not be used on children under 10 years of age without medical supervision; FDA's age limit is not for use on children under 2 years of age.

(6) Great Britain's directions are to use sparingly over a small area 1 or 2 times a day for a maximum period of 1 week; FDA's directions are as follows: Adults and children 2 years of age or older: Apply to affected area not more than 3 or 4 times daily. Children under 2 years of age: consult a physician or doctor. Also, FDA has a warning, "If condition worsens or if symptoms

persist for more than 7 days, discontinue use of the product and consult a physician."

As with many drugs, FDA finds the methods of marketing and labeling for OTC hydrocortisone to vary among foreign countries. For example, in Sweden the OTC indication includes "mild eczema," but this term is not allowed in Great Britain. Based upon 10 years of OTC marketing experience of 0.25 to 0.5 percent hydrocortisone in the United States, the agency believes that products containing hydrocortisone at concentrations of 0.25 to 1 percent and hydrocortisone acetate equivalent to 0.25 to 1 percent hydrocortisone may be safely marketed in the United States under existing procedures.

## II. Safety

### A. Introduction

The agency has reviewed the submitted data as well as the conclusions of the three panels that evaluated the safety of hydrocortisone for OTC use. The agency believes that products containing 0.25 to 1 percent hydrocortisone and hydrocortisone acetate equivalent to 0.25 to 1 percent hydrocortisone are safe for OTC use. Concentrations from 0.25 to 0.5 percent have been marketed OTC in the United States since December 4, 1979, without any major problems occurring, as noted throughout this document.

### B. Studies Reviewed by the Panel

The Panel's conclusion that up to 0.5 percent hydrocortisone is safe for OTC use was based in part on its assessment of studies in which concentrations of hydrocortisone of 1 percent or more were used. One of the Panel's conclusions regarding the safety of 0.5 percent hydrocortisone was that percutaneous absorption is minimal and that systemic effects such as those observed after systemic administration are unlikely (44 FR 69768 at 69818). This conclusion is supported by the results of an absorption study conducted by Malkinson (Ref. 14) on the percutaneous absorption of topically applied 2.5-percent hydrocortisone preparations.

Malkinson was unable to demonstrate any absorption of hydrocortisone by normal skin for 5½ to 6 hours after the topical application of a radioactively-labeled 2.5-percent hydrocortisone ointment by using a gas-flow cell that measured the residual radiation at the site of application. Malkinson further reported that there was also no evidence of absorption of the radioactively-labeled 2.5-percent hydrocortisone ointment before or after exposure of the

skin sites to an erythema-producing dose of ultraviolet light. Malkinson stated that it was not surprising that the gas-flow cell was unable to detect any absorption of the ointment by normal skin because the quantitative absorption of this compound is well within the inherent percentage of error of this device. He noted, however, that previous studies had shown that 1 to 2 percent of a topically applied dose of hydrocortisone-4-$C^{14}$ was absorbed by normal skin. Malkinson also demonstrated that skin stripping dramatically increased the amount of absorption of hydrocortisone that could be expected after topical administration.

As additional evidence of the low level of absorption of topically applied hydrocortisone, the Panel cited studies by Smith (Refs. 15 and 16), Fleischmajer (Ref. 17), and Witten, Shapiro, and Silber (Ref. 18). These studies demonstrated no significant systemic effect, i.e., drop in circulating eosinophil count, alteration in plasma or urinary steroids, or changes in blood glucose levels, after the topical application of a preparation containing 2.5 percent hydrocortisone. Smith (Ref. 15) reported no consistent alteration in circulating eosinophil counts after using 6 grams (g) of a 2.5-percent hydrocortisone acetate ointment on eight normal subjects and seven subjects with generalized skin disease. In a subsequent study by Smith (Ref. 16), no significant alteration in urinary 17-ketosteroids or 17-hydroxycorticosteroids as compared to baseline values was demonstrated after the use of 10 g of a 2.5-percent hydrocortisone ointment on eight normal subjects.

Fleischmajer (Ref. 17) reported no clinical side effects directly attributable to treatment and no distinct changes in various laboratory analyses performed during a study of 19 subjects treated twice daily with a 2.5-percent hydrocortisone ointment for periods ranging from 3 to 20 months. The subjects received total doses of hydrocortisone acetate ranging from 8,750 to 95,000 milligrams (mg).

Witten, Shapiro, and Silber (Ref. 18) reported no increase in 17,21-dihydroxy-20-ketosteroid levels in urine and blood after using a 2.5-percent hydrocortisone acetate ointment on six normal subjects and nine subjects with extensive or generalized skin disease. However, the Panel noted that Gemzell, Hard, and Nilzen (Ref. 19) reported an increase in the plasma levels of 17-hydroxycorticosteroids followed by a decrease in circulating eosinophil levels after the application of 200 mg of hydrocortisone in various vehicles to the anterior

surface of the body from the neck to the knees in 48 subjects. The authors did not consider these changes significant but suggested that they may be indicative of some general internal effect of hydrocortisone after topical application to the skin.

The Panel conducted a thorough review of the available literature on hydrocortisone and stated that it found no report of the aggravation of cutaneous bacterial, fungal, or viral infection attributable to the topical application of hydrocortisone-containing products (44 FR 69768 at 69817). This review included the 37 efficacy studies cited by the Panel. Of those 37 studies, 31 involved concentrations of hydrocortisone of 1 percent or greater. The Panel did report two cases of secondary infection in patients treated with a 2.5-percent hydrocortisone ointment as part of the Fleischmajer study (Ref. 17). However, Fleischmajer stated that the infections were in areas affected by severe excoriation due to scratching and that the infections promptly cleared after local and systemic antibiotic therapy without any interruption of hydrocortisone therapy.

In another study cited by the Panel, conducted by the Staff of Saint John's Hospital for Skin Diseases and Institute of Dermatology (Ref. 20), the authors reported a few cases of worsening of symptoms due to infection in a study of 708 subjects with various eczemas treated with preparations containing 0.25 to 2.5 percent hydrocortisone or hydrocortisone acetate. The authors concluded, however, that there seemed to be little or no evidence that hydrocortisone ointment positively favors superficial infections.

The Panel also mentioned a multicenter double-blind study by Carpenter et al. (Ref. 21) in which a product containing clioquinol (formerly known as iodochlorhydroxyquin) and 1 percent hydrocortisone was compared to the individual components in the treatment of subjects with acute dermatitis complicated by secondary bacterial or fungal infection. Carpenter et al. found no evidence of the exacerbation of infection in the 68 subjects who received the 1-percent hydrocortisone component.

The Panel's extensive review of the literature revealed no evidence of local changes in the skin such as striae formation or telangiectasia (a vascular lesion formed by the dilation of a group of small blood vessels) directly attributable to the topical application of 1 percent hydrocortisone. The Panel also found there was a low incidence of allergic reactions.

## C. Systemic Effects and Risk of Superinfection

The agency has also conducted an extensive review of the data submitted to demonstrate the comparative efficacy of 0.5 and 1 percent hydrocortisone as well as the efficacy studies submitted to the Panel in which concentrations of 1 percent hydrocortisone or more were used. While evaluating the efficacy data, the agency also looked to see whether the studies showed possible systemic effects or a worsening of symptoms due to infection resulting from the application of topical hydrocortisone products. Based on this review, as discussed below, the agency concludes that the likelihood of systemic toxic effects or an increased risk of infection due to the topical application of 1 percent hydrocortisone or hydrocortisone acetate is quite small.

In a study by Robinson, Robinson, and Strahan (Ref. 22) using concentrations of hydrocortisone or hydrocortisone acetate of 0.5, 1.0, and 2.5 percent in 1,655 subjects with various dermatitides, there was no evidence of serious side effects or systemic toxic reactions. A similar conclusion was stated by Robinson and Robinson (Ref. 23) in a followup study using 1 and 2.5 percent hydrocortisone and hydrocortisone acetate concentrations, other steroids, and other salts of hydrocortisone on 2,542 subjects with steroid sensitive dermatitides. Sulzberger and Witten (Ref. 24) treated 252 subjects with selected dermatitides with various ointments containing hydrocortisone 1 and 2.5 percent and reported that the topical application did not produce any clinical evidence of adverse systemic effects. Cahn and Levy (Ref. 25) also reported no manifestation of systemic toxicity in a study that included the application of 1.0 percent hydrocortisone to 58 subjects in the treatment of a variety of common dermatoses.

In a study by Mullins and Hicks (Ref. 26) comparing the effectiveness of 1- and 2.5-percent hydrocortisone preparations in 100 subjects with selected dermatitides, the authors reported that there were no untoward systemic absorption effects in any of the subjects. Kalz, McCorriston, and Prichard (Ref. 27) observed 581 subjects with multiple dermatitides treated with preparations containing 1 to 2.5 percent hydrocortisone and noted no evidence of systemic effects due to the absorption of hydrocortisone. However, they observed the development of follicular pustules and boils in the areas treated in four of the patients included in their

study. Polano (Ref. 28) also reported no untoward side reactions in a study comparing 1 percent hydrocortisone to other treatments in 245 subjects with a variety of dermatitides.

In a study involving 259 subjects with various dermatitides, Howell (Ref. 29) reported no evidence of percutaneous absorption from a 1- or 2.5-percent hydrocortisone ointment. Howell also noted that six subjects with chronic allergic (atopic) eczema included in the study had practically generalized involvement and that the ointment was applied over extensive areas of the body for as long as 2 months without any untoward effect. Portnoy (Ref. 30) noted no cutaneous or systemic reactions in any of 129 subjects with pruritus ani, pruritus vulvae, infantile eczema, contact dermatitis, and flexural prurigo who were treated with 0.1 percent 9α-fluorohydrocortisone or 1-percent hydrocortisone ointment. Warin (Ref. 31) reported no tendency to secondary infection or systemic effects in treating 40 infants and children suffering from infantile eczema with 1 or 2.5 percent hydrocortisone acetate.

Infectious complications occurred in 9 (2.23 percent) out of the 402 subjects with chronic dermatitides who were treated with 1.0 and 2.5 percent hydrocortisone or hydrocortisone acetate in a study by Welsh and Ede (Ref. 32). However, these secondary infections were easily controlled with topical antibiotics. The authors considered this a low incidence of secondary infection and concluded that based on these results and the known sensitizing properties of antibiotics, that it is inadvisable to use hydrocortisone with a topical antibiotic as a regular therapeutic approach. In a study of 1 and 2.5 percent hydrocortisone by Russell et al. (Ref. 33), one out of the 132 subjects developed a secondary infection. This subject, who was being treated for otitis externa, experienced an increase in swelling and exudation of the ears shortly after treatment was begun with the hydrocortisone ointment. The patient's eyes also became swollen. Culture revealed *Staphylococcus pyogenes, Streptococcus haemolyticus,* and *Pseudomonas pyocyanea.* Patch tests with hydrocortisone and the vehicle were negative.

The observations of these investigators indicate that even under the exaggerated conditions of use (relative to OTC use) found in these studies, the risk of systemic effects or an increased incidence of secondary infections following the use of topical 1 percent hydrocortisone or hydrocortisone acetate is minimal. No

systemic effects were noted in any of these studies. While some cases of secondary infection have been reported, they do not appear to be of a serious nature. The agency believes that these potential risks would be further diminished under the proposed label limitations of OTC use, i.e., a 7-day maximum treatment period on minor skin irritations with a warning to discontinue use of the product and consult a doctor if the condition worsens, or if symptoms persist for more than 7 days or clear up and occur again within a few days. These warnings were proposed in § 348.50(c)(1)(iii) of the tentative final monograph for OTC external analgesic drug products (47 FR 5852 at 5868).

*D. Sensitization and Irritation Potential of Hydrocortisone*

Few cases of sensitization or irritation due to the topical application of hydrocortisone or hydrocortisone acetate have been reported in clinical studies involving over 6,000 subjects (Refs. 20, 22, 24, 25, 26, 27, and 32 through 40). Rather, patch testing, when done on subjects who had exacerbation of symptoms during treatment, showed reactions for the most part to be due to local irritations from ingredients in the vehicle or base (e.g., lanolin), and not to hydrocortisone or hydrocortisone acetate ((Refs. 20, 22, 32, 33, 37, and 38). However, there have been some verified reports of allergic sensitivity to hydrocortisone or hydrocortisone acetate.

Coskey (Ref. 41) reported two cases of allergic reactions in subjects with otitis externa whose conditions were aggravated by the application of topically applied preparations containing 1 percent hydrocortisone. Patch tests conducted on these subjects revealed a sensitivity to hydrocortisone. Coskey stated that it was difficult to explain why one subject was sensitive to hydrocortisone alcohol but not to hydrocortisone acetate. Coskey theorized that the subjects may have been sensitive to one of the precursors of hydrocortisone (e.g., 21-diol acetate), but this could not be determined because patch tests for these substances were not available. Edwards and Rudner (Ref. 42) reported a case that was interpreted as an example of pure hydrocortisone sensitivity in an atopic subject treated for a weeping eczematous dermatitis of the feet with a 1-percent hydrocortisone cream. A patch test ruled out all components of the suspected product except for the pure hydrocortisone powder. Kooij (Ref. 43) reported a case of sensitivity to hydrocortisone in a subject with

weeping eczema of the face and hands whose condition worsened after treatment with a 1-percent hydrocortisone ointment. Positive patch test results were obtained with several brands of hydrocortisone preparations (ranging from 0.5- to 1.5-percent concentration) and to a pure solution of 6 percent hydrocortisone succinate in water. Kooij concluded that, based on these results, it could be assumed that this was a case of hypersensitivity to a pure hydrocortisone compound.

Alani and Alani (Ref. 44) performed a series of routine patch tests to study the incidence of cortisone and other corticosteroid sensitivity. Tests were performed on 1,835 subjects with contact dermatitis. A retrieval search for subjects with allergic contact dermatitis suspected of being sensitive to steroid creams was also performed. The 17 subjects obtained from the retrieval search were also tested with the routine patch test series. Included in the test were purified preparations of hydrocortisone and hydrocortisone acetate, two proprietary preparations, two mixtures of hydrocortisone and hydrocortisone acetate by two different manufacturers, various brands of hydrocortisone and hydrocortisone acetate, and two brands of prednisone. Concentrations of hydrocortisone and hydrocortisone acetate used in the patch tests were 10, 15, and 25 percent. All subjects who showed sensitivity by patch testing to corticosteroids were subsequently patch-tested with supplemental patch tests that included previously-used topical steroids and all other constituents of the suspected offending steroid cream. The consecutive routine patch test revealed six subjects (0.3 percent) who gave positive reactions to two mixtures of hydrocortisone and hydrocortisone acetate of two different brands. Alani and Alani concluded that based on the negative reactions among 1,835 consecutive subjects, irritant reactions are rare. However, they stated that they expected the incidence of corticosteroid sensitivity to increase due to the tendency of higher concentrations of steroids in proprietary preparations. The incidence of sensitivity reactions in this study from Sweden is apparently higher than the incidence observed in the clinical studies discussed below. This may in part be due to differences in European and United States drug product formulations and the lack of patch testing with the chemical precursor in the synthesis of hydrocortisone acetate, 21-diol acetate. For example, in a European study, Church (Ref. 45) demonstrated that five

cases of apparent sensitivity to an ointment containing hydrocortisone acetate were actually due to 21-diol acetate that was present in the product in small amounts as a contaminant, apparently left over from the manufacturing process.

In the clinical study conducted by Robinson, Robinson, and Strahan (Ref. 22) involving 1,655 subjects, no serious cutaneous reactions were observed. The majority of the local reactions noted was due to local irritative phenomena and not primarily to sensitization. Further, the more complicated the product base was, the higher the percentage of reactions. Local irritations were noted in 81 individuals, who were patch tested with the vehicle minus the steroid. In each instance, the irritation was due to the vehicle in which the active ingredient was dispensed. Two subjects with acne vulgaris developed numerous new follicular lesions following the application of 1.0-percent hydrocortisone acetate greaseless cream, but no other reactions that could be attributed to the local application of the steriod occurred in any of the subjects. Two subjects, treated with an oily base containing lanolin, developed erythema at the site of application. Patch tests on both of these individuals were positive for lanolin.

In another study by Robinson and Robinson (Ref. 34) involving 418 subjects treated with concentrations of 0.5, 1.0, and 2.5 percent hydrocortisone and hydrocortisone acetate in several different vehicles, two subjects with acne vulgaris developed numerous new lesions after the application of a 1.0-percent hydrocortisone acetate greaseless cream. The authors stated that this was the only adverse reaction that could be attributed to the primary ingredient in the cream. Thirty-eight subjects (treated with three different hydrocortisone preparations) developed mild adverse reactions as evidenced by a moderate increase in erythema and itching. However, the authors concluded that any evidence of local sensitivity was invariably caused by the base in which the drug was dispensed.

Rattner (Ref. 35) reported in a study of 1,200 subjects with various dermatological conditions, who were treated with concentrations of hydrocortisone or hydrocortisone acetate of 0.5, 1, and 2.5 percent, that neither the acetate nor the free alcohol proved irritating and that both caused only a localized action. In another report (Ref. 20), 22 (approximately 3 percent) of the 708 subjects treated with hydrocortisone or hydrocortisone acetate experienced a worsening of their

eczematous lesions. Patch testing revealed no hypersensitivity to hydrocortisone, but occasional intolerance to all available hydrocortisone products was demonstrated.

Malkinson and Wells (Ref. 36) reported that irritation occurred in 4 of 71 subjects with various superficial inflammatory dermatoses who were treated with an ointment containing 2.5 percent hydrocortisone acetate. However, the authors further reported that no evidence of allergic sensitivity to hydrocortisone was demonstrated. Russell et al. (Ref. 33) reported no cases of sensitization in 132 subjects treated for various dermatological conditions with an ointment containing hydocortisone 1 or 2.5 percent or the ointment vehicle. Three subjects abandoned treatment due to a worsening of symptoms. Two of these were either sensitive to the vehicle or one of its constituents, and the third abandoned treatment apparently in response to a secondary infection. One subject who complained that the ointment "burned" was using the vehicle. Another subject complained of a fresh outcrop of vesicles after applying the hydrocortisone ointment for three days. Patch tests conducted with the hydrocortisone ointment and the vehicle were negative. However, when patch testing was carried out with the separate constituents of the vehicle, a positive reaction was obtained to propylene glycol.

Rein (Ref. 37) reported that 4 of 131 subjects experienced a flare-up of their dermatitides after the use of hydrocortisone acetate ointment. Patch tests on these subjects conducted with the free alcohol, the acetate, and the base all gave negative reactions.

Friedlaender and Friedlaender (Ref. 38) reported that the dermatitis became worse in 9 (5.6 percent) of 159 subjects following the use of one of various hydrocortisone or hydrocortisone acetate ointments or hydrocortisone acetate/neomycin combinations. Sensitization to hydrocortisone, hydrocortisone acetate, or neomycin could not be demonstrated in any of these subjects. Six subjects were felt to be sensitive to the oinment base used as determined by patch tests or repeated applications of the base ointment to areas of the dermatitis and uninvolved skin. Three subjects were determined to be sensitive to the wool-fat base. Two subjects were felt to be sensitive to petrolatum, while two subjects appeared to be irritated due to the use of an ointment during an acute phase of their dermatitis. One subject showed

aggravation and progression of poison ivy lesions after extensive local application of hydrocortisone in both types of ointment bases. Patch tests performed several weeks after the complete subsidence of the dermatitis failed to reveal any evidence of specific sensitization. Further, the subject was given the ointments to rub into the skin daily for several weeks and no irritation resulted. The authors felt that "the aggravation noted was due to primary irritation by an ointment in an acute phase of a dermatitis which ordinarily would be treated by bland local therapy such as compresses, colloid baths, and shake lotions." The cause of the aggravation of symptoms was not determined in one subject.

Welsh and Ede (Ref. 32) reported that 3 of 402 subjects with chronic dermatitides had reactions to 1.0 or 2.5 percent hydrocortisone acetate. However, in subsequent patch tests, the reactions proved to be due to the ointment base and not to hydrocortisone. Kalz, McCorriston, and Prichard (Ref. 27) reported 12 instances of irritation or exacerbation of the skin condition treated in 581 subjects. The ointment base rather than the hydrocortisone acetate (1 to 2.5 percent) was found to be responsible in all cases. The carbowax base was the offending agent in most instances, either because of its drying properties or allergic sensitization. Petrolatum and oily cold creams were not well tolerated in some cases because of their oily and heavy consistency.

Brodthagen (Ref. 39) reported several instances of exacerbation of symptoms in 195 subjects treated with a 2-percent hydrocortisone acetate ointment. However, this exacerbation generally subsided under continued treatment. In three of these subjects, an eczema test was performed with the ointment with negative results. Sulzberger (Ref. 40), in a symmetrical pared comparison of 9α-fluorohydrocortisone to hydrocortisone in the treatment of 82 subjects with assorted dermatitides, reported that no instances of allergic sensitization were observed following the topical application of any of the hydrocortisone derivatives. Sulzberger and Witten (Ref. 24) reported no cases of allergic sensitization directly attributable to the 1.0 and 2.5 percent hydrocortisone acetate or the hydrocortisone free alcohol ointments used to treat 252 subjects. The authors reported that they had not observed any instances of allergic sensitization even after prolonged use and predicted that the sensitization index for these ingredients would be very low. Mullins and Hicks

(Ref. 26) similarly reported no evidence of primary irritation or sensitization during treatment of 100 subjects with 1 and 2.5 percent hydrocortisone acetate. Cahn and Levy (Ref. 25) reported that there were no manifestations of local hypersensitivity in 58 subjects who applied 1.0 percent hydrocortisone to various dermatoses.

### E. Local Effects of Hydrocortisone

Localized dermal effects such as skin atrophy, striae, or telangiectasia that have been observed following topical use of more potent fluorinated steroids have rarely been reported following topical application of a hydrocortisone. In addition to the case report of a woman who developed atrophy with telangiectasia of the eyelid skin following topical application of a hydrocortisone preparation to her eyelids for "several years" as a cosmetic (Ref. 46), which was cited by the Panel (44 FR 69768 at 69817), the agency has identified only one other similar report in the literature. Guin (Ref. 47) reported atrophy of the skin and telangiectasia of the eyelids in two women who had used preparations containing 1 percent hydrocortisone for periods of 12 and 4 months, respectively. The agency is not aware of any studies or case reports of skin atrophy occurring with hydrocortisone under conditions of OTC use as proposed in the tentative final monograph for OTC external analgesic drug products (48 FR 5852 at 5868).

Smith, Wehr, and Chalker (Ref. 48) used a bioassay method to evaluate the adverse effects (including skin atrophy and telangiectasia) of nine topically applied corticosteroids, which included 1.0-percent hydrocortisone cream. A topical application of 0.1 g of the cream was applied to a shaved midposterior lateral area of the back of young Sprague-Dawley rats for 28 days. The animals were weighed twice weekly and evaluated for telangiectasia. On day 28 of the study, the animals were sacrificed and the skin thickness was determined by lifting a skin fold and measuring the double skin-fold thickness with a micrometer with a potential accuracy of 0.0001 inch. The authors found no evidence of telangiectasia in any of the rats treated with the 1.0-percent hydrocortisone, while the other eight corticosteroids produced mild to severe telangiectasia. The authors concluded that the weight gain correlated well with skin thickness and that 1.0 percent hydrocortisone (and 0.1 percent betamethasone valerate) had the least effects on weight gain and double skin thickness as compared with controls.

Other data in humans, in which sophisticated techniques were used to measure changes in skin thickness, support the safety of 1 percent hydrocortisone for OTC use. James, Black, and Sparkes (Ref. 49) studied the localized dermal effects of 4 test steroids in 20 normal adult males 25 to 40 years of age. The test steroids were 0.0125-percent flurandrenolone cream, 0.05-percent clobetasone butyrate cream, 0.1-percent hydrocortisone 17-butyrate cream, and 1-percent hydrocortisone cream. The control steroid used was 0.025-percent fluocinolone acetonide cream. Volunteers were asked to rub a standard amount of the control and test steroids into an outline area of the middle one-third of the radial aspect of contralateral forearms twice daily for 3 months. Radiographs of the forearm skin were taken before application and at monthly intervals for 3 months. The authors reported that at 3 months significant atrophy was seen in 14 of 19 subjects using fluocinolone acetonide, 3 of the 5 subjects using clobetasone butyrate, all of the 5 subjects using hydrocortisone 17-butyrate, 1 of 4 subjects using flurandrenolone, and none of the 5 subjects using 1-percent hydrocortisone cream.

A double-blind, half-side study by Black, Platt, and Mugglestone (Ref. 50) compared dermal atrophy in 29 healthy male volunteers using various steroid preparations: 0.75 percent fluocortin butylester, 0.05 percent clobetasone butyrate, 1 percent hydrocortisone acetate, and the base placebo creams. Each volunteer was instructed to apply a 1 centimeter (cm) length of the cream being used to a clearly defined area on each forearm twice daily for a period of 8 weeks. The skin thickness at the site of application was determined by a modified radiographic technique immediately prior to the first application of the creams and again after the eighth week of application. Clinically significant skin thinning occurred in 3 of the 10 subjects treated with clobetasone butyrate, and atrophy of a marginal significance occurred in 1 of the 29 subjects treated with fluocortin butylester. Only 1 of 10 subjects treated with a 1-percent hydrocortisone cream experienced a statistically significant increase in skin thickness. However, the authors judged this increase not to be clinically significant. The remaining nine subjects treated with 1-percent hydrocortisone cream had no significant difference between the initial and post-treatment skin thickness.

Snyder and Greenberg (Ref. 51) also used a double-blind comparative methodology to study the effects of chronic usage of commercially prepared formulations of a 1-percent hydrocortisone cream, a 0.1-percent triamcinolone acetonide cream, and a placebo cream. Five dermatologically normal male and female volunteers were randomly assigned coded creams and instructed to apply each cream to an appropriately demarcated area on the volar forearm three times a day. A small amount of each cream was rubbed into an area of approximately 8 square centimeters ($cm^2$) and the excess was removed by blotting. No more than two creams were applied to each forearm. Daily treatment continued without exception for 12 weeks at which time all treatments ceased. Skin thickness of the test area was measured by soft tissue X-ray techniques. After approximately 2 months of treatment with the 0.1-percent triamcinolone acetonide cream, all subjects showed clinical signs of skin atrophy. At no time during the 12-week treatment period did the 1-percent hydrocortisone or placebo treated sites show any clinical signs of atrophy. The average percent decreases in skin thickness measured after 8 weeks of treatment were 6 percent for the placebo and hydrocortisone test sites and 17.1 percent for the triamcinolone acetonide cream test sites. The authors reported that, based on a matched-pair comparison test, the difference in skin thickness between triamcinolone acetonide and 1-percent hydrocortisone treatment was significant at $0.1 > p > 0.05$ and that there was no significant difference in skin thickness between skin treated with hydrocortisone and placebo cream. During the first week after cessation of treatment, the clinical appearance of the skin began to improve and by 1 month all treated areas had essentially returned to pretreatment thickness.

In a double-blind controlled investigation by Tan, Marks, and Payne (Ref. 52), 48 healthy adult male and female volunteers were randomly assigned to treatments of 2 of 6 preparations (1 for each forearm). The treatments were two of the following applied to the flexor aspect of the forearm twice a day: The cream base, a 1-percent hydrocortisone cream, a 0.1-percent hydrocortisone 17-butyrate cream, a 0.05-percent clobetasone butyrate cream, a 0.1-percent betamethasone 17-valerate cream, and a 0.05-percent clobetasol propionate cream. A one centimeter extrusion of the cream was applied to a defined area measuring $10 \times 5$ cm and the area was not washed for at least 1 hour after application. The total amount of cream applied to each area over the 6-week

treatment period was approximately 30 g.

Both xeroradiographic and pulsed ultrasound techniques were used to measure skin thickness before and after 6 weeks of treatment. Measurements using the ultrasound technique were also made at days 2, 4–5, 8–9, 14–16, 28–30, and 42–44, and at 4 weeks after cessation of treatment. Dermal thinning of 4 to 5 percent could be detected by ultrasound measurement as early as 2 days after treatment with betamethasone 17-valerate and clobetasol propionate. Dermal thinning in the hydrocortisone group was 13 percent as measured by ultrasound and 7 to 8 percent measured by the radiographic technique. The placebo group showed 9 percent dermal thinning using ultrasound measurements and 4 percent using the radiographic technique. Overall, the degree of dermal thinning was greater as measured by the ultrasound technique than when measured by the radiographic technique. The authors found that an analysis of variance comparing the dermal thinning induced by the 1-percent hydrocortisone cream versus the base from data derived from both techniques did not reach the nominal $p=0.05$ level of statistical significance. Recovery from dermal thinning, to 91 to 96 percent of the pretreatment values, was apparent in all treatment groups 4 weeks after cessation of therapy.

Kirby and Munro (Ref. 53) studied the effects on mice and humans of several different steroid preparations commercially available in the United Kingdom. Included in both segments of the study was 0.1 percent hydrocortisone incorporated in a water miscible base. In the human portion of the study, 0.05 milliliter (mL) of the test preparation was applied to a well defined area of the forearm of two groups (Groups I and II) of normal adult volunteers and covered by an occlusive dressing. In Group I, the site of application was not varied. In Group II, the site of application on the forearm was varied. Changing sites did not produce statistically significant differences between right or left arm, proximal or distal placement on the same side.

Skin-fold thickness measurements were made at points on the flexor of the forearm before the initial application of the test preparations and repeated at 7-day intervals for 2 weeks. The dressings were renewed after each of the measurements taken at weeks one and two. After one week all compounds tested produced thinning skin in both groups. Two week measurements

showed a further decrease in skin thickness on the corticosteroid treated sites in Group I while the two week measurements in Group II showed a varied response, with some preparations (including 0.1 percent hydrocortisone) showing an increase in thickness beyond the first week's readings. Among the steroids tested, the 0.1-percent hydrocortisone preparation produced less thinning than any of the other steroid preparations tested in the two groups, but more thinning than the placebo. However, it is unclear from the study to what extent the base for the 0.1-percent hydrocortisone product resembled the placebo used in the study. Because other investigators (Refs. 51 and 52) have demonstrated that the base can produce dermal thinning of its own that is comparable to that demonstrated by the 0.1-percent hydrocortisone in this study, the conclusion that the observed dermal thinning is attributable to the hydrocortisone content of the preparation is in doubt. Recovery of thinning was noted within two weeks with three of the preparations tested, including the 0.1-percent hydrocortisone preparation.

In summary, the studies conducted on humans on the effects of these corticosteroids on skin thickness show that prolonged use without occlusion of 1 percent hydrocortisone for periods of up to 11 weeks does not produce changes in skin thickness that are statistically or clinically significant from the control base. Moreover, these studies demonstrate that what changes do occur readily reverse themselves after cessation of treatment. These findings also indicate that the occasional case reports of skin atrophy that have appeared in the literature result from the use of hydrocortisone preparations on susceptible areas of the body well in excess of the recommended period of use in the proposed OTC labeling for products containing this ingredient. Based on the above studies, the agency believes that the risk of skin atrophy, striae, and telangiectasia is small within the recommended period of use being proposed for OTC drug products containing up to 1 percent hydrocortisone.

### F. Rebound Potential

The Miscellaneous External Panel in its review of hydrocortisone stated that there is a rebound effect, i.e., a return of symptoms more severe than those experienced prior to treatment, when therapy with fluorinated corticosteroids is gradually discontinued (47 FR 54646 at 54675). The Panel further stated that it was not known whether this effect may occur with hydrocortisone preparations

of higher than 0.5 percent. However, a review of the published literature reveals only descriptions of relapse of symptoms upon discontinuance of hydrocortisone therapy at concentrations greater than 0.5 percent and no tendency for rebound.

Heilesen, Kristjansen, and Reymann (Ref. 54) reported that relapse occurred in the majority of 25 subjects suffering from anogenital eczema when withdrawal of 1-percent hydrocortisone therapy was attempted. However, the authors pointed out that several of these subjects had symptoms for 10 to 15 years before the study and had been resistant to the dermatologic treatments generally employed. Relapse was also reported in one subject with nummular eczema. Treatment of this subject with hydrocortisone produced a rapid regression of symptoms that was followed by a prompt relapse of symptoms upon transition to therapy with the ointment base alone. However, the authors further reported several cases in which no relapse occurred. One subject with neurodermatitis of 10 years standing was able to do without hydrocortisone treatment for a month without experiencing a relapse, and two other subjects with neurodermatitis needed only to apply the hydrocortisone ointment at intervals of several days.

In their study of 1,655 patients, Robinson, Robinson, and Strahan (Ref. 22) noted that in most instances continued applications of hydrocortisone free alcohol and hydrocortisone acetate in concentrations of 0.5, 1.0, and 2.5 percent were necessary to maintain the relief of symptoms of atopic dermatitis, neurodermatitis, allergic contact dermatitis, stasis dermatitis, and pruritus ani and vulvae. Relapses occurred when the applications were discontinued. However, the authors also stated that when the eruption or symptoms had completely subsided it was possible in the majority of subjects to reduce the frequency of applications to once daily or once every other day.

The staff of Saint John's Hospital (Ref. 20) reported that complete clearing of symptoms without relapse was uncommon (6 percent) in the 100 patients treated for atopic eczema with concentrations of hydrocortisone and hydrocortisone acetate ranging from 0.25 to 2.5 percent. The authors further reported that in 86 subjects suffering from discoid eczema, relapse occurred regularly on withdrawal of hydrocortisone therapy. Kalz, McCorriston, and Prichard (Ref. 27) similarly reported that short remissions were induced in many subjects treated

for atopic dermatitis with a 1- or 2.5-percent hydrocortisone ointment, but that some relapses occurred after several weeks. In some instances, the relapses were not well controlled by the 1-percent hydrocortisone ointment and the 2.5-percent ointment was required. Brodthagen (Ref. 39) also observed relapses during and after treatment of subjects suffering from a variety of dermatitides with a 2-percent hydrocortisone acetate ointment. However, Brodthagen reported that the relapses were rarely as severe as the original eruptions and, as might be expected, the frequency of relapse is the highest after the shortest period of treatment.

The above data demonstrate that hydrocortisone and hydrocortisone acetate provide only a temporary control of symptoms for certain types of skin conditions and that a relapse of symptoms can occur when treatment with concentrations of 0.5 percent or greater of these ingredients is stopped. However, the data further demonstrate that in those cases where hydrocortisone therapy does not effect a cure but is only used to provide symptomatic relief, no rebound of symptoms upon cessation of therapy would be expected. With regard to the possibility of a relapse of symptoms when the use of OTC drug products containing hydrocortisone or hydrocortisone acetate is stopped, the agency believes that the risk to consumers is minimal. The studies where relapse was reported involved subjects with dermatological disorders more severe than the indications proposed for hydrocortisone-containing products in the tentative final monograph for OTC external analgesic drug products (48 FR 5852 at 5868). Moreover, the agency believes that consumers who experience a relapse of symptoms are provided adequate guidance by the proposed warning in § 348.50(b)(7), which warns against further use of these products without first consulting a physician when symptoms clear up and occur again in a few days.

## G. Adverse Drug Reactions

The agency has reviewed a summary listing of adverse drug reactions reported for single entity hydrocortisone drug products (both prescription and OTC) to its Spontaneous Reporting System for the years 1970 through 1989 (Ref. 55). This summary listing includes 724 reports of adverse drug reactions to these products. Of these reports, 207 relate to adverse drug reactions associated with the topical use of hydrocortisone or hydrocortisone

acetate containing drug products in varying concentrations from 0.25 to 2.5 percent. Virtually all of the reported reactions related to the use of these products are of a topical nature, with contact dermatitis (61 reports), allergic reaction (48 reports), rash (33 reports), application site reaction (23 reports), and pain and pruritus (29 reports) being the most frequently reported reactions. A review of the corresponding case reports for these reactions (Ref. 56) indicates that the reactions reported for drug products containing 0.5 and 1 percent hydrocortisone or hydrocortisone acetate are similar and that use of the higher 1-percent concentration does not appear to result in more severe reactions. None of these reports indicate that disability or death occurred as an outcome to these reactions.

Two case reports (Refs. 57 and 58) indicated hospitalization occurred as an outcome of reported reactions associated with the use of an OTC drug product containing 0.5 percent hydrocortisone acetate. Although not indicated by the case report for the reaction (Ref. 59), the agency was subsequently informed of a third hospitalization associated with the use of the same OTC hydrocortisone product (Ref. 60). However, the agency notes that in each case the product was not used according to the indications currently proposed in § 348.50(b)(3) (i) and (ii) of the tentative final monograph for OTC external analgesic drug products (48 FR 5852 at 5868), which states that these products are indicated for the temporary relief of itching associated with minor skin irritations and rashes due to minor conditions such as eczema, insect bites, or poison ivy. Two of the reports (Refs. 57 and 58) involved an exacerbation of an existing infection while the third report (Refs. 59 and 60) involved an incidence of bullious erythema multiforme associated with the use of the hydrocortisone product under a band aid on a scratch and a blister. The physician reporting this reaction commented that the precise etiology of his patient's rash was never determined and that the patient had reported a preceding respiratory reaction, which could not be ruled out as the cause of the rash (Ref. 59.)

The agency notes that the majority of the reported reactions appears to be the result of irritancy or sensitivity resulting from use of the products. In a few cases, the cause of the reaction is confirmed by patch testing with the individual components of the product. In the majority of the instances where patch tests were performed using the

components of the product, sensitivity or irritation due to one or more of the excipients included in the product was demonstrated (Ref. 61). While no conclusions regarding the incidence of sensitivity or irritation to hydrocortisone or hydrocortisone acetate among these reported reactions can be made because of the lack of definitive patch tests in the majority of these reports, the agency believes that the information derived from the patch tests that were performed supports the occurrence of confirmed allergic sensitivity reactions to hydrocortisone or hydrocortisone acetate, at least for some individuals, that was observed by the agency in its safety evaluation of clinical studies of the drug. (See part II, paragraph D. above—*Sensitization and Irritation Potential of Hydrocortisone.*)

The adverse drug reaction data for single entity hydrocortisone or hydrocortisone acetate containing products provided by manufacturers of these drug products from their own adverse drug reaction files (Refs. 3 and 4) to support the safety of the OTC use of these ingredients describe the same type of topical reactions as disclosed by the agency's Spontaneous Reporting System. Some additional reports are included in the data provided by the manufacturers. However, none of these reports provide sufficient detail to permit a definitive evaluation of the cause of these reactions.

Not all of the adverse reaction data provided by manufacturers relate to the safety of 1 percent hydrocortisone or hydrocortisone products. One manufacturer reported that 67.7 percent of the reports received by the company for its 0.5 percent hydrocortisone acetate products from December 10, 1979, through December 31, 1987, were for a lack of effectiveness (Ref. 4).

The agency finds that the adverse drug reaction data in its Spontaneous Reporting System and reported by the manufacturers of these products are consistent and reflective of the adverse drug reaction profile described in the clinical studies discussed above. (See part II, paragraphs C. through E. above.) As in the clinical studies, the majority of the adverse drug reactions reported were minor topical reactions. With the exception of a single foreign report of hypokalemia (Ref. 62), there is no evidence of the putative systemic effects cited by the Panel when hydrocortisone is administered orally or parenterally, i.e., suppression of the adrenal axis (44 FR 69768 at 69818). Further, the report of hypokalemia is questionable because the route of

administration of the hydrocortisone treatment is not specified.

The adverse drug reaction data include one report of secondary infection (Ref. 63), one report of withdrawal symptoms (Ref. 64), and two reports of skin atrophy (Ref. 65) associated with the topical use of hydrocortisone or hydrocortisone acetate drug products. The agency finds the incidence of these reports and the accounts of hospitalization to be a very small percentage of the total number of reported reactions, considering the widespread use of these products.

Therefore, based on the safety data obtained from the thousands of subjects who participated in the clinical studies of the safety and effectiveness of these products and the supportive evidence of the subsequent adverse drug reaction experience for these products reported to the manufacturers and the agency, the agency proposes that hydrocortisone or hydrocortisone acetate at a concentration of 1 percent can be safely used topically as an OTC drug product for the indications discussed above.

## III. Effectiveness

### A. Introduction

After reviewing the data and other information relating to the effectiveness of 1 percent hydrocortisone provided in the citizen petition (Ref. 3) and in the submission by the manufacturers' association (Ref. 4), the agency concludes that they demonstrate that 1 percent hydrocortisone is a more effective concentration than 0.5 percent for OTC use to provide relief in many pruritic conditions. Based on the view that OTC drug products should contain the lowest effective dosage, the Panel recommended 0.25 to 0.5 percent as the effective OTC concentration for hydrocortisone and hydrocortisone acetate equivalent to hydrocortisone. However, the agency notes that the majority of the controlled studies cited by the Panel as demonstrating effectiveness for topical hydrocortisone involved 1 percent hydrocortisone, and in several studies 2.5 percent was the concentration used (44 FR 69768 at 69822).

The effectiveness of concentrations of hydrocortisone and hydrocortisone acetate above 0.5 percent was evaluated as part of the agency's Drug Efficacy Study Implementation (DESI) review of prescription topical corticosteroid drugs. In the Federal Register of April 1, 1971 (36 FR 7982), based on reports received from the National Academy of Sciences-National Research Council (NAS–NRC), the agency stated conditions under which 0.5- to 2.5-percent hydrocortisone

preparations (ointment, cream, lotion, aerosol spray, or any other form suitable for topical application) were effective for symptomatic relief and adjunctive management of certain dermatoses. Based on the NAS–NRC evaluation and subsequent data that have been submitted to the agency and reviewed by the Panel and FDA, the agency has determined that substantial data exist that demonstrate the effectiveness of 1 percent hydrocortisone for various dermatitides, eczemas, and other indications that are discussed below.

### B. A Low Potency Steroid

Several reports show that hydrocortisone (alcohol or acetate) is a low potency steroid. As a result of the chemical synthesis of more potent topical steroids, a ranking system for relative potency was developed. Miller and Munro (Ref. 66) described one method (the vasoconstrictor test) for assessing topical corticosteroid activity. Effectiveness is judged by the drug's ability to cause skin blanching under occlusion. By this assay method, the relative potency is a composite of several of the corticosteroid's properties: its ability to penetrate the skin barrier after release from the vehicle, its intrinsic activity at the receptor, and its rate of clearance from the site. There is usually a strong correlation between clinical and assay results, but the evidence does not suggest that increased absorption is responsible for the increased clinical activity of the more potent compounds. The clinical potency of hydrocortisone (alcohol and acetate) 0.1 to 1.0 percent was rated as "mild" (lowest potency) by this assay, while beclomethasone dipropionate 0.5 percent was ranked as "very potent," hydrocortisone butyrate 0.1 percent as "potent," and fluocinolone acetonide 0.01 percent as "moderately potent."

Sneddon (Ref. 67) divided topical corticosteroids into four grades of potency and classified hydrocortisone 1 percent as "weak" (grade IV-lowest rating). Stoughton (Ref. 68) used vasoconstriction bioassay techniques to compare the relative effectiveness of various corticosteroids applied topically in controlled clinical studies. Hydrocortisone acetate 1.0 percent had a comparative effectiveness of 1, versus 10 for flurandrenalone acetonide 0.05 percent, 100 for triamcinolone acetonide 0.1 percent, and 360 for betamethasone valerate 0.1 percent.

Barry and Woodford (Ref. 69) evaluated the comparative bioavailability of 30 topical corticosteroid creams and gels for vasoconstriction using an occluded blanching test. The method differed from

other vasoconstriction assays in that a more sensitive estimation of pallor and more reading times were employed in order to determine the complete blanching profile of the preparation. Hydrocortisone and its acetate at a 1-percent concentration were ranked 29th (hydrocortisone) and 30th (acetate) with area under the blanching curve values of 180 and 167, respectively, when occluded. Comparatively, the highest ranked drug, with a value of 2,900 occluded, was clobetasol propionate 0.05 percent. The authors stated that hydrocortisone and its acetate are recognized as being less potent than newer steroids and were at the bottom of the classification table of preparations. As was also noted in the Miller and Munro study (Ref. 66), the authors thought the results indirectly suggest that the ranking of proprietary corticosteroid preparations based on the skin blanching tests may reflect their relative clinical efficacy.

Barry and Woodford (Ref. 70) did a similar study with 31 corticosteroid ointments. The concentration for hydrocortisone and hydrocortisone acetate was 0.1 percent. Hydrocortisone acetate ranked 30th and hydrocortisone 31st with values of 368 and 175, respectively, when occluded. Fluocinolone acetonide 0.025 percent ranked first with a value of 2,750 occluded, and 2,530 nonoccluded. Although hydrocortisone and hydrocortisone acetate ointments were tested at a lower concentration (0.1 percent) than the creams (1 percent) used in the first study (Ref. 69), the values obtained were higher, especially for hydrocortisone acetate. The authors did not provide an explanation of these results. However, it was indicated that the area under the curve values in the tests were often higher for ointments probably because of the occlusive effect of the ointment vehicle. In both studies, the hydrocortisone and hydrocortisone acetate ointment and cream were ranked last of all the products tested, demonstrating that hydrocortisone is a low potency steroid.

Cahn and Levy (Ref. 25) used hydrocortisone 1.0 percent as the reference standard in evaluating the relative effectiveness of several topical corticosteroids. The investigators noted that hydrocortisone had received the widest recognition and most extensive use in the treatment of inflammatory dermatoses and had been considered for years as the benchmark against which the effectiveness of new steroids was measured.

*The Medical Letter* (Ref. 71) has stated that topical corticosteroids are

effective in the treatment of a variety of common skin disorders including seborrheic dermatitis, neurodermatitis, psoriasis, atopic determatitis, and anogenital pruritis, and, in general, the fluorinated topical corticosteroids are more effective than other preparations. However, it was indicated that many disorders respond equally well to the less potent and less expensive steroids such as hydrocortisone. Topical steroid preparations were arranged in a chart roughly according to strength. Hydrocortisone 0.25 and 0.5 percent were considered the weakest strengths, while hydrocortisone 1.0 percent was rated a little higher, equivalent to fluocinolone acetonide 0.01 percent and flurandrenolide 0.025 percent. *The Medical Letter* noted that absolute equivalents of topical steroids have not been established, and some dermatologists might disagree with the positions given to some of the formulations presented in the chart.

The above data show that, in comparison to other steroids, hydrocortisone has been determined to be a low potency drug that is effective for the treatment of many common dermatoses. The Panel concluded that numerous controlled and uncontrolled studies provide strong documentation for the efficacy of hydrocortisone and hydrocortisone acetate for antipruritic and anti-inflammatory use in the 0.5- to 5-percent dosage range. As noted above, the Panel identified a number of effectiveness studies in which the 1-percent concentration of hydrocortisone was used and a high percentage of subject improvement occurred for various dermatoses (44 FR 69768 at 69822).

## C. Hydrocortisone 1 Percent Is More Effective Than 0.5 Percent

Seven controlled clinical trails (Refs. 22, 32, 35, 54, 72, 73, and 74) involving over 4,000 subjects with various dermatoses demonstrate that 1 percent hydrocortisone is more effective than the 0.5-percent concentration in many subjects. The methodology used by many of the investigators in these clinical trials was either paired simultaneous comparisons of active vs. placebo or active vs. active, or crossover patterns using actives and/or placebo. The paired simultaneous comparison technique is used to study the effects of different concentrations of active ingredients applied topically on the same subject. In this procedure, subjects having symmetrical skin lesions of closely similar duration, degree, and extent are selected for comparative evaluation of the effects of one product applied on one side of the body vs.

another product applied simultaneously on the other side of the body. In certain conditions (e.g., anogenital pruritus), contralateral areas may be in opposition to one another, thus making discrete unilateral topical applications impossible.

The crossover technique is well-known and is an effective way to determine the minimal effective dose of a drug, particularly in conditions that are longstanding and generally unresponsive to previous therapy. In a number of instances where investigators had accepted the therapeutic effectiveness of topical hydrocortisone, crossover comparisons were no longer made to placebo (or previously accepted topical therapy) but were made to higher or lower concentrations of hydrocortisone. This approach provide data on the minimum effective dose for maintenance or cure of the condition.

Frank, Stritzler, and Kaufman (Ref. 72) studied 282 subjects with atopic dermatitis, contact dermatitis, nummular and hand eczema, neurodermatitis, seborrheic eczema, and pruritus ani and vulvae to compare the effects of 0.5- and 1-percent hydrocortisone alcohol. The subjects were treated with two ointments: one containing 0.5-percent hydrocortisone free alcohol and the other containing 1-percent hydrocortisone free alcohol. Whenever possible, contralateral areas were treated with each ointment for comparative evaluation. When contralateral areas could not be treated because of location, both ointments were alternated. Of the 282 subjects using both ointments, 169 found the 0.5-percent and the 1-percent products equally effective, 80 found the 1 percent more effective, and 33 found the 0.5 percent more effective. The authors stated that, in general, the impression was that the 0.5-percent concentration was about 75 percent as effective as the 1-percent concentration. The authors also noted that frequently a better response to the 0.5-percent concentration was obtained in areas where treatment was initiated with the 1-percent product and then maintained with the 0.5-percent product.

Robinson, Robinson, and Strahan (Ref. 22) evaluated the effects of multiple combinations of different vehicles and concentrations of topical hydrocortisone (0.5, 1.0, and 2.5 percent) in the treatment of various dermatoses in 1,655 subjects. Hydrocortisone free alcohol 0.5, 1.0, and 2.5 percent in various vehicles was used on 757 subjects, and hydrocortisone acetate 0.5, 1.0, and 2.5 percent in various vehicles was used on 349 subjects. The results

indicated that 0.5 percent hydrocortisone (alcohol and acetate) was effective in 60 percent of the subjects studied. This concentration was also effective in maintaining symptomatic relief when treatment was initiated with a higher concentration. The paired comparison method was used in several cases of extensive atopic dermatitis, with placebo applied to one part of the body and active drug to another part. In subjects with atopic dermatitis, 0.5 percent hydrocortisone proved to be effective for 60 percent, 1 percent was effective for 80 percent, and 2.5 percent effective for 90 percent. The 1- and 2.5-percent concentrations were of great value in the treatment of dermatitis venenata, while the 0.5-percent concentration was not effective. In anogenital pruritis, the improved, partially improved, and not improved results were as follows: 7:2:4 for 0.5 percent, 27:9:6 for 1 percent, and 18:3:2 for 2.5 percent. Robinson, Robinson, and Strahan concluded from this study that both 0.5- and 1-percent hydrocortisone concentrations were useful and that 1 percent was the optimum concentration. The authors also concluded that there is not appreciable difference between the local action of hydrocortisone free alcohol and hydrocortisone acetate.

Rattner (Ref. 35) studied 1,200 subjects having various dermatoses using topical hydrocortisone acetate in various concentrations and bases and comparing them with placebo bases and standard ointments. Whenever possible, simultaneously paired comparisons were made, using the hydrocortisone product on one side of the body and using the base on a similar lesion on the opposite side of the body. One percent hydrocortisone acetate yielded excellent results in a majority of cases of atopic eczema, contact dermatitis, localized neurodermatitis, otitis externa, and pruritus ani. Rattner found the 1-percent concentration (in an ointment base) to be more effective than the 0.5-percent concentration but occasionally less effective than the 2.5-percent concentration. Rattner also reported that no difference in results was observed between the hydrocortisone acetate and the free alcohol preparation.

Irke and Griffin (Ref. 73) used paired simultaneous comparisons in 60 elderly subjects (between 60 and 90 years of age, average 68 years) of combination products containing a fixed amount of neomycin with various concentrations of hydrocortisone from 0.5 to 2.5 percent. The conditions studied included lichen simplex chronicus, anogenital pruritus, severe and prolonged contact dermatitis, seborrheic dermatitis, stasis dermatitis,

infectious eczematoid dermatitis, dishidrosis, and nummular eczema. They found that the 0.5-percent hydrocortisone preparation was the least satisfactory, the 2.5-percent hydrocortisone was the most effective, and the 1-percent hydrocortisone was somewhat less effective than the 2.5-percent but was considered adequate for most conditions studied.

Heilesen, Kristjansen, and Reymann (Ref. 54) in a study of 130 subjects with various dermatoses reported that 0.1- or 0.5-percent concentration of hydrocortisone was not capable of maintaining the effect obtained from using the 1-percent concentration. The authors concluded that the 1-percent concentration seems clearly to mark the threshold of effectiveness.

Welsh and Ede (Ref. 32) compared the effects of 1.0 and 2.5 percent hydrocortisone and its acetate in 402 subjects with chronic dermatoses refractory to other available topical remedies. They found both concentrations adequately treated acute contact dermatitis, mild transient atopic dermatitis, eczema, uncomplicated stasis dermatitis, and pruritus ani. They concluded that the therapeutic effectiveness between the two concentrations was not striking. Later they expanded the study (Ref. 74) and included 306 additional subjects (708 total) with dermatoses known to be refractory to usual treatment. Hydrocortisone ointment (acetate and alcohol) in 0.5-, 1.0-, and 2.5-percent concentrations was used. The alcohol was more effective than the acetate. All three concentrations were effective in treating mild dermatoses, but for very acute or chronic dermatoses only 1 and 2.5 percent were effective. The authors stated that their observations failed to confirm those reported by others, i.e., that the 1-percent concentration clearly marked the threshold of effectiveness, and that 0.5 percent is not capable of maintaining the effects obtained with 1 percent hydrocortisone.

The Panel evaluated 37 studies demonstrating the effectiveness of topical hydrocortisone at concentrations ranging from 0.1 to 2.5 percent. In 22 studies, 1 percent hydrocortisone was the concentration used, and 9 other studies included 1 percent hydrocortisone in a range of concentrations that were evaluated (44 FR 69768 at 69822). The agency notes that five of the seven studies (Refs. 22, 35, 54, 72, and 74) described above were cited by the Panel as supporting the effectiveness of hydrocortisone (44 FR 69822). The agency has determined that these clinical studies demonstrate that a

1-percent concentration of hydrocortisone is more effective than a 0.5-percent concentration for a number of dermatologic conditions that are included in the OTC labeling for products containing this ingredient. However, the agency concludes that a range of concentrations from 0.25 to 1 percent is appropriate for OTC drug products containing hydrocortisone.

## IV. Labeling

### A. Introduction

Labeling for 0.25 to 0.5 percent hydrocortisone and hydrocortisone acetate was proposed by the agency in the tentative final monograph for OTC external analgesic drug products (48 FR 5852 at 5868 and 5869). It was revised in amendments to that proposed monograph in the **Federal Register** of July 30, 1986 (51 FR 27360 at 27363) and August 5, 1988 (53 FR 32592 at 32593). The labeling contains indications that the agency considers as being amenable for using hydrocortisone for self-treatment, such as "For the temporary relief of itching associated with minor skin irritations * * * and rashes * * *." The proposed warnings and directions applicable to all OTC external analgesic drug products also apply to hydrocortisone, e.g., for external use only and 7-day use limitation. In addition, the following warning is specifically required for OTC hydrocortisone products bearing a label indication for external genital itching or for external feminine itching: "Do not use if you have a vaginal discharge. Consult a" (select one of the following: "physician" or "doctor"). The agency concludes from the safety and effectiveness data presented that the labeling that was proposed for 0.25 to 0.5 percent hydrocortisone, with the modifications described below, would also be appropriate for OTC drug products containing 1 percent hydrocortisone.

### B. Proposed OTC Labeling for 1 Percent Hydrocortisone

The citizen petition (Ref. 3) contained proposed labeling for 1 percent hydrocortisone, while the manufacturers' association's (Ref. 4) proposed labeling was for concentrations "up to" 1 percent. The labeling proposed by these two parties is substantially similar to the labeling proposed by the agency for the 0.25- to 0.5-percent concentration of hydrocortisone in the tentative final monograph for OTC external analgesic drug products (48 FR 5852 at 5868) and the amended tentative final monograph (51 FR 27360 at 27363).

The labeling proposed by the petitioner (Ref. 3) for 1 percent hydrocortisone is as follows:

*Indications.* For the temporary relief of minor skin irritations; inflammation, itches, and rashes due to insect bites; external anal itching; and allergic and irritant dermatitis caused by poison ivy, poison oak, poison sumac, soaps, detergents, cosmetics, or jewelry. Other uses or the use of the product for more than 7 days should be undertaken only under the advice and supervision of a physician.

*Warnings.* For external use only. Avoid contact with eyes. If the condition being treated worsens, or if symptoms persist for more than 7 days, discontinue use of this product and consult a physician. *Do not use for the treatment of diaper rash* or on children under 2 years of age except under the advice and supervision of a physician. Keep this and all drugs out of the reach of children. In case of accidental ingestion, seek professional assistance or contact a poison center immediately.

*Directions for use.* For adults and children 2 years of age and older: Apply to affected area not more than 3 or 4 times daily. Do not use in children under 2 years of age except under the advice and supervision of a physician.

The petitioner excluded what it considered "chronic conditions" (i.e., eczema) from the proposed indications for use because it felt that OTC topical hydrocortisone 1 percent should be reserved for short-term use in acute dermatologic conditions, and that conditions requiring therapy for more than 7 days should be treated by a physician. The petitioner also proposed the following new statement: "Other uses or the use of the product for more than 7 days should be undertaken only under the advice and supervision of a physician."

The petitioner stated that the proposed warning "do not use for the treatment of diaper rash * * * except under the advice and supervision of a physician" was based on the Dermatologic Drugs Advisory Committee's concern regarding the potential use of 1 percent hydrocortisone in the treatment of diaper rash. The petitioner considered this to be a valid concern. The petitioner also felt that the warning was necessary to help restrict use of 1 percent hydrocortisone to children 2 years of age and older and adults.

The labeling proposed by the manufacturers' association (Ref. 4) for OTC topical hydrocortisone and hydrocortisone acetate for short-term therapy as antipruritics in concentrations up to 1 percent was as follows:

*Indications.* For the temporary relief of itching associated with minor skin irritations,

inflammation, and rashes due to (select one or more of the following: eczema, insect bites, poison ivy, poison oak, or poison sumac, soaps, detergents, cosmetics, jewelry, seborrheic dermatitis, psoriasis) and/or (and for external (select one or more of the following: genital, feminine, and anal) itching).

*Warnings.* For external use only. Avoid contact with the eyes. If condition worsens, or if symptoms persist for more than 7 days or clear up and occur again within a few days, do not use this or any other hydrocortisone product unless you have consulted with a (physician/doctor). Do not use on children under 2 years of age except under the advice and supervision of a physician. Do not use if you have a vaginal discharge. Consult a (physician/doctor). (Only if indications evident genital or feminine itching.)

*Directions.* Adults and children 2 years of age and older: Apply to affected area not more than 3 to 4 times daily. For children under 2 years of age there is no recommended dosage except under the advice and supervision of a physician.

There are some differences in these two proposed labels for OTC hydrocortisone drug products. The indications for itching due to "eczema," "seborrheic dermatitis," "psoriasis," "genital," and "feminine" itching were included in one proposal, but excluded in the other proposal. The phrase "* * * do not use this or any other hydrocortisone product unless you have consulted with a (physician/doctor)" was proposed as an addition to the 7 day limit-of-use warning by the manufacturers' associations for the reason that this additional wording is more directly informative and instructional to the consumer, particularly with market availability of OTC hydrocortisone at several concentrations. The other proposal contained a similar statement: "Other uses or the use of the product for more than 7 days should be undertaken only under the advice and supervision of a physician."

The agency believes that the labeling proposed for hydrocortisone and hydrocortisone acetate should apply to and be the same for all concentrations (0.25 to 1.0 percent), just as the labeling proposed for hydrocortisone and hydrocortisone acetate in the tentative final monograph for OTC external analgesic drug products applies to both 0.25 and 0.5 percent concentrations (48 FR 5852 at 5868 and 5869, 51 FR 27360 at 27363, and 53 FR 35292 at 35293).

The agency has considered the two labeling proposals and determined that they are not significantly different in concept from the labeling that the agency has proposed for hydrocortisone in § 348.50 in the tentative final monograph for OTC external analgesic

drug products. The agency's original proposal in 1983 (48 FR 5868) did not include seborrheic dermatitis or psoriasis as indications. In the Federal Register of July 30, 1986 (51 FR 27360), the agency amended the indications in § 348.50(b)(3) (i) and (ii) of the tentative final monograph to include seborrheic dermatitis and psoriasis as conditions for which hydrocortisone at 0.25- to 0.5-percent concentration can be labeled for OTC use. The agency has determined that "eczema" can remain the OTC labeling for these products because many of the safety and effectiveness studies described above involved the treatment of eczematous conditions, with improvement evident within a week. (See Part II. above—Safety and Part III. above—Effectiveness.) In addition, the 7-day limit of use warning is intended to prevent long-term use of hydrocortisone for any indication, such as "eczema," without consulting a physician/doctor. Therefore, the agency is proposing that the indications in § 348.50(b)(3) (i) and (ii), as amended in 1986, be used for all concentrations of hydrocortisone from 0.25 to 1 percent. These indications are currently proposed as follows: (i): "For the temporary relief of itching associated with minor skin irritations and rashes" [which may be followed by: due to" (select one or more of the following: "eczema," "insect bites," "poison ivy, poison oak, or poison sumac," "soaps," "detergents," "cosmetics," "jewelry," "seborrheic dermatitis," "psoriasis") and/or ("and for external" (select one or more of the following, "genital," "feminine," and "anal") "itching")].

(ii): "For the temporary relief of itching associated with minor skin irritations, inflammation, and rashes due to" (select one or more of the following: "eczema," "insect bites," "poison ivy, poison oak, or poison sumac," "soaps," "detergents," "cosmetics," "jewelry," "seborrheic dermatitis," "psoriasis)," and/or ("and for external" (select one or more of the following: "genital," "feminine," and "anal") "itching").

The agency believes that part of the statement "other uses or the use of this product (for more than 7 days) should be undertaken only under the advice and supervision of a physician," proposed by the petitioner for inclusion with the indications, may help prevent misuse of hydrocortisone for cuts, blisters, infections, etc. (nonindications), which could result in adverse reactions. Accordingly, the agency is amending proposed § 348.50(b)(3) to add paragraph (iii) to read: "Other uses of this product should be only under the advice and supervision of a" (select one of the following: "physician" or

"doctor"). The agency is not including the words "for more than 7 days" because it believes that these words might inadvertently encourage use of the product for more than 7 days.

The agency agrees with the manufacturers' association that addition of the phrase "* * * do not use this or any other hydrocortisone product unless you have consulted a (physician/ doctor)" to the 7 day limit-of-use warning will be helpful to consumers because of the proposed availability of hydrocortisone for OTC use at concentrations ranging from 0.25 to 1 percent. Accordingly, the agency is revising proposed § 348.50(c)(7) to add paragraph (i), to read as follows:

(7) *For products containing hydrocortisone preparations identified in § 348.10(d) (1) and (2).* (i) "If condition worsens, or if symptoms persist for more than 7 days or clear up and occur again within a few days, do not use this or any other hydrocortisone product unless you have consulted a" (select one of the following: "Physician" or "doctor").

The warning currently proposed in § 348.50(c)(7) in the tentative final monograph (February 8, 1983; 48 FR 5852 at 5869) for products with an indication for external "genital or feminine itching" will be redesignated as § 348.50(c)(7)(ii).

Other warnings being included in this proposed amendment apply to products for "external anal itching." In the Federal Register published August 25, 1988 (53 FR 32592 at 32593), the agency amended the tentative final monograph for OTC external analgesic drug products to include the hydrocortisone-containing products warnings and directions proposed in § 346.50(c) (2), (3), and (4), and (d)(1) of the tentative final monograph for OTC anorectal drug products. These warnings are now being included in § 348.50(c)(7)(iii), instead of (c)(9) as previously designated, and read: "For products containing hydrocortisone preparations identified in § 348.10(d) (1) and (2) that are labeled with the indication' * * * for external anal itching." In addition to the warnings in paragraph (c)(1) of this section, the labeling of the product also contains the warnings proposed in § 346.50(c) (2), (3), and (4) of this chapter. (See the Federal Register of August 15, 1988; 53 FR 30756.)"

The agency notes that the Panel did not discuss the use of hydrocortisone for the treatment of diaper rash. The Miscellaneous External Panel briefly mentioned the use of 0.5 to 1 percent hydrocortisone for the treatment of severe diaper rash by physicians (47 FR 39412 at 39416).

The agency believes that the proposed warning "do not use for the treatment of diaper rash or on children under 2 years of age except under the advice and supervision of a physician" is appropriate, even though diaper rash is not an indication in the tentative final monograph for OTC external analgesic drug products, and the directions state not to use on children under 2 years of age. The Panel advised that products containing any external analgesic active ingredient not be used on children under 2 years of age except under the advice and supervision of a physician. The Panel's main concern was related to increased cutaneous penetration of a drug under the occlusive conditions found in infants resulting from a diaper, lying on a waterproof mattress, wet clothing, or from body folds touching each other. The Panel noted that the penetration of hydrocortisone is enhanced 10- to 100-fold by occlusion, and that ingredients under occlusion may possibly be corrosive to the infant's skin (44 FR 69768 at 69773 and 69774).

The agency is aware that children over 2 years of age may also have diaper rash (Refs. 75, 76, and 77). The above warning would also alert parents of children over 2 years of age not to use hydrocortisone-containing drug products for diaper rash unless directed to do so by a physician. The agency believes possible enhanced penetration of hydrocortisone could also be a potential problem if an occlusive environment existed in a child over 2 years of age. Accordingly, the agency is proposing a new paragraph (iv) in § 348.50(c)(7) to read: "Do not use for the treatment of diaper rash. Consult a" (select one of the following: "physician" or "doctor"). The agency invites comments regarding this proposed warning.

External analgesic drug products for diaper rash use were evaluated by the Miscellaneous External Panel in an advance notice of proposed rulemaking published in the Federal Register of September 7, 1982 (47 FR 39412). The agency will present its tentative findings on these products, which includes hydrocortisone-containing products, in a future issue of the Federal Register.

Based on the Panel's concerns about drug penetration being enhanced under occlusion, the agency believes that it may be appropriate to revise and clarify the directions for use applicable to all OTC external analgesic drug products in § 348.50(d)(1) for children under 2 years of age. The agency believes it would be appropriate to add the words "do not use" in addition to the instruction to "consult a physician (or doctor)." Accordingly, the agency is revising the

general directions that apply to all OTC external analgesic drug products (which includes hydrocortisone) in proposed § 348.50(d)(1) to read as follows: * * * "Adults and children 2 years of age and older: Apply to affected area not more than 3 to 4 times daily. Children under 2 years of age: Do not use, consult a" (select one of the following: "physician" or "doctor").

The agency tentatively concludes that the changes proposed in this amendment should result in labeling that is clear to consumers and that assures safe and proper self-use of OTC topical hydrocortisone drug products up to 1-percent concentration. Because OTC marketing of hydrocortisone is a prescription-to-OTC switch, agency regulations in 21 CFR 330.13(b)(2) require that such a product be marketed with labeling that is in accord with a proposed monograph or a tentative final monograph. Accordingly, the labeling proposed in 1979 (44 FR 69768 at 69865 and 69866) or 1983 (48 FR 5852 at 5868 and 5869), as amended in 1986 (51 FR 27360 at 27363) and in 1988 (53 FR 32592 at 32593), should continue to be used for OTC hydrocortisone-containing drug products. This document, while it does not allow OTC marketing of products containing above 0.5 percent hydrocortisone up to 1 percent hydrocortisone, does apply to currently marketed products containing 0.25 to 0.5 percent hydrocortisone. Irrespective of the final decision on OTC status of hydrocortisone above 0.5 percent up to 1 percent, the agency intends for the labeling revisions proposed in this document to apply to OTC drug products containing 0.25 to 0.5 percent hydrocortisone. Accordingly, manufacturers may use the labeling proposed in this amendment on currently marketed OTC hydrocortisone-containing drug products. The final monograph, when published, will establish the final labeling that will be required for all OTC drug products that contain hydrocortisone.

### C. Differentiation Between Product Strengths in OTC Labeling

Based on the market availability of multiple strengths of other OTC external and internal drug ingredients, the manufacturers' association indicated that packaging graphics will clearly communicate to consumers that there is a difference in strength of OTC drug products containing hydrocortisone. The use of terms such as "Regular Strength" and "Maximum Strength" was suggested so that consumers would be able to treat indicated itch/rash conditions with what they determined to be the

appropriate product concentration for their specific needs.

The agency recognizes that currently there are OTC drugs on the market containing varying concentrations of active ingredients per dosage unit. Although terms such as "regular strength" and "maximum strength" may be helpful to consumers by alerting them to the fact that products with such labeling may not necessarily contain the quantity of ingredient contained in other products they have purchased, the agency believes such terms and other similar terms are only peripherally related to an OTC drug product's safety and effectiveness. Therefore, the agency considers such terms to be outside the scope of the OTC drug review and is not including such terms in the monograph.

The agency is aware that the term "maximum strength" currently appears in the labeling of some 0.5 percent OTC hydrocortisone drug products. The agency is concerned about the degree of confusion that may be caused to consumers if products containing 0.5 percent hydrocortisone are relabeled to state "regular strength" without further explanation regarding the change. It is possible that the same entity (a 0.5-percent hydrocortisone product), marketed by either the same manufacturer or different manufacturers, could appear on the store shelf side-by-side with different labeling: one stating that the product is "regular strength" and the other stating that the same strength product is "maximum strength." Further, referring to 1 percent hydrocortisone as "maximum strength" could not only be confusing but also be considered misleading because there are higher concentrations of hydrocortisone available by prescription. In addition, the agency questions which term would be used to designate the 0.25-percent concentration of hydrocortisone and any concentrations in between 0.25 percent and 1 percent, which might be marketed under the OTC drug monograph. Based on the above, if these terms are used in the labeling of OTC hydrocortisone-containing drug products, the agency believes that an adequate explanation of their meaning should be provided to consumers.

As stated above, these terms will not be included in the labeling required by the monograph for OTC external analgesic drug products, but they could be used elsewhere in the labeling. However, if such terms are used, the agency believes manufacturers should provide consumers with an explanation of these terms as they relate to these specific products. In accordance with

§ 201.62(a) (21 CFR 201.62(a)), the concentration of the hydrocortisone present should be included in the labeling to give accurate information about the strength of the drug in a specific package.

## V. Suitable Dosage Forms

### A. Introduction

The Panel emphasized that vehicles play an important role in the safety and effectiveness of dermatological drug products (44 FR 69768 at 69774 and 69775). Vehicles were discussed as one of the physiochemical factors that affect skin penetration. The Panel believed that the vehicle in which an active ingredient or combination of ingredients is incorporated may influence effectiveness. The Panel stated that the vehicle must provide solubility, stability, maintain contact of the active ingredient with the lesion of the skin, and must not retard passage of the drug into the skin or lesions, thereby decreasing bioavailability. A drug's rate of release from its vehicle depends on its rate of diffusion within the vehicle. A vehicle may also affect the hydration of the stratum corneum. Those which increase or maintain hydration usually promote drug absorption. Dimethylsulfoxide (DMSO) and dimethylformamide (DMF), used as vehicles, may accelerate absorption of substances through the skin barrier. Surface active ingredients (surfactants) also increase absorption. Most vehicles consist of emulsions, i.e., suspensions of droplets of one liquid in another in which it is insoluble. Ointments, pastes, or creams are semisolid vehicles. Oleaginous vehicles consist of hydrocarbons, fatty acids, or esters of fatty acids. The Panel determined that ideal dermatological vehicles are stable, neutral, nongreasy, nondegreasing, nonirritating, nondehydrating, nondrying, washable, odorless, and stainless. Additionally, vehicles should act efficiently on all kinds of human skin, hold at least 50 percent water, and should be easily compounded with known chemicals. The Panel recommended that all inactive ingredients, including those in vehicles, be listed in the drug products' labeling.

### B. The Panel's Discussion of Vehicles in Relation to Hydrocortisone

In its discussion of hydrocortisone, the Panel referred to vehicles a number of times. The Panel cited the **Federal Register** of April 28, 1971 (36 FR 7962) as containing a statement that 0.5-, 1.0-, and 2.0-percent hydrocortisone products in different types of vehicles were generally recognized as safe and

effective (44 FR 69768 at 69813). The Panel mentioned a study in which hydrocortisone solutions or suspensions in several vehicles (i.e., polyethylene glycol, olive oil, chloroform plus olive oil, physiological saline, or ointment base) were applied to shaved backs of female rats (44 FR 69816). No significant difference in results among the various vehicles was detected. Adverse reactions in some studies were attributed to the vehicle or a contaminant (44 FR 69817). Also, vehicles have been implicated in sensitivity and irritation reactions with hydrocortisone (44 FR 69822). At its 23d meeting held on March 4 and 5, 1976 (Ref. 7), the Panel decided that its report on hydrocortisone was to include a recommendation: "Not to be incorporated in vehicles greatly enhancing cutaneous penetration such as DMSO and related compounds." This statement was considered necessary in view of the possibility of future development of new vehicles and formulations which may enhance absorption and the effectiveness of topically applied medicaments.

At its 24th meeting held on May 19 and 20, 1976 (Ref. 78), the Panel again expressed concern regarding the use of new vehicles, with properties similar to DMSO, which may increase absorption of ingredients beyond what the Panel determined to be safe and effective. The Panel concluded at that meeting that "Ingredients reviewed by this Panel were categorized on the basis of their use in currently employed topical vehicles," (Ref. 78).

### C. Discussion of Vehicles in Submissions

OTC drug monographs do not, as a general rule, identify a formulation (vehicles) for dosage forms containing monograph active ingredients. Although vehicles are considered to be inactive ingredients, the Panel noted that many vehicles interact physically and chemically with the outer layer of human skin. The substantivity, penetration, and resistance of the active ingredients to sweating, washing, and other factors often depend upon the vehicle (44 FR 69768 at 69775). The OTC drug regulations in 21 CFR 330.1(e) address vehicles in OTC drug products by stating that a product may contain only suitable inactive ingredients which are safe and do not interfere with the effectiveness of the preparation or with suitable tests or assays to determine if the product meets its professed standards of identity, strength, quality, and purity.

The petitioner (Ref. 3) did not address vehicles used in OTC hydrocortisone

containing drug products, but the manufacturers' association (Ref. 4) referred to the comprehensive examination and discussion of vehicles in the Panel's report on OTC external analgesic drug products, published in the **Federal Register** of December 4, 1979 (44 FR 69768), and the published clinical studies evaluated by the Panel as supporting the lack of effects of vehicles on percutaneous absorption of hydrocortisone. The manufacturers' association contended that the studies show that under normal conditions of use, topically applied hydrocortisone is only minimally absorbed systemically. (See also part II. paragraph C. above— *Systemic Effects and Risk of Superinfection*.) Two studies (Refs. 79 and 80) were cited as showing that only 1 percent or less of the amount of hydrocortisone applied is absorbed through normal adult skin and that 2 percent is absorbed through damaged skin. In one study (Ref. 79), the amount and rate of penetration of $^{14}C$ hydrocortisone applied to normal skin was evaluated by measuring excretion in the urine over a period of 10 days. The authors commented that urinary excretion of $^{14}C$ hydrocortisone accurately reflects the penetration of $^{14}C$ hydrocortisone through the epidermis because excretion of $^{14}C$ after intravenous or intradermal injection is very rapid with little delay when compared to any method of topical application. This is further confirmed by the relatively efficient recovery of 63 to 75 percent of the drug. The authors concluded that their data confirm that less than 1 percent of topically applied hydrocortisone is absorbed through intact skin and that this absorption is spread out as long as 10 days.

The other study (Ref. 80) was a preliminary and short, but similar, report involving only 2 subjects. Peak excretion of hydrocortisone 4-C$^{14}$ in an ointment base occurred in the second 24 hours after application, but lower levels of radioactivity persisted throughout the 6-day experimental period. The authors concluded that while precise quantitative data could not be determined under the conditions of the experiment, less than 1 percent of the topically applied 4-C$^{14}$ hydrocortisone was excreted in the urine over a period of 6 days. It was postulated, based on this excretion pattern, that a depot of hydrocortisone forms, possibly in the skin, which persistently releases small amounts of the hormone over an extended period of time.

The manufacturers' association calculated a "worst case scenario" where topical application of one ounce

Case 4:22-cv-02625-HSG   Document 22-2   Filed 08/24/22   Page 207 of 210

of product (entire OTC package quantity) at one time would lead to absorption of only 300 mg of hydrocortisone if all the drug were absorbed, which would not occur. The association stated that this quantity of hydrocortisone is only slightly higher than the initial dosage of 20 to 240 mg a day approved by FDA in the labeling of orally-administered hydrocortisone tablets. Based on the amount of data on vehicles for hydrocortisone products reviewed by the Panel, the manufacturers' association reasoned that neither the Panel nor the agency saw a need to limit or specify the types of dermatologic vehicles appropriate for OTC 0.5 percent hydrocortisone. The manufacturers' association concluded that any of the commonly available dermatological vehicles would be appropriate for the safe and effective delivery of 1 percent hydrocortisone in an OTC drug product.

The agency agrees with the Panel's recommendation that hydrocortisone for OTC use should be incorporated into vehicles that do not greatly enhance percutaneous absorption with the resulting possibility of causing safety risks. The agency also agrees with the Panel, in its discussion of vehicles, that all inactive ingredients in the product (including those in vehicles) be listed on the labeling of OTC drug products (44 FR 69768 at 69775). Such information would help consumers avoid products containing ingredients to which they are allergic or sensitive. Hydrocortisone safety studies discussed above indicated that most sensitization and irritancy reactions were caused by the vehicle. (See also part II, paragraph D. above—*Sensitization and Irritation Potential of Hydrocortisone.*) The agency also notes that some vehicles decrease penetration, diminishing availability of the drug to the skin. As stated above, the OTC drug regulations in 21 CFR 330.1(e) should be used as the basis for formulating OTC hydrocortisone drug products.

### References

(1) Comments No. CP00005, MT00007, and LET00004, Docket No. 78N–0301, Dockets Management Branch.

(2) Summary Minutes of the Twenty-Sixth Meeting of the Dermatologic Drugs Advisory Committee, pp. 7–9, November 18, 1985, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(3) Comment No. CP00005, Docket No. 78N–0301, Dockets Management Branch.

(4) Comment No. C00102, Docket No. 78N–0301, Dockets Management Branch.

(5) Transcript of Proceedings of the Sixteenth Meeting of the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products,

Volume I, p. 125, January 21, 1975, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(6) Transcript of Proceedings of the Nineteenth Meeting of the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products, Volume II, pp. 2–6, May 22, 1975, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(7) Summary Minutes of the Twenty-Third Meeting of the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products, p. 2, March 4 and 5, 1976, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(8) Summary Minutes of the Thirty-Fifth Meeting of the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products, p. 11, May 22 and 23, 1978, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(9) Transcript of Proceedings of the Dermatologic Drugs Advisory Committee, pp. 191, 203, 205, 220, and 221, November 18, 1985, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(10) Memorandum of Telephone Conversation, October 27, 1989, between C. L. Peeler, Federal Trade Commission, and W. E. Gilbertson, FDA, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(11) Comment No. C00105, Docket No. 78N–0301, Dockets Management Branch.

(12) Kamil, L., J. Lilja, and M. Sjoblom, "What Happened When Hydrocortisone Ointment Became Available on the Swedish Market Without Prescriptions," Department of Social Pharmacy, Uppsala University, Sweden, unpublished paper in Comment No. C00105, Docket No. 78N–0301, Dockets Management Branch.

(13) Department of Health and Social Security: Medicines Act Information Letter, February 1986, Comment No. C00105, Docket No. 78N–0301, Dockets Management Branch.

(14) Malkinson, F. D., "Studies on the Percutaneous Absorption of C¹⁴Labeled Steroids By Use of the Gas-Flow Cell," *Journal of Investigative Dermatology*, 31:19–28, 1958.

(15) Smith, C. C., "Eosinophilic Response After Inunction of Hydrocortisone Ointment," *American Medical Association Archives of Dermatology and Syphilology*, 68:50–53, 1953.

(16) Smith, C. C., "Urinary Excretion of 17 Ketosteroids and 17 Hydroxycorticosteroids After Inunction of Hydrocortisone Ointment," *Journal of Investigative Dermatology*, 25:67–69, 1955.

(17) Fleischmajer, R., "The Lack of Systemic Hydrocortisone Effects After Massive and Prolonged External Applications," *Journal of Investigative Dermatology*, 36:11–16, 1961.

(18) Witten, V. H., A. J. Shapiro, and R. H. Silber, "Attempts to Demonstrate Absorption of Hydrocortisone by New Chemical Test Following Inunction Into Human Skin," *Proceedings of the Society for Experimental Biology and Medicine*, 88:419–421, 1955.

(19) Gemzell, C. A., S. Hard, and A. Nilzen, "The Effect of Hydrocortisone, Applied Locally to the Skin, on Eosinophil Count and the Plasma Level of 17-Hydroxycorticosteroids," *Acta Dermato-Venereologica*, 35:327–33, 1954.

(20) Staff of Saint John's Hospital for Diseases of the Skin and the Institute of Dermatology, London, "The Value of Local Hydrocortisone in the Treatment of Skin Diseases," *The Practitioner*, 178:337–341, 1957.

(21) Carpenter, C. L., et al., "Combined Steroid-Antiinfective Topical Therapy in Common Dermatoses: A Double-Blind, Multi-Center Study of Iodochlorhydroxyquin-Hydrocortisone in 277 Patients," *Current Therapeutic Research*, 15:650–659, 1973.

(22) Robinson, H. M., R. C. V. Robinson, and J. F. Strahan, "Indications for Local Hydrocortisone Therapy," *Medical Times*, 83:227–237, 1955.

(23) Robinson, R. C. V., and H. M. Robinson, "Topical Treatment of Dermatoses with Steroids," *Southern Medical Journal*, 49:260–266, 1956.

(24) Sulzberger, M. B., and V. H. Witten, "Hydrocortisone Ointment in Dermatological Therapy," *The Medical Clinics of North America*, 38:321–336, 1954.

(25) Cahn, M. M., and E. J. Levy, "A Comparison of Topical Corticosteroids: Triamcinolone Acetonide, Prednisolone, Fluorometholone, and Hydrocortisone, "*Antibiotic Medicine and Clinical Therapy*, VI:734–738, 1959.

(26) Mullins, J.F., and J.H. Hicks, "Hydrocortisone Ointment in the Treatment of Dermatological Disorders," Texas State Journal of Medicine, 50:703–705, 1954.

(27) Kalz, F., L.R. McCorriston, and H. Prichard, "An Evaluation of Hydrocortisone Acetate Ointment in Various Skin Diseases," *Canadian Medical Association Journal*, 72:7–12, 1955.

(28) Polano, M.K., "On the External Use of Hydrocortisone in Skin Diseases," *Acta Dermato-Venereologica*, 36:283–290, 1956.

(29) Howell, C.M., "An Evaluation of the Treatment of 259 Cases of Inflammatory Dermatoses with Hydrocortisone Free Alcohol Ointment," *Journal of Allergy*, 27:477–479, 1956.

(30) Portnoy, B., "A Comparison Between 9α-Fluorohydrocortisone and Hydrocortisone in the Topical Treatment of Certain Dermatoses," *British Journal of Dermatology*, 68:303–306, 1956.

(31) Warin, R.P., "The Local Use of Hydrocortisone in Infantile Eczema," *The Practitioner*, 175:182–185, 1955.

(32) Welsh, A.L., and M. Ede, "Hydrocortisone Ointments: Their Rational Use in Dermatology," *Ohio State Medical Journal*, 50:837–840, 1954.

(33) Russell, B., et al., "A Valuation of Hydrocortisone Ointment," *The Lancet*, 1:1038–1043, 1955.

(34) Robinson, H.M., and R.C.V. Robinson, "Treatment of Dermatoses with Local Application of Hydrocortisone Acetate," *Journal of the American Medical Association*, 155:1213–1216, 1954.

Case 4:22-cv-02625-HSG   Document 22-2   Filed 08/24/22   Page 208 of 210

(35) Rattner, H., "The Status of Corticosteroid Therapy in Dermatology," *California Medicine,* 83:331–335, 1955.

(36) Malkinson, F.D., and G.C. Wells, "Clinical Experience with Hydrocortisone," *British Journal of Dermatology,* 66:300–303, 1954.

(37) Rein, C.R., "The Present Status of Hydrocortisone Acetate Ointment in Dermatologic Therapy," *American Medical Association Archives of Dermatology and Syphilology,* 68:452–456, 1953.

(38) Friedlaender, S., and A.S. Friedlaender, "Topical Use of Hydrocortisone and Hydrocortisone-Neomycin Ointments in Allergic Dermatoses," *Journal of Allergy,* 25:417–428, 1954.

(39) Brodthagen, H., "Treatment of Skin Diseases with Hydrocortisone Ointment," *Acta Dermato-Venereologica,* 35:51–57, 1955.

(40) Sulzberger, M.B., "Comparative Effectiveness of Fluorohydrocortisone and Hydrocortisone in the Topical Treatment of Skin Diseases," *Annals New York Academy of Sciences,* 61:599–604, 1955.

(41) Coskey, R.J., "Contact Dermatitis Due to Topical Hydrocortisone and Prednisolone," *Michigan Medicine,* 64:669–670, 1965.

(42) Edwards, M., and E.J. Rudner, "Dermatitis Venenata Due to Hydrocortisone Alcohol," *Cutis,* 6:757–758, 1970.

(43) Kooij, R., "Hypersensitivity to Hydrocortisone," *British Journal of Dermatology,* 71:392–394, 1959.

(44) Alani, M.D., and S.D. Alani, "Allergic Contact Dermatitis to Corticosteroids," *Annals of Allergy,* 30:181–185, 1972.

(45) Church, R., "Sensitivity to Hydrocortisone Acetate Ointment," *British Journal of Dermatology,* 72:341–344, 1960.

(46) Stevanovic, D.V., "Corticosteroid-Induced Atrophy of the Skin with Telangiectasica—A Clinical and Experimental Study," *British Journal of Dermatology,* 87:548–556, 1972.

(47) Guin, J.D., "Complications of Topical Hydrocortisone," *Journal of the American Academy of Dermatology,* 4:417–422, 1981.

(48) Smith, J.G., R.F. Wehr, and D.K. Chalker, "Corticosteroid-Induced Cutaneous Atrophy and Telangiectasia," *Archieves of Dermatology,* 112:1115–1117, 1976.

(49) James, M.P., M.M. Black, and C.G. Sparkes, "Measurement of Dermal Atrophy Induced by Topical Steroids Using a Radiographic Technique," *British Journal of Dermatology,* 96:303–305, 1977.

(50) Black, M.M., N.E. Platt, and C.J. Mugglestone, "A Study of Potential Skin Atrophy Following Topical Application of Weak Corticosteroids," *Current Medical Research and Opinion,* 7:463–470, 1981.

(51) Snyder, D.S., and R.A. Greenberg, "Radiographic Measurement of Topical Corticosteroid-Induced Atrophy," *The Journal of Investigative Dermatology,* 69:279–281, 1977.

(52) Tan, C.Y., R. Marks, and P. Payne, "Comparison of Xeroradiographic and Ultrasound Detection of Corticosteroid Induced Dermal Thinning," *The Journal of Investigative Dermatology,* 76:126–128, 1981.

(53) Kirby, J.D., and D.D. Munro, "Steroid-Induced Atrophy in an Animal and Human Model," *British Journal of Dermatology,* 94:111–119, 1976.

(54) Heilesen, B., A. Kristjansen, and F. Reymann, "Hydrocortisone in Therapy of Cutaneous Disease. Preliminary Report," *American Medical Association Archives of Dermatology and Syphilology,* 70:350–362, 1954.

(55) Summary List of Reported Adverse Drug Reactions to Hydrocortisone Containing Drug Products Retrieved from the FDA Drug Experience Information System 1970 to June 13, 1989, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(56) Case Reports of Reported Adverse Drug Reactions to Hydrocortisone Containing Drug Products Retrieved from the FDA Drug Experience Information System April 7, 1970, to September 19, 1988, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(57) Drug Experience Report No. 00114386, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(58) Drug Experience Report No. 00120879, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(59) Drug Experience Report No. 00353766, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(60) Letter from consumer to M. Novitch, FDA, November 16, 1984, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(61) Drug Experience Reports No. 00067846, 00080600, 00080743, 70002062, 00100898, 00100899, 70006147, 70006154, 70013774, 70013781, 70009443, 70009446, 70018119, 70010120, 70018269, 00315128, 00376683, 00376744, 00415665, 00436971, 00455849, 00502807, 00502810, 00558296, and 00559488, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(62) Drug Experience Report No. 00304129, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(63) Drug Experience Report No. 70001967, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(64) Drug Experience Report No. 00406374, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(65) Drug Experience Reports No. 00304458 and 00304459, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(66) Miller, J.A., and D.D. Munro, "Topical Corticosteroids: Clinical Pharmacology and Therapeutic Use," *Current Therapeutics,* 21:119–139, 1980.

(67) Sneddon, I.B., "Clinical Use of Topical Corticosteroids," *Drugs* 11:193–199, 1976.

(68) Stoughton, R.B., "Topical Steroids," *Modern Treatment,* 2:841–846, 1965.

(69) Barry, B.W., and R. Woodford, "Comparative Bio-Availability of Proprietary Topical Corticosteroid Preparations; Vasoconstrictor Assays on Thirty Creams and Gels," *British Journal of Dermatology,* 91:323–388, 1974.

(70) Barry, B.W., and R. Woodford, "Comparative Bio-Availability and Activity of Proprietary Topical Corticosteroid Preparations: Vasoconstrictor Assays on Thirty-One Ointments," *British Journal of Dermatology,* 93:563–571, 1975.

(71) The Medical Letter, Inc., "Gels and Other Topical Corticosteroids," *The Medical Letter,* 16(12):50–52–1974.

(72) Frank, L., C. Stritzler, and J. Kaufman, "Clinical Evaluation of Five-Tenths Per Cent Hydrocortisone Ointment," *A.M.A. Archives of Dermatology,* 71:637–638, 1955.

(73) Irke, R.E., and J.P. Griffin, "Topical Steroid Therapy in the Older Age Group," *American Geriatrics Society Journal,* 4:1004, 1956.

(74) Welsh, A.L., and M. Ede, "Further Observations on Hydrocortisone Ointments: Their Rational Use in Dermatology," *The Ohio State Medical Journal,* 51:350–353, 1955.

(75) Weston, W.L., A.T. Lane, and J.A. Weston, "Diaper Dermatitis: Current Concepts," *Pediatrics,* 66:532–536, 1980.

(76) Lipschutz, A., and H. Agerty, "Prophylaxis in Pediatric Skin Case: A Routine for Prevention of Diaper Rashes in Infants," *Archives of Pediatrics,* 79:257–262, 1962.

(77) Cooke, J.V., "Etiology and Treatment of Ammonia Dermatitis of the Genital Region of Infants," *American Journal of Diseases of Children,* 22:481–492, 1921.

(78) Summary Minutes of the Twenty-fourth Meeting of the Advisory Review Panel on OTC Topical Analgesic, Antirheumatic, Otic, Burn, and Sunburn Prevention and Treatment Drug Products, May 19 and 20, 1976, pp. 4 and 5, OTC Volume 06HTFM, Docket No. 78N–301H, Dockets Management Branch.

(79) Feldmann, R. J., and H. I. Maibach, "Penetration of $^{14}$C Hydrocortisone Through Normal Skin," *Archives of Dermatology,* 91:661–666, 1965.

(80) Malkinson, F. D., and E. H. Ferguson, Preliminary and Short Report— "Percutaneous Absorption of Hydrocortisone 4–$C^{14}$ in Two Human Subjects," *Journal of Investigative Dermatology,* 25:281–283, 1955.

## VI. Summary of the Agency's Changes

FDA has considered the comments in the citizen petition (Ref. 3) and from the manufacturers' association (Ref. 4), and other relevant information. The agency is amending the tentative final monograph to include conditions for OTC use of hydrocortisone and its hydrocortisone acetate equivalent in concentrations above 0.5 up to 1 percent based on its evaluations of the data and other changes described in the summary below. A summary of the changes made by the agency follows.

1. The agency is revising § 348.10(d)(1) to read as follows: "Hydrocortisone, 0.25 to 1 percent."

2. The agency is revising § 348.10(d)(2) to read as follows: "Hydrocortisone acetate, equivalent to hydrocortisone, 0.25 to 1 percent."

3. In the tentative final monograph published on February 8, 1983, the spray dosage form was not included in the statement of identity proposed in § 348.50(a)(2). The agency listed several examples of appropriate dosage forms, e.g., cream, lotion, or ointment. The agency is expanding this list to also include a spray dosage form.

Accordingly, the agency is amending § 348.50(a)(2) to read "The labeling identifies the product as "antipruritic (anti-itch)," "anti-itch," "antipruritic (anti-itch) (insert dosage form, e.g., cream, lotion, ointment, or spray)," or "anti-itch (insert dosage form, e.g., cream, lotion, ointment, or spray)."

4. The agency is proposing that the indications in § 348.50(b)(3) (i) and (ii), as amended on July 30, 1986 to include seborrheic dermatitis and psoriasis (51 FR 27360 at 27363), be used for all OTC concentrations of hydrocortisone and hydrocortisone acetate.

5. To help prevent misuse of OTC hydrocortisone drug products, with possible resultant adverse reactions, the agency is proposing an additional statement in § 348.50(b)(3), as paragraph (iii), to read as follows: "Other uses of this product should be only under the advice and supervision of a" (select one of the following: "physician" or "doctor").

6. The agency is proposing that the 7-day limit of use warning in § 348.50(c)(1)(iii) not be used for OTC hydrocortisone drug products. In its place, hydrocortisone drug products will bear a somewhat different warning, which is being incorporated in § 348.50(c)(7)(i), to read as follows: "If condition worsens, or if symptoms persist for more than 7 days or clear up and occur again within a few days, do not use this or any other hydrocortisone product unless you have consulted a" (select one of the following: "physician" or "doctor").

7. The agency is proposing to redesignate the current warning for hydrocortisone products in § 348.50(c)(7) as paragraph (7)(ii).

8. The agency is proposing to redesignate the current warnings for hydrocortisone products in § 348.50(c)(9) as (c)(7)(iii).

9. The agency is proposing to add the warning "Do not use for the treatment of diaper rash. Consult a" (select one of the following: "physician" or "doctor") to § 348.50(c)(7) as paragraph (iv). Because children over 2 years of age may get diaper rash, the agency believes this warning will alert parents not to use OTC hydrocortisone products for diaper rash for children of any age, without first consulting a doctor.

10. The agency proposes to add the instruction "do not use" to the general directions for all OTC external analgesic drug products (including hydrocortisone) because it better alerts consumers about use of these products on children under 2 years of age and makes an additional warning unnecessary. The proposed revision in § 348.50(d)(1) reads: * * * "Directions": (1) Adults

and children 2 years of age and older: Apply to affected area not more than 3 to 4 times daily. Children under 2 years of age: Do not use, consult a" (select one of the following: "physician" or "doctor".)

The agency has examined the economic consequences of this proposed rulemaking in conjunction with other rules resulting from the OTC drug review. In a notice published in the **Federal Register** of February 8, 1983 (48 FR 5806), the agency announced the availability of an assessment of these economic impacts. The assessment determined that the combined impacts of all the rules resulting from the OTC drug review do not constitute a major rule according to the criteria established by Executive Order 12291. The agency therefore concludes that no one of these rules, including this proposed amendment of the OTC external analgesic drug products tentative final monograph, is a major rule.

The economic assessment also concluded that the overall OTC drug review was not likely to have a significant economic impact on a substantial number of small entities as defined in the Regulatory Flexibility Act (Pub. L. 96–354). That assessment included a discretionary Regulatory Flexibility Analysis in the event that an individual rule might impose an unusual or disproportionate impact on small entities. However, this particular rulemaking for OTC external analgesic drug products is not expected to pose such as impact on small businesses. Therefore, the agency certifies that this proposed rule, if implemented, will not have a significant economic impact on a substantial number of small entities.

The agency invites public comment regarding any substantial or significant economic impact that this rulemaking would have on OTC hydrocortisone external analgesic drug products. Types of impact may include, but are not limited to, costs associated with product testing, relabeling, repackaging, or reformulating. Comments regarding the impact of this rulemaking on OTC hydrocortisone external analgesic drug products should be accompanied by appropriate documentation. A period of 60 days from the date of publication of this proposed rulemaking in the **Federal Register** will be provided for comments on this subject to be developed and submitted. The agency will evaluate any comments and supporting data that are received and will reassess the economic impact of this rulemaking in the preamble to the final rule.

The agency has carefully considered the potential environmental effects of this action. FDA has concluded that the

action will not have a significant impact on the human environment, and that an environmental impact statement is not required. The agency's finding of no significant impact and the evidence supporting that finding, contained in an environmental assessment, may be seen in the Dockets Management Branch (address above) between 9 a.m. and 4 p.m., Monday through Friday. This action was considered under FDA's final rule implementing the National Environmental Policy Act (21 CFR part 25).

Interested persons may, on or before April 30, 1990, submit to the Dockets Management Branch (HFA–305), Food and Drug Administration, Room 4–62, 5600 Fishers Lane, Rockville, MD 20857, written comments, objections, or requests for oral hearing before the Commissioner on the proposed regulation. A request for an oral hearing must specify points to be covered and time requested. Written comments on the agency's economic impact determination may be submitted on or before April 30, 1990. Three copies of all comments, objections, and requests are to be submitted, except that individuals may submit one copy. Comments, objections, and requests are to be identified with the docket number found in brackets in the heading of this document and may be accompanied by a supporting memorandum or brief. Comments, objections, and requests may be seen in the office above between 9 a.m. and 4 p.m., Monday through Friday. Any scheduled oral hearing will be announced in the **Federal Register**.

In establishing a final monograph, the agency will ordinarily consider only data submitted prior to the closing of the administrative record on April 30, 1990. Data submitted after the closing of the administrative record will be reviewed by the agency only after a final monograph is published in the **Federal Register**, unless the Commissioner finds good cause has been shown that warrants earlier consideration.

### List of Subjects in 21 CFR Part 348

External analgesic drug products, Labeling, Over-the-counter drugs.

Therefore, under the Federal Food, Drug, and Cosmetic Act and the Administrative Procedure Act it is proposed that subchapter D of chapter I of title 21 of the Code of Federal Regulations be amended in part 348 (as proposed in the **Federal Register** of February 8, 1983; 48 FR 5852) as follows:

**PART 348—EXTERNAL ANALGESIC DRUG PRODUCTS FOR OVER-THE-COUNTER HUMAN USE**

1. The authority citation for 21 CFR part 348 is revised to read as follows:

**Authority:** Secs. 201, 501 502, 503, 505, 510, 701 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321, 351, 352, 353, 355, 360, 371).

2. Section 348.10 is amended by revising paragraphs (d) (1) and (2) to read as follows:

**§ 348.10   Analgesic, anesthetic, and antipruritic active ingredients.**
\*   \*   \*   \*   \*

(d) \* \* \*

(1) Hydrocortisone, 0.25 to 1 percent.
(2) Hydrocortisone acetate, equivalent to hydrocortisone, 0.25 to 1 percent.
\*   \*   \*   \*   \*

3. Section 348.50 is amended by revising paragraph (a)(2), by adding new paragraph (b)(3)(iii), by revising the heading for paragraph (c)(1), by revising paragraph (c)(7), and by revising paragraph (d)(1) to read as follows:

**§ 348.50   Labeling of external analgesic drug products.**

(a) \* \* \*

(2) *For products containing hydrocortisone or hydrocortisone*

*acetate identified in § 348.10(d).* The labeling identifies the product as "antipruritic (anti-itch)," "anti-itch," "antipruritic (anti-itch) (insert dosage form, e.g., cream, lotion, ointment, or spray)," or "anti-itch (insert dosage form, e.g., cream, lotion, ointment, or spray)."
\*   \*   \*   \*   \*

(b) \* \* \*
(3) \* \* \*
(iii) "Other uses of this product should be only under the advice and supervision of a" (select one of the following: "physician" or "doctor").
\*   \*   \*   \*   \*

(c) \* \* \*
(1) *For products containing any external analgesic active ingredient identified in § 348.10 (a), (b), and (c) and § 348.12.* \* \* \*
\*   \*   \*   \*   \*

(7) *For products containing hydrocortisone preparations identified in § 348.10(d) (1) and (2).* (i) "If condition worsens, or if symptoms persist for more than 7 days or clear up and occur again within a few days, do not use this or any other hydrocortisone product unless you have consulted a" (select one of the following: "physician" or "doctor").

(ii) *For products that are labeled with this indications "\* \* \* for external*

*genital itching," or "\* \* \* for external feminine itching."* "Do not use if you have a vaginal discharge. Consult a" (select one of the following: "physician" or "doctor").

(iii) *For products containing hydrocortisone preparations identified in § 348.10(d) (1) and (2) that are labeled with indication "\* \* \* for external anal itching."* In addition to the warnings in paragraph (c)(1) of this section, the labeling of the product also contains the warnings proposed in § 346.50(c) (2), (3), and (4) of this chapter. (See the Federal Register of August 15, 1988; 53 FR 30756.)

(iv) "Do not use for the treatment of diaper rash. Consult a" (select one of the following: "Physician" or "doctor").
\*   \*   \*   \*   \*

(d) \* \* \*
(1) Adults and children 2 years of age and older: Apply to affected area not more than 3 to 4 times daily. Children under 2 years of age: Do not use, consult a (select one of the following: physician or doctor).
\*   \*   \*   \*   \*

Dated: February 14, 1990.
**James S. Benson,**
*Acting Commissioner of Food and Drugs.*
[FR Doc. 90–4392 Filed 2–26–90; 8:45 am]
**BILLING CODE 4160-01-M**